**VIRGINIA: IN THE CIRCUIT COURT FOR THE CITY OF RICHMOND**

**JONATHAN CLARKE**

       Plaintiff,

                             **Civil Action No._____**

v.

                             **TRIAL BY JURY DEMANDED**

**3M COMPANY (f/k/a Minnesota
Mining and Manufacturing Company);
AGC CHEMICALS AMERICAS, INC.;
AMEREX;
ARCHROMA U.S., INC.;
ARKEMA, INC.;
BASF CORPORATION;
BLUE RIDGE RESCUE SUPPLIERS, INC.;
BRADSDEN SOLUTIONS, INC.;
BUCKEYE FIRE EQUIPMENT COMPANY;
CARRIER GLOBAL CORPORATION;
CHEMDESIGN PRODUCTS, INC.;
CHEMGUARD, INC.;
CHEMICALS, INC.;
CHEMOURS COMPANY FC, LLC;
CLARIANT CORPORATION;
CORTEVA, INC.;
DAIKIN AMERICA, INC.;
DEEPWATER CHEMICALS, INC.;
DU PONT DE NEMOURS INC. (f/k/a
DOWDUPONT INC.);
DYNAX CORPORATION;
E.I. DU PONT DE NEMOURS AND
COMPANY;FIRE SERVICE PLUS, INC.;
GLOBE MANUFACTURING COMPANY LLC;
HONEYWELL INTERNATIONAL, INC.;
HONEYWELL SAFETY PRODUCTS USA, INC.;
JOHNSON CONTROLS, INC.;
KIDDIE P.L.C., INC.;
KIDDE-FENWAL, INC.;
LION GROUP, INC.;
MALLORY SAFETY AND SUPPLY, LLC;
MINE SAFETY APPLIANCES COMPANY, LLC;
MSA SAFETY SALES, LLC;
MUNICIPAL EMERGENCY SERVICES INC.;
NATION FORD CHEMICAL COMPANY;**

**NATIONAL FOAM, INC.;**
**PBI PERFORMANCE PRODUCTS, INC.;**
**SOUTHERN MILLS, INC.;**
**STEDFAST USA, INC.;**
**TENCATE PROTECTIVE FABRICS USA**
**d/b/a SOUTHERN MILLS INC.;**
**THE CHEMOURS COMPANY LLC;**
**TYCO FIRE PRODUCTS;**
**UNITED TECHNOLOGIES CORPORATION;**
**UTC FIRE & SECURITY AMERICAS**
**CORPORATION, INC. (f/k/a GE Interlogix, Inc.);**
**W.L. GORE & ASSOCIATES, INC.;**

   **Defendants.**

## COMPLAINT

COMES NOW Plaintiff Jonathan Clarke who moves this Honorable Court for judgment against 3M COMPANY (f/k/a Minnesota Mining and Manufacturing Company); AGC CHEMICALS AMERICAS, INC.; AMEREX; ARCHROMA U.S., INC.; ARKEMA, INC.; BASF CORPORATION; BLUE RIDGE RESCUE SUPPLIERS, INC.; BRADSDEN SOLUTIONS, INC.; BUCKEYE FIRE EQUIPMENT COMPANY; CARRIER GLOBAL CORPORATION; CHEMDESIGN PRODUCTS, INC.; CHEMGUARD, INC.; CHEMICALS, INC.; CHEMOURS COMPANY FC, LLC; CLARIANT CORPORATION; CORTEVA, INC.; DAIKIN AMERICA, INC.; DEEPWATER CHEMICALS, INC.; DU PONT DE NEMOURS INC. (f/k/a DOWDUPONT INC.); DYNAX CORPORATION; E.I. DU PONT DE NEMOURS AND COMPANY; FIRE SERVICE PLUS, INC.; GLOBE MANUFACTURING COMPANY LLC; HONEYWELL INTERNATIONAL, INC.; HONEYWELL SAFETY PRODUCTS USA, INC.; JOHNSON CONTROLS, INC.; KIDDIE P.L.C., INC.; KIDDE-FENWAL, INC.;

2

LION GROUP, INC.; MALLORY SAFETY AND SUPPLY, LLC; MINE SAFETY
APPLIANCES COMPANY, LLC; MSA SAFETY SALES, LLC; MUNICIPAL EMERGENCY
SERVICES INC.; NATION FORD CHEMICAL COMPANY; NATIONAL FOAM, INC.;
PBI PERFORMANCE PRODUCTS, INC.; SOUTHERN MILLS, INC.; STEDFAST USA, INC.;
TENCATE PROTECTIVE FABRICS USA d/b/a SOUTHERN MILLS INC.; THE CHEMOURS
COMPANY LLC; TYCO FIRE PRODUCTS;  UNITED TECHNOLOGIES CORPORATION;
UTC FIRE & SECURITY AMERICAS CORPORATION, INC. (f/k/a GE Interlogix, Inc.); W.L.
GORE & ASSOCIATES, INC.; Defendants, jointly and severally, for compensatory damages,
punitive damages, costs of this action, and pre-judgment interest and post-judgment interest
together with actual damages, treble damages, and attorney's fees pursuant to the Virginia
Consumer Protection Act on the grounds set forth below:

## BACKGROUND

1.   Jonathan Clarke ("Plaintiff Clarke") is a firefighter who works for the Richmond
Fire Department and serves the City of Richmond.

2.   Plaintiff Clarke brings this action for monetary damages and appropriate equitable
and injunctive relief for harm resulting from exposure to per- and polyfluoroalkyl substances
("PFAS") that were manufactured, designed, sold, supplied, distributed and/or contained in
products manufactured, designed, sold supplied and/or distributed by each of the Defendants,
individually or through their predecessors or subsidiaries.

3.   PFAS are human-made chemicals consisting of a chain of carbon and fluorine
atoms used in manufactured products to, *inter alia*, resist and repel oil, stains, heat and water. PFAs
include "long-chain" PFAS made up of seven or more carbon atoms ("long-chain PFAS") as well
as "short-chain" PFAS made up of six or fewer carbon atoms ("short-chain PFAS").

3

4.     PFAS are known as "forever chemicals" because they are immune to degradation, bioaccumulate in individual organisms and humans, and increase in concentration up the food chain. PFAS exposure to humans can occur through inhalation, ingestion and dermal contact.

5.     PFAS have been associated with multiple and serious adverse health effects in humans including cancer, tumors, liver damage, immune system and endocrine disorders, high cholesterol, thyroid disease, ulcerative colitis, birth defects, decreased fertility, and pregnancy-induced hypertension. PFAS have also been found to concentrate in human blood, bones, and organs.

6.     Unbeknownst to Plaintiff Clarke, Defendants have manufactured, marketed, distributed, sold, or used PFAS and PFAS-containing materials in protective clothing specifically designed for firefighters ("turnouts") and firefighting foams known as aqueous film forming foams ("AFFF").

7.     AFFF is a specialized substance designed to extinguish petroleum-based fires. It has been used for decades by firefights to extinguish fires in training and in response to Class B fires.

8.     For decades, Defendants were aware of the toxic nature of PFAS and the harmful impact these substances have on human health. Yet, Defendants manufactured, designed, marketed, sold, supplied, or distributed PFAS and PFAS chemical feedstock, as well PFAS-containing turnouts and AFFF, to firefighting training facilities and fire departments nationally, including in Virginia and in the City of Richmond. Defendants did so, moreover, without ever informing firefighters or the public that turnouts and AFFF contained PFAS, and without warning firefighters or the public of the substantial and serious health injuries that can result from exposure to PFAS or PFAS-containing materials.

4

9.      Plaintiff wore turnouts and used AFFF in the usual and normal course of performing his firefighting duties and training and was repeatedly exposed to PFAS in his workplace. Plaintiff did not know and, in the exercise of reasonable diligence, could not have known that these products contained PFAS or PFAS-containing materials. Plaintiff Clarke also did not know that PFAS were in his body and blood.

10.     At all relevant times and continuing to the present, Defendants have represented that their turnouts and AFFF are safe.

11.     Plaintiff Clarke used the turnouts and AFFF as they were intended and in a foreseeable manner which exposed him to PFAS in the course of his firefighting activities.

12.     This repeated and extensive exposure to PFAS resulted in Plaintiff Clarke developing Leukemia.

13.     Defendants knowingly and willfully manufactured, designed, marketed, sold, and distributed chemicals and/or products containing PFAS for use within the State of Virginia when they knew or reasonably should have known that Plaintiff would repeatedly inhale, ingest, and/or have dermal contact with these harmful compounds during firefighting training exercises and in firefighting emergencies, and that such exposure would threaten the health and welfare of firefighters exposed to these dangerous and hazardous chemicals.

## PARTIES

### *Plaintiff*

14.     Plaintiff Jonathan Clarke is an adult resident of the Commonwealth of Virginia. Plaintiff Clarke has worked as a firefighter, serving the City of Richmond since February 9, 2024. As a result of exposure to PFAS contained in his turnouts and AFFF while working as a firefighter, Plaintiff Clarke was diagnosed with Leukemia on or around July 2022.

## *Defendants*

15.     Defendants are designers, marketers, developers, manufacturers, distributors, promoters, instructors, and sellers of PFAS-containing turnout gear and/or AFFF products. The following Defendants, at all times relevant to this lawsuit, manufactured, designed, marketed, distributed, released, instructed, promoted and/or otherwise sold (directly or indirectly) PFAS-containing turnout gear and/or AFFF products across the United States, including Virginia and the City of Richmond, for use in firefighting duties and fighting Class B fires such that each Defendant knew or should have known said products would be delivered to areas for active use by Plaintiff Clarke during the course of training and firefighting duties.

16.     Defendant 3M Company (a/k/a Minnesota Mining and Manufacturing Company) ("3M") is a Delaware corporation that does business throughout the United States, including conducting business in Virginia. 3M has its principal place of business in St. Paul, Minnesota. 3M developed, manufactured, marketed, distributed, released, sold and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and AFFF used in firefighting training and in firefighting, including in Virginia and in the City of Richmond.

17.     Defendant AGC Chemicals Americas, Inc. ("AGC") is a Delaware corporation that does business throughout the United States, including conducting business in Virginia by and through its introduction of its products and goods into the stream of commerce which it knew or had reason to know would enter, be sold, used, and consumed throughout the Commonwealth of Virginia. AGC has its principal place of business in Exton, Pennsylvania. AGC developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and AFFF used in firefighting training and in firefighting, including in Virginia and in the City of Richmond.

6

18.     Defendant Amerex Corporation ("Amerex") is an Alabama corporation that does business throughout the United States, including conducting business in Virginia. Amerex has its principal place of business in Trussville, Alabama. Amerex developed, manufactured, marketed, distributed, released, sold and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and AFFF used in firefighting training and in firefighting, including in Virginia and in the City of Richmond.

19.     Defendant Archroma U.S., Inc. ("Archroma") is a North Carolina corporation that does business throughout the United States, including conducting business in Virginia. Archroma has its principal place of business in Charlotte, North Carolina. Archroma developed, manufactured, marketed, distributed, released, sold and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and AFFF used in firefighting training and in firefighting, including in Virginia and in the City of Richmond.

20.     Defendant Arkema, Inc. ("Arkema") is a Pennsylvania corporation that does business throughout the United States, including conducting business in Virginia. Arkema has its principal place of business in King of Prussia, Pennsylvania. Arkema developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and AFFF used in firefighting training and in firefighting, including in Virginia and in the City of Richmond.

21.     Defendant BASF Corporation ("BASF") is a Delaware corporation that does business throughout the United States, including conducting business in Virginia. BASF has its principal place of business in Florham Park, New Jersey. BASF developed, manufactured, marketed, distributed, released, sold and/or used PFAS, PFAS materials, and products containing

7

PFAS in AFFF used in firefighting training and in firefighting by the City of Richmond Fire Department to include Plaintiff Clarke.

22.     Defendant Blue Ridge Rescue Suppliers, Inc. ("Blue Ridge") is or was a Virginia stock corporation doing business throughout the Commonwealth of Virginia by and through its sale and distribution of turnouts containing PFAS to the City of Richmond Fire Department to include Plaintiff Clarke.

23.     Defendant Bradsden Solutions, Inc. ("Bradsden"), is believed to be the acquiring company or the same corporate entity under a newly registered name as Blue Ridge Rescue Suppliers, Inc. Bradsden Solutions, Inc. is a Virginia stock corporation that did business throughout the Commonwealth of Virginia by and through its sale and distribution of turnouts containing PFAS to the City of Richmond Fire Department to include Plaintiff Clarke.

24.     Defendant Buckeye Fire Equipment Company ("Buckeye") is an Ohiocorporation that does business throughout the United States, including conducting business in Virginia. Buckeye has its principal place of business in Mountain, North Carolina. Buckeye developed, manufactured, marketed, distributed, released, sold and/or used PFAS, PFAS materials, and products containing PFAS in AFFF used in firefighting training and in firefighting by the City Richmond Fire Department to include Plaintiff Clarke.

25.     Defendant Carrier Global Corporation ("Carrier") is a Delaware corporation that does business throughout the United States, including conducting business in Virginia. Carrier has its principal place of business in Palm Beach Gardens, Florida. Carrier is the parent of Defendant Kidde-Fenwal, Inc. Carrier developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and in the City of Richmond.

8

26.     Defendant ChemDesign Products, Inc. ("ChemDesign") is a Texas corporation that does business throughout the United States, including conducting business in Virginia. ChemDesign has its principal place of business in Marinette, Wisconsin. ChemDesign developed, manufactured, marketed, distributed, released, sold and/or used PFAS, PFAS materials, and products containing PFAS in AFFF used in firefighting training and in firefighting by the City of Richmond Fire Department to include Plaintiff Clarke.

27.     Defendant Chemicals, Inc. ("Chemicals") is a Texas corporation that does business throughout the United States, including conducting business in Virginia. Chemicals has its principal place of business in Baytown, Texas. Chemicals developed, manufactured, marketed, distributed, released, sold and/or used PFAS, PFAS materials, and products containing PFAS in AFFF used in firefighting training and in firefighting by the City of Richmond Fire Department to include Plaintiff Clarke.

28.     Defendant Chemours Company FC, LLC ("Chemours FC") is a Delaware corporation that does business throughout the United States, including conducting business in Virginia. Chemours FC has its principal place of business in Wilmington, Delaware. Chemours FC developed, manufactured, marketed, distributed, released, sold and/or used PFAS, PFAS materials, and products containing PFAS in AFFF used in firefighting training and in firefighting by the City of Richmond Fire Department to include Plaintiff Clarke.

29.     Defendant Clariant Corporation ("Clariant") is a New York corporation that does business throughout the United States, including conducting business in Virginia. Clariant has its principal place of business in Charlotte, North Carolina. Clariant developed, manufactured, marketed, distributed, released, sold and/or used PFAS, PFAS materials, and products containing

9

PFAS in AFFF used in firefighting training and in firefighting by the City of Richmond Fire Department to include Plaintiff Clarke.

30.    Defendant Corteva, Inc. ("Corteva") is a Delaware corporation that does business throughout the United States, including conducting business in Virginia. Corteva has its principal place of business in Wilmington, Delaware. Corteva is the successor-in-interest to Dupont Chemical Solutions Enterprise. Corteva developed, manufactured, marketed, distributed, released, sold and/or used PFAS, PFAS materials, and products containing PFAS in AFFF used in firefighting training and in firefighting by the City of Richmond Fire Department to include Plaintiff Clarke.

31.    Defendant Daikin America, Inc. ("Daikin America") is a Delaware corporation that does business throughout the United States, including conducting business in Virginia. Daikin America has its principal place of business in Orangeburg, New York. Daikin America developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and the City of Richmond.

32.    Defendant Deepwater Chemicals, Inc. ("Deepwater") is a Delaware corporation that does business throughout the United States, including conducting business in Virginia. Deepwater has its principal place of business in Woodward, Oklahoma. Deepwater developed, manufactured, marketed, distributed, released, sold and/or used PFAS, PFAS materials, and products containing PFAS in AFFF used in firefighting training and in firefighting by the City of Richmond Fire Department to include Plaintiff Clarke.

33.    Defendant Du Pont de Nemours Inc. (f/k/a/ DowDuPont, Inc.) ("DowDuPont") is a Delaware corporation that does business throughout the United States, including conducting business in Virginia. DowDuPont has its principal place of business in Wilmington, Delaware and

10

Midland, Michigan. DowDuPont was created in 2015 to transfer Chemours and Dupont liabilities for manufacturing and distributing flurosurfactants to AFFF manufacturers. DowDuPont developed, manufactured, marketed, distributed, released, sold and/or used PFAS, PFAS materials, and products containing PFAS in AFFF used in firefighting training and in firefighting by the City of Richmond Fire Department to include Plaintiff Clarke.

34.     Defendant Dynax Corporation ("Dynax") is a New York corporation that does business throughout the United States, including conducting business in Virginia. Dynax has its principal place of business in Elmsford, New York. Dynax developed, manufactured, marketed, distributed, released, sold and/or used PFAS, PFAS materials, and products containing PFAS in AFFF used in firefighting training and in firefighting by the City of Richmond Fire Department to include Plaintiff Clarke.

35.     Defendant E.I. du Pont de Nemours & Co. ("DuPont") is a Delaware corporation that does business throughout the United States, including conducting business in Virginia. DuPont has its principal place of business in Wilmington, Delaware. DuPont developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and AFFF used in firefighting training and in firefighting, including in Virginia and in the City of Richmond.

36.     Defendant Fire Service Plus, Inc. ("Fire Service Plus") is a Georgia corporation that does business throughout the United States, including conducting business in Virginia by and through its introduction of its products and goods into the stream of commerce which it knew or had reason to know would enter, be sold, used, and consumed throughout the Commonwealth of Virginia. Fire Service Plus has its principal place of business in Simi Valley, California. Fire Service Plus developed, manufactured, marketed, distributed, released, sold, and/or used PFAS,

11

PFAS materials, and products containing PFAS in turnouts, including in Virginia and in the City of Richmond.

37.     Defendant Globe Manufacturing Company, LLC ("Globe") is a New Hampshire corporation that does business throughout the United States, including conducting business in Virginia. Globe has its principal place of business in Pittsfield, New Hampshire. Globe developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and in the City of Richmond. Defendant Mine Safety Appliance Company acquired Globe Holding Company, LLC and its subsidiaries (collectively, "MSA/Globe") in 2017 and continues to do business under the Globe name.

38.     Defendant Honeywell International, Inc. ("Honeywell International") is a Delaware corporation that does business throughout the United States, including conducting business in Virginia. Honeywell Int'l has its principal place of business in Charlotte, North Carolina. Honeywell International developed manufactured, marketed, distributed, released, sold and/or used PFAS, PFAS materials, and products containing PFAS in turnouts including its Morning Pride branded turnout throughout Virginia including the City of Richmond.

39.     Defendant Honeywell Safety Products USA, Inc. ("Honeywell") is a Delaware corporation that does business throughout the United States, including conducting business in Virginia. Honeywell has its principal place of business in Charlotte, North Carolina. Honeywell developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts including its Morning Pride branded turnout throughout Virginia including the City of Richmond.

12

40.     Defendant Johnson Controls, Inc. ("Johnson Controls") is a Delaware corporation
that does business throughout the United States, including conducting business in Virginia.
Johnson Controls has its principal place of business in Milwaukee, Wisconsin. Johnson Controls
is the parent of Defendants Tyco Fire Products, LP and Chemguard, Inc. Johnson Controls
developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS
materials, and products containing PFAS in turnouts, including in Virginia and in the City of
Richmond.

41.     Defendant Kiddie P.L.C., Inc. ("Kiddie P.L.C.) is a foreign organized and existing
under the laws of the State of Delaware and does business throughout the United States, including
conducting business in Virginia. Kiddie P.L.C. has its principal place of business in Farmington,
Connecticut. Kiddie P.L.C. developed, manufactured, marketed, distributed, released, sold and/or
used PFAS, PFAS materials, and products containing PFAS in AFFF used in firefighting training
and in firefighting by the City of Richmond Fire Department to include Plaintiff Clarke.

42.     Defendant Kidde-Fenwal, Inc. ("Kidde-Fenwal") is a Delaware corporation that
does business throughout the United States, including conducting business in Virginia. Kidde-
Fenwal has its principal place of business in Ashland, Massachusetts. Kidde-Fenwal developed,
manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and
products containing PFAS in turnouts and AFFF used in firefighter training and in firefighting,
including in Virginia and in the City of Richmond.

43.     Defendant Lion Group, Inc., ("Lion") is an Ohio corporation that does business
throughout the United States, including conducting business in Virginia by and through its
introduction of its products and goods into the stream of commerce which it knew or had reason
to know would enter, be sold, used, and consumed throughout the Commonwealth of Virginia.

13

Lion has its principal place of business in Dayton, Ohio. Lion developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and the City of Richmond.

44.     Defendant Mallory Safety and Supply, LLC ("Mallory") is a California corporation that does business throughout the United States, including conducting business in Virginia. Mallory has its principal place of business in Portland, Oregon. Mallory developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and the City of Richmond.

45.     Defendant Mine Safety Appliance Company, LLC ("MSA/Globe") is a Pennsylvania corporation that does business throughout the United States, including conducting business in Virginia. MSA has its principal place of business in Cranberry Township, Pennsylvania. MSA acquired Globe Holding Company, LLC and its subsidiaries (collectively, "MSA/Globe") in 2017 and continues to do business under the Globe name. MSA developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and the City of Richmond.

46.     Defendant MSA Safety Sales, LLC ("MSA Safety Sales") is a Pennsylvania corporation that does business throughout the United States, including conducting business in Virginia. MSA has its principal place of business in Cranberry Township, Pennsylvania. MSA Safety Sales developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and the City of Richmond.

47.     Municipal Emergency Services, Inc. ("MES") is a Nevada corporation that does business throughout the United States, including conducting business in Virginia. MES has its

14

principal place of business in Sandy Hook, Connecticut. MES developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and the City of Richmond.

48.     Defendant Nation Ford Chemical Company ("Nation Ford") is a South Carolina corporation that does business throughout the United States, including conducting business in Virginia. Nation Ford has its principal place of business in Fort Mill, South Carolina. Nation Ford developed, manufactured, marketed, distributed, released, sold and/or used PFAS, PFAS materials, and products containing PFAS in AFFF used in firefighting training and in firefighting by the City of Richmond Fire Department to include Plaintiff Clarke.

49.     Defendant National Foam, Inc. ("National Foam") is a Delaware corporation that does business throughout the United States, including conducting business in Virginia. National Ford has its principal place of business in Angier, North Carolina. National Foam developed, manufactured, marketed, distributed, released, sold and/or used PFAS, PFAS materials, and products containing PFAS in AFFF used in firefighting training and in firefighting by the City of Richmond Fire Department to include Plaintiff Clarke.

50.     Defendant PBI Performance Products, Inc., ("PBI") is a Delaware corporation that does business throughout the United States, including conducting business in Virginia. PBI has its principal place of business in Charlotte, North Carolina. PBI developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and City of Richmond.

51.     Defendant StedFast USA, Inc. ("StedFast") is a Delaware corporation that does business throughout the United States, including conducting business in Virginia. StedFast has its principal place of business in Piney Flats, Tennessee. StedFast developed, manufactured,

15

marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and City of Richmond.

52. Defendant TenCate Protective Fabrics USA d/b/a Southern Mills, Inc. ("Tencate") is a Georgia corporation that does business throughout the United States, including conducting business in Virginia by and through its introduction of its products and goods into the stream of commerce which it knew or had reason to know would enter, be sold, used, and consumed throughout the Commonwealth of Virginia. Tencate has its principal place of business in Senoia, Georgia. Tencate developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and the City of Richmond.

53. Defendant The Chemours Company, LLC ("Chemours") is a Delaware corporation that does business throughout the United States, including conducting business in Virginia. Chemours has its principal place of business in Wilmington, Delaware. Chemours developed, manufactured, marketed, distributed, released, sold and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and AFFF used in firefighting training and in firefighting, including in Virginia and in the City of Richmond.

54. Defendant Tyco Fire Products, L.P. ("Tyco") is a Delaware corporation that does business throughout the United States, including conducting business in Virginia. Tyco has its principal place of business in Princeton, New Jersey. Tyco developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and AFFF used in firefighting training and in firefighting, including in Virginia and in the City of Richmond.

16

55.    Defendant United Technologies Corporation ("United Technologies") is a foreign corporation organized and existing under the laws of the State of Delaware and that does business throughout the United States, including conducting business in Virginia. United Technologies has its principal place of business in Farmington, Connecticut. United Technologies developed, manufactured, marketed, distributed, released, sold and/or used PFAS, PFAS materials, and products containing PFAS in AFFF used in firefighting training and in firefighting by the City of Richmond Fire Department to include Plaintiff Clarke.

56.    Defendant UTC Fire & Security Americas Corporation, Inc. (f/k/a GE Interlogix, Inc.) ("UTC") is a North Carolina corporation that does business throughout the United States, including conducting business in Virginia. UTC has its principal place of business in Lincolnton, North Carolina. UTC developed, manufactured, marketed, distributed, released, sold and/or used PFAS, PFAS materials, and products containing PFAS in AFFF used in firefighting training and in firefighting by the City of Richmond Fire Department to include Plaintiff Clarke. Upon information and belief, Kiddie-Fenwal, Inc. is part of the UTC Climate Control & Security unit of United Technologies Corporation.

57.    Defendant W. L. Gore & Associates, Inc., ("Gore") is a Delaware corporation that does business throughout the United States, including conducting business in Virginia. Gore has its principal place of business in Newark, Delaware. Gore developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and in the City of Richmond.

## JURISDICTION AND VENUE

58.    This Court has personal jurisdiction over the Defendants pursuant to Va. Code § 8.01-328.1(A)(1)–(4), as the cause of action arises from the foreign Defendants' transacting

17

business in Virginia, contracting to supply services or things in Virginia, causing tortious injury by an act or omission in Virginia, and causing tortious injury by an act or omission outside of Virginia when they regularly conduct business in Virginia.

59.     This Court has general and specific jurisdiction over Defendants, as they have purposefully availed themselves of the privileges of conducting business activities within Virginia through the marketing, sale, and distribution of products and services in Virginia, and/or profiting from such activity; they have purposefully directed activities towards Virginia and Virginia residents; and this litigation results from injuries that arose out of those activities.

60.     This Court has general and specific jurisdiction over Defendants by virtue of their purposeful, continuous, systematic contacts, and general business purpose in Virginia.

61.     Plaintiff's exposure and injuries, resulting from the acts of Defendants alleged herein, occurred within the Commonwealth of Virginia.

62.     Venue is proper in this Court under Va. Code § 8.01-262(2), (3) and (4).

## SUBSTANTIVE ALLEGATIONS

### A. Plaintiff Clarke's Use of and Exposure to PFAS-Containing Products

63.     Plaintiff Clarke proudly has served the City of Richmond as a firefighter for the Richmond Fire Department for over 20 years.

64.     As a first responder to fire, hazardous materials incidents, and other emergency and medical calls, Plaintiff Clarke risks his life on a daily basis. He not only saved lives and homes but also provided emergency services and medical care, performed rescues, and offered support to people in traumatic circumstances. To prepare him for this enormously challenging work, Plaintiff Clarke wore turnouts, used AFFF to suppress Class B fires and received extensive and ongoing

18

training in fire suppression, fire prevention, rescue, and emergency medical care action to protect and/or minimize the loss of life, property, and damage to the environment.

65.     The Richmond Fire Department ("RFD") serves the residents of Richmond, Virginia by providing an all-hazard response service. Richmond firefighters also provide emergency medical technicians ("EMT") and paramedics to the community. RFD protects the city's residents, workers and tourists in high-rise buildings, schools, hospitals, churches, community centers, stores, historical landmarks, tunnels, bridges, hotels, and residential structures in densely populated neighborhoods.

66.     For decades, Defendants, either individually or through their predecessors or subsidiaries, have manufactured, designed, sold, supplied, and distributed AFFF and/or turnouts containing PFAS to firefighting training facilities and fire departments globally, including within the Commonwealth of Virginia and the City of Richmond and neighboring communities in Virginia.

67.     With over 5,000 individual chemicals, PFAS is a large and ever-growing category of human-made chemicals, consisting of a nearly indestructible chain of carbon and fluorine atoms that are widely used in products to, *inter alia*, resist and repel oil, heat and water, and have been found to have negative health effects. As detailed below, these toxic chemicals are present in firefighter turnouts and AFFF.

### (1) PFAS-Containing Turnout Gear

68.     Defendants knew or should have known that during firefighting training and when responding to fires and performing fire extinguishment, firefighters wear turnouts that are intended to provide a degree of thermal, chemical, and biological protection for a firefighter. Turnout gear components include a helmet, hood, jacket, pants, boots, and gloves. Each component is made of

19

an outer layer, as well as several inner layers that include a moisture barrier and thermal liner which are meant to protect the firefighter from ambient heat.

69.    A June 2020 study of turnout gear by researchers at the University of Notre Dame analyzed 30 new and used turnout jackets and pants originally marketed, distributed and sold in 2008, 2014, and 2017, by six turnout gear makers, including Defendants MSA/Globe, Lion and Honeywell, and found high levels of PFAS in turnout gear worn, used, or handled by firefighters using these brands of turnout gear, which included Plaintiff Clarke.

70.    In May 2023, Section 338 of the William M. Thornberry National Defense Authorization Act for titled the "Guaranteeing Equipment for Safety for Firefighters Act of 2020," directed the National Institute of Standards and Technology ("NIST") to identify the type, prevalence and concentration of PFAS in unused firefighter turnout gear. The study specifically looked at twenty textiles used to make firefighter turnout gear. The NIST study found between one and seventeen PFAS present in each textile used to construct the turnout gear.

71.    When exposed to heat, PFAS chemicals in the turnouts off-gas, break down, and degrade into highly mobile and toxic particles and dust, exposing firefighters to PFAS chemicals, particles and dust, including through skin contact/absorption, ingestion (e.g., hand-to-mouth contact) and/or inhalation. Further firefighter exposure to these highly mobile and toxic materials occurs through normal workplace activities, because particles or dust from their turnouts spread to fire vehicles and fire stations, as well as firefighters' cars and homes.

72.    Such workplace exposure to PFAS or PFAS-containing materials has been found to be toxic to humans. As far back as a July 31, 1980, internal memo, DuPont officials described measures that were needed to prevent workplace exposure to PFOA, which they knew could permeate all protective materials, and noted that PFOA's toxicity varied depending on the

20

exposure pathway, acknowledging that ingestion was "slightly toxic," dermal contact was "slightly to moderately toxic" and inhalation was "highly toxic." The memo concluded "continued exposure is not tolerable."

73.    As alleged herein, the Plaintiff Clarke wore turnouts in the ordinary course of performing his duties, as the turnouts were intended to be used and in a foreseeable manner, which exposed him to significant levels of PFAS.

74.    Plaintiff Clarke did not know, and in the exercise of reasonable diligence could not have known, that the turnouts they wore or used in the course of performing his duties contained PFAS or PFAS-containing materials, and similarly did not know and could not have known that he routinely suffered exposure to PFAS or PFAS-containing materials in the turnouts they wore or used in performing his duties. The turnout gear worn or used by Plaintiff Clarke did not contain labeling information saying that the gear contained PFAS, and similarly did not warn Plaintiff Clarke of the health risks associated with exposure to PFAS.

75.    Like many fire departments across the country, Plaintiff Clarke only had one set of turnouts to wear for years, and would wash his turnouts at home and/or in station machines along with his daily station wear uniforms.

### (2) PFAS-Containing AFFF

76.    Aqueous Film-Forming Foam ("AFFF") is a combination of chemicals used to extinguish hydrocarbon fuel-based fires.

77.    AFFF is a Class-B firefighting foam, which contains PFAS. It is mixed with water and used to extinguish fires that are difficult to fight, particularly those that involve petroleum or other flammable liquids.

21

78.     AFFF concentrate is typically sold in five-gallon containers that a firefighter is responsible for storing on the engine and/or pouring into the foam bladder of engine. To mix the foam concentrate and water in an engine that is not pre-plumbed, an eductor must be placed in the foam concentrate to draw up the concentrate and mix it with water to create a thick, white, foamy substance. The firefighter is responsible for this process of preparing the foam and for cleaning the equipment (bladders, hoses, nozzles, etc.) after use.

79.     The process of mixing AFFF, plumbing and preparing it, and cleaning the equipment after foam use causes exposure to PFAS through skin contact, inhalation, or ingestion (e.g., hand-to-mouth contact). The AFFF containers used by Plaintiff Clarke in his fire department to mix and prepare AFFF for use did not say that the foam contains PFAS, and did not warn Plaintiff Clarke of the serious health risks associated with exposure to PFAS.

80.     AFFF is used in fire extinguishment in a manner typical of routine methods of fire extinguishment—by being sprayed through a fire hose.

81.     The techniques used for "laying a blanket" of AFFF in fire extinguishment include: banking the foam off a wall or vertical surface to agitate the foam before it covers the fire; or applying it to the ground surface where the fire is burning. In structural fires, it can also be necessary to spray the ceilings, walls and floors. Reapplication of foam is often necessary because the foam blanket will break down over time.

82.     These techniques are used routinely in firefighting training as well as in real-world fire extinguishment, and result in firefighters being sprayed or entirely soaked with AFFF, walking in and through AFFF, or kneeling in AFFF during used—all as depicted in the exemplar photos below. As a result, the techniques cause exposure to PFAS through skin contact, inhalation, or ingestion (e.g., hand-to-mouth contact).

22





83.    As alleged herein, Plaintiff Clarke used AFFF in the ordinary course of

performing his firefighting duties, as it was intended to be used and in a foreseeable manner

which exposed him to significant levels of PFAS.

84.    Plaintiff Clarke did not know, and in the exercise of reasonable diligence, could

not have known that the AFFF he used in the course of performing his duties contained PFAS or

23

PFAS-containing materials, and similarly did not known and could not have known that he routinely suffered exposure to PFAS or PFAS-containing materials in the AFFF used in performing his duties.

**B. The Chemical Structure of PFAS Makes Them Harmful to Human Health**

    **85.** PFAS are known as "forever chemicals" because they are immune to degradation, bioaccumulate in individual organisms and humans, and increase in concentration up the food chain. Indeed, scientists are unable to estimate an environmental half-life (i.e., the time it takes for 50% of the chemical to disappear) for PFAS. Additionally, some PFAS chemicals (known as "precursors") degrade into different long-chain PFAS chemicals.

    86.    PFAS are nearly indestructible and are highly transportable. PFAS exposure to humans can occur through inhalation, ingestion, or dermal contact.

    87.    PFAS chemicals include "older" long-chain PFAS like PFOA, PFOS, and PFNA that have seven or more carbon atoms, and "newer" short-chain PFAS, like PFBA, PFBS, PFHxA, and PFHxS. The PFAS chemical industry has repeatedly asserted that short-chain PFAS are safer and bio-degrade more easily than long-chain PFAS. However, short-chain PFAS are molecularly similar to long-chain PFAS, and recent scientific research conducted in 2020, shows that short-chain PFAS are in fact extremely persistent, highly mobile and transportable, almost impossible to remove from water, bio-accumulate in humans and the environment, and show similar toxicity as long-chain PFAS. For example, short-chain PFBA (with only four carbon molecules) which was created by defendant 3M and reportedly has a shorter half-life than other PFAS, recently has been found to accumulate in the lungs and, in turn, increase the severity of COVID-19 in patients with elevated levels of PFBA, among other health concerns. Short-chain PFAS also have lower

24

technical performance and may therefore be used at higher quantities cancelling out any supposed benefits of lower bioaccumulation potential.

88.    In October 2021, the U.S. Environmental Protection Agency ("EPA") updated its 2018 assessment of short-chain PFAS, also known as "GenX", finding that two of Defendant Chemours GenX chemicals are *more toxic* than PFOA - the highly toxic chemical these were intended to replace.

89.    To date, there is no safe, acceptable or "normal" level of PFAS in the human body. Further, the fact that PFOA, PFOS, PFHxS, PFHpA, and PFNA are often found together presents a substantial risk to human health. Defendants' assertions that their products are safe because they do not contain PFOA or PFOS, or because they contain short-chain PFAS is just another example of their efforts to deflect from the reality that there are thousands of PFAS – including precursor PFAS which degrade into PFOA and PFOS.

90.    PFAS exposure affects nearly every system in the body. It has been associated with multiple and serious adverse health effects in humans including, but not limited to, cancer, tumors, liver damage, immune system and endocrine disorders, thyroid disease, ulcerative colitis, birth defects, decreased fertility, pregnancy-induced hypertension, accelerated changes in gene expression, and increases in oxidative stress which can contribute to DNA changes, tumor promotion, and other health conditions.

## C. Defendants Knowingly Manufactured, Developed, Marketed, Distributed, Supplied, and/or Sold Toxic PFAS and/or Products Containing PFAS

91.    Defendants have each marketed, developed, distributed, sold, promoted, manufactured, released, or otherwise used PFAS chemicals in products, including in PFAS-containing turnout gear and AFFF, throughout the United States and in Virginia.

25

92.    PFAS were first developed in the 1930s and 1940s. Soon after, 3M began manufacturing a PFAS material called perfluorooctanoic acid ("PFOA"), selling it to other companies, including DuPont.

93.    By the 1950s, PFAS were widely used in large-scale manufacturing. Prior to this, PFAS had never been detected in nor were present in human blood or bodies.

94.    In the 1960s, Class B foam (including AFFF) containing PFAS entered the global market and became the primary firefighting foam all over the world with 3M as one of the largest manufacturers.

95.    In the 1970s, Defendants National Foam and Tyco began to manufacture, market and sell AFFF containing PFAS, followed by Defendants Chemguard and Dynax in the 1990s, and Defendant Buckeye in the 2000s.

96.    Founded in 1918, Defendant MSA/Globe began manufacturing, marketing and selling turnout gear with DuPont's NOMEX® PFAS-containing flame resistant fabric in 1966. MSA/Globe (under the Globe name) continues to manufacture, market and sell turnout gear using PFAS-containing fabrics supplied by its partners, DuPont, Gore, Tencate, and PBI.

97.    Defendant Lion began to manufacture, market and sell turnout gear in 1970. Since its founding, and continuing through to the present, Lion makes, markets and sells turnout gear using PFAS-containing fabrics, including Teflon® F-PPE-treated thermal lining material supplied by Defendants DuPont's NOMEX® PFAS-containing flame/water/oil-resistant fabric, and moisture barrier fabrics supplied by Defendant Gore.

98.    Defendant Honeywell acquired Norcross Safety Products LLC in 2008, entering the protective gear industry and becoming one of the leading manufacturers of turnouts. Honeywell

makes, markets and sells turnout gear using PFAS-containing fabrics, supplied by Defendants DuPont, Gore, PBI and StedFast.

### D. Defendants Know Exposure to PFAS Causes Serious Health Impacts

99.     Defendants, including specifically 3M and DuPont, have long known about the serious and significant impacts to health caused by exposure to PFAS, having conducted study after study on the exposure and health effects of PFAS on animals, and in some cases, even on their own employees. The findings of these studies were discussed internally within the companies, yet were never made public or shared with any regulatory agencies. Among the findings:

> a. A 1950 3M study showed that PFAS could build up in the blood of mice and that PFAS could bind to proteins in human blood suggesting that PFAS would not only remain, but also persist and accumulate in the body of the exposed individuals with each additional exposure.
>
> b. In 1961, a DuPont toxicologist warned that PFAS chemicals enlarge rat and rabbit livers. A year later, these results were replicated in studies with dogs.
>
> c. In 1963, 3M's technical handbook classified PFAS as toxic and advised that "due care should be exercised in handling these materials."
>
> d. In 1970, a company that purchased 3M's firefighting foam had to abandon a test of the product because all the fish died.
>
> e. In the 1970s, DuPont discovered that there were high concentrations of PFOA in the blood samples of factory workers at DuPont's Washington Works site.
>
> f. By the end of the 1970s, studies performed by, at least 3M, indicated that PFAS materials were resistant to environmental degradation and would persist in the environment.
>
> g. In 1981, 3M, which still supplied PFOA to DuPont and other corporations, found that ingestion of PFOA caused birth defects in rats. 3M reported this information to DuPont. DuPont then tested the children of pregnant employees in their Teflon division and found that of seven births, two children had eye defects. Defendants reassigned the female employees, but did not inform the EPA or make this information public.

27

h. In 1988, a company that purchased PFAS firefighting foam complained to 3M because the product was not biodegradable as 3M represented. Subsequently, a 3M employee wrote an internal memo that 3M should stop perpetrating the myth that these fluorochemical surfactants are biodegradable, but the company continued to sell them.

i. By at least the end of the 1980s, research performed by Defendants, including specifically, Defendants 3M and DuPont, manufacturing and/or using PFAS materials indicated that at least one such PFAS material, PFOA, caused testicular tumors in a chronic cancer study in rats, resulting in at least Defendant DuPont classifying such PFAS material internally as a confirmed animal carcinogen and possible human carcinogen.

j. In the 1990s, Defendant DuPont knew that PFOA caused cancerous testicular, pancreatic and liver tumors in lab animals. One study also suggested that PFOA exposure could cause possible DNA damage. Another study of workers found a link between PFOA exposure and prostate cancer.

k. In response to the alarming and detrimental health impact, DuPont began to develop an alternative to PFOA and in 1993, an internal memo announced that "for the first time, we have a viable candidate" that appeared to be less toxic and showed less bioaccumulation. DuPont decided against using this potentially safer alternative, however, because products manufactured with PFOA were worth $1 billion in annual profit.

l. On June 30, 2000, 3M and DuPont met to share 3M's "pertinent data on PFOA." 3M informed DuPont that the half-life of PFOA was much longer than animal studies showed.

100.    Additionally, approximately fifty years of studies by Defendants, including by 3M and DuPont, on human exposure to PFAS found unacceptable levels of toxicity and bio-accumulation, as well as a link to increased incidence of liver damage, various cancers, and birth defects in humans exposed to PFAS. These studies also revealed that, once in the body, PFAS has a very long half-life and that it takes years before even one-half of the chemicals begins to be eliminated from the body—assuming, of course, the body experiences no additional PFAS chemical exposure.

101.    In the face of these findings, and despite passage of the Toxic Substances Control Act in 1976, which requires companies that manufacture, process or distribute chemicals to

28

immediately report to the Environmental Protection Agency ("EPA") information that "reasonably supports the conclusion" that a chemical presents a substantial risk to health or the environment, Defendants did not inform the EPA, Plaintiff Clarke, or the public about the health impacts resulting from exposure to PFAS.

102.    In 2000, 3M announced that it would cease manufacturing a specific PFAS chemical, PFOS, on the same day the EPA announced that PFOA and PFOS, two chemicals in the PFAS family, had a "strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term."

103.    However, 3M did not recall PFOS, its chemical feedstock, or any Class B foam, including AFFF, that it had previously manufactured, sold, or distributed, or that was then stored at firehouses and being used by firefighters around the country. And, no other Defendant stopped manufacturing PFAS chemicals or products containing PFAS. Rather, Defendants continued to manufacture, develop, market, promote, distribute and sell PFAS chemicals and PFAS-containing products, including specifically PFAS-containing turnouts and AFFF and did so without any warning to firefighters or to the public concerning the fact that these turnouts and foam contained PFAS, or that they posed a serious health risk to human health. Defendants instead continued to claim their products were safe.

104.    By the 2000s, Defendants' own research of its employees revealed multiple adverse health effects among workers who had been exposed to PFAS, including increased cancer incidence, hormone changes, lipid changes, and thyroid and liver impacts.

105.    In 2001, a class action lawsuit was filed in West Virginia against DuPont on behalf of people whose water had been contaminated by the nearby DuPont chemical plant where PFAS chemicals were manufactured.

106. Defendants continued to manufacture, market, promote, distribute, and sell PFAS and PFAS-containing products, including turnouts and AFFF, and continued to publicly claim that these products were safe. Defendants affirmatively suppressed independent research on PFAS, and instead commissioned research and white papers to support their claims that PFAS and PFAS-containing products were safe to use, engaging consultants to further this strategy and ensure that they would continue to profit from these toxic chemicals and products.

107. As one consultant wrote in pitching its services to DuPont, it was critical that the PFAS industry develop an aggressive strategy to "[discourage] governmental agencies, Plaintiffs' bar and misguided environmental groups" and "[implement] a strategy to limit the effect of litigation and regulation on the revenue stream generated by PFOA." The strategy was further described by consultant as follows:

DUPONT MUST SHAPE THE DEBATE AT ALL LEVELS . . . The outcome of this process will result in the preparation of a multifaceted plan to take control of the ongoing risk assessment by the EPA, looming regulatory challenges, likely litigation, and almost certain medical monitoring hurdles. The primary focus of this endeavor is to strive to create the climate and conditions that will obviate, or at the very least, minimize ongoing litigation and contemplated regulation relating to PFOA. This would include facilitating the publication of papers and articles dispelling the alleged nexus between PFOA and teratogenicity as well as other claimed harm. We would also lay the foundation for creating Daubert precedent to discourage additional lawsuits.

108. Defendants also pivoted with a new industry strategy. Defendants continued to publicly represent that PFAS and/or products containing PFAS were safe, while developing newer, "short-chain" PFAS alternatives.

30

109.    In 2005, the EPA fined DuPont $16.5 million for failing to submit decades of toxicity studies of PFOA (one PFAS chemical manufactured by the company). Undeterred by the EPA's action, Defendant turnout manufacturers, such as MSA (Globe) and Lion, partnered with DuPont and with Defendant Gore to develop, manufacture, market, and distribute turnouts made with DuPont's and/or Gore's PFAS-based textile coatings (e.g., Nomex® and Gore® Protective Fabrics).

110.    In 2006, the EPA "invited" eight PFOA manufacturers, including Defendants DuPont, 3M, Arkema, and Daikin to join in a "Global Stewardship Program" and phase out production of PFOA by 2015.

111.    By this time, Defendants had begun to aggressively manufacture, market and/or distribute short-chain PFAS, such as Gen X, claiming that these alternative PFAS chemicals did not pose significant health risks to humans or the environment. But, these claims, too, were false. Defendants knew that certain of these short-chain PFAS chemicals had been found in human blood, and that at least one of them produces the same types of cancerous tumors (testicular, liver, and pancreatic) in rats as had been found in long-chain PFAS studies.

112.    In 2011, a C8 Science Panel convened as part of a settlement in the West Virginia DuPont water contamination case described *supra* began releasing its findings. The Panel had analyzed the blood serum of nearly 70,000 residents living in the water contamination area for two long-chain PFAS (PFOA and PFOS), and found significant negative human health effects (including, kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, high cholesterol and preeclampsia) associated with exposure to these PFAS chemicals in the area groundwater.

113.    In 2013, DuPont entered an agreement with the EPA and ceased production and use of PFOA – just one of thousands of PFAS chemicals the company makes, promotes and sells.

31

Defendants, however, continued manufacturing short-chain PFAS materials, chemical feedstock, and products—all the while peddling them as safer, and as more easily bio-degraded than long-chain PFAS, despite evidence to the contrary.

114.    In 2015, DuPont spun-off its PFAS chemicals business, as well two-thirds of its environmental liabilities and 90% of its active litigation, to Defendant Chemours. As part of the transaction, DuPont required Chemours to indemnify the "new" DuPont for all assigned environmental liabilities should a regulatory agency or plaintiff seek to hold the "new" DuPont accountable. As Chemours President Paul Kirsch testified before Congress: "DuPont designed the separation of Chemours to create a company where it could dump its liabilities to protect itself from environmental cleanup and related responsibilities."

115.    In June 2018, the Agency for Toxic Substances and Disease Registry (ASTDR), a division of the Centers for Disease Control and Prevention at the US Department of Health and Human Services released an 852-page draft toxicology report analyzing scientific data about the most common PFAS chemical variants, finding that PFAS "are potentially more hazardous than previously known, are particularly concerning because of these compounds' persistence in the environment and widespread prevalence—PFAS are extremely slow to biodegrade."

116.    In September 2019, DuPont chief operations and engineering officer Daryl Roberts testified before Congress that the "new DuPont" (to be distinguished from the "old DuPont" which manufactured and sold PFAS for decades before being spun-off to Chemours) no longer uses or manufactures PFAS and is no longer responsible for obligations and harms resulting from over 65 years of producing PFAS. Roberts further testified that he knew nothing about "old DuPont's" efforts to suppress research on PFAS' toxicity as testified to by one of DuPont's former scientists only a few days earlier. Finally, he stated that any liabilities from "old DuPont's" PFAS operations

32

were now Chemours' problem because DuPont is essentially a completely new company with no past – only a bright future of doing good in the world.

### E. Defendants Failed to Warn Plaintiff Clarke of the Dangers of Exposure to PFAS and Falsely Represented That Their PFAS Products Were Safe.

117.    As alleged above, Defendants knew that PFAS are persistent, toxic, and bioaccumulating with very long half-life. They knew that exposure to PFAS can cause serious and life-threatening diseases, including cancer.

118.    Yet, Defendants **did not warn** Plaintiff Clarke that PFAS and Defendants' PFAS-containing products, including turnouts and AFFF used by Plaintiff Clarke, contained PFAS, or that exposure to PFAS in the normal and intended use of such products, causes serious bodily harm and illnesses, including cancer.

119.    Instead, Defendants falsely represented—and continue to falsely represent— that PFAS and PFAS-containing products, including turnouts and AFFF, are safe and not harmful to humans or the environment.

120.    Such assertions fly in the face of science and a global movement toward eliminating this class of chemicals from consumer products. In just these past few years, for example, Congress passed legislation to address PFAS in turnouts. The U.S. Food and Drug Administration similarly has called for phasing out of short-chain PFAS that contain 6:2 fluorotelomer alcohol (6:2 FTOH). And private companies like Home Depot, Lowes and Staples recently have begun to discontinue selling products containing any PFAS, as have several outdoor, durable clothing companies (e.g., Columbia and Marmot), clothing retailers (e.g., H&M, Levi Strauss & Co), shoe companies (e.g., Adidas and New Balance), car seat manufacturers (e.g., Britax and Graco), furniture companies (e.g., IKEA), personal care companies (e.g. Johnson & Johnson and Oral-B), and textile manufacturing companies.

## (1) Defendants Provide No Safety Warnings on Product Labels

121.    Plaintiff Clarke alleges that the packaging on the PFAS-containing AFFF containers used for mixing the foam with water, pumping the mixture from engines, and for spraying and laying foam blankets for fire suppression or fire suppression training, contained no warning that the AFFF contained PFAS. Nor did it inform persons handling or using the foam as it was intended to be handled that such use can result in exposure to PFAS and serious bodily harm and/or death.

122.    Below are pictures of some of the AFFF foam containers manufactured, marketed, distributed, or sold by Defendants in Virginia. The labels on the containers warned only of possible skin or eye irritation and suggest rinsing areas of contact with water. They contained **no information** about the AFFF containing PFAS or PFAS-containing materials, and provided no warning whatsoever of the human health risks and serious conditions associated with PFAS exposure resulting from the normal and intended use of AFFF in fire suppression or fire suppression training.





123.    The turnouts containing PFAS or PFAS materials sold by Defendants in Virginia, and used by Plaintiff Clarke in training, emergency incidents, or in fire suppression during their firefighting career, also contained no warning that the turnouts contain PFAS or PFAS materials. Nor did these labels inform persons handling, wearing, or using the turnouts as they were intended to be handled, worn or used can result in exposure to PFAS and serious bodily harm.

124.    Below are pictures of warning labels for turnouts manufactured, marked, sold and distributed by Defendants Honeywell International, Honeywell Safety, MSA/Globe and Lion. As depicted below, the labels make no mention of PFAS, do not advise that the turnouts contain PFAS or PFAS materials, and contain no warning that handling, wearing, or using the turnouts as they were intended to be handled, worn or used can result in exposure to PFAS and serious bodily harm. Further, while the labels provide washing instructions, the instructions do not advise that turnouts

should be washed in a commercial extractor to prevent cross-contamination and PFAS-exposure to family members who handle or wash the turnouts with other garments in home washing machines.





**Garment Safety Label**

## ⚠ DANGER

6150

You must read and understand these warnings and instructions.
Failure to follow these warnings and instructions will result in serious injury or death.

- Wear this garment ONLY FOR FIREFIGHTING ACTIVITIES
- THIS GARMENT DOES NOT PROVIDE PROTECTION AGAINST CBRN TERRORISM AGENTS.
- Before wearing this garment, you must read and understand the User Instruction, Safety and Training Guide provided with this garment. This guide explains: 1. critical safety information and protective clothing limitations; 2. proper sizing/adjustment; 3. procedures for putting on and removing protective clothing; 4. how to clean/decontaminate, inspect and store this garment; 5. use consistent with NFPA1500; 6. limitations on useful life and retirement procedures.
- You should wear this garment only if you have been properly trained in firefighting techniques, and have knowledge of the proper selection, fit, use, care and limitations of protective clothing and equipment. To obtain a free user guide, write Lion
@7200 Poe Ave., Suite 400 Dayton, OH 45414
or call 1-800-421-2926.

- This garment provides limited protection against heat and flame. Minimize exposure to heat. You may be burned without warning or without receiving damage to garment. Avoid contact with hot objects. Skin burns occur when skin reaches a temperature of 118°F. Fires burn at temperatures up to 2000°F.
- Moisture and/or compression in your garment may reduce protection.
- Exertion in hot conditions may result in heat exhaustion or poor judgment. If you feel dizziness, dehydration, loss of focus, or shortness of breath, get to a safe area, remove this garment, and seek medical attention.
- Do not use this garment if it is damaged or dirty, garments act NOT provide the extended protection. ALWAYS follow manufacturer's cleaning instructions.
- This garment has limited useful life. You must inspect regularly and retire when appropriate according to the User Instruction, Safety and Training Guide.
See also NFPA 1851.

DO NOT REMOVE OR WRITE ON THIS LABEL!

**Garment Cleaning Label**           **Garment Information Label**

6434

🦁 **LION**

Questions, write or call immediately:
Lion
7200 Poe Ave., Suite 400 Dayton, OH 45414  1-800-421-2926

**CLEANING AND STORAGE INSTRUCTIONS**
- Users must clean, inspect, maintain, store and alter only in accordance with the User Instruction, Safety and Training Guide.
- Never use chlorine bleach. Chlorine bleach will significantly compromise the protection afforded by textile and film materials utilized in the construction of this garment.
- For coats only, remove DRD and launder DRD by hand washing with mild detergent and warm water.
- Fasten all hooks and D-rings and turn inside out or place in a laundry bag.
- Machine wash, warm water, using only liquid detergent and if needed, liquid non-chlorine bleach. Double rinse in cool water. Never use fabric softeners.
- Never dry clean.
- Dry by hanging in open area, out of direct or indirect sunlight and fluorescent light.
- Store out of direct or indirect sunlight and fluorescent light.
THIS STRUCTURAL FIRE FIGHTING PROTECTIVE GARMENT MEETS THE GARMENT REQUIREMENTS OF NFPA1971, 2013 EDITION.
PROTECTIVE GARMENT FOR STRUCTURAL FIRE FIGHTING IN ACCORDANCE WITH NFPA 1971-2013, 58F6

When worn with the inner liner and outer shell assembled together, this garment meets the personal protective equipment criteria of US Dept. of Labor OSHA Bloodborne Pathogens Standard, Title 29 CFR, Part 1910.1030, and CAL-OSHA Standard Title 8 Section 3406.
DO NOT REMOVE OR WRITE ON THIS LABEL

Rev.1.0 12142



Janesville
CROSSTECH MOISTURE BARRIER (PTFE)
GLIDE 2L ARAFLO E-89 (K) THERM.LINER
NOMEX E-89 QUILT
REQ:401971
MFG DATE:10/5/2012
CUT:104246AA006
MODEL:CVFM
LINER:CX7CVFM
SIZE:4432R

0000552642

**Garment Liner Attachment Safety Label**

## ⚠ WARNING

FOR COMPLIANCE WITH NFPA 1971, THE FOLLOWING PROTECTIVE ITEMS MUST BE WORN IN CONJUNCTION WITH THIS GARMENT: OUTER SHELL 7.0 OZ MINIMUM WEIGHT

This INNER LINER alone does not provide protection against heat, flame, chemical or biological hazards. NEVER wear this INNER LINER without the SAME SIZE and MODEL OUTER SHELL, as identified on labels located on each detachable component.

To reduce the risk of injury or death, you must assemble and wear together ALL of the following items: 1. protective coat and pant with outer shell, attached inner liner and DRD installed in coat 2. gloves 3. boots 4. helmet with eye protection 5. protective hood 6. SCBA 7. PASS device
ALWAYS make sure that all ensemble layers have the proper overlap and that all items fit with adequate looseness.Tight fit covers insulation protection and restricts mobility.

MADE IN THE U.S.A.
DO NOT REMOVE OR WRITE ON THIS LABEL!    Fx 6151

**Drag Rescue Device (DRD) Label**

### (2) Defendants' Misrepresentations About PFAS Continue to this Day

125.    Despite their decades of knowledge about PFAS and its dangers, Defendants continue to make false claims, continue to misrepresent the safety of PFAS, and continue to minimize and fail to warn about the hazards of exposure to PFAS, or turnouts and AFFF made with or containing PFAS.

126.    Defendants' misinformation campaign is long-standing and continues to this day. Some pertinent examples include:

- a.  2017 – Defendant Lion's President, Stephen Schwartz, wrote a letter to the editor of the Columbus Dispatch, expressing outrage at the assertion in a government filing that firefighters may have been exposed to PFAS through turnout gear. Schwartz called this assertion false, stating that Lion's turnout gear is not treated or made with PFOS or PFOA:. "PFOAs and PFOSs have never been components of LION's turn-out gear, either as a coating or as a textile." He acknowledged that turn-out gear is treated with PTFE to provide a durable water repellant, and that the textile industry in the past had used PFOA as a processing aid to manufacture PTFE moisture barrier films and repellants. "It is possible that trace amounts may have been present as a residue when the films and finishes were incorporated into LION's turn-out gear. **However, based on all available scientific data, such nominal trace amounts, if they existed at all, would not have posed any health risk to firefighters. There is absolutely no connection at all between PFOS and firefighter turnout gear.**" (Emphasis added).

- b.  2018 – The National Fire Protection Association (which maintains committees on foams and turnouts that are comprised, in part, of certain Defendants) issued a publication listing 11 ways to minimize risk of occupational cancer – the suggestions centered on wearing turnouts for protection resulting from combustion or spills, and cleaning turnouts after exposure to chemicals. There was not a single mention of avoiding contact with foam and/or the risks of wearing turnouts containing PFAS or PFAS-containing materials.

- c.  2019 – Defendant 3M Vice President, Denise Rutherford, testified before Congress that she **absolutely agreed with the statement that "the weight of current scientific evidence does not show that PFOS or PFOA cause adverse health effects in humans at current rates of exposure."** (emphasis added)

39

    d. 2019 - The Fire Fighting Foam Council (of which many Defendants have been members since its inception in 2001) wrote in their newsletter that: "Short-chain (C6) fluorosurfactants do not contain or breakdown in the environment to PFOS or PFOA and are currently considered lower in toxicity and have significantly reduced bio-accumulative potential than long-chain PFAS."

    e. 2020 - FluorCouncil – the lobbying arm of the PFAS industry – maintains that PFAS fluorotelomers that are in AFFF and turnouts do not cause cancer, disrupt endocrine activity, negatively affect human development or reproductive systems, do not build up in the human body, and do not become concentrated in the bodies of living organisms.

    f. 2020 - The Fire Fighting Foam Council website states: "The short-chain (C6) fluorosurfactants that have been the predominant fluorochemicals used in fluorotelomer-based AFFF for the last 25 years are low in toxicity and not considered to be bio-accumulative based on current regulatory criteria."

    g. 2020 - The Fire Fighting Foam Council's Best Practice Guidance for Use of Class B Foam - which was published in May 2016 and has not been updated to reflect the latest research - focuses entirely on eliminating and containing foam to minimize impact on the environment. It makes no mention of how to minimize the impact on firefighters who routinely handle, prepare, spray, or use Class B foam during training or in firefighting.

127.    As frequent sponsors and advertisers in fire service publications, Defendants have been so influential in the industry that fire service leadership have echoed these narratives.

128.    For example, in 2017, the International Association of Fire Fighters ("IAFF"), which represents more than 324,000 full-time professional firefighters, issued a statement that both mischaracterized and purported to state that the risks associated with exposure to PFAS and PFAS chemicals and materials in turnouts and AFFF was minimal to non-existent. The statement even encouraged firefighters to continue to wear turnouts, creating a false sense that these PFAS-containing turnouts were safe. The statement reads, in relevant part:

Importantly, PFOA use has been almost completely phased out in the US….. If PFOA is a combustion product of PFOA-containing consumer products made prior to phasing out use of this chemical, fire fighters will be exposed in fire suppression activities. However, the data are too limited at present to determine this. PFOA is

unlikely to be a component in recently US manufactured turnout gear. However, if PFOA is a combustion product, it may be present as a contaminant on turnout gear. PFOA may also be present as a manufactured component of legacy turnout gear….The exposure contribution from any such PFOA content is likely to be minimal since volatilization from the manufactured product would be required….**At this time, IAFF does not recommend that legacy turnout gear be replaced outside of its lifecycle. Fire fighters wishing to minimize PFOA exposure should continue to wear their PPE…and regularly decontaminate their turnout gear.** IAFF will continue to monitor developments and update this fact sheet should new information become available.

129.    The IAFF maintained the Defendants' position that the turnout gear and AFFF was safe until new leadership took over in 2021. Because of these and other false claims and misrepresentations on the part of Defendants, Plaintiff Clarke did not know and, in the exercise of reasonable diligence, could not have known that the turnouts and AFFF he used contained PFAS or PFAS-containing materials, and caused Plaintiff Clarke to be exposed to PFAS and/or PFAS-containing materials, leading to his cancer.

130.    Also, in January 2021, Defendants DuPont and Chemours along with Corteva (the agricultural unit of DuPont that it spun off in 2019) announced a cost-sharing agreement worth $4 billion to settle lawsuits involving the historic use of PFAS – thereby acknowledging, at long last, the significant harm their PFAS chemicals have caused to human health and the environment.

### F.  New Research Indicates That Firefighters are at Significant Risk of Harm From Exposure to PFAS in Turnouts and AFFF— But Defendants Continue to Discount or Deny These Risks

131.    While historical research (and follow-on litigation) has centered on environmental impacts and environmental exposures associated with PFAS and PFAS-containing products, recent studies have focused specifically on the serious health impacts to firefighters stemming from their occupational exposure to turnouts containing PFAS.

132.    In June 2020, scientists at the University of Notre Dame published a ground-breaking study on PFAS in turnout gear, and the exposure risks posed to firefighters that wear,

41

wore, or handle such gear ("Notre Dame Turnout Study"). The Notre Dame Turnout Study analyzed over 30 sets of used and unused (still in their original packaging) turnout gear made by six U.S. manufacturers, including Defendants MSA/Globe, Lion and Honeywell over several production years, as listed below:

| PPE gear manufacturers sampled: | # samples |
|---|---|
| Globe Manufacturing (Pittsfield MA), | 11 |
| Lion Group (Dayton OH), | 12 |
| Honeywell First Responder (Dayton, OH), Lakeland Fire (Decatur, AL) | 2 2 |
| Quest Fire Apparel (Saratoga Springs, NY) | 1 |
| Quaker Safety (Quakertown, PA) | 2 |

The type and number of turnout gear samples used in this study.

133.    The Notre Dame Turnout Study noted that these manufacturers' turnout gear (or personal protective equipment-PPE, as it is described in the study) are manufactured "from textiles that are made from fluoropolymers (one form of PFAS) or extensively treated by PFAS in the form of side-chain fluoropolymers." According to the researchers, "[t]hese PFAS include fluoropolymer materials such as PTFE used as a moisture barrier in the inner layers of turnout gear." The study found significant levels of PFAS chemicals – including PFOA, PFOS, PFBA, PFPeA, PFHxA, PFHpA, PFNA, PFDA, PFUnA, PFDoA, PFTrDA, PFToDA, PFBS, PFOSA, N-EtFOSA, MeFOSAA, N-MeFOSE, N-EtFOSE and 6:20FTS – in both new and used turnout gear, and across layers, portions, and materials in the turnout gear, including in material layers that are not intentionally treated with PFAS by the manufacturer, thereby providing "the first evidence that suggests PFAS appear to migrate from the highly fluorinated layers and collect in the untreated layer of clothing worn against the skin."

134.    These findings suggest that, as the garments are worn, PFAS from the outer shell and the moisture barrier can migrate from the turnouts and contaminate both the firefighter, their

42

apparatus and workplace with PFAS. The analysis also indicated that fluoropolymers from the

outer layer decompose into other PFAS, including PFOA.

Environmental Science & Technology Letters                    pubs.acs.org/journal/estlcu                    Letter

Table 2. Quantities of Target PFAS (in ppb) Found in US Turnout Gear by LC–MS/MS Analysis

| values in ppb | jacket 2008 unused | | | pants 2014 used | | | jacket 2009 used | jacket 2017 unused |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | thermal liner | moisture barrier | outer shell | thermal liner | moisture barrier | outer shell | moisture barrier | moisture barrier |
| PFBA | <MDL | 12.3 | 16.6 | 1.39 | 6.15 | 21.5 | 28.3 | 951 |
| PFPeA | <MDL | 12.6 | 17.5 | 2.28 | 104 | 364 | 13.1 | 2.69 |
| PFHxA | <MDL | 36.5 | 16.5 | 199 | 38.6 | 209 | 35.8 | 16.5 |
| PFHpA | <MDL | 12.4 | 23.4 | 165 | 5.32 | 2.23 | 14.3 | 25.4 |
| PFOA | 78 | 46 | 182 | 330 | 51 | 97 | 37 | <MDL |
| PFNA | 2.63 | <MDL | 8.2 | 25.3 | 1.95 | <MDL | 2.76 | <MDL |
| PFDA | 2.93 | 6.51 | 5.51 | 133 | <MDL | <MDL | 23.7 | <MDL |
| PFUnA | <MDL | <MDL | <MDL | 7.36 | <MDL | <MDL | 13.1 | <MDL |
| PFDoA | <MDL | 5.01 | <MDL | 64.6 | <MDL | <MDL | 23.9 | <MDL |
| PFBS | 28.5 | 140 | 142 | 33400 | 47900 | 1058 | 290 | 9K 400 |
| PFOS | <MDL | <MDL | <MDL | 7 | <MDL | <MDL | 2 | <MDL |
| 6:2 FTS | <MDL | <MDL | <MDL | 13.9 | 129 | <MDL | <MDL | <MDL |
| 8:2 FTS | <MDL | <MDL | <MDL | <L.1 | <MDL | <MDL | <MDL | <MDL |

135.    "Startlingly," researchers reported, "garment to hand transfer of total fluorine in the

ppm range was also observed when researchers simply manipulated the textiles in [the]

laboratory." The accumulation of PFAS on researchers' hands strongly suggests that transference

of ppm levels of PFAS can occur merely by handling the turnouts and that PFAS exposure

pathways include inhalation, ingestion and/or absorption (through dermal contact) – all of which

DuPont internally acknowledged as being toxic in 1980. Such exposure pathways are a concern

not only for firefighters that rely on turnouts to protect them from heat, fire, water and chemical

hazards in the field, but to family members who may be exposed to the PFAS in turnouts as the

result of home washing or storage. Lead researcher Graham Peaslee commented that turnouts are

"the most highly fluorinated textiles I've ever seen" and that the level of PFAS in the turnout gear

means that firefighters are "swimming in a sea of [PFAS]. Those numbers for scientists are scarily

high..."

43

Over time, PFAS in a firefighter's turnout gear can migate from a moisture barrier (orange) into a thermal liner that contacts skin. PFAS can also be shed from an outer shell (black) into the environment.

136.    Despite these findings, Defendants have been quick to mischaracterize, dismiss or downplay the significance of the Notre Dame Turnout Study. Defendant MSA/Globe, when contacted about the study and asked whether Globe planned to study this issue and find an alternative to PFAS for turnouts, merely responded thusly: "[P]rotecting (firefighters) is Globe's business; every piece of our turnout gear meets or exceeds applicable industry standards."

137.    Defendant Lion's responses have been similar and have also dismissed or minimized the significance of the Notre Dame Turnout Study's findings. Lion issued a Customer Safety Alert for PFOA and Turnout Gear stating: "Your LION turnout gear continues to be safe and ready for action especially when properly maintained. It is extremely important that firefighters continue to wear and properly care for their gear to stay safe on the job."

138.    The Customer Safety Alert goes on to stress that Lion does not use PFOA or PFOS (two long-chain PFAS chemicals) in its turnouts. It does not, however, address that the maker's

44

turnouts in fact contain other PFAS chemicals, nor warn firefighters or the public about health

harms associated with exposure to these toxic, bio-accumulating chemicals.

**HERE'S ALL YOU NEED TO KNOW
ABOUT PFOA AND YOUR TURNOUT GEAR.**

**What is PFOA and why are we talking about it?**

**Perfluorooctanic Acid (PFOA) is a chemical that until recently was
used in the process to make many different industrial chemicals and
products.** The manufacture and use of PFOA was mostly phased out by
major chemical companies by 2010. By 2015, its manufacture was eliminated
in the United States.

In the firefighting protective clothing industry, PFOA was used as a processing
agent in the manufacture of resins used to make PTFE films – the primary
component of the moisture barrier used in turnout gear. While most residual
PFOA was eliminated from the manufacturing process of PTFE, some tiny
trace amounts remained.

LION does not use PFOA or PFOS
in our turnout gear or any of our
protective products.

PFOS has never been a component
of turnout gear. PFOS health and
environmental concerns are largely
related to AFFF foams and are not
connected to turnout gear.

139.     Defendant Lion's paid consultant, Dr. Paul Chrostowski, also has taken aim at the

Notre Dame Turnout Study and its findings. Refuting a Fire Rescue magazine article about the

study, Chrostowski repeated Lion's website statement that "PFOA was never part of the gear itself

and frequent independent testing has found only trace amounts of it in any of the gear – not nearly

enough to cause concern, and in amounts similar to consumer products." Chrostowski went on to

say "[t]he fact is that one may find trace amounts of 'short-chain' PFAS such as PFBS and PFHxA

in firefighting textiles, but the scientific research shows that these materials are far less toxic than

even PFOA and at the tiny trace levels the risk are extremely low based on numerous credible

published scientific research papers." Finally, Chrostowski falsely stated that the link between

PFAS exposure and cancer is "extremely weak."

140.     And yet, Lion concedes that dermal absorption is a pathway of exposure to cancer

causing chemicals for firefighters. In a *Not in Our House* cancer awareness fact sheet that currently

appears on the company's website, Lion warns firefighters: "For every 5 degree increase in

temperature, skin becomes 400% more absorbent. The hotter you are, the more carcinogens your

45

skin absorbs. This statistic is alarming given that the core body temperature of firefighters routinely

increases during firefighting activities while wearing turnouts which contain known carcinogens.



141.    The IAFF holds a yearly cancer summit and yet has done little to address the PFAS

in turnouts. Defendants, including at least DuPont, Gore, Lion and MSA (Globe), have been

regular sponsors of the IAFF Cancer Summit.



142.    At this event, as well as in firefighter cancer-related publications, programs and events, Defendants repeatedly used the summit as an opportunity to push the narrative that incidence of cancer among firefighters is attributable either to *other chemicals* encountered in the line of duty, or firefighters' failure to wash their turnouts after every call. Not once have the turnout Defendants admitted that the PFAS materials in their products has been found to be carcinogenic, and that the very equipment that should be protecting firefighters are causing the most harm. Further, Lion's recently launched "Not in Our House" cancer awareness program is sadly ironic in that it encourages *firefighters to make a pledge* ("I will make every effort to protect myself and my team by doing my part to take precautions that will minimize the risk of exposure to carcinogens that may lead to cancer...") while refusing to take any responsibility for continually exposing firefighters to carcinogens in their protective gear.

143.    Plaintiff Clarke deserves more. Firefighters are the first to respond to emergencies faced by their community, and never hesitate to help. Whether delivering a baby, responding to a fire, medical emergency, accident, mass shooting, terrorist attack, natural disaster, or teaching kids about fire safety, they always put the community first. When a child is drowning in a pool or a family is caught in a burning house, firefighters do not stop to calculate whether they will benefit by doing the right thing. They are true public servants. They step in and do what is needed when it is needed the most. Their health, safety and well-being must be of the highest priority.

## COUNT I | BREACH OF IMPLIED WARRANTIES

144.    This cause of action is asserted against all Defendants.

145.    Plaintiff Clarke incorporates by reference all allegations asserted in this Complaint, as though fully set forth herein.

47

146. Each Defendant, their predecessors-in-interest, and/or their alter egos, and/or entities they have acquired, have engaged in the business of manufacturing, distributing, supplying, testing, labeling, promoting, or advertising of turnouts and AFFFand through that conduct have knowingly placed PFAS-containing products into the stream of commerce with full knowledge that they were sold to fire departments or to companies that sold turnouts and AFFF to fire departments for use by firefighters such as Plaintiff Clarke, who was exposed to PFAS through ordinary and foreseeable uses for the purpose of firefighting activities and training.

147. Defendants intended that the turnouts and AFFF they were manufacturing, selling, distributing, supplying, promoting, and or selling would be used by firefighters, including Plaintiff Clarke, without any substantial change in the condition of the products from when it was initially manufactured, sold, distributed, and marketed by Defendants. Turnouts and AFFF were not safe for use by firefighters even when used as directed by the manufacturer and for its intended purpose for firefighting activities which include training, extinguishment, fire suppression, ventilation, search-and-rescue, salvage, containment, and overhaul.

148. Further, knowing of the dangerous and hazardous properties of turnouts and AFFF, Defendants could have manufactured, marketed, distributed, and sold alternative designs or formulations of turnouts that did not contain PFAS.

149. These alternative designs and/or formulations were already available, practical, similar in cost, and technologically feasible.

150. The use of these alternative designs would have reduced or prevented the reasonably foreseeable harm to Plaintiff Clarke that was caused by the Defendants' manufacture, marketing, and sale of turnouts and/or AFFF containing PFAS and PFAS-containing materials.

48

151.    Additionally, the turnouts and AFFF that were designed, manufactured, marketed, tested, advertised, promoted, sold, and distributed by the Defendants contained PFAS or PFAS-containing materials that were so toxic and unreasonably dangerous to human health and the environment, with the toxic chemicals being so mobile and persistent, that the act of designing, formulating, manufacturing, marketing, distributing, and selling these products was unreasonably dangerous under the circumstances.

152.    The turnouts and/or AFFF designed, manufactured, marketed, tested, advertised, marketed, promoted, sold and distributed by the Defendants were dangerous and defective in design or formulation because, at the time in which the products left the hands of the manufacturer or distributors, the foreseeable risks exceeded the benefits associated with the design or formulation of turnouts and/or AFFF.

153.    The turnouts and/or AFFF designed, manufactured, marketed, tested, advertised, marketed, promoted, sold, and distributed by the Defendants were dangerous and defective in design or formulation because, when the PFAS-containing products left the hands of the manufacturer or distributors, said products were unreasonably dangerous, unreasonably dangerous in normal use, and were more dangerous than an ordinary consumer-firefighter would expect.

154.    The turnouts and/or AFFF were in a defective condition and unsafe, and Defendants knew or had reason to know that these PFAS-containing products were defective and unsafe, especially when used in the form and manner as provided by Defendants.

155.    When placed in the stream of commerce, Defendants' PFAS-containing turnouts and/or AFFF were defective in design and formulation and as a result failed to meet ordinary users' expectations as to their safety and failed to perform as an ordinary user would expect.

49

156.    When placed in the stream of commerce, Defendants' PFAS-containing turnouts and/or AFFF were defective in design and formulation, and as a result, dangerous to an extent beyond which an ordinary consumer-firefighter would anticipate.

157.    When placed in the stream of commerce, Defendants' PFAS-containing turnouts and/or AFFF were unreasonable dangers in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

158.    When placed in the stream of commerce, Defendants' PFAS-containing turnouts and/or AFFF contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated manner.

159.    When placed in the stream of commerce, Defendants' PFAS-containing turnouts and/or AFFF did not provide an adequate warning of the potential harm that might result from exposure to PFAS and/or emitted from the turnouts and, alternatively, did not have adequate instructions for safe use of the products.

160.    Exposure to PFAS presents a risk of grave and harmful side effects and injuries that outweigh any potential utility stemming from their use.

161.    Defendants knew or should have known at the time of manufacturing, selling, distributing, promoting or marketing their PFAS-containing turnouts and/or AFFF that exposure to PFAS could result in cancer and other grave and serious illnesses and injuries as alleged herein.

162.    The foreseeable risk of harm could have been reduced or eliminated by the adoption of a reasonable, alternative design that was not unreasonably dangerous.

163.    Plaintiff Clarke used these PFAS-containing products in the ways that Defendants intended them to be used.

50

164. Plaintiff Clarke used these PFAS-containing products in ways that were foreseeable to Defendants.

165. Plaintiff Clarke was exposed to PFAS by using Defendants' turnouts and AFFF in the course of his employment, as described above, without knowledge of turnouts' dangerous propensities.

166. The design defect in turnouts and/or AFFF containing PFAS exposed Plaintiff Clarke to toxic levels of PFAS and therefore, was a substantial factor in causing Plaintiff Clarke's cancer and damages.

167. Through the use of advertising and marketing, Defendants, by and through their agents, employees, officers, representatives, and others for whom they are legally responsible, directed the attention of the public, including Plaintiff Clarke, to their products by means of implied representations, statements, and descriptions that the PFAS-containing products they were manufacturing, selling, distributing, supplying, and/or promoting were safe for use and free from hazards or dangerous properties in their ordinary uses and in the manner directed and for the purposes intended by the Defendants, which became a part of the basis of the bargain.

168. In using the PFAS-containing products designed manufactured, sold, distributed, supplied, and/or promoted by the Defendants, Plaintiff Clarke relied upon the skill and judgment of the Defendants, upon implied warranties of merchantability and fitness for a particular purpose that the PFAS-containing products were safe and fit for their intended and foreseeable functions for which they were designed without causing the injuries of which Plaintiff Clarke complains as a result of probable, foreseeable, and ordinary uses of the product.

169. At all times mentioned herein, the Defendants implied warranties of merchantability and fitness for a particular purpose in that the PFAS-containing products designed,

51

manufactured, sold, distributed, supplied, and/or advertised were unreasonably dangerous for their ordinary use and other reasonably foreseeable uses/purposes at the time they left Defendants' possession.

170.    As a result of Defendants' design and formulation of a defective product, Defendants are strictly liable in damages to Plaintiff Clarke.

171.    As a direct and proximate result of the foregoing acts and omissions, Plaintiff Clarke suffered the injuries and damages described herein.

172.    Defendants acted with willful or conscious disregard for the rights, health, and safety of Plaintiff Clarke, as described herein, thereby entitling Plaintiff Clarke to an award of punitive damages.

## COUNT II | BREACH OF EXPRESS WARRANTIES

173.    This cause of action is asserted against all Defendants.

174.    Plaintiff Clarke incorporates by reference all allegations asserted in this Complaint, as though fully set forth herein.

175.    Each Defendant, their predecessors-in-interest, and/or their alter egos, and/or entities they have acquired, have engaged in the business of manufacturing, distributing, supplying, testing, labeling, promoting, or advertising of turnouts and/or AFFF containing PFAS or PFAS-containing materials and, through that conduct, have knowingly placed PFAS-containing products into the stream of commerce with full knowledge that they were sold to fire departments or to companies that sold turnouts and/or AFFF to fire departments for the use by firefighters such as Plaintiff Clarke, who was exposed to PFAS through ordinary and foreseeable uses for the purpose of firefighting activities and training.

52

176.    The products complained of were manufactured, designed, sold, supplied and/or distributed by each of the Defendants and used by and/or in the vicinity of Plaintiff Clarke during his lifetime and/or was exposed to PFAS while using turnouts in the ordinary course of performing his duties as a firefighter.

177.    Defendants expected that the PFAS-containing products they were manufacturing, selling, distributing, supplying, and/or promoting would reach firefighters, including Plaintiff Clarke, without any substantial change in the condition of the products from when it was initially manufactured, sold, distributed, and marketed by Defendants.

178.    Defendants knew or should have reasonably known that the manner in which they were manufacturing, marketing, and selling turnouts and/or AFFF containing PFAS was hazardous to human health.

179.    The potential risks of using PFAS-containing products presented a substantial danger to firefighters, including Plaintiff Clarke, when the turnouts and/or AFFF were used or worn in an intended or reasonably foreseeable way.

180.    Plaintiff Clarke wore turnouts and used AFFF in the intended or reasonably foreseeable way in the ordinary course of performing his duties as a firefighter, including fire suppression and fire suppression training.

181.    The turnouts and/or AFFF manufactured, marketed, and sold by the Defendants were dangerous and defective because the foreseeable risk of harm could have been reduced or eliminated by the adoption of a reasonable, alternative design that was not unreasonably dangerous.

182.    Defendants' products were in a defective condition and unreasonably dangerous, in that the turnouts and/or AFFF which, by design, contain PFAS or PFAS-containing products, were deleterious, toxic, and highly harmful to Plaintiff Clarke.

183.    Defendants knew or should have reasonably known that exposure to PFAS was hazardous to human health, but:

        a. Did not provide an adequate warning of the potential harm that might result from exposure to PFAS or PFAS-containing materials in turnouts and/or AFFF;

        b. Did not have adequate instructions for safe use of the products;

        c. Did not have warnings to persons, such as Plaintiff Clarke, who had been, or reasonably may have been, exposed to Defendants' turnouts and/or AFFF, of their disease potential, the proper steps to take to reduce the harmful effects of previous exposure, the need to have periodic medical examinations including the giving of histories which revealed the details of the previous exposure, and the need to have immediate and vigorous medical treatment for all related adverse health effects;

        d. Did not manufacture, market, promote, distribute, or sell reasonably comparable products not containing PFAS when it became feasible to design.

184.    At the time of manufacture, distribution, promotion, labeling, distribution, and/or sale, Defendants could have provided warnings or instructions regarding the full and complete risks of turnouts and/or AFFF containing PFAS or PFAS-containing materials, because Defendants knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

185.    At all relevant times, Defendants' turnouts and/or AFFF did not contain an adequate warning or caution statement, which was necessary.

54

186.   Plaintiff Clarke was unaware of the defective and unreasonably dangerous condition of Defendants' products at a time when such products were being used for the purposes for which they were intended, and Plaintiff Clarke was exposed to PFAS released from the Defendants' turnouts and/or AFFF.

187.   Plaintiff Clarke did not and could not have known that the use of turnouts and/or AFFF in the ordinary course of performing his duties as a firefighter could be hazardous to his health, bio-accumulate in the blood, and cause serious health effects, including cancer.

188.   Defendants knew that the use of turnouts and/or AFFF, even when used as instructed by Defendants, subjected Plaintiff Clarke and others to a substantial risk of harm and yet, failed to adequately warn Plaintiff Clarke, the EPA or the public.

189.   As a result of their inadequate warnings, Defendants' turnouts and/or AFFF were defective and unreasonably dangerous when they left the possession and/or control of Defendants, were distributed by Defendants, and used or worn by Plaintiff Clarke.

190.   The lack of adequate and sufficient warnings was a substantial factor in causing Plaintiff Clarke's cancer, as described herein.

191.   As a result of Defendants' failure to provide adequate and sufficient warnings, Defendants are strictly liable in damages to Plaintiff Clarke.

192.   Through the use of such advertising and marketing, Defendants, by and through their agents, employees, officers, representatives, and others for whom they are legally responsible, directed the attention of the public, including Plaintiff Clarke, to their products by means of express and implied representations, statements, and descriptions that the PFAS-containing products they were manufacturing, selling, distributing, supplying, and/or promoting were safe for use and free

from hazards or dangerous properties in their ordinary uses and in the manner directed and for the purposes intended by the Defendants, which became a part of the basis of the bargain.

193.    In using the PFAS-containing products designed manufactured, sold, distributed, supplied, and/or promoted by the Defendants, Plaintiff Clarke relied upon the skill and judgment of the Defendants, upon implied warranties of merchantability and fitness for a particular purpose that the PFAS-containing products were safe and fit for their intended and foreseeable functions for which they were designed without causing the injuries of which Plaintiff Clarke complains as a result of probable, foreseeable, and ordinary uses of the product.

194.    At all times mentioned herein, the Defendants breached express warranties in that the PFAS-containing products designed, manufactured, sold, distributed, supplied, and/or advertised were defective and unreasonably dangerous for their ordinary use and other reasonably foreseeable uses/purposes at the time it left Defendants' possession contrary to express representations made by Defendants regarding the PFAS-containing products safety and or lack of or absence of harmful substances such as PFAS.

195.    As a direct and proximate result of the foregoing acts and omissions, Plaintiff Clarke suffered the injuries and damages described herein.

196.    Defendants acted with willful or conscious disregard for the rights, health, and safety of Plaintiff Clarke, as described herein, thereby entitling Plaintiff Clarke to an award of punitive damages.

## COUNT III | NEGLIGENCE, GROSS NEGLIGENCE, RECKLESSNESS AND WILLFUL AND WANTON MISCONDUCT

197.    This cause of action is asserted against all Defendants.

198.    Plaintiff Clarke incorporates by reference all allegations asserted in this Complaint.

56

199. Defendants owed a duty of care towards Plaintiff Clarke that was commensurate with the inherently dangerous, harmful, injurious, bio-persistent, environmentally-persistent, toxic, and bio-accumulative nature of turnouts and/or AFFF containing PFAS or PFAS-containing materials.

200. Defendants had a duty to exercise reasonable care in the design, research, testing, manufacture, marketing, formulation, supply, promotion, sale, labeling, training of users, production of information materials, use and/or distribution of turnouts and/or AFF into the stream of commerce, including a duty of care to ensure the PFAS did not infiltrate, persist in, accumulate in the blood and/or body of Plaintiff Clarke and including a duty to assure their products would not cause users to suffer unreasonable, dangerous side effects.

201. Defendants had a duty to exercise reasonable care to ensure that turnouts and/or AFFF were manufactured, marketed, and sold in such a way as to ensure that the end users of turnouts and/or AFFF were aware of the potential harm PFAS can cause to human health, and were advised to use it in such a way that would not be hazardous to their health.

202. Defendants had a duty to warn of the hazards associated with PFAS and PFAS-containing materials and were in the best position to provide adequate instructions, proper labeling, and sufficient warnings about the turnouts and/or AFFF. However, Defendants knowingly and intentionally failed to do so.

203. Defendants failed to exercise ordinary care in the designing, researching, testing, manufacturing, formulating, marketing, testing, promotion, supply, sale, and/or distribution of their PFAS chemicals and PFAS-containing products in the regular course of business, in that Defendants knew or should have known that use and exposure to PFAS and PFAS-containing

57

materials was hazardous to human health and created a high risk of unreasonable, dangerous side effects, including but not limited to severe personal injuries, as described herein.

204.    Defendants also knew or should have known that the manner in which they were manufacturing, marketing, distributing, and selling turnouts containing PFAS or PFAS-containing materials was hazardous to human health, bio-accumulated in the blood, and caused serious health effects, including cancer.

205.    Defendants    negligently    and    deceptively    underreported,    underestimated, downplayed the serious health dangers of the turnouts and/or AFFF products.

206.    Defendants negligently, carelessly and recklessly recommended application and disposal techniques for PFAS and/or for products containing PFAS that directly and proximately caused harm to Plaintiff Clarke.

207.    Defendants knew or should have known that firefighters wearing turnouts and/or AFFF products would be exposed to PFAS.

208.    At all times material, Plaintiff Clarke inhaled, ingested and/or absorbed dermally hazardous PFAS contaminants released from the Defendants' turnouts and/or AFFF.

209.    Plaintiff Clarke's exposure to Defendants' turnouts and/or AFFF, which were connected to and incidental to Defendants' manufacture, design, sale, supply and/or distribution of its PFAS-containing products, was harmful and substantially increased the risk of injuries to the Plaintiff Clarke and did cause injuries to Plaintiff Clarke.

210.    Defendants knew or should have known that the manner in which they were manufacturing, marketing, distributing and selling turnouts and/or AFFF containing PFAS or PFAS-containing materials would result in harm to Plaintiff Clarke as a result of using turnouts and/or AFFF in the ordinary course of performing his duties as a firefighter.

58

211.    Defendants knew, foresaw, anticipated, and/or should have foreseen, anticipated, and/or known that the design, engineering, manufacture, fabrication, sale, release, handling, use, and/or distribution of PFAS or PFAS-containing materials in turnouts and/or AFFF, and/or Defendants' other acts and/or omissions as described in this Complaint, could likely result in PFAS exposure to Plaintiff Clarke, the persistence and accumulation of toxic and harmful PFAS in his blood and/or body, and cause injuries to Plaintiff Clarke as herein alleged.

212.    Despite knowing, anticipating, and/or foreseeing the bio-persistent, bio-accumulative, toxic, and/or otherwise harmful and/or injurious nature of PFAS materials, Defendants, their agents, servants, and/or employees, committed negligent acts and/or omissions that resulted in PFAS exposure to Plaintiff Clarke, the persistence and accumulation of toxic and harmful PFAS in his blood and/or body, and caused injuries to Plaintiff Clarke as herein alleged.

213.    Defendants, through their acts and/or omissions as described in this complaint, breached their duties to Plaintiff Clarke.

214.    It was reasonably foreseeable to Defendants that Plaintiff Clarke would likely suffer the injuries and harm described in this complaint by virtue of Defendants' breach of their duty and failure to exercise ordinary care, as described herein.

215.    Defendants' acts and omissions amount to negligence, gross negligence, reckless disregard for human life and safety, and willful and wanton misconduct.

216.    As a direct and proximate result of the Defendants' acts and omissions, Plaintiff Clarke suffered the injuries and damages.

217.    Defendants acted with willful or wanton conduct, or such recklessness as evinces a conscious disregard for the rights, health, and safety of others including Plaintiff Clarke, as described herein, thereby entitling Plaintiff Clarke to an award of punitive damages.

## COUNT IV | VIOLATIONS OF THE VIRGINIA CONSUMER PROTECTION
## ACT [VCPA],
## Va. Code § 59.1-196, *et seq.*

218.    This cause of action is asserted against all Defendants.

219.    Plaintiff Clarke incorporates by reference all allegations asserted in this Complaint.

220.    Plaintiff Clarke's claims arise under the Commonwealth of Virginia's Consumer
Protection Act [VCPA], Va. Code § 59.1-196, *et seq.*

221.    Defendants are "suppliers" as that term is defined by the VCPA.

222.    The turnouts and/or AFFF designed, developed, manufactured, marketed,
distributed, released, and/or sold by Defendants the reached Plaintiff Clarke as an end user are
"goods" as that term is defined by the VCPA.

223.    Defendants design, develop, manufacture, marketing, distribution, release, and/or
sale of the turnouts and/or AFFF into the chain of commerce and ultimately reaching Plaintiff
Clarke were consumer transactions as that term is defined under the VCPA. Va. Code § 59.1-198.

224.    Defendants, by and through their acts and omissions alleged *supra*, violated
Sections 59.1-200(A)(5)(6) and (14) of the VCPA by

> a. Misrepresenting that goods or services have certain quantities,
> characteristics, ingredients, uses, or benefits, Va. Code § 59.1-200(A)(5);
>
> b. Misrepresenting that goods or services are of a particular standard, quality,
> grade, style, or model; and
>
> c. Using any other deception, fraud, false pretense, false promise, or
> misrepresentation in connection with a consumer transaction, Va. Code §
> 59.1-200(A)(14).

225.    Defendants made various material misrepresentations to the general public regarding the attributes of turnouts and/or AFFF and the dangers, or lack thereof, of PFAS chemicals for the purpose of inducing members of the general public to purchase their goods and rely on the safety of their goods.

226.    Defendants knew or should have known Plaintiff Clarke would rely, and he did rely, on the material misrepresentations concerning the safety and quality of their products and goods.

227.    As a direct and proximate result of the Defendants' acts and omissions, Plaintiff Clarke suffered the injuries.

228.    Defendants acted with willful or wanton conduct, or such recklessness as evinces a conscious disregard for the rights, health, and safety of others including Plaintiff Clarke, as described herein, thereby entitling Plaintiff Clarke to an award of punitive damages.

229.    Plaintiff Clarke is also entitled to reasonable attorneys' fees and court costs pursuant to the VCPA, Va. Code § 59.1-204(B).

230.    Because the violations of the VCPA as alleged herein were willful, Plaintiff Clarke is entitled to treble damages pursuant to Va. Code § 59.1-204(A).

## PRAYER FOR RELIEF

231.    Plaintiff Clarke incorporates by reference all allegations asserted in this Complaint.

232.    As a direct and proximate result of Defendants' wrongful acts, Plaintiff Clarke suffered injuries and is entitled to damages in the form of:

    a. Compensatory damages, including but not limited to, pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount according to proof at the time of trial;

61

b. Compensatory damages for future damages, including but not limited to the Plaintiff Clarke's pain and suffering and for severe permanent personal injuries sustained by Plaintiff Clarke, including future health care costs, medical monitoring, and/or economic loss;

c. Economic damages including but not limited to medical expenses, out of pocket expenses, lost earnings and other economic damages in an amount to be determined at trial;

d. Punitive damages for the wanton, willful, fraudulent, and reckless acts of the Defendants, who demonstrated a conscious disregard and reckless indifference for the safety and welfare of the public in general and of Plaintiff Clarke in particular, in an amount sufficient to punish Defendants and deter future similar conduct, to the extent allowed by applicable law;

e. Pre-judgment and post-judgment interest, at the legal rate, on all amounts claimed;

f. Attorneys' fees and costs pursuant as permitted by law;

g. For equitable and injunctive relief, as necessary, to ensure that Defendants refrain from continuing to harm others; and

h. Any such relief this Court deems just and proper.

WHEREFORE, for the foregoing reasons, Plaintiff Jonathan Clarke respectfully prays for relief against Defendants, jointly and severally, in the sum of SEVENTY-FIVE MILLION DOLLARS ($75,000,000.00) in compensatory damages, ONE HUNDRED FIFTY MILLION DOLLARS ($150,000,000.00) in punitive damages or in an amount deemed recoverable pursuant to the law of the state deemed applicable to Plaintiff's claim to punitive damages, treble damages

pursuant to Va. Code § 59.1-204(A), the cost of this action, pre-judgment interest, post-judgment interest, and any other relief this Court deems just and proper.

### TRIAL BY JURY DEMANDED

Plaintiffs hereby demand a trial with a jury on all issues in the cause, including liability and damages.

**Respectfully submitted,**

Dated: July 2, 2024          By Counsel: _____

Kevin Biniazan, Esq. | VSB No. 92109
Jeffrey A. Breit, Esq. | VSB No. 18876
Don Scott, Esq. | VSB No. 88725
Scott M. Perry, Esq. | VSB No. 67417
Lauren Martin, Esq. | VSB No. 93653
Salem B. Amare, Esq. | VSB No. 99238
BREIT BINIAZAN, PC
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, VA 23451
Telephone | 757.622.6000
Facsimile | 757.299.8028
Email | kevin@bbtrial.com
Email | jeffrey@bbtrial.com
Email | don@bbtrial.com
Email | scott@bbtrial.com
Email | lauren@bbtrial.com
Email | salem@bbtrial.com

*Counsel for Plaintiffs*

**Jonathan Clarke**

# AFFIDAVIT OF SERVICE

CASE NUMBER: CL24002853

**vs**                                                          *Plaintiff*

**3 M Company et al**                                                      **COURT DATE:**

**JOB NUMBER: 244515**

*Defendant*

Commonwealth of Virginia: County of Roanoke

The undersigned being duly sworn, states:
That pursuant to 8.01-293(2) of the Code of Virginia: I am over the age of 18 and not a party or otherwise interested in the subject matter of the above-referenced controversy.

**I MADE SERVICE OF: Summons and Complaint**

**SERVICE ON: Blue Ridge Rescue Suppliers Inc,**

**ADDRESS: 1273 Colonial Fort Dr , Montvale , VA 24064**

**DATE SERVED: 7/2/2024 10:50 AM**

**(XX) COMPANY: - BY SERVING Andrew Rice , Operations .**

**Comments:**

I declare under penalties of perjury that the information contained herein is correct to the best of my knowledge.

_____  7/2/2024

Lisa H Joyner
Blue Ridge Legal Process Services
316 E Washington Ave
Vinton, VA 24179
540-527-3783

Commonwealth of Virginia
County of Roanoke

The foregoing instrument was acknowledged before me 2nd day of July, 2024

_____
NOTARY PUBLIC
Lynda D Mabrey
Reg# 7568632
EXP: 12/31/2025

LYNDA D MABREY
NOTARY PUBLIC
REG. #7568632
MY COMMISSION
EXPIRES
12/31/2025
COMMONWEALTH OF VIRGINIA

## RICHMOND CIRCUIT COURT

**Jonathan Clarke**

# AFFIDAVIT OF SERVICE

CASE NUMBER: CL24002853

vs

*Plaintiff*

**3 M Company et al**

**COURT DATE:**

**JOB NUMBER: 244513**

*Defendant*

Commonwealth of Virginia: County of Roanoke

The undersigned being duly sworn, states:
That pursuant to 8.01-293(2) of the Code of Virginia: I am over the age of 18 and not a party or otherwise interested in the subject matter of the above-referenced controversy.

**I MADE SERVICE OF: Summons and Complaint**

**SERVICE ON: Blue Ridge Rescue Suppliers Inc, c/o J Lee E Osborne , Registered Agent , Woods Rogers Vandeventer Black**

**ADDRESS: 10 S Jefferson St Ste 1400, Roanoke , VA 24011**

**DATE SERVED: 7/2/2024 11:53 AM**

**(XX) COMPANY: - BY SERVING Lee E Osborne, Registered Agent.**

**Comments:**

I declare under penalties of perjury that the information contained herein is correct to the best of my knowledge.

_____  7/2/2024

William B Cobble III
Blue Ridge Legal Process Services
316 E Washington Ave
Vinton, VA 24179
540-527-3783

Commonwealth of Virginia
County of Roanoke

The foregoing instrument was acknowledged before me 2nd day of July 2024

_____

NOTARY PUBLIC
Lisa H Joyner
Reg# 7379735
Exp:11/30/2026

Uploaded: 2024JUL02 14:44 Filed By: TOLIVER on behalf of RICHMOND CIRCUIT COURT ER-146766
E-Filed: 2024JUL02 RICHMOND CITY CC ILIPSCOMB at 2024JUL03 12:04 CL24002853-00

**Jonathan Clarke**

# AFFIDAVIT OF SERVICE

CASE NUMBER: CL24002853

                                          **vs**                              **Plaintiff**

**3 M Company et al**                                                    **COURT DATE:**

**JOB NUMBER: 244512**

                                                              **Defendant**

Commonwealth of Virginia: County of Roanoke

The undersigned being duly sworn, states:
That pursuant to 8.01-293(2) of the Code of Virginia: I am over the age of 18 and not a party or otherwise interested in the subject matter of the above-referenced controversy.

**I MADE SERVICE OF: Summons and Complaint**

**SERVICE ON: Bradsen Solutions, Inc, c/o Lee E Osborne, Registered Agent, Woods Rogers Vandeventer**

**ADDRESS: 10 S Jefferson St Ste 1400, Roanoke , VA 24011**

**DATE SERVED: 7/2/2024 10:51 AM**

**(XX) COMPANY: - BY SERVING Lee E Osborne, Registered Agent.**

**Comments:**

I declare under penalties of perjury that the information contained herein is correct to the best of my knowledge.

_____ 7/2/2024

William B Cobble III
Blue Ridge Legal Process Services
316 E Washington Ave
Vinton, VA 24179
540-527-3783

Commonwealth of Virginia
County of Roanoke

The foregoing instrument was acknowledged before me 2nd day of July, 2024

_____
NOTARY PUBLIC
Lisa H Joyner
Reg# 7379735
Exp:11/30/2026

## RICHMOND CIRCUIT COURT

**Jonathan Clarke**

# AFFIDAVIT OF SERVICE

CASE NUMBER: CL24002853

**vs**                                                                    *Plaintiff*

**3 M Company et al**                                                       **COURT DATE:**

**JOB NUMBER: 244514**

*Defendant*

Commonwealth of Virginia: County of Roanoke

The undersigned being duly sworn, states:
That pursuant to 8.01-293(2) of the Code of Virginia: I am over the age of 18 and not a party or otherwise interested in the subject matter of the above-referenced controversy.

**I MADE SERVICE OF: Summons and Complaint**

**SERVICE ON: Bradsen Solutions, Inc.**

**ADDRESS: 1273 Colonial Fort Dr , Montvale , VA 24064**

**DATE SERVED: 7/2/2024 10:50 AM**

**(XX) COMPANY: - BY SERVING Andrew Rice , Operations .**

**Comments:**

I declare under penalties of perjury that the information contained herein is correct to the best of my knowledge.

_____ 7/2/2024

Lisa H Joyner
Blue Ridge Legal Process Services
316 E Washington Ave
Vinton, VA 24179
540-527-3783

Commonwealth of Virginia
County of Roanoke

The foregoing instrument was acknowledged before me 2nd day of July, 2024

_____

NOTARY PUBLIC
Lynda D Mabrey
Reg# 7568632
EXP: 12/31/2025

LYNDA D MABREY
NOTARY PUBLIC
REG #7568632
MY COMMISSION
EXPIRES
12/31/2025
COMMONWEALTH OF VIRGINIA

VIRGINIA:

## IN THE CIRCUIT COURT FOR THE CITY OF RICHMOND

JONATHAN CLARKE,

  Plaintiff,

v.                                          Case No. CL24002853-00

3M COMPANY (F/K/A MINNESOTA
MINING AND MANUFACTURING
COMPANY), et al.,

  Defendants.

### **ANSWER OF BRADSDEN SOLUTIONS, INC.**

  Bradsden Solutions, Inc. ("Bradsden"), by and through undersigned counsel, states as follows for its Answer to Plaintiff's Amended Complaint:

  1.    In responses to Plaintiff's first unnumbered paragraph of the Amended Complaint, Bradsden denies that Plaintiff is entitled to any recovery under any theory against it.

  2.    Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 1 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

  3.    Bradsden denies the allegations contained in Paragraph 2 of Plaintiff's Amended Complaint.

  4.    Bradsden avers that Paragraph 3 of Plaintiff's Amended Complaint seeks expert opinion thereby requiring no response. To the extent a response is required, Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 3 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

5.      Bradsden avers that Paragraph 4 of Plaintiff's Amended Complaint seeks expert opinion thereby requiring no response. To the extent a response is required, Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 4 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

6.      Bradsden avers that Paragraph 5 of Plaintiff's Amended Complaint seeks expert opinion thereby requiring no response. To the extent a response is required, Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 5 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

7.      Bradsden denies the allegations contained in Paragraph 6 of Plaintiff's Amended Complaint that pertain to it. Bradsden expressly denies that Plaintiff was exposed to harmful levels of PFAS from any product for which Bradsden may be held liable. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the remaining allegations contained in Paragraph 6 of Plaintiff's Amended Complaint that pertain to the other defendants; therefore, it denies those allegations and calls for strict proof thereof.

8.      In response to Paragraph 7 of Plaintiff's Amended Complaint, Bradsden avers that the allegations contained in Paragraph 7 of Plaintiff's Amended Complaint concerning the alleged nature and impact of PFAS seek expert opinion, thereby requiring no response. Bradsden further avers that it has never sold turnouts to any individual or entity. Bradsden denies the remaining allegations contained in Paragraph 8 of Plaintiff's Amended Complaint that pertain to it. Bradsden expressly denies that Plaintiff was exposed to harmful levels of PFAS from any product for which Bradsden may be held liable. Bradsden lacks information sufficient to form a

belief as to the truth or falsity of the remaining allegations contained in Paragraph 7 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

9.      Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 8 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof. Bradsden expressly denies that Plaintiff was exposed to harmful levels of PFAS from any product for which Bradsden may be held liable.

10.     In response to Paragraph 9 of Plaintiff's Amended Complaint, Bradsden denies that the Plaintiff was exposed to harmful levels of PFAS for which Bradsden may be held liable. Bradsden avers that the allegations contained in Paragraph 9 of Plaintiff's Amended Complaint, as phrased, state legal conclusions, thereby requiring no response.

11.     Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 10 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof. Bradsden expressly denies that Plaintiff was exposed to harmful levels of PFAS from any product for which Bradsden may be held liable.

12.     Bradsden denies the allegations contained in Paragraph 11 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 11 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

13.     Bradsden lacks information to form a belief as to the truth or falsity of the allegations contained in Paragraph 12 of Plaintiff's Amended Complaint; therefore it denies those allegations and calls for strict proof thereof. Bradsden expressly denies that Plaintiff was exposed to harmful levels of PFAS from any product for which Bradsden may be held liable.

14.     The allegations contained in Paragraph 13 of Plaintiff's Amended Complaint are not directed at Bradsden; therefore, no response is required. To the extent a response is required, Bradsden lacks information sufficient to admit or deny the allegations; therefore, the allegations are denied.

15.     The allegations contained in Paragraph 14 of Plaintiff's Amended Complaint are not directed at Bradsden; therefore, no response is required. To the extent a response is required, Bradsden lacks information sufficient to admit or deny the allegations; therefore, the allegations are denied.

16.     The allegations contained in Paragraph 15 of Plaintiff's Amended Complaint are not directed at Bradsden; therefore, no response is required. To the extent a response is required, Bradsden lacks information sufficient to admit or deny the allegations; therefore, the allegations are denied.

17.     The allegations contained in Paragraph 16 of Plaintiff's Amended Complaint are not directed at Bradsden; therefore, no response is required. To the extent a response is required, Bradsden lacks information sufficient to admit or deny the allegations; therefore, the allegations are denied.

18.     The allegations contained in Paragraph 17 of Plaintiff's Amended Complaint are not directed at Bradsden; therefore, no response is required. To the extent a response is required, Bradsden lacks information sufficient to admit or deny the allegations; therefore, the allegations are denied.

19.     In response to the allegations contained in Paragraph 18 of Plaintiff's Amended Complaint, Bradsden avers that Bradsden Solutions, Inc. is a Virginia Stock corporation which does not, and has not ever, sold turnouts to any individual or entity.

4

20.     The allegations contained in Paragraph 19 of Plaintiff's Amended Complaint are not directed at Bradsden; therefore, no response is required. To the extent a response is required, Bradsden lacks information sufficient to admit or deny the allegations; therefore, the allegations are denied.

21.     The allegations contained in Paragraph 20 of Plaintiff's Amended Complaint are not directed at Bradsden; therefore, no response is required. To the extent a response is required, Bradsden lacks information sufficient to admit or deny the allegations; therefore, the allegations are denied.

22.     The allegations contained in Paragraph 21 of Plaintiff's Amended Complaint are not directed at Bradsden; therefore, no response is required. To the extent a response is required, Bradsden lacks information sufficient to admit or deny the allegations; therefore, the allegations are denied.

23.     The allegations contained in Paragraph 22 of Plaintiff's Amended Complaint are not directed at Bradsden; therefore, no response is required. To the extent a response is required, Bradsden lacks information sufficient to admit or deny the allegations; therefore, the allegations are denied.

24.     The allegations contained in Paragraph 23 of Plaintiff's Amended Complaint are not directed at Bradsden; therefore, no response is required. To the extent a response is required, Bradsden lacks information sufficient to admit or deny the allegations; therefore, the allegations are denied.

25.     The allegations contained in Paragraph 24 of Plaintiff's Amended Complaint are not directed at Bradsden; therefore, no response is required. To the extent a response is required,

Bradsden lacks information sufficient to admit or deny the allegations; therefore, the allegations are denied.

      26.     The allegations contained in Paragraph 25 of Plaintiff's Amended Complaint are not directed at Bradsden; therefore, no response is required. To the extent a response is required, Bradsden lacks information sufficient to admit or deny the allegations; therefore, the allegations are denied.

      27.     The allegations contained in Paragraph 26 of Plaintiff's Amended Complaint are not directed at Bradsden; therefore, no response is required. To the extent a response is required, Bradsden lacks information sufficient to admit or deny the allegations; therefore, the allegations are denied.

      28.     The allegations contained in Paragraph 27 of Plaintiff's Amended Complaint are not directed at Bradsden; therefore, no response is required. To the extent a response is required, Bradsden lacks information sufficient to admit or deny the allegations; therefore, the allegations are denied.

      29.     The allegations contained in Paragraph 28 of Plaintiff's Amended Complaint are not directed at Bradsden; therefore, no response is required. To the extent a response is required, Bradsden lacks information sufficient to admit or deny the allegations; therefore, the allegations are denied.

      30.     The allegations contained in Paragraph 29 of Plaintiff's Amended Complaint are not directed at Bradsden; therefore, no response is required. To the extent a response is required, Bradsden lacks information sufficient to admit or deny the allegations; therefore, the allegations are denied.

31. The allegations contained in Paragraph 30 of Plaintiff's Amended Complaint are not directed at Bradsden; therefore, no response is required. To the extent a response is required, Bradsden lacks information sufficient to admit or deny the allegations; therefore, the allegations are denied.

32. The allegations contained in Paragraph 31 of Plaintiff's Amended Complaint are not directed at Bradsden; therefore, no response is required. To the extent a response is required, Bradsden lacks information sufficient to admit or deny the allegations; therefore, the allegations are denied.

33. The allegations contained in Paragraph 32 of Plaintiff's Amended Complaint are not directed at Bradsden; therefore, no response is required. To the extent a response is required, Bradsden lacks information sufficient to admit or deny the allegations; therefore, the allegations are denied.

34. The allegations contained in Paragraph 33 of Plaintiff's Amended Complaint are not directed at Bradsden; therefore, no response is required. To the extent a response is required, Bradsden lacks information sufficient to admit or deny the allegations; therefore, the allegations are denied.

## JURISDICTION AND VENUE

35. Bradsden avers that Paragraph 34 of Plaintiff's Amended Complaint contains legal conclusions, thereby requiring no response. To the extent a response is required, Bradsden avers that it is not challenging the Court's exercise of personal jurisdiction over it in this case. Bradsden lacks information sufficient to form a belief as to the truth or the falsity of the allegations contained in Paragraph 34 of Plaintiff's Amended Complaint as they pertain to the other defendants; therefore, it denies those allegations.

7

36.    Bradsden avers that Paragraph 35 of Plaintiff's Amended Complaint contains legal conclusions, thereby requiring no response. To the extent a response is required, Bradsden avers that it is not challenging the Court's exercise of personal jurisdiction over it in this case. Bradsden lacks information sufficient to form a belief as to the truth or the falsity of the allegations contained in Paragraph 35 of Plaintiff's Amended Complaint as they pertain to the other defendants; therefore, it denies those allegations.

37.    Bradsden avers that Paragraph 36 of Plaintiff's Amended Complaint contains legal conclusions, thereby requiring no response. To the extent a response is required, Bradsden avers that it is not challenging the Court's exercise of personal jurisdiction over it in this case. Bradsden lacks information sufficient to form a belief as to the truth or the falsity of the allegations contained in Paragraph 36 of Plaintiff's Amended Complaint as they pertain to the other defendants; therefore, it denies those allegations.

38.    Bradsden denies the allegations contained in Paragraph 37 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or the falsity of the allegations contained in Paragraph 37 of Plaintiff's Amended Complaint as they pertain to the other defendants; therefore, it denies those allegations.

39.    Bradsden avers that Paragraph 38 of Plaintiff's Amended Complaint contains legal conclusions; thereby requiring no response. To the extent a response is required, Bradsden avers that it is not challenging venue in this case. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 38 of Plaintiff's Amended Complaint as they pertain to the other defendants; therefore, it denies those allegations.

40.    Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 39 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

41.    Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 40 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

42.    Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 41 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

43.    In response to Paragraph 42 of Plaintiff's Amended Complaint, Bradsden specifically denies that it has ever sold turnouts to any individual or entity. Bradsden denies the remaining allegations contained in Paragraph 42 of Plaintiff's Amended Complaint that pertain to it. Bradsden expressly denies that Plaintiff was exposed to harmful levels of PFAS from any product for which Bradsden may be held liable. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the remaining allegations contained in Paragraph 42 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

44.    Bradsden avers that Paragraph 43 of Plaintiff's Amended Complaint seeks expert opinion, thereby requiring no response. To the extent a response is required, Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 43 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

45.     Upon information and belief, Bradsden admits the allegations contained in Paragraph 44 of Plaintiff's Amended Complaint.

46.     Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 45 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

47.     Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 46 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

48.     Bradsden avers that Paragraph 47 of Plaintiff's Amended Complaint seeks expert opinion, thereby requiring no response. To the extent that a response is required, Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 47 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof. Bradsden expressly denies that Plaintiff was exposed to harmful levels of PFAS from any product for which Bradsden may be held liable.

49.     Bradsden avers that Paragraph 48 of Plaintiff's Amended Complaint seeks expert opinion, thereby requiring no response. To the extent that a response is required, Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 48 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof. Bradsden expressly denies that Plaintiff was exposed to harmful levels of PFAS from any product for which Bradsden may be held liable.

50.     Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 49 of Plaintiff's Amended Complaint; therefore, it denies

those allegations and calls for strict proof thereof. Bradsden expressly denies that Plaintiff was exposed to harmful levels of PFAS from any product for which Bradsden may be held liable.

51.     Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 50 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof. Bradsden expressly denies that Plaintiff was exposed to harmful levels of PFAS from any product for which Bradsden may be held liable.

52.     Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 51 of Plaintiff's Amended Complaint; therefore it denies those allegations and calls for strict proof thereof.

53.     Bradsden avers that Paragraph 52 of Plaintiff's Amended Complaint seeks expert opinion, thereby requiring no response. To the extent that a response is required, Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 52 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof. Bradsden expressly denies that Plaintiff was exposed to harmful levels of PFAS from any product for which Bradsden may be held liable.

54.     Bradsden avers that Paragraph 53 of Plaintiff's Amended Complaint seeks expert opinion, thereby requiring no response. To the extent that a response is required, Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 53 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof. Bradsden expressly denies that Plaintiff was exposed to harmful levels of PFAS from any product for which Bradsden may be held liable.

55.     Bradsden avers that Paragraph 54 of Plaintiff's Amended Complaint seeks expert opinion, thereby requiring no response. To the extent that a response is required, Bradsden lacks

information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 54 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof. Bradsden expressly denies that Plaintiff was exposed to harmful levels of PFAS from any product for which Bradsden may be held liable.

56.     Bradsden avers that Paragraph 55 of Plaintiff's Amended Complaint seeks expert opinion, thereby requiring no response. To the extent that a response is required, Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 55 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof. Bradsden expressly denies that Plaintiff was exposed to harmful levels of PFAS from any product for which Bradsden may be held liable.

57.     Bradsden avers that Paragraph 56 of Plaintiff's Amended Complaint seeks expert opinion, thereby requiring no response. To the extent that a response is required, Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 56 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof. Bradsden expressly denies that Plaintiff was exposed to harmful levels of PFAS from any product for which Bradsden may be held liable.

58.     Bradsden avers that Paragraph 57 of Plaintiff's Amended Complaint seeks expert opinion, thereby requiring no response. To the extent that a response is required, Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 57 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof. Bradsden expressly denies that Plaintiff was exposed to harmful levels of PFAS from any product for which Bradsden may be held liable.

59.    In response to Paragraph 58 of Plaintiff's Amended Complaint, Bradsden specifically denies that it has sold turnouts to any individual or entity. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 58 that pertain to it; therefore, it denies those allegations. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the remaining allegations that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

60.    Bradsden lacks information sufficient to form a belief as to the truth or the falsity of the allegations contained in Paragraph 59 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

61.    Bradsden lacks information sufficient to form a belief as to the truth or the falsity of the allegations contained in Paragraph 60 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

62.    In response to Paragraph 61 of Plaintiff's Amended Complaint, Bradsden admits, upon information and belief, that Globe manufactures turnouts. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the remaining allegations contained in Paragraph 61 of Plaintiff's Amended Complaint and calls for strict proof thereof.

63.    Bradsden lacks information sufficient to form a belief as to the truth or the falsity of the allegations contained in Paragraph 62 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

64.    In response to Paragraph 63 of Plaintiff's Amended Complaint, Bradsden admits, upon information and belief, that Honeywell manufactures turnouts. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the remaining allegations contained in Paragraph 63 of Plaintiff's Amended Complaint and calls for strict proof thereof.

13

65.    Bradsden denies the allegations contained in Paragraph 64 of Plaintiff's Amended Complaint that pertain to it, including sub-paragraphs (a) through (j). Bradsden lacks information sufficient to form a belief as to the truth or falsity of the remaining allegations contained in Paragraph 64 of Plaintiff's Amended Complaint that pertain to other defendants, including sub-paragraphs (a) through (j); therefore, it denies those allegations and calls for strict proof thereof.

66.    Bradsden denies the allegations contained in Paragraph 65 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the remaining allegations contained in Paragraph 65 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

67.    Bradsden denies the allegations contained in Paragraph 66 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the remaining allegations contained in Paragraph 66 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

68.    Bradsden lacks information sufficient to form a belief as to the truth or the falsity of the allegations contained in Paragraph 67 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

69.    As phrased, Bradsden denies the allegations contained in Paragraph 68 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 68 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

70.     Bradsden denies the allegations contained in Paragraph 69 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 69 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

71.     Bradsden lacks information sufficient to form a belief as to the truth or the falsity of the allegations contained in Paragraph 70 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

72.     Bradsden denies the allegations contained in Paragraph 71 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 71 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

73.     Bradsden lacks information sufficient to form a belief as to the truth or the falsity of the allegations contained in Paragraph 72 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

74.     Bradsden denies the allegations contained in Paragraph 73 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 73 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

75.     Bradsden lacks information sufficient to form a belief as to the truth or the falsity of the allegations contained in Paragraph 74 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

76.     Bradsden lacks information sufficient to form a belief as to the truth or the falsity of the allegations contained in Paragraph 75 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

77.     Bradsden denies the allegations contained in Paragraph 76 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 76 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

78.     Bradsden lacks information sufficient to form a belief as to the truth or the falsity of the allegations contained in Paragraph 77 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

79.     Bradsden denies the allegations contained in Paragraph 78 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 78 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

80.     Bradsden lacks information sufficient to form a belief as to the truth or the falsity of the allegations contained in Paragraph 79 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

81.     Bradsden lacks information sufficient to form a belief as to the truth or the falsity of the allegations contained in Paragraph 80 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

82.     Bradsden lacks information sufficient to form a belief as to the truth or the falsity of the allegations contained in Paragraph 81 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

83. Bradsden denies the allegations contained in Paragraph 82 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 82 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

84. As phrased, Bradsden denies the allegations contained in Paragraph 83 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 83 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

85. Bradsden denies the allegations contained in Paragraph 84 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 84 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

86. Bradsden denies the allegations contained in Paragraph 85 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 85 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

87. In response to the allegations contained in Paragraph 86 of Plaintiff's Amended Complaint, Bradsden avers that the labels on the turnouts worn by Plaintiff, if any, speak for themselves. Bradsden denies any characterization of such labels that are inconsistent with their terms.

88.    Bradsden lacks information sufficient to form a belief as to the truth or the falsity of the allegations contained in Paragraph 87 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

89.    Bradsden denies the allegations contained in Paragraph 88 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 88 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

90.    Bradsden denies the allegations contained in Paragraph 89 of Plaintiff's Amended Complaint that pertain to it, including sub-paragraphs (a) through (c). Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 89 of Plaintiff's Amended Complaint that pertain to other defendants including sub-paragraphs (a) through (c); therefore, it denies those allegations and calls for strict proof thereof.

91.    Bradsden denies the allegations contained in Paragraph 90 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 90 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

92.    Bradsden lacks information sufficient to form a belief as to the truth or the falsity of the allegations contained in Paragraph 91 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

93.    Bradsden denies the allegations contained in Paragraph 92 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 92 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

94.    Bradsden lacks information sufficient to form a belief as to the truth or the falsity of the allegations contained in Paragraph 93 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

95.    Bradsden lacks information sufficient to form a belief as to the truth or the falsity of the allegations contained in Paragraph 94 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

96.    Bradsden lacks information sufficient to form a belief as to the truth or the falsity of the allegations contained in Paragraph 95 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

97.    Bradsden lacks information sufficient to form a belief as to the truth or the falsity of the allegations contained in Paragraph 96 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

98.    Bradsden lacks information sufficient to form a belief as to the truth or the falsity of the allegations contained in Paragraph 97 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

99.    Bradsden denies the allegations contained in Paragraph 98 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 98 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

100.    Bradsden lacks information sufficient to form a belief as to the truth or the falsity of the allegations contained in Paragraph 99 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

101.   Bradsden lacks information sufficient to form a belief as to the truth or the falsity of the allegations contained in Paragraph 100 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

102.   Bradsden lacks information sufficient to form a belief as to the truth or the falsity of the allegations contained in Paragraph 101 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

103.   Bradsden lacks information sufficient to form a belief as to the truth or the falsity of the allegations contained in Paragraph 102 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

104.   Bradsden denies the allegations contained in Paragraph 103 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 103 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

105.   Bradsden denies the allegations contained in Paragraph 104 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 104 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

106.   In response to Paragraph 105 of Plaintiff's Amended Complaint, Bradsden admits that firefighters provide a valuable and laudable service to the community. Bradsden avers that the remaining statements in Paragraph 105 of Plaintiff's Amended Complaint do not state the proper legal standard applicable to the allegations and claims made and otherwise require no

response. Bradsden expressly denies that the Plaintiff was exposed to harmful levels of PFAS from any product for which Bradsden may be held liable.

107.    Bradsden avers that Paragraph 106 of Plaintiff's Amended Complaint requires no response. To the extent a response is required, Bradsden expressly denies that Plaintiff was exposed to harmful levels of PFAS from any product for which Bradsden may be held liable.

108.    In responses to Paragraph 107 of Plaintiff's Amended Complaint, Bradsden restates and incorporates its responses to all allegations asserted in the Amended Complaint.

109.    In response to paragraph 108 of Plaintiff's Amended Complaint, Bradsden specifically denies that it has sold turnouts to any individual or entity. Bradsden denies the remaining allegations contained in paragraph 108 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 108 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

110.    In response to paragraph 109 of Plaintiff's Amended Complaint, Bradsden specifically denies that it has sold turnouts to any individual or entity. Bradsden denies the remaining allegations contained in paragraph 109 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 109 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

111.    Bradsden denies the allegations contained in Paragraph 110 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 110 of Plaintiff's Amended

Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

112.    Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 111 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

113.    Bradsden denies the allegations contained in Paragraph 112 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 112 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

114.    Bradsden denies the allegations contained in Paragraph 113 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 113 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

115.    Bradsden denies the allegations contained in Paragraph 114 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 114 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

116.    Bradsden denies the allegations contained in Paragraph 115 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 115 of Plaintiff's Amended

Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

117.    Bradsden denies the allegations contained in Paragraph 116 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 116 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

  a. Bradsden denies the allegations contained in sub-paragraph (a) of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in sub-paragraph (a) of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

  b. Bradsden denies the allegations contained in sub-paragraph (b) of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in sub-paragraph (b) of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

  c. Bradsden denies the allegations contained in sub-paragraph (c) of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in sub-paragraph (c) of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

d. Bradsden denies the allegations contained in Paragraph subparagraph (d) of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in sub-paragraph (d) of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

e. Bradsden denies the allegations contained in sub-paragraph (e) of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in sub-paragraph (e) of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

f. Bradsden avers that the allegations contained in sub-paragraph (f) of Plaintiff's Amended Complaint seek expert opinion, thereby requiring no response. To the extent a response is required, Bradsden denies the allegations contained in sub-paragraph (f) of Plaintiff's Amended Complaint and calls for strict proof thereof.

118.    Bradsden denies the allegations contained in Paragraph 117 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 117 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

119.    Bradsden denies the allegations contained in Paragraph 118 of Plaintiff's Amended Complaint.

24

120.    Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 119 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

121.    Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 120 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

122.    Bradsden denies the allegations contained in Paragraph 121 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 121 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

123.    Bradsden denies the allegations contained in Paragraph 122 of Plaintiff's' Amended Complaint.

124.    Bradsden denies the allegations contained in Paragraph 123 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 123 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

125.    Bradsden denies the allegations contained in Paragraph 124 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 124 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

25

126.    Bradsden denies the allegations contained in Paragraph 125 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 125 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

127.    Bradsden denies the allegations contained in Paragraph 126 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 126 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

128.    Bradsden denies the allegations contained in Paragraph 127 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 127 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

129.    Bradsden avers that Paragraph 128 of Plaintiff's Amended Complaint requires no response. To the extent a response is required, Bradsden expressly denies that the Plaintiff was exposed to harmful levels of PFAS from any product for which Bradsden may be held liable.

130.    In response to Paragraph 129 of Plaintiff's Amended Complaint, Bradsden restates and incorporates its responses to all allegations asserted in the Amended Complaint.

131.    Bradsden denies the allegations contained in Paragraph 130 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 130 of Plaintiff's Amended

Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

132.    Bradsden denies the allegations contained in Paragraph 131 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 131 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

133.    In response to Paragraph 132 of Plaintiff's Amended Complaint, Bradsden specifically denies that it has sold turnouts to any individual or entity. As phrased, Bradsden denies the allegations contained in Paragraph 132 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 132 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

134.    Bradsden denies the allegations contained in Paragraph 133 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 133 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

135.    Bradsden denies the allegations contained in Paragraph 134 of Plaintiff's Amended Complaint.

136.    Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 135 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

27

137.    Bradsden denies the allegations contained in Paragraph 136 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 136 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

138.    Bradsden denies the allegations contained in Paragraph 137 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 137 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

139.    Bradsden denies the allegations contained in Paragraph 138 of Plaintiff's Amended Complaint that pertain to it, including sub-paragraphs (a) through (d). Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 138 of Plaintiff's Amended Complaint, including sub-paragraphs (a) through (d) that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

140.    Bradsden denies the allegations contained in Paragraph 139 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 139 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

141.    Bradsden denies the allegations contained in Paragraph 140 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 140 of Plaintiff's Amended

Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

142.    Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 141 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

143.    Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 142 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

144.    Bradsden denies the allegations contained in Paragraph 143 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 143 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

145.    Bradsden denies the allegations contained in Paragraph 144 of Plaintiff's Amended Complaint.

146.    Bradsden denies the allegations contained in Paragraph 145 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 145 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

147.    Bradsden denies the allegations contained in Paragraph 146 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 146 of Plaintiff's Amended

Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

148.    Bradsden denies the allegations contained in Paragraph 147 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 147 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

149.    Bradsden denies the allegations contained in Paragraph 148 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 148 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

150.    Bradsden denies the allegations contained in Paragraph 149 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 149 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

151.    Bradsden denies the allegations contained in Paragraph 150 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 150 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

152.    Bradsden avers that Paragraph 151 of Plaintiff's Amended Complaint requires no response. To the extent a response is required, Bradsden expressly denies that Plaintiff was exposed to harmful levels of PFAS from any product for which Bradsden may be held liable.

153.    In response to Paragraph 152 of Plaintiff's Amended Complaint, Bradsden restates and incorporates its responses to all allegations asserted in the Amended Complaint.

154.    Bradsden avers that Paragraph 153 of Plaintiff's Amended Complaint contains legal conclusions to which no response is required. To the extent a response is required, Bradsden denies the allegations contained in Paragraph 153 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 153 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

155.    Bradsden avers that Paragraph 154 of Plaintiff's Amended Complaint contains legal conclusions to which no response is required. To the extent a response is required, Bradsden denies the allegations contained in Paragraph 154 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 154 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

156.    Bradsden avers that Paragraph 155 of Plaintiff's Amended Complaint contains legal conclusions to which no response is required. To the extent a response is required, Bradsden denies the allegations contained in Paragraph 155 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 155 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

157. Bradsden avers that Paragraph 156 of Plaintiff's Amended Complaint contains legal conclusions to which no response is required. To the extent a response is required, Bradsden denies the allegations contained in Paragraph 156 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 156 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

158. Bradsden denies the allegations contained in Paragraph 157 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 157 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

159. Bradsden denies the allegations contained in Paragraph 158 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 158 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

160. Bradsden denies the allegations contained in Paragraph 159 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 159 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

161. Bradsden denies the allegations contained in Paragraph 160 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as

to the truth or falsity of the allegations contained in Paragraph 160 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

162.     Bradsden denies the allegations contained in Paragraph 161 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 161 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

163.     Bradsden denies the allegations contained in Paragraph 162 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 162 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

164.     Bradsden denies the allegations contained in Paragraph 163 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 163 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

165.     Bradsden denies the allegations contained in Paragraph 164 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 164 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

33

166.    Bradsden denies the allegations contained in Paragraph 165 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 165 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

167.    Bradsden denies the allegations contained in Paragraph 166 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 166 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

168.    Bradsden denies the allegations contained in Paragraph 167 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 167 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

169.    Bradsden denies the allegations contained in Paragraph 168 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 168 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

170.    Bradsden denies the allegations contained in Paragraph 169 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 169 of Plaintiff's Amended

Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

171.    Bradsden avers that Paragraph 170 of Plaintiff's Amended Complaint requires no response. To the extent a response is required, Bradsden expressly denies that Plaintiff was exposed to harmful levels of PFAS from any product for which Bradsden may be held liable.

172.    In response to Paragraph 171 of Plaintiff's Amended Complaint, Bradsden restates and incorporates its responses to all allegations asserted in Plaintiff's Amended Complaint.

173.    Bradsden avers that Paragraph 172 of Plaintiff's Amended Complaint contains legal conclusions to which no response is required. To the extent a response is required, Bradsden denies the allegations contained in Paragraph 172 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 172 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

174.    Bradsden avers that Paragraph 173 of Plaintiff's Amended Complaint contains legal conclusions to which no response is required. To the extent a response is required, Bradsden denies the allegations contained in Paragraph 173 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 173 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

175.    Bradsden avers that Paragraph 174 of Plaintiff's Amended Complaint contains legal conclusions to which no response is required. To the extent a response is required, Bradsden denies the allegations contained in Paragraph 174 of Plaintiff's Amended Complaint

that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 174 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

176.    Bradsden avers that Paragraph 175 of Plaintiff's Amended Complaint contains legal conclusions to which no response is required. To the extent a response is required, Bradsden denies the allegations contained in Paragraph 175 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 175 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

177.    Bradsden denies the allegations contained in Paragraph 176 of Plaintiff's Amended Complaint that pertain to it, including sub-paragraphs (a) through (c). Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 176 of Plaintiff's Amended Complaint that pertain to other defendants, including sub-paragraphs (a) through (c) ; therefore, it denies those allegations and calls for strict proof thereof.

178.    Bradsden denies the allegations contained in Paragraph 177 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 177 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

179.    Bradsden denies the allegations contained in Paragraph 178 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 178 of Plaintiff's Amended

36

Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

180. Bradsden denies the allegations contained in Paragraph 179 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 179 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

181. Bradsden denies the allegations contained in Paragraph 180 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 180 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

182. Bradsden avers that Paragraph 181 of Plaintiff's Complain contains legal conclusions to which no response is required. To the extent a response is required, Bradsden denies the allegations contained in Paragraph 181 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 181 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

183. Bradsden avers that Paragraph 182 of Plaintiff's Complain contains legal conclusions to which no response is required. To the extent a response is required, Bradsden denies the allegations contained in Paragraph 182 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the

37

allegations contained in Paragraph 182 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

184.    In response to Paragraph 183 of Plaintiff's Amended Complaint, Bradsden restates and incorporates its responses to all allegations asserted in the Amended Complaint.

185.    Bradsden denies the allegations contained in Paragraph 184 of Plaintiff's Amended Complaint that pertain to it. Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 184 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

186.    Bradsden denies the allegations contained in Paragraph 185 of Plaintiff's Amended Complaint that pertains to it, including sub-paragraphs (a) through (g). Bradsden lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 185 of Plaintiff's Amended Complaint that pertain to other Defendants, including sub-paragraphs (a) through (g); therefore, it denies those allegations and calls for strict proof thereof.

187.    Bradsden denies the allegations contained in the WHEREFORE Paragraphs of Plaintiff's Amended Complaint.

188.    Bradsden denies that Plaintiff is entitled to the relief sought in the WHEREFORE Paragraphs of Plaintiff's Amended Complaint.

189.    Bradsden denies all allegations not expressly admitted herein.

190.    Bradsden denies that it is indebted to Plaintiff in the amount claimed, or any amount, for the reasons stated or for any other reason.

191.    Bradsden denies that it committed any act of negligence that was a proximate cause of Plaintiff's alleged injuries.

192.    Bradsden avers that the exposures in question, if any, and Plaintiff's damages, if any, were caused by the acts and/or omissions of third parties over whom Bradsden has no control and for whom Bradsden is not responsible at law.

193.    Bradsden avers that Plaintiff's alleged damages were directly and proximately caused by the superseding, intervening acts and conduct of others, thereby precluding Plaintiff from recovery from Bradsden.

194.    Bradsden avers that it is entitled to a set-off from any sums recovered by or on behalf of Plaintiff by way of any settlement, judgment, or otherwise, which were, or are, entered into or received by Plaintiff from any party or non-party to this action.

195.    Bradsden avers that it acted in conformity with the existing state-of-the-art at all times relevant to this litigation.

196.    Bradsden avers that Plaintiff has failed to demonstrate that the alleged exposure to products supplied by Bradsden alone would have been sufficient to cause the injury/death at issue, as required under *Ford Motor Co. v. Boomer*, 285 Va. 141 (2013).

197.    To the extent they are supported by the evidence, Bradsden will rely upon the defenses of contributory negligence, assumption of the risk, the sophisticated user doctrine, lack of privity, limitation or disclaimer of warranties, and/or product misuse or abuse.

198.    Bradsden incorporates the defenses asserted by other defendants as such are applicable to Bradsden.

199.    Bradsden reserves the right to assert additional defenses or to supplement or amend this Answer, and to assert crossclaims, counterclaims, or third-party claims, upon ascertaining more definite facts during and upon completion of discovery and investigation.

200.    Bradsden expressly reserves the right to assert the defense of Statute of Limitations.

WHEREFORE, Defendant Bradsden Solutions, Inc., by counsel, respectfully requests that this Court dismiss this action and award its costs incurred herein.

TRIAL BY JURY IS DEMANDED.


**BRADSDEN SOLUTIONS, INC.**

By Counsel


John R. Owen (VSB No. 39560)
Julie S. Palmer (VSB No. 65800)
John P. Dunnigan (VSB No. 93483)
Imani E. Sowell (VSB No. 95982)
Yevgeniy K. Klinovskiy (VSB No. 98264)
Harman, Claytor, Corrigan & Wellman
P.O. Box 70280
Richmond, Virginia 23255
804-747-5200 - Phone
804-747-6085 - Fax
jowen@hccw.com
jpalmer@hccw.com
jdunnigan@hccw.com
isowell@hccw.com
yklinovskiy@hccw.com

## CERTIFICATE

I hereby certify that a true copy of the foregoing was sent via U.S. Mail and email this 21st day of April, 2025 to:

Kevin Biniazan, Esq.(VSB No. 92109)
Jeffrey A. Breit, Esq. (VSB No. 18876)
Don Scott, Esq. (VSB No. 88725)
Scott M. Perry, Esq. (VSB No. 67417)
Lauren A. Martin, Esq. (VSB No. 93653)
Alexis Bale Esq. (VSB No. 100318)
Breit Biniazan, P.C.
Towne Pavillion Center II
600 22nd Street, Suite 402
Virginia Beach, VA 23451-4088
757-622-6000 - Phone
757-299-8028 - Fax
Kevin@bbtrial.com
Jeffrey@bbtrial.com
don@bbtrial.com
scott@bbtrial.com
lmartin@bbtrial.com
abale@bbtrial.com

Julie S. Palmer

VIRGINIA:

IN THE CIRCUIT COURT FOR THE CITY OF RICHMOND

JONATHAN CLARKE,

    Plaintiff,

v.                                                        Case No. CL24002853-00

3M COMPANY (F/K/A MINNESOTA
MINING AND MANUFACTURING
COMPANY), et al.,

    Defendants.

## **ANSWER OF BLUE RIDGE RESCUE SUPPLIERS, INC.**

    Blue Ridge Rescue Suppliers, Inc. ("Blue Ridge") by and through undersigned counsel, states as follows for its Answer to Plaintiff's Amended Complaint:

    1.    In responses to Plaintiff's first unnumbered paragraph of the Amended Complaint, Blue Ridge denies that Plaintiff is entitled to any recovery under any theory against it.

    2.    Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 1 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

    3.    Blue Ridge denies the allegations contained in Paragraph 2 of Plaintiff's Amended Complaint.

    4.    Blue Ridge avers that Paragraph 3 of Plaintiff's Amended Complaint seeks expert opinion thereby requiring no response. To the extent a response is required, Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in

1

Paragraph 3 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

5.      Blue Ridge avers that Paragraph 4 of Plaintiff's Amended Complaint seeks expert opinion thereby requiring no response. To the extent a response is required, Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 4 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

6.      Blue Ridge avers that Paragraph 5 of Plaintiff's Amended Complaint seeks expert opinion thereby requiring no response. To the extent a response is required, Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 5 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

7.      Blue Ridge denies the allegations contained in Paragraph 6 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge expressly denies that Plaintiff was exposed to harmful levels of PFAS from any product for which Blue Ridge may be held liable. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the remaining allegations contained in Paragraph 6 of Plaintiff's Amended Complaint that pertain to the other defendants; therefore, it denies those allegations and calls for strict proof thereof.

8.      In response to Paragraph 7 of Plaintiff's Amended Complaint, Blue Ridge admits that it has sold turnouts designed for firefighters and that it has sold some turnouts to fire departments in Virginia. Blue Ridge avers that the allegations contained in Paragraph 7 of Plaintiff's Amended Complaint concerning the alleged nature and impact of PFAS seek expert opinion, thereby requiring no response. Blue Ridge denies the allegations contained in Paragraph

2

8 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge expressly denies that Plaintiff was exposed to harmful levels of PFAS from any product for which Blue Ridge may be held liable. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the remaining allegations contained in Paragraph 7 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

9.      Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 8 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof. Blue Ridge expressly denies that Plaintiff was exposed to harmful levels of PFAS from any product for which Blue Ridge may be held liable.

10.     In response to Paragraph 9 of Plaintiff's Amended Complaint, Blue Ridge denies that the Plaintiff was exposed to harmful levels of PFAS for which Blue Ridge may be held liable. Blue Ridge avers that the allegations contained in Paragraph 9 of Plaintiff's Amended Complaint, as phrased, state legal conclusions, thereby requiring no response.

11.     Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 10 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof. Blue Ridge expressly denies that Plaintiff was exposed to harmful levels of PFAS from any product for which Blue Ridge may be held liable.

12.     Blue Ridge denies the allegations contained in Paragraph 11 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 11 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

3

13.    Blue Ridge lacks information to form a belief as to the truth or falsity of the allegations contained in Paragraph 12 of Plaintiff's Amended Complaint; therefore it denies those allegations and calls for strict proof thereof. Blue Ridge expressly denies that Plaintiff was exposed to harmful levels of PFAS from any product for which Blue Ridge may be held liable.

14.    The allegations contained in Paragraph 13 of Plaintiff's Amended Complaint are not directed at Blue Ridge; therefore, no response is required. To the extent a response is required, Blue Ridge lacks information sufficient to admit or deny the allegations; therefore, the allegations are denied.

15.    The allegations contained in Paragraph 14 of Plaintiff's Amended Complaint are not directed at Blue Ridge; therefore, no response is required. To the extent a response is required, Blue Ridge lacks information sufficient to admit or deny the allegations; therefore, the allegations are denied.

16.    The allegations contained in Paragraph 15 of Plaintiff's Amended Complaint are not directed at Blue Ridge; therefore, no response is required. To the extent a response is required, Blue Ridge lacks information sufficient to admit or deny the allegations; therefore, the allegations are denied.

17.    The allegations contained in Paragraph 16 of Plaintiff's Amended Complaint are not directed at Blue Ridge; therefore, no response is required. To the extent a response is required, Blue Ridge lacks information sufficient to admit or deny the allegations; therefore, the allegations are denied.

18.    In response to Paragraph 17 of Plaintiff's Amended Complaint, Blue Ridge avers that it previously was a Virginia stock corporation doing business in the Commonwealth of Virginia. Blue Ridge avers that in January 2023, it entered into an Asset Purchase Agreement

whereby Municipal Emergency Services, Inc. purchased its assets. Therefore, Blue Ridge is no longer in the business of selling turnouts and firefighting related products.

19.     The allegations contained in Paragraph 18 of Plaintiff's Amended Complaint are not directed at Blue Ridge; therefore, no response is required. To the extent a response is required, Blue Ridge lacks information sufficient to admit or deny the allegations; therefore, the allegations are denied.

20.     The allegations contained in Paragraph 19 of Plaintiff's Amended Complaint are not directed at Blue Ridge; therefore, no response is required. To the extent a response is required, Blue Ridge lacks information sufficient to admit or deny the allegations; therefore, the allegations are denied.

21.     The allegations contained in Paragraph 20 of Plaintiff's Amended Complaint are not directed at Blue Ridge; therefore, no response is required. To the extent a response is required, Blue Ridge lacks information sufficient to admit or deny the allegations; therefore, the allegations are denied.

22.     The allegations contained in Paragraph 21 of Plaintiff's Amended Complaint are not directed at Blue Ridge; therefore, no response is required. To the extent a response is required, Blue Ridge lacks information sufficient to admit or deny the allegations; therefore, the allegations are denied.

23.     The allegations contained in Paragraph 22 of Plaintiff's Amended Complaint are not directed at Blue Ridge; therefore, no response is required. To the extent a response is required, Blue Ridge lacks information sufficient to admit or deny the allegations; therefore, the allegations are denied.

24.     The allegations contained in Paragraph 23 of Plaintiff's Amended Complaint are not directed at Blue Ridge; therefore, no response is required. To the extent a response is required, Blue Ridge lacks information sufficient to admit or deny the allegations; therefore, the allegations are denied.

25.     The allegations contained in Paragraph 24 of Plaintiff's Amended Complaint are not directed at Blue Ridge; therefore, no response is required. To the extent a response is required, Blue Ridge lacks information sufficient to admit or deny the allegations; therefore, the allegations are denied.

26.     The allegations contained in Paragraph 25 of Plaintiff's Amended Complaint are not directed at Blue Ridge; therefore, no response is required. To the extent a response is required, Blue Ridge lacks information sufficient to admit or deny the allegations; therefore, the allegations are denied.

27.     The allegations contained in Paragraph 26 of Plaintiff's Amended Complaint are not directed at Blue Ridge; therefore, no response is required. To the extent a response is required, Blue Ridge lacks information sufficient to admit or deny the allegations; therefore, the allegations are denied.

28.     The allegations contained in Paragraph 27 of Plaintiff's Amended Complaint are not directed at Blue Ridge; therefore, no response is required. To the extent a response is required, Blue Ridge lacks information sufficient to admit or deny the allegations; therefore, the allegations are denied.

29.     The allegations contained in Paragraph 28 of Plaintiff's Amended Complaint are not directed at Blue Ridge; therefore, no response is required. To the extent a response is

required, Blue Ridge lacks information sufficient to admit or deny the allegations; therefore, the allegations are denied.

30.    The allegations contained in Paragraph 29 of Plaintiff's Amended Complaint are not directed at Blue Ridge; therefore, no response is required. To the extent a response is required, Blue Ridge lacks information sufficient to admit or deny the allegations; therefore, the allegations are denied.

31.    The allegations contained in Paragraph 30 of Plaintiff's Amended Complaint are not directed at Blue Ridge; therefore, no response is required. To the extent a response is required, Blue Ridge lacks information sufficient to admit or deny the allegations; therefore, the allegations are denied.

32.    The allegations contained in Paragraph 31 of Plaintiff's Amended Complaint are not directed at Blue Ridge; therefore, no response is required. To the extent a response is required, Blue Ridge lacks information sufficient to admit or deny the allegations; therefore, the allegations are denied.

33.    The allegations contained in Paragraph 32 of Plaintiff's Amended Complaint are not directed at Blue Ridge; therefore, no response is required. To the extent a response is required, Blue Ridge lacks information sufficient to admit or deny the allegations; therefore, the allegations are denied.

34.    The allegations contained in Paragraph 33 of Plaintiff's Amended Complaint are not directed at Blue Ridge; therefore, no response is required. To the extent a response is required, Blue Ridge lacks information sufficient to admit or deny the allegations; therefore, the allegations are denied.

## JURISDICTION AND VENUE

35.      Blue Ridge avers that Paragraph 34 of Plaintiff's Amended Complaint contains legal conclusions, thereby requiring no response. To the extent a response is required, Blue Ridge avers that it is not challenging the Court's exercise of personal jurisdiction over it in this case. Blue Ridge lacks information sufficient to form a belief as to the truth or the falsity of the allegations contained in Paragraph 34 of Plaintiff's Amended Complaint as they pertain to the other defendants; therefore, it denies those allegations.

36.      Blue Ridge avers that Paragraph 35 of Plaintiff's Amended Complaint contains legal conclusions, thereby requiring no response. To the extent a response is required, Blue Ridge avers that it is not challenging the Court's exercise of personal jurisdiction over it in this case. Blue Ridge lacks information sufficient to form a belief as to the truth or the falsity of the allegations contained in Paragraph 35 of Plaintiff's Amended Complaint as they pertain to the other defendants; therefore, it denies those allegations.

37.      Blue Ridge avers that Paragraph 36 of Plaintiff's Amended Complaint contains legal conclusions, thereby requiring no response. To the extent a response is required, Blue Ridge avers that it is not challenging the Court's exercise of personal jurisdiction over it in this case. Blue Ridge lacks information sufficient to form a belief as to the truth or the falsity of the allegations contained in Paragraph 36 of Plaintiff's Amended Complaint as they pertain to the other defendants; therefore, it denies those allegations.

38.      Blue Ridge denies the allegations contained in Paragraph 37 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or the falsity of the allegations contained in Paragraph 37 of Plaintiff's Amended Complaint as they pertain to the other defendants; therefore, it denies those allegations.

8

39.    Blue Ridge avers that Paragraph 38 of Plaintiff's Amended Complaint contains legal conclusions; thereby requiring no response. To the extent a response is required, Blue Ridge avers that it is not challenging venue in this case. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 38 of Plaintiff's Amended Complaint as they pertain to the other defendants; therefore, it denies those allegations.

40.    Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 39 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

41.    Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 40 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

42.    Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 41 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

43.    In response to Paragraph 42 of Plaintiff's Amended Complaint, Blue Ridge avers that it has sold turnouts designed for firefighters and that it has sold some turnouts to fire departments in Virginia. Blue Ridge denies the allegations contained in Paragraph 42 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge expressly denies that Plaintiff was exposed to harmful levels of PFAS from any product for which Blue Ridge may be held liable. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the remaining allegations contained in Paragraph 42 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

44.     Blue Ridge avers that Paragraph 43 of Plaintiff's Amended Complaint seeks expert opinion, thereby requiring no response. To the extent a response is required, Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 43 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

45.     Upon information and belief, Blue Ridge admits the allegations contained in Paragraph 44 of Plaintiff's Amended Complaint.

46.     Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 45 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

47.     Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 46 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

48.     Blue Ridge avers that Paragraph 47 of Plaintiff's Amended Complaint seeks expert opinion, thereby requiring no response. To the extent that a response is required, Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 47 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof. Blue Ridge expressly denies that Plaintiff was exposed to harmful levels of PFAS from any product for which Blue Ridge may be held liable.

49.     Blue Ridge avers that Paragraph 48 of Plaintiff's Amended Complaint seeks expert opinion, thereby requiring no response. To the extent that a response is required, Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 48 of Plaintiff's Amended Complaint; therefore, it denies those

10

allegations and calls for strict proof thereof. Blue Ridge expressly denies that Plaintiff was exposed to harmful levels of PFAS from any product for which Blue Ridge may be held liable.

50.     Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 49 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof. Blue Ridge expressly denies that Plaintiff was exposed to harmful levels of PFAS from any product for which Blue Ridge may be held liable.

51.     Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 50 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof. Blue Ridge expressly denies that Plaintiff was exposed to harmful levels of PFAS from any product for which Blue Ridge may be held liable.

52.     Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 51 of Plaintiff's Amended Complaint; therefore it denies those allegations and calls for strict proof thereof.

53.     Blue Ridge avers that Paragraph 52 of Plaintiff's Amended Complaint seeks expert opinion, thereby requiring no response. To the extent that a response is required, Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 52 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof. Blue Ridge expressly denies that Plaintiff was exposed to harmful levels of PFAS from any product for which Blue Ridge may be held liable.

54.     Blue Ridge avers that Paragraph 53 of Plaintiff's Amended Complaint seeks expert opinion, thereby requiring no response. To the extent that a response is required, Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 53 of Plaintiff's Amended Complaint; therefore, it denies those

11

allegations and calls for strict proof thereof. Blue Ridge expressly denies that Plaintiff was exposed to harmful levels of PFAS from any product for which Blue Ridge may be held liable.

55.     Blue Ridge avers that Paragraph 54 of Plaintiff's Amended Complaint seeks expert opinion, thereby requiring no response. To the extent that a response is required, Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 54 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof. Blue Ridge expressly denies that Plaintiff was exposed to harmful levels of PFAS from any product for which Blue Ridge may be held liable.

56.     Blue Ridge avers that Paragraph 55 of Plaintiff's Amended Complaint seeks expert opinion, thereby requiring no response. To the extent that a response is required, Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 55 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof. Blue Ridge expressly denies that Plaintiff was exposed to harmful levels of PFAS from any product for which Blue Ridge may be held liable.

57.     Blue Ridge avers that Paragraph 56 of Plaintiff's Amended Complaint seeks expert opinion, thereby requiring no response. To the extent that a response is required, Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 56 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof. Blue Ridge expressly denies that Plaintiff was exposed to harmful levels of PFAS from any product for which Blue Ridge may be held liable.

58.     Blue Ridge avers that Paragraph 57 of Plaintiff's Amended Complaint seeks expert opinion, thereby requiring no response. To the extent that a response is required, Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations

12

contained in Paragraph 57 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof. Blue Ridge expressly denies that Plaintiff was exposed to harmful levels of PFAS from any product for which Blue Ridge may be held liable.

59. In response to Paragraph 58 of Plaintiff's Amended Complaint, Blue Ridge avers that it has sold turnouts designed for firefighters and that it has sold some turnouts to fire departments in Virginia. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 58 that pertain to it; therefore, it denies those allegations. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the remaining allegations that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

60. Blue Ridge lacks information sufficient to form a belief as to the truth or the falsity of the allegations contained in Paragraph 59 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

61. Blue Ridge lacks information sufficient to form a belief as to the truth or the falsity of the allegations contained in Paragraph 60 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

62. In response to Paragraph 61 of Plaintiff's Amended Complaint, Blue Ridge admits, upon information and belief, that Globe manufactures turnouts. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the remaining allegations contained in Paragraph 61 of Plaintiff's Amended Complaint and calls for strict proof thereof.

63. Blue Ridge lacks information sufficient to form a belief as to the truth or the falsity of the allegations contained in Paragraph 62 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

64.    In response to Paragraph 63 of Plaintiff's Amended Complaint, Blue Ridge admits, upon information and belief, that Honeywell manufactures turnouts. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the remaining allegations contained in Paragraph 63 of Plaintiff's Amended Complaint and calls for strict proof thereof.

65.    Blue Ridge denies the allegations contained in Paragraph 64 of Plaintiff's Amended Complaint that pertain to it, including sub-paragraphs (a) through (j). Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the remaining allegations contained in Paragraph 64 of Plaintiff's Amended Complaint that pertain to other defendants, including sub-paragraphs (a) through (j); therefore, it denies those allegations and calls for strict proof thereof.

66.    Blue Ridge denies the allegations contained in Paragraph 65 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the remaining allegations contained in Paragraph 65 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

67.    Blue Ridge denies the allegations contained in Paragraph 66 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the remaining allegations contained in Paragraph 66 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

68.    Blue Ridge lacks information sufficient to form a belief as to the truth or the falsity of the allegations contained in Paragraph 67 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

69.    As phrased, Blue Ridge denies the allegations contained in Paragraph 68 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 68 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

70.    Blue Ridge denies the allegations contained in Paragraph 69 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 69 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

71.    Blue Ridge lacks information sufficient to form a belief as to the truth or the falsity of the allegations contained in Paragraph 70 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

72.    Blue Ridge denies the allegations contained in Paragraph 71 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 71 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

73.    Blue Ridge lacks information sufficient to form a belief as to the truth or the falsity of the allegations contained in Paragraph 72 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

74.    Blue Ridge denies the allegations contained in Paragraph 73 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 73 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

75.    Blue Ridge lacks information sufficient to form a belief as to the truth or the falsity of the allegations contained in Paragraph 74 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

76.    Blue Ridge lacks information sufficient to form a belief as to the truth or the falsity of the allegations contained in Paragraph 75 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

77.    Blue Ridge denies the allegations contained in Paragraph 76 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 76 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

78.    Blue Ridge lacks information sufficient to form a belief as to the truth or the falsity of the allegations contained in Paragraph 77 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

79.    Blue Ridge denies the allegations contained in Paragraph 78 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 78 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

80.    Blue Ridge lacks information sufficient to form a belief as to the truth or the falsity of the allegations contained in Paragraph 79 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

81.     Blue Ridge lacks information sufficient to form a belief as to the truth or the falsity of the allegations contained in Paragraph 80 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

82.     Blue Ridge lacks information sufficient to form a belief as to the truth or the falsity of the allegations contained in Paragraph 81 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

83.     Blue Ridge denies the allegations contained in Paragraph 82 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 82 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

84.     As phrased, Blue Ridge denies the allegations contained in Paragraph 83 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 83 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

85.     Blue Ridge denies the allegations contained in Paragraph 84 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 84 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

86.     Blue Ridge denies the allegations contained in Paragraph 85 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as

to the truth or falsity of the allegations contained in Paragraph 85 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

87.     In response to the allegations contained in Paragraph 86 of Plaintiff's Amended Complaint, Blue Ridge avers that the labels on the turnouts worn by Plaintiff, if any, speak for themselves. Blue Ridge denies any characterization of such labels that are inconsistent with their terms.

88.     Blue Ridge lacks information sufficient to form a belief as to the truth or the falsity of the allegations contained in Paragraph 87 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

89.     Blue Ridge denies the allegations contained in Paragraph 88 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 88 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

90.     Blue Ridge denies the allegations contained in Paragraph 89 of Plaintiff's Amended Complaint that pertain to it, including sub-paragraphs (a) through (c). Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 89 of Plaintiff's Amended Complaint that pertain to other defendants including sub-paragraphs (a) through (c); therefore, it denies those allegations and calls for strict proof thereof.

91.     Blue Ridge denies the allegations contained in Paragraph 90 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 90 of Plaintiff's Amended

18

Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

92.    Blue Ridge lacks information sufficient to form a belief as to the truth or the falsity of the allegations contained in Paragraph 91 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

93.    Blue Ridge denies the allegations contained in Paragraph 92 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 92 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

94.    Blue Ridge lacks information sufficient to form a belief as to the truth or the falsity of the allegations contained in Paragraph 93 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

95.    Blue Ridge lacks information sufficient to form a belief as to the truth or the falsity of the allegations contained in Paragraph 94 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

96.    Blue Ridge lacks information sufficient to form a belief as to the truth or the falsity of the allegations contained in Paragraph 95 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

97.    Blue Ridge lacks information sufficient to form a belief as to the truth or the falsity of the allegations contained in Paragraph 96 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

98.     Blue Ridge lacks information sufficient to form a belief as to the truth or the falsity of the allegations contained in Paragraph 97 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

99.     Blue Ridge denies the allegations contained in Paragraph 98 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 98 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

100.    Blue Ridge lacks information sufficient to form a belief as to the truth or the falsity of the allegations contained in Paragraph 99 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

101.    Blue Ridge lacks information sufficient to form a belief as to the truth or the falsity of the allegations contained in Paragraph 100 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

102.    Blue Ridge lacks information sufficient to form a belief as to the truth or the falsity of the allegations contained in Paragraph 101 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

103.    Blue Ridge lacks information sufficient to form a belief as to the truth or the falsity of the allegations contained in Paragraph 102 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

104.    Blue Ridge denies the allegations contained in Paragraph 103 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 103 of Plaintiff's Amended

Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

105.    Blue Ridge denies the allegations contained in Paragraph 104 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 104 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

106.    In response to Paragraph 105 of Plaintiff's Amended Complaint, Blue Ridge admits that firefighters provide a valuable and laudable service to the community. Blue Ridge avers that the remaining statements in Paragraph 105 of Plaintiff's Amended Complaint do not state the proper legal standard applicable to the allegations and claims made, and otherwise require no response. Blue Ridge expressly denies that the Plaintiff was exposed to harmful levels of PFAS from any product for which Blue Ridge may be held liable.

107.    Blue Ridge avers that Paragraph 106 of Plaintiff's Amended Complaint requires no response. To the extent a response is required, Blue Ridge expressly denies that Plaintiff was exposed to harmful levels of PFAS from any product for which Blue Ridge may be held liable.

108.    In responses to Paragraph 107 of Plaintiff's Amended Complaint, Blue Ridge restates and incorporates its responses to all allegations asserted in the Amended Complaint.

109.    In response to Paragraph 108 of Plaintiff's Amended Complaint, Blue Ridge avers that it has sold turnouts designed for firefighters and that it has sold some turnouts to fire departments in Virginia. Blue Ridge denies the allegations contained in paragraph 108 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 108

of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

110.    In response to Paragraph 109 of Plaintiff's Amended Complaint, Blue Ridge avers that it has sold turnouts designed for firefighters and that it has sold some turnouts to fire departments in Virginia. Blue Ridge denies the allegations contained in paragraph 109 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 109 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

111.    Blue Ridge denies the allegations contained in Paragraph 110 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 110 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

112.    Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 111 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

113.    Blue Ridge denies the allegations contained in Paragraph 112 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 112 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

114. Blue Ridge denies the allegations contained in Paragraph 113 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 113 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

115. Blue Ridge denies the allegations contained in Paragraph 114 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 114 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

116. Blue Ridge denies the allegations contained in Paragraph 115 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 115 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

117. Blue Ridge denies the allegations contained in Paragraph 116 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 116 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

a. Blue Ridge denies the allegations contained in sub-paragraph (a) of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in sub-paragraph (a) of Plaintiff's

23

Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

b. Blue Ridge denies the allegations contained in sub-paragraph (b) of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in sub-paragraph (b) of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

c. Blue Ridge denies the allegations contained in sub-paragraph (c) of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in sub-paragraph (c) of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

d. Blue Ridge denies the allegations contained in Paragraph subparagraph (d) of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in sub-paragraph (d) of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

e. Blue Ridge denies the allegations contained in sub-paragraph (e) of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in sub-paragraph (e) of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

24

f. Blue Ridge avers that the allegations contained in sub-paragraph (f) of Plaintiff's Amended Complaint seek expert opinion, thereby requiring no response. To the extent a response is required, Blue Ridge denies the allegations contained in sub-paragraph (f) of Plaintiff's Amended Complaint and calls for strict proof thereof.

118.    Blue Ridge denies the allegations contained in Paragraph 117 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 117 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

119.    Blue Ridge denies the allegations contained in Paragraph 118 of Plaintiff's Amended Complaint.

120.    Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 119 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

121.    Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 120 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

122.    Blue Ridge denies the allegations contained in Paragraph 121 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 121 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

123.    Blue Ridge denies the allegations contained in Paragraph 122 of Plaintiff's' Amended Complaint.

124.    Blue Ridge denies the allegations contained in Paragraph 123 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 123 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

125.    Blue Ridge denies the allegations contained in Paragraph 124 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 124 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

126.    Blue Ridge denies the allegations contained in Paragraph 125 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 125 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

127.    Blue Ridge denies the allegations contained in Paragraph 126 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 126 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

128.    Blue Ridge denies the allegations contained in Paragraph 127 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 127 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

129.    Blue Ridge avers that Paragraph 128 of Plaintiff's Amended Complaint requires no response. To the extent a response is required, Blue Ridge expressly denies that the Plaintiff was exposed to harmful levels of PFAS from any product for which Blue Ridge may be held liable.

130.    In response to Paragraph 129 of Plaintiff's Amended Complaint, Blue Ridge restates and incorporates its responses to all allegations asserted in the Amended Complaint.

131.    Blue Ridge denies the allegations contained in Paragraph 130 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 130 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

132.    Blue Ridge denies the allegations contained in Paragraph 131 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 131 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

133.    In response to Paragraph 132 of Plaintiff's Amended Complaint, Blue Ridge admits that it has sold turnouts designed for firefighters and that it has sold some turnouts to fire

27

departments in Virginia. As phrased, Blue Ridge denies the allegations contained in Paragraph 132 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 132 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

134.    Blue Ridge denies the allegations contained in Paragraph 133 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 133 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

135.    Blue Ridge denies the allegations contained in Paragraph 134 of Plaintiff's Amended Complaint.

136.    Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 135 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

137.    Blue Ridge denies the allegations contained in Paragraph 136 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 136 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

138.    Blue Ridge denies the allegations contained in Paragraph 137 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 137 of Plaintiff's Amended

Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

139.    Blue Ridge denies the allegations contained in Paragraph 138 of Plaintiff's Amended Complaint that pertain to it, including sub-paragraphs (a) through (d). Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 138 of Plaintiff's Amended Complaint, including sub-paragraphs (a) through (d) that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

140.    Blue Ridge denies the allegations contained in Paragraph 139 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 139 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

141.    Blue Ridge denies the allegations contained in Paragraph 140 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 140 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

142.    Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 141 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

143.    Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 142 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

144.    Blue Ridge denies the allegations contained in Paragraph 143 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 143 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

145.    Blue Ridge denies the allegations contained in Paragraph 144 of Plaintiff's Amended Complaint.

146.    Blue Ridge denies the allegations contained in Paragraph 145 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 145 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

147.    Blue Ridge denies the allegations contained in Paragraph 146 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 146 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

148.    Blue Ridge denies the allegations contained in Paragraph 147 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 147 of Plaintiff's Amended

Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

149.     Blue Ridge denies the allegations contained in Paragraph 148 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 148 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

150.     Blue Ridge denies the allegations contained in Paragraph 149 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 149 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

151.     Blue Ridge denies the allegations contained in Paragraph 150 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 150 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

152.     Blue Ridge avers that Paragraph 151 of Plaintiff's Amended Complaint requires no response. To the extent a response is required, Blue Ridge expressly denies that Plaintiff was exposed to harmful levels of PFAS from any product for which Blue Ridge may be held liable.

153.     In response to Paragraph 152 of Plaintiff's Amended Complaint, Blue Ridge restates and incorporates its responses to all allegations asserted in the Amended Complaint.

154. Blue Ridge avers that Paragraph 153 of Plaintiff's Amended Complaint contains legal conclusions to which no response is required. To the extent a response is required, Blue Ridge denies the allegations contained in Paragraph 153 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 153 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

155. Blue Ridge avers that Paragraph 154 of Plaintiff's Amended Complaint contains legal conclusions to which no response is required. To the extent a response is required, Blue Ridge denies the allegations contained in Paragraph 154 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 154 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

156. Blue Ridge avers that Paragraph 155 of Plaintiff's Amended Complaint contains legal conclusions to which no response is required. To the extent a response is required, Blue Ridge denies the allegations contained in Paragraph 155 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 155 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

157. Blue Ridge avers that Paragraph 156 of Plaintiff's Amended Complaint contains legal conclusions to which no response is required. To the extent a response is required, Blue Ridge denies the allegations contained in Paragraph 156 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of

the allegations contained in Paragraph 156 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

158.    Blue Ridge denies the allegations contained in Paragraph 157 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 157 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

159.    Blue Ridge denies the allegations contained in Paragraph 158 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 158 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

160.    Blue Ridge denies the allegations contained in Paragraph 159 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 159 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

161.    Blue Ridge denies the allegations contained in Paragraph 160 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 160 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

162.   Blue Ridge denies the allegations contained in Paragraph 161 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 161 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

163.   Blue Ridge denies the allegations contained in Paragraph 162 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 162 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

164.   Blue Ridge denies the allegations contained in Paragraph 163 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 163 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

165.   Blue Ridge denies the allegations contained in Paragraph 164 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 164 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

166.   Blue Ridge denies the allegations contained in Paragraph 165 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 165 of Plaintiff's Amended

Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

167.    Blue Ridge denies the allegations contained in Paragraph 166 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 166 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

168.    Blue Ridge denies the allegations contained in Paragraph 167 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 167 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

169.    Blue Ridge denies the allegations contained in Paragraph 168 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 168 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

170.    Blue Ridge denies the allegations contained in Paragraph 169 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 169 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

171.    Blue Ridge avers that Paragraph 170 of Plaintiff's Amended Complaint requires no response. To the extent a response is required, Blue Ridge expressly denies that Plaintiff was exposed to harmful levels of PFAS from any product for which Blue Ridge may be held liable.

172.    In response to Paragraph 171 of Plaintiff's Amended Complaint, Blue Ridge restates and incorporates its responses to all allegations asserted in Plaintiff's Amended Complaint.

173.    Blue Ridge avers that Paragraph 172 of Plaintiff's Amended Complaint contains legal conclusions to which no response is required. To the extent a response is required, Blue Ridge denies the allegations contained in Paragraph 172 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 172 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

174.    Blue Ridge avers that Paragraph 173 of Plaintiff's Amended Complaint contains legal conclusions to which no response is required. To the extent a response is required, Blue Ridge denies the allegations contained in Paragraph 173 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 173 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

175.    Blue Ridge avers that Paragraph 174 of Plaintiff's Amended Complaint contains legal conclusions to which no response is required. To the extent a response is required, Blue Ridge denies the allegations contained in Paragraph 174 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of

36

the allegations contained in Paragraph 174 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

176. Blue Ridge avers that Paragraph 175 of Plaintiff's Amended Complaint contains legal conclusions to which no response is required. To the extent a response is required, Blue Ridge denies the allegations contained in Paragraph 175 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 175 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

177. Blue Ridge denies the allegations contained in Paragraph 176 of Plaintiff's Amended Complaint that pertain to it, including sub-paragraphs (a) through (c). Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 176 of Plaintiff's Amended Complaint that pertain to other defendants, including sub-paragraphs (a) through (c) ; therefore, it denies those allegations and calls for strict proof thereof.

178. Blue Ridge denies the allegations contained in Paragraph 177 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 177 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

179. Blue Ridge denies the allegations contained in Paragraph 178 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 178 of Plaintiff's Amended

Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

180.    Blue Ridge denies the allegations contained in Paragraph 179 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 179 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

181.    Blue Ridge denies the allegations contained in Paragraph 180 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 180 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

182.    Blue Ridge avers that Paragraph 181 of Plaintiff's Complain contains legal conclusions to which no response is required. To the extent a response is required, Blue Ridge denies the allegations contained in Paragraph 181 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 181 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

183.    Blue Ridge avers that Paragraph 182 of Plaintiff's Complain contains legal conclusions to which no response is required. To the extent a response is required, Blue Ridge denies the allegations contained in Paragraph 182 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the

allegations contained in Paragraph 182 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

184.    In response to Paragraph 183 of Plaintiff's Amended Complaint, Blue Ridge restates and incorporates its responses to all allegations asserted in the Amended Complaint.

185.    Blue Ridge denies the allegations contained in Paragraph 184 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 184 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

186.    Blue Ridge denies the allegations contained in Paragraph 185 of Plaintiff's Amended Complaint that pertains to it, including sub-paragraphs (a) through (g). Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 185 of Plaintiff's Amended Complaint that pertain to other Defendants, including sub-paragraphs (a) through (g); therefore, it denies those allegations and calls for strict proof thereof.

187.    Blue Ridge denies the allegations contained in the WHEREFORE Paragraphs of Plaintiff's Amended Complaint.

188.    Blue Ridge denies that Plaintiff is entitled to the relief sought in the WHEREFORE Paragraphs of Plaintiff's Amended Complaint.

189.    Blue Ridge denies all allegations not expressly admitted herein.

190.    Blue Ridge denies that it is indebted to Plaintiff in the amount claimed, or any amount, for the reasons stated or for any other reason.

191.    Blue Ridge denies that it committed any act of negligence that was a proximate cause of Plaintiff's alleged injuries.

192.    Blue Ridge avers that the exposures in question, if any, and Plaintiff's damages, if any, were caused by the acts and/or omissions of third parties over whom Blue Ridge has no control and for whom Blue Ridge is not responsible at law.

193.    Blue Ridge avers that Plaintiff's alleged damages were directly and proximately caused by the superseding, intervening acts and conduct of others, thereby precluding Plaintiff from recovery from Blue Ridge.

194.    Blue Ridge avers that it is entitled to a set-off from any sums recovered by or on behalf of Plaintiff by way of any settlement, judgment, or otherwise, which were, or are, entered into or received by Plaintiff from any party or non-party to this action.

195.    Blue Ridge avers that it acted in conformity with the existing state-of-the-art at all times relevant to this litigation.

196.    Blue Ridge avers that Plaintiff has failed to demonstrate that the alleged exposure to products supplied by Blue Ridge alone would have been sufficient to cause the injury/death at issue, as required under *Ford Motor Co. v. Boomer*, 285 Va. 141 (2013).

197.    To the extent they are supported by the evidence, Blue Ridge will rely upon the defenses of contributory negligence, assumption of the risk, the sophisticated user doctrine, lack of privity, limitation or disclaimer of warranties, and/or product misuse or abuse.

198.    Blue Ridge incorporates the defenses asserted by other defendants as such are applicable to Blue Ridge.

199.    Blue Ridge reserves the right to assert additional defenses or to supplement or amend this Answer, and to assert crossclaims, counterclaims, or third-party claims, upon ascertaining more definite facts during and upon completion of discovery and investigation.

200.    Blue Ridge expressly reserves the right to assert the defense of Statute of Limitations.

WHEREFORE, Defendant Blue Ridge Rescue Suppliers, Inc., by counsel, respectfully requests that this Court dismiss this action and award its costs incurred herein.

TRIAL BY JURY IS DEMANDED.

**BLUE RIDGE RESCUE SUPPLIERS, INC.**

By Counsel

John R. Owen (VSB No. 39560)
Julie S. Palmer (VSB No. 65800)
John P. Dunnigan (VSB No. 93483)
Imani E. Sowell (VSB No. 95982)
Yevgeniy K. Klinovskiy (VSB No. 98264)
Harman, Claytor, Corrigan & Wellman
P.O. Box 70280
Richmond, Virginia 23255
804-747-5200 - Phone
804-747-6085 - Fax
jowen@hccw.com
jpalmer@hccw.com
jdunnigan@hccw.com
isowell@hccw.com
yklinovskiy@hccw.com

41

# **C E R T I F I C A T E**

I hereby certify that a true copy of the foregoing was sent via U.S. Mail and email this 21st day of April, 2025 to:

Kevin Biniazan, Esq.(VSB No. 92109)
Jeffrey A. Breit, Esq. (VSB No. 18876)
Don Scott, Esq. (VSB No. 88725)
Scott M. Perry, Esq. (VSB No. 67417)
Lauren A. Martin, Esq. (VSB No. 93653)
Alexis Bale Esq. (VSB No. 100318)
Breit Biniazan, P.C.
Towne Pavillion Center II
600 22nd Street, Suite 402
Virginia Beach, VA 23451-4088
757-622-6000 - Phone
757-299-8028 - Fax
Kevin@bbtrial.com
Jeffrey@bbtrial.com
don@bbtrial.com
scott@bbtrial.com
lmartin@bbtrial.com
abale@bbtrial.com

Julie S. Palmer

42

# VIRGINIA: IN THE CIRCUIT COURT FOR THE CITY OF RICHMOND

**JONATHAN CLARKE**

**Plaintiff,**

**Civil Action No. CL24002853-00**

v.

**3M COMPANY (f/k/a Minnesota
Mining and Manufacturing Company);
AGC CHEMICALS AMERICAS, INC.;
AMEREX;
ARCHROMA U.S., INC.;
ARKEMA, INC.;
BASF CORPORATION;
BLUE RIDGE RESCUE SUPPLIERS, INC.;
BRADSDEN SOLUTIONS, INC.;
BUCKEYE FIRE EQUIPMENT COMPANY;
CARRIER GLOBAL CORPORATION;
CHEMDESIGN PRODUCTS, INC.;
CHEMGUARD, INC.;
CHEMICALS, INC.;
CHEMOURS COMPANY FC, LLC;
CLARIANT CORPORATION;
CORTEVA, INC.;
DAIKIN AMERICA, INC.;
DEEPWATER CHEMICALS, INC.;
DU PONT DE NEMOURS INC. (f/k/a
DOWDUPONT INC.);
DYNAX CORPORATION;
E.I. DU PONT DE NEMOURS AND
COMPANY;
FIRE SERVICE PLUS, INC.;
GLOBE MANUFACTURING COMPANY LLC;
HONEYWELL INTERNATIONAL, INC.;
HONEYWELL SAFETY PRODUCTS USA, INC.;
JOHNSON CONTROLS, INC;
KIDDIE P.L.C., INC.;
KIDDIE FENWAL, INC.;
LION GROUP, INC.;
MALLORY SAFETY AND SUPPLY, LLC;
MINE SAFETY APPLIANCES COMPANY, LLC;
MSA SAFETY SALES, LLC;
MUNICIPAL EMERGENCY SERVICES INC.;**

**NATION FORD CHEMICAL COMPANY;**
**NATIONAL FOAM, INC.;**
**PBI PERFORMANCE PRODUCTS, INC.;**
**SOUTHERN MILLS, INC.;**
**STEDFAST USA, INC.;**
**TENCATE PROTECTIVE FABRICS USA**
**d/b/a SOUTHERN MILLS INC.;**
**THE CHEMOURS COMPANY LLC;**
**TYCO FIRE PRODUCTS;**
**UNITED TECHNOLOGIES CORPORATION;**
**UTC FIRE & SECURITY AMERICAS**
**CORPORATION, INC. (f/k/a GE Interlogix, Inc.);**
**W.L. GORE & ASSOCIATES, INC.;**

    **Defendants.**

### ORDER GRANTING MOTION FOR LEAVE TO AMEND COMPLAINT

    CAME THIS DAY, Plaintiff Jonathan Clarke, by counsel, and moved this Court for leave to amend the Complaint filed herein to modify and remove certain statements, Defendants and factual allegations so as to simply and streamline this litigation process.

    IT APPEARING TO THE COURT that leave to amend the Complaint previously has not been sought or granted, the litigation is currently in its infant stages, and the Defendants will not be prejudiced if the Court grants Plaintiff's leave to amend, it is hereby ORDERED that Plaintiff's Motion for Leave to Amend their Complaint is GRANTED. The Amended Complaint, attached to Plaintiff's Motion for Leave as **Exhibit A**, is deemed filed on the date of entry of this Order.

    The clerk is directed to forward a certified copy of this Order to counsel of record.

Entered on _____ day of _____ 2025.

                _____

                   JUDGE

WE ASK FOR THIS

Kevin Biniazan, Esq. | VSB No. 92109
Jeffrey A. Breit, Esq. | VSB No. 18876
Don Scott, Esq. | VSB No. 88725
Scott M. Perry, Esq. | VSB No. 67417
Lauren Martin, Esq. | VSB No. 93653
Alexis Bale, Esq. | VSB No. 100318
BREIT BINIAZAN, PC
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, VA  23451
Telephone | 757.622.6000
Facsimile | 757.299.8028
Email | kevin@bbtrial.com
Email | jeffrey@bbtrial.com
Email | don@bbtrial.com
Email | scott@bbtrial.com
Email | lauren@bbtrial.com
Email | abale@bbtrial.com
*Counsel for Plaintiffs*

SEEN AND Not objected to

John R. Owen (VSB No. 39560)
Julie S. Palmer (VSB No. 65800)
John P. Dunnigan (VSB No. 93483)
Imani E. Sowell (VSB No. 95982)
Yevgeniy K. Klinovskiy (VSB No. 98264)
HARMON, CLAYTOR, CORRIGAN, & WELLMAN
P.O. Box 70280
Richmond, Virginia 23255
(804) 747-5200 – Phone
(804) 747-6085 – Fax
jowen@hccw.com
jpalmer@hccw.com
jdunnigan@hccw.com
isowell@hccw.com
yklinovskiy@hccw.com

*Counsel for Defendants Blue Ridge Rescue
Suppliers, Inc. and Bradsden Solutions, Inc.*

## VIRGINIA: IN THE CIRCUIT COURT FOR THE CITY OF RICHMOND

**JONATHAN CLARKE**

**Plaintiff,**

**Civil Action No. CL24002853-00**

v.

**TRIAL BY JURY DEMANDED**

**3M COMPANY (f/k/a Minnesota**
**Mining and Manufacturing Company);**
**AGC CHEMICALS AMERICAS, INC.;**
**ARCHROMA U.S., INC.;**
**ARKEMA, INC.;**
**BLUE RIDGE RESCUE SUPPLIERS, INC.;**
**BRADSDEN SOLUTIONS, INC.;**
**DAIKIN AMERICA, INC.;**
**E.I. DU PONT DE NEMOURS AND**
**COMPANY, a/k/a EDIP, Inc.;**
**GLOBE MANUFACTURING COMPANY LLC;**
**HONEYWELL INTERNATIONAL, INC.;**
**HONEYWELL SAFETY PRODUCTS USA, INC.;**
**LION GROUP, INC.;**
**MALLORY SAFETY AND SUPPLY, LLC;**
**MINE SAFETY APPLIANCES COMPANY, LLC;**
**MSA SAFETY SALES, LLC;**
**MUNICIPAL EMERGENCY SERVICES INC.;**
**PBI PERFORMANCE PRODUCTS, INC.;**
**STEDFAST USA, INC.;**
**TENCATE PROTECTIVE FABRICS USA**
**d/b/a SOUTHERN MILLS INC.;**
**THE CHEMOURS COMPANY LLC;**
**and**
**;**
**W.L. GORE & ASSOCIATES, INC.;**

**Defendants.**

## FIRST AMENDED COMPLAINT

COMES NOW Plaintiff Jonathan Clarke who moves this Honorable Court for judgment

against 3M COMPANY (f/k/a Minnesota Mining and Manufacturing Company); AGC



CHEMICALS AMERICAS, INC.; ARCHROMA U.S., INC.; ARKEMA, INC.; ; BLUE RIDGE RESCUE SUPPLIERS, INC.; BRADSDEN SOLUTIONS, INC.;

DAIKIN AMERICA, INC.;; E.I. DU PONT DE NEMOURS AND COMPANY, a/k/a EDIP, Inc.;.; GLOBE MANUFACTURING COMPANY LLC; HONEYWELL INTERNATIONAL, INC.; HONEYWELL SAFETY PRODUCTS USA, INC.;

LION GROUP, INC.; MALLORY SAFETY AND SUPPLY, LLC; MINE SAFETY APPLIANCES COMPANY, LLC; MSA SAFETY SALES, LLC; MUNICIPAL EMERGENCY SERVICES INC.;

PBI PERFORMANCE PRODUCTS, INC.; STEDFAST USA, INC.;

TENCATE PROTECTIVE FABRICS USA d/b/a SOUTHERN MILLS INC.; THE CHEMOURS COMPANY LLC;; and W.L. GORE & ASSOCIATES, INC., jointly and severally, for compensatory damages, punitive damages, costs of this action, and pre-judgment interest and post-judgment interest together with actual damages, treble damages, and attorney's fees pursuant to the Virginia Consumer Protection Act on the grounds set forth below:

## BACKGROUND

1.      Jonathan Clarke ("Plaintiff Clarke") is a firefighter who works for the Richmond Fire Department and serves the City of Richmond.

2.      Plaintiff Clarke brings this action for monetary damages and appropriate equitable and injunctive relief for harm resulting from exposure to per- and polyfluoroalkyl substances ("PFAS") that were manufactured, designed, sold, supplied, distributed and/or contained in protective clothing specifically designed for firefighters ("turnouts") manufactured, designed, sold supplied and/or distributed by each of the Defendants, individually or through their predecessors or subsidiaries.

2

3.      PFAS are human-made chemicals consisting of a chain of carbon and fluorine atoms used in manufactured products to, *inter alia*, resist and repel oil, stains, heat and water. PFAs include "long-chain" PFAS made up of seven or more carbon atoms ("long-chain PFAS") as well as "short-chain" PFAS made up of six or fewer carbon atoms ("short-chain PFAS").

4.      PFAS are known as "forever chemicals" because they are immune to degradation, bioaccumulate in individual organisms and humans, and increase in concentration up the food chain. PFAS exposure to humans can occur through inhalation, ingestion and dermal contact.

5.      PFAS have been associated with multiple and serious adverse health effects in humans including cancer, tumors, liver damage, immune system and endocrine disorders, high cholesterol, thyroid disease, ulcerative colitis, birth defects, decreased fertility, and pregnancy-induced hypertension. PFAS have also been found to concentrate in human blood, bones, and organs.

6.      Unbeknownst to Plaintiff Clarke, Defendants manufactured, marketed, distributed, sold, or used PFAS and PFAS-containing materials in protective clothing specifically designed for firefighters ("turnouts").

7.      For decades, Defendants were aware of the toxic nature of PFAS and the harmful impact these substances have on human health. Yet, Defendants manufactured, designed, marketed, sold, supplied, or distributed PFAS-containing turnouts, to firefighting training facilities and fire departments nationally, including in Virginia and in the City of Richmond. Defendants did so, moreover, without ever informing firefighters or the public that turnouts contained PFAS, and without warning firefighters or the public of the substantial and serious health injuries that can result from exposure to PFAS or PFAS-containing materials.

3

8.      Plaintiff wore turnouts in the usual and normal course of performing his firefighting duties and training and was repeatedly exposed to PFAS in his turnouts. Plaintiff did not know and, in the exercise of reasonable diligence, could not have known that these turnouts contained PFAS or PFAS-containing materials. Plaintiff Clarke also did not know that PFAS were in his body and blood.

9.      At all relevant times and continuing to the present, Defendants have represented that their turnouts are safe.

10.      Plaintiff Clarke used the turnouts as they were intended and in a foreseeable manner which exposed him to PFAS in the course of his firefighting activities. This repeated and extensive exposure to PFAS resulted in Plaintiff Clarke developing Leukemia.

11.      Defendants knowingly and willfully manufactured, designed, marketed, sold, and distributed chemicals and/or products containing PFAS for use within the State of Virginia when they knew or reasonably should have known that Plaintiff would repeatedly inhale, ingest, and/or have dermal contact with these harmful compounds during the ordinary course of his profession, including during firefighting training exercises and in firefighting emergencies, and that such exposure would threaten the health and welfare of firefighters exposed to these dangerous and hazardous chemicals.

## PARTIES

### *Plaintiff*

12.      Plaintiff Jonathan Clarke is an adult resident of the Commonwealth of Virginia. Plaintiff Clarke has worked as a firefighter, serving the City of Richmond since February 9, 2004. As a result of exposure to PFAS contained in his turnouts while working as a firefighter, Plaintiff Clarke was diagnosed with Leukemia on or around July 2022.

4

***Defendants***

13.     Defendant 3M Company (a/k/a Minnesota Mining and Manufacturing Company) ("3M") is a Delaware corporation that does business throughout the United States, including conducting business in Virginia. 3M has its principal place of business in St. Paul, Minnesota. 3M developed, manufactured, marketed, distributed, released, sold and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and in the City of Richmond.

14.     Defendant AGC Chemicals Americas, Inc. ("AGC") is a Delaware corporation that does business throughout the United States, including conducting business in Virginia by and through its introduction of its products and goods into the stream of commerce which it knew or had reason to know would enter, be sold, used, and consumed throughout the Commonwealth of Virginia. AGC has its principal place of business in Exton, Pennsylvania. AGC developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and in the City of Richmond.

15.     Defendant Archroma U.S., Inc. ("Archroma") is a North Carolina corporation that does business throughout the United States, including conducting business in Virginia. Archroma has its principal place of business in Charlotte, North Carolina. Archroma developed, manufactured, marketed, distributed, released, sold and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and in the City of Richmond.

16.     Defendant Arkema, Inc. ("Arkema") is a Pennsylvania corporation that does business throughout the United States, including conducting business in Virginia. Arkema has its principal place of business in King of Prussia, Pennsylvania. Arkema developed, manufactured,

5

marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and in the City of Richmond.

17.     Defendant Blue Ridge Rescue Suppliers, Inc. ("Blue Ridge") is or was a Virginia stock corporation doing business throughout the Commonwealth of Virginia by and through its sale and distribution of turnouts containing PFAS to the City of Richmond Fire Department to include Plaintiff Clarke.

18.     Defendant Bradsden Solutions, Inc. ("Bradsden"), is believed to be the acquiring company or the same corporate entity under a newly registered name as Blue Ridge Rescue Suppliers, Inc. Bradsden Solutions, Inc. is a Virginia stock corporation that did business throughout the Commonwealth of Virginia by and through its sale and distribution of turnouts containing PFAS to the City of Richmond Fire Department to include Plaintiff Clarke.

19.     Defendant Daikin America, Inc. ("Daikin America") is a Delaware corporation that does business throughout the United States, including conducting business in Virginia. Daikin America has its principal place of business in Orangeburg, New York. Daikin America developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and the City of Richmond.

20.     Defendant E.I. du Pont de Nemours & Co., also known as EIDP, Inc. ("DuPont"), is a Delaware corporation that does business throughout the United States, including conducting business in Virginia. DuPont has its principal place of business in Wilmington, Delaware. DuPont developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and in the City of Richmond.

6

21.  Defendant Globe Manufacturing Company, LLC ("Globe") is a New Hampshire corporation that does business throughout the United States, including conducting business in Virginia. Globe has its principal place of business in Pittsfield, New Hampshire. Globe developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and in the City of Richmond. Defendant Mine Safety Appliance Company acquired Globe Holding Company, LLC and its subsidiaries (collectively, "MSA/Globe") in 2017 and continues to do business under the Globe name.

22.  Defendant Honeywell International, Inc. ("Honeywell International") is a Delaware corporation that does business throughout the United States, including conducting business in Virginia. Honeywell Int'l has its principal place of business in Charlotte, North Carolina. Honeywell International developed manufactured, marketed, distributed, released, sold and/or used PFAS, PFAS materials, and products containing PFAS in turnouts including its Morning Pride branded turnout throughout Virginia including the City of Richmond.

23.  Defendant Honeywell Safety Products USA, Inc. ("Honeywell") is a Delaware corporation that does business throughout the United States, including conducting business in Virginia. Honeywell has its principal place of business in Charlotte, North Carolina. Honeywell developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts including its Morning Pride branded turnout throughout Virginia including the City of Richmond.

24.  Defendant Lion Group, Inc., ("Lion") is an Ohio corporation that does business throughout the United States, including conducting business in Virginia by and through its introduction of its products and goods into the stream of commerce which it knew or had reason

7

to know would enter, be sold, used, and consumed throughout the Commonwealth of Virginia. Lion has its principal place of business in Dayton, Ohio. Lion developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and the City of Richmond.

25.    Defendant Mallory Safety and Supply, LLC ("Mallory") is a California corporation that does business throughout the United States, including conducting business in Virginia. Mallory has its principal place of business in Portland, Oregon. Mallory developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and the City of Richmond.

26.    Defendant Mine Safety Appliance Company, LLC ("MSA/Globe") is a Pennsylvania corporation that does business throughout the United States, including conducting business in Virginia. MSA has its principal place of business in Cranberry Township, Pennsylvania. MSA acquired Globe Holding Company, LLC and its subsidiaries (collectively, "MSA/Globe") in 2017 and continues to do business under the Globe name. MSA developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and the City of Richmond.

27.    Defendant MSA Safety Sales, LLC ("MSA Safety Sales") is a Pennsylvania corporation that does business throughout the United States, including conducting business in Virginia. MSA has its principal place of business in Cranberry Township, Pennsylvania. MSA Safety Sales developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and the City of Richmond.

8

28.     Municipal Emergency Services, Inc. ("MES") is a Nevada corporation that does business throughout the United States, including conducting business in Virginia. MES has its principal place of business in Sandy Hook, Connecticut. MES developed, manufactured, marketed, · distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and the City of Richmond.

29.     Defendant PBI Performance Products, Inc., ("PBI") is a Delaware corporation that does business throughout the United States, including conducting business in Virginia. PBI has its principal place of business in Charlotte, North Carolina. PBI developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and City of Richmond.

30.     Defendant StedFast USA, Inc. ("StedFast") is a Delaware corporation that does business throughout the United States, including conducting business in Virginia. StedFast has its principal place of business in Piney Flats, Tennessee. StedFast developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and City of Richmond.

31.     Defendant TenCate Protective Fabrics USA d/b/a Southern Mills, Inc. ("Tencate") is a Georgia corporation that does business throughout the United States, including conducting business in Virginia by and through its introduction of its products and goods into the stream of commerce which it knew or had reason to know would enter, be sold, used, and consumed throughout the Commonwealth of Virginia. Tencate has its principal place of business in Senoia, Georgia. Tencate developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and the City of Richmond.

9

32.     Defendant The Chemours Company, LLC ("Chemours") is a Delaware corporation that does business throughout the United States, including conducting business in Virginia. Chemours has its principal place of business in Wilmington, Delaware. Chemours developed, manufactured, marketed, distributed, released, sold and/or used PFAS, PFAS materials, and products containing PFAS in turnouts including in Virginia and in the City of Richmond.

33.     Defendant W. L. Gore & Associates, Inc., ("Gore") is a Delaware corporation that does business throughout the United States, including conducting business in Virginia. Gore has its principal place of business in Newark, Delaware. Gore developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and in the City of Richmond.

## JURISDICTION AND VENUE

34.     This Court has personal jurisdiction over the Defendants pursuant to Va. Code § 8.01-328.1(A)(1)–(4), as the cause of action arises from the foreign Defendants' transacting business in Virginia, contracting to supply services or things in Virginia, causing tortious injury by an act or omission in Virginia, and causing tortious injury by an act or omission outside of Virginia when they regularly conduct business in Virginia.

35.     This Court has general and specific jurisdiction over Defendants, as they have purposefully availed themselves of the privileges of conducting business activities within Virginia through the marketing, sale, and distribution of products and services in Virginia, and/or profiting from such activity; they have purposefully directed activities towards Virginia and Virginia residents; and this litigation results from injuries that arose out of those activities.

36.     This Court has general and specific jurisdiction over Defendants by virtue of their purposeful, continuous, systematic contacts, and general business purpose in Virginia.

10

37.     Plaintiff's exposure and injuries, resulting from the acts of Defendants alleged herein, occurred within the Commonwealth of Virginia.

38.     Venue is proper in this Court under Va. Code § 8.01-262(2), (3) and (4).

## SUBSTANTIVE ALLEGATIONS

### A. Plaintiff Clarke's Use of and Exposure to PFAS-Containing Products

39.     Plaintiff Clarke proudly has served the City of Richmond as a firefighter for the Richmond Fire Department for over 20 years.

40.     As a first responder to fire, hazardous materials incidents, and other emergency and medical calls, Plaintiff Clarke risks his life on a daily basis. He not only saved lives and homes but also provided emergency services and medical care, performed rescues, and offered support to people in traumatic circumstances. To prepare him for this enormously challenging work, Plaintiff Clarke wore turnouts and received extensive and ongoing training in fire suppression, fire prevention, rescue, and emergency medical care action to protect and/or minimize the loss of life, property, and damage to the environment.

41.     The Richmond Fire Department ("RFD") serves the residents of Richmond, Virginia by providing an all-hazard response service. Richmond firefighters also provide emergency medical technicians ("EMT") and paramedics to the community. RFD protects the city's residents, workers and tourists in high-rise buildings, schools, hospitals, churches, community centers, stores, historical landmarks, tunnels, bridges, hotels, and residential structures in densely populated neighborhoods.

42.     For decades, Defendants, either individually or through their predecessors or subsidiaries, have manufactured, designed, sold, supplied, and distributed turnouts containing PFAS to firefighters, firefighting training facilities, and fire departments globally, including within

11

the Commonwealth of Virginia and the City of Richmond and neighboring communities in Virginia.

43.     With over 5,000 individual chemicals, PFAS is a large and ever-growing category of human-made chemicals, consisting of a nearly indestructible chain of carbon and fluorine atoms that are widely used in products to, *inter alia*, resist and repel oil, heat and water, and have been found to have negative health effects. As detailed below, these toxic chemicals are present in firefighter turnouts.

### (1) PFAS-Containing Turnout Gear

44.     Defendants knew or should have known that during firefighting training and when responding to fires and performing fire extinguishment, firefighters wear turnouts that are intended to provide a degree of thermal, chemical, and biological protection for a firefighter. Turnout gear components include a helmet, hood, jacket, pants, boots, and gloves. Each component is made of an outer layer, as well as several inner layers that include a moisture barrier and thermal liner which are meant to protect the firefighter from ambient heat.

45.     A June 2020 study of turnout gear by researchers at the University of Notre Dame analyzed 30 new and used turnout jackets and pants originally marketed, distributed and sold in 2008, 2014, and 2017, by six turnout gear makers, including Defendants MSA/Globe, Lion and Honeywell, and found high levels of PFAS in turnout gear worn, used, or handled by firefighters using these brands of turnout gear, which included Plaintiff Clarke.

46.     In May 2023, Section 338 of the William M. Thornberry National Defense Authorization Act for titled the "Guaranteeing Equipment for Safety for Firefighters Act of 2020," directed the National Institute of Standards and Technology ("NIST") to identify the type, prevalence and concentration of PFAS in unused firefighter turnout gear. The study specifically

12

looked at twenty textiles used to make firefighter turnout gear. The NIST study found between one and seventeen PFAS present in each textile used to construct the turnout gear.

47.     When exposed to heat, PFAS chemicals in the turnouts off-gas, break down, and degrade into highly mobile and toxic particles and dust, exposing firefighters to PFAS chemicals, particles and dust, including through skin contact/absorption, ingestion (e.g., hand-to-mouth contact) and/or inhalation. Further firefighter exposure to these highly mobile and toxic materials occurs through normal workplace activities, because particles or dust from their turnouts spread to fire vehicles and fire stations, as well as firefighters' cars and homes.

48.     Such workplace exposure to PFAS or PFAS-containing materials has been found to be toxic to humans. As far back as a July 31, 1980, internal memo, DuPont officials described measures that were needed to prevent workplace exposure to PFOA, which they knew could permeate all protective materials, and noted that PFOA's toxicity varied depending on the exposure pathway, acknowledging that ingestion was "slightly toxic," dermal contact was "slightly to moderately toxic" and inhalation was "highly toxic." The memo concluded "continued exposure is not tolerable."

49.     As alleged herein, the Plaintiff Clarke wore turnouts in the ordinary course of performing his duties, as the turnouts were intended to be used and in a foreseeable manner, which exposed him to significant levels of PFAS.

50.     Plaintiff Clarke did not know, and in the exercise of reasonable diligence could not have known, that the turnouts they wore or used in the course of performing his duties contained PFAS or PFAS-containing materials, and similarly did not know and could not have known that he routinely suffered exposure to PFAS or PFAS-containing materials in the turnouts they wore or used in performing his duties. The turnout gear worn or used by Plaintiff Clarke did not contain

13

labeling information saying that the gear contained PFAS, and similarly did not warn Plaintiff Clarke of the health risks associated with exposure to PFAS.

51. Like many fire departments across the country, Plaintiff Clarke had a limited number of turnouts to wear for years and would wash his turnouts at home and/or in station machines along with his daily station wear uniforms.

## B. The Chemical Structure of PFAS Makes Them Harmful to Human Health

52. PFAS are known as "forever chemicals" because they are immune to degradation, bioaccumulate in individual organisms and humans, and increase in concentration up the food chain. Indeed, scientists are unable to estimate an environmental half-life (i.e., the time it takes for 50% of the chemical to disappear) for PFAS. Additionally, some PFAS chemicals (known as "precursors") degrade into different long-chain PFAS chemicals.

53. PFAS are nearly indestructible and are highly transportable. PFAS exposure to humans can occur through inhalation, ingestion, or dermal contact.

54. PFAS chemicals include "older" long-chain PFAS like PFOA, PFOS, and PFNA that have seven or more carbon atoms, and "newer" short-chain PFAS, like PFBA, PFBS, PFHxA, and PFHxS. The PFAS chemical industry has repeatedly asserted that short-chain PFAS are safer and bio-degrade more easily than long-chain PFAS. However, short-chain PFAS are molecularly similar to long-chain PFAS, and recent scientific research conducted in 2020, shows that short-chain PFAS are in fact extremely persistent, highly mobile and transportable, almost impossible to remove from water, bio-accumulate in humans and the environment, and show similar toxicity as long-chain PFAS. For example, short-chain PFBA (with only four carbon molecules) which was created by defendant 3M and reportedly has a shorter half-life than other PFAS, recently has been found to accumulate in the lungs and, in turn, increase the severity of COVID-19 in patients

14

with elevated levels of PFBA, among other health concerns. Short-chain PFAS also have lower technical performance and may therefore be used at higher quantities cancelling out any supposed benefits of lower bioaccumulation potential.

55.    In October 2021, the U.S. Environmental Protection Agency ("EPA") updated its 2018 assessment of short-chain PFAS, also known as "GenX", finding that two of Defendant Chemours GenX chemicals are *more toxic* than PFOA - the highly toxic chemical these were intended to replace.

56.    To date, there is no safe, acceptable or "normal" level of PFAS in the human body. Further, the fact that PFOA, PFOS, PFHxS, PFHpA, and PFNA are often found together presents a substantial risk to human health. Defendants' assertions that their products are safe because they do not contain PFOA or PFOS, or because they contain short-chain PFAS is just another example of their efforts to deflect from the reality that there are thousands of PFAS – including precursor PFAS which degrade into PFOA and PFOS.

57.    PFAS exposure affects nearly every system in the body. It has been associated with multiple and serious adverse health effects in humans including, but not limited to, cancer, tumors, liver damage, immune system and endocrine disorders, thyroid disease, ulcerative colitis, birth defects, decreased fertility, pregnancy-induced hypertension, accelerated changes in gene expression, and increases in oxidative stress which can contribute to DNA changes, tumor promotion, and other health conditions.

## C. Defendants Knowingly Manufactured, Developed, Marketed, Distributed, Supplied, and/or Sold Toxic PFAS and/or Products Containing PFAS

58.    Defendants have each marketed, developed, distributed, sold, promoted, manufactured, released, or otherwise used PFAS chemicals in turnout gear throughout the United States and in Virginia.

15

59. PFAS were first developed in the 1930s and 1940s. Soon after, 3M began manufacturing a PFAS material called perfluorooctanoic acid ("PFOA"), selling it to other companies, including DuPont.

60. By the 1950s, PFAS were widely used in large-scale manufacturing. Prior to this, PFAS had never been detected in nor were present in human blood or bodies.

61. Founded in 1918, Defendant MSA/Globe began manufacturing, marketing and selling turnout gear with DuPont's NOMEX® PFAS-containing flame resistant fabric in 1966. MSA/Globe (under the Globe name) continues to manufacture, market and sell turnout gear using PFAS-containing fabrics supplied by its partners, DuPont, Gore, Tencate, and PBI.

62. Defendant Lion began to manufacture, market and sell turnout gear in 1970. Since its founding, and continuing through to the present, Lion makes, markets and sells turnout gear using PFAS-containing fabrics, including Teflon® F-PPE-treated thermal lining material supplied by Defendants DuPont's NOMEX® PFAS-containing flame/water/oil-resistant fabric, and moisture barrier fabrics supplied by Defendant Gore.

63. Defendant Honeywell acquired Norcross Safety Products LLC in 2008, entering the protective gear industry and becoming one of the leading manufacturers of turnouts. Honeywell makes, markets and sells turnout gear using PFAS-containing fabrics, supplied by Defendants DuPont, Gore, PBI and StedFast.

**D. Defendants Know Exposure to PFAS Causes Serious Health Impacts**

64. Defendants, including specifically 3M and DuPont, have long known about the serious and significant impacts to health caused by exposure to PFAS, having conducted study after study on the exposure and health effects of PFAS on animals, and in some cases, even on

16

their own employees. The findings of these studies were discussed internally within the companies,

yet were never made public or shared with any regulatory agencies. Among the findings:

a. A 1950 3M study showed that PFAS could build up in the blood of mice and that PFAS could bind to proteins in human blood suggesting that PFAS would not only remain, but also persist and accumulate in the body of the exposed individuals with each additional exposure.

b. In 1961, a DuPont toxicologist warned that PFAS chemicals enlarge rat and rabbit livers. A year later, these results were replicated in studies with dogs.

c. In 1963, 3M's technical handbook classified PFAS as toxic and advised that "due care should be exercised in handling these materials."

d. In the 1970s, DuPont discovered that there were high concentrations of PFOA in the blood samples of factory workers at DuPont's Washington Works site.

e. By the end of the 1970s, studies performed by, at least 3M, indicated that PFAS materials were resistant to environmental degradation and would persist in the environment.

f. In 1981, 3M, which still supplied PFOA to DuPont and other corporations, found that ingestion of PFOA caused birth defects in rats. 3M reported this information to DuPont. DuPont then tested the children of pregnant employees in their Teflon division and found that of seven births, two children had eye defects. Defendants reassigned the female employees, but did not inform the EPA or make this information public.

g. By at least the end of the 1980s, research performed by Defendants, including specifically, Defendants 3M and DuPont, manufacturing and/or using PFAS materials indicated that at least one such PFAS material, PFOA, caused testicular tumors in a chronic cancer study in rats, resulting in at least Defendant DuPont classifying such PFAS material internally as a confirmed animal carcinogen and possible human carcinogen.

h. In the 1990s, Defendant DuPont knew that PFOA caused cancerous testicular, pancreatic and liver tumors in lab animals. One study also suggested that PFOA exposure could cause possible DNA damage. Another study of workers found a link between PFOA exposure and prostate cancer.

i. In response to the alarming and detrimental health impact, DuPont began to develop an alternative to PFOA and in 1993, an internal memo announced

17

that "for the first time, we have a viable candidate" that appeared to be less toxic and showed less bioaccumulation. DuPont decided against using this potentially safer alternative, however, because products manufactured with PFOA were worth $1 billion in annual profit.

j.  On June 30, 2000, 3M and DuPont met to share 3M's "pertinent data on PFOA." 3M informed DuPont that the half-life of PFOA was much longer than animal studies showed.

65.     Additionally, approximately fifty years of studies by Defendants, including by 3M and DuPont, on human exposure to PFAS found unacceptable levels of toxicity and bio-accumulation, as well as a link to increased incidence of liver damage, various cancers, and birth defects in humans exposed to PFAS. These studies also revealed that, once in the body, PFAS has a very long half-life and that it takes years before even one-half of the chemicals begins to be eliminated from the body—assuming, of course, the body experiences no additional PFAS chemical exposure.

66.     In the face of these findings, and despite passage of the Toxic Substances Control Act in 1976, which requires companies that manufacture, process or distribute chemicals to immediately report to the Environmental Protection Agency ("EPA") information that "reasonably supports the conclusion" that a chemical presents a substantial risk to health or the environment, Defendants did not inform the EPA, Plaintiff Clarke, or the public about the health impacts resulting from exposure to PFAS.

67.     In 2000, 3M announced that it would cease manufacturing a specific PFAS chemical, PFOS, on the same day the EPA announced that PFOA and PFOS, two chemicals in the PFAS family, had a "strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term."

68.     However, 3M did not recall PFOS that it had previously manufactured, sold, or distributed, or that was then stored at firehouses and being used by firefighters around the country.

18

And, no other Defendant stopped manufacturing PFAS chemicals or products containing PFAS. Rather, Defendants continued to manufacture, develop, market, promote, distribute and sell PFAS chemicals and PFAS-containing products, including specifically PFAS-containing turnouts, and did so without any warning to firefighters or to the public concerning the fact that these turnouts contained PFAS, or that they posed a serious health risk to human health. Defendants instead continued to claim their products were safe.

69.      By the 2000s, Defendants' own research of its employees revealed multiple adverse health effects among workers who had been exposed to PFAS, including increased cancer incidence, hormone changes, lipid changes, and thyroid and liver impacts.

70.      In 2001, a class action lawsuit was filed in West Virginia against DuPont on behalf of people whose water had been contaminated by the nearby DuPont chemical plant where PFAS chemicals were manufactured.

71.      Defendants continued to manufacture, market, promote, distribute, and sell PFAS and PFAS-containing turnouts, and continued to publicly claim that these products were safe. Defendants affirmatively suppressed independent research on PFAS, and instead commissioned research and white papers to support their claims that PFAS and PFAS-containing turnouts were safe to use, engaging consultants to further this strategy and ensure that they would continue to profit from these toxic chemicals and products.

72.      As one consultant wrote in pitching its services to DuPont, it was critical that the PFAS industry develop an aggressive strategy to "[discourage] governmental agencies, Plaintiffs' bar and misguided environmental groups" and "[implement] a strategy to limit the effect of litigation and regulation on the revenue stream generated by PFOA." The strategy was further described by consultant as follows:

19

DUPONT MUST SHAPE THE DEBATE AT ALL LEVELS . . . The outcome of this process will result in the preparation of a multifaceted plan to take control of the ongoing risk assessment by the EPA, looming regulatory challenges, likely litigation, and almost certain medical monitoring hurdles. The primary focus of this endeavor is to strive to create the climate and conditions that will obviate, or at the very least, minimize ongoing litigation and contemplated regulation relating to PFOA. This would include facilitating the publication of papers and articles dispelling the alleged nexus between PFOA and teratogenicity as well as other claimed harm. We would also lay the foundation for creating Daubert precedent to discourage additional lawsuits.

73.     Defendants also pivoted with a new industry strategy. Defendants continued to publicly represent that PFAS and/or products containing PFAS were safe, while developing newer, "short-chain" PFAS alternatives.

74.     In 2005, the EPA fined DuPont $16.5 million for failing to submit decades of toxicity studies of PFOA (one PFAS chemical manufactured by the company). Undeterred by the EPA's action, Defendant turnout manufacturers, such as MSA (Globe) and Lion, partnered with DuPont and with Defendant Gore to develop, manufacture, market, and distribute turnouts made with DuPont's and/or Gore's PFAS-based textile coatings (e.g., Nomex® and Gore® Protective Fabrics).

75.     In 2006, the EPA "invited" eight PFOA manufacturers, including Defendants DuPont, 3M, Arkema, and Daikin to join in a "Global Stewardship Program" and phase out production of PFOA by 2015.

76.     By this time, Defendants had begun to aggressively manufacture, market and/or distribute short-chain PFAS, such as Gen X, claiming that these alternative PFAS chemicals did not pose significant health risks to humans or the environment. But, these claims, too, were false. Defendants knew that certain of these short-chain PFAS chemicals had been found in human blood, and that at least one of them produces the same types of cancerous tumors (testicular, liver, and pancreatic) in rats as had been found in long-chain PFAS studies.

20

77.    In 2011, a C8 Science Panel convened as part of a settlement in the West Virginia DuPont water contamination case described *supra* began releasing its findings. The Panel had analyzed the blood serum of nearly 70,000 residents living in the water contamination area for two long-chain PFAS (PFOA and PFOS), and found significant negative human health effects (including, kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, high cholesterol and preeclampsia) associated with exposure to these PFAS chemicals in the area groundwater.

78.    In 2013, DuPont entered an agreement with the EPA and ceased production and use of PFOA – just one of thousands of PFAS chemicals the company makes, promotes and sells. Defendants, however, continued manufacturing short-chain PFAS materials, chemical feedstock, and products—all the while peddling them as safer, and as more easily bio-degraded than long-chain PFAS, despite evidence to the contrary.

79.    In 2015, DuPont spun-off its PFAS chemicals business, as well two-thirds of its environmental liabilities and 90% of its active litigation, to Defendant Chemours. As part of the transaction, DuPont required Chemours to indemnify the "new" DuPont for all assigned environmental liabilities should a regulatory agency or plaintiff seek to hold the "new" DuPont accountable. As Chemours President Paul Kirsch testified before Congress: "DuPont designed the separation of Chemours to create a company where it could dump its liabilities to protect itself from environmental cleanup and related responsibilities."

80.    In June 2018, the Agency for Toxic Substances and Disease Registry (ASTDR), a division of the Centers for Disease Control and Prevention at the US Department of Health and Human Services released an 852-page draft toxicology report analyzing scientific data about the most common PFAS chemical variants, finding that PFAS "are potentially more hazardous than

21

previously known, are particularly concerning because of these compounds' persistence in the environment and widespread prevalence—PFAS are extremely slow to biodegrade."

81.     In September 2019, DuPont chief operations and engineering officer Daryl Roberts testified before Congress that the "new DuPont" (to be distinguished from the "old DuPont" which manufactured and sold PFAS for decades before being spun-off to Chemours) no longer uses or manufactures PFAS and is no longer responsible for obligations and harms resulting from over 65 years of producing PFAS. Roberts further testified that he knew nothing about "old DuPont's" efforts to suppress research on PFAS' toxicity as testified to by one of DuPont's former scientists only a few days earlier. Finally, he stated that any liabilities from "old DuPont's" PFAS operations were now Chemours' problem because DuPont is essentially a completely new company with no past – only a bright future of doing good in the world.

## E.  Defendants Failed to Warn Plaintiff Clarke of the Dangers of Exposure to PFAS and Falsely Represented That Their PFAS Products Were Safe.

82.     As alleged above, Defendants knew that PFAS are persistent, toxic, and bioaccumulating with very long half-life. They knew that exposure to PFAS can cause serious and life-threatening diseases, including cancer.

83.     Yet, Defendants **did not warn** Plaintiff Clarke that PFAS, and Defendants' PFAS-containing turnouts used by Plaintiff Clarke, contained PFAS, or that exposure to PFAS in the normal and intended use of such products, causes serious bodily harm and illnesses, including cancer.

84.     Instead, Defendants falsely represented—and continue to falsely represent— that PFAS and PFAS-containing turnouts, are safe and not harmful to humans or the environment.

85.     Such assertions fly in the face of science and a global movement toward eliminating this class of chemicals from consumer products. In just these past few years, for example, Congress

22

passed legislation to address PFAS in turnouts. The U.S. Food and Drug Administration similarly has called for phasing out of short-chain PFAS that contain 6:2 fluorotelomer alcohol (6:2 FTOH). And private companies like Home Depot, Lowes and Staples recently have begun to discontinue selling products containing any PFAS, as have several outdoor, durable clothing companies (e.g., Columbia and Marmot), clothing retailers (e.g., H&M, Levi Strauss & Co), shoe companies (e.g., Adidas and New Balance), car seat manufacturers (e.g., Britax and Graco), furniture companies (e.g., IKEA), personal care companies (e.g. Johnson & Johnson and Oral-B), and textile manufacturing companies.

**(1) Defendants Provide No Safety Warnings on Product Labels**

86.    The turnouts containing PFAS or PFAS materials sold by Defendants in Virginia, and used by Plaintiff Clarke in training, emergency incidents, or in fire suppression during their firefighting career, also contained no warning that the turnouts contain PFAS or PFAS materials. Nor did these labels inform persons handling, wearing, or using the turnouts as they were intended to be handled, worn or used can result in exposure to PFAS and serious bodily harm.

87.    Below are pictures of warning labels for turnouts manufactured, marked, sold and distributed by Defendants Honeywell International, Honeywell Safety, MSA/Globe and Lion. As depicted below, the labels make no mention of PFAS, do not advise that the turnouts contain PFAS or PFAS materials, and contain no warning that handling, wearing, or using the turnouts as they were intended to be handled, worn or used can result in exposure to PFAS and serious bodily harm. Further, while the labels provide washing instructions, the instructions do not advise that turnouts should be washed in a commercial extractor to prevent cross-contamination and PFAS-exposure

23

to family members who handle or wash the turnouts with other garments in home washing machines.



24



**Garment Safety Label**



**⚠ DANGER**

You must read and understand these warnings and instructions.
Failure to follow these warnings and instructions will result in serious injury or death.



**Garment Cleaning Label**

**Garment Information Label**





**Garment Liner Attachment Safety Label**

**⚠ WARNING**

FOR COMPLIANCE WITH THE STRUCTURAL FIRE FIGHTING GARMENT
REQUIREMENTS OF NFPA 1971, THE FOLLOWING PROTECTIVE ITEMS MUST BE
WORN IN CONJUNCTION WITH THIS GARMENT: OUTER SHELL 7.0 OZ MINIMUM WEIGHT

This INNER LINER alone does not provide protection against heat, flame, chemical or
biological hazards. NEVER wear this INNER LINER without the SAME SIZE AND MODEL OUTER SHELL,
as identified on labels located on each detachable component.

To reduce the risk of injury or death, you must assemble and wear together ALL of the following items:
1. protective coat and pant with outer shell, attached inner liner and DRD installed in coat 2. gloves 3. boots
4. helmet with eye protection 5. protective hood 6. SCBA 7. PASS device
ALWAYS make sure that all ensemble layers have the proper overlap and that all items fit with
adequate looseness.Tight fit lowers insulation protection and restricts mobility.

MADE IN THE U.S.A.
DO NOT REMOVE OR WRITE ON THIS LABEL!

**Drag Rescue Device (DRD) Label**

25

### (2) Defendants' Misrepresentations About PFAS Continue to this Day

88.     Despite their decades of knowledge about PFAS and its dangers, Defendants continue to make false claims, continue to misrepresent the safety of PFAS, and continue to minimize and fail to warn about the hazards of exposure to PFAS, or turnouts made with or containing PFAS.

89.     Defendants' misinformation campaign is long-standing and continues to this day. Some pertinent examples include:

- a.   2017 – Defendant Lion's President, Stephen Schwartz, wrote a letter to the editor of the Columbus Dispatch, expressing outrage at the assertion in a government filing that firefighters may have been exposed to PFAS through turnout gear. Schwartz called this assertion false, stating that Lion's turn-out gear is not treated or made with PFOS or PFOA:. "PFOAs and PFOSs have never been components of LION's turn-out gear, either as a coating or as a textile." He acknowledged that turn-out gear is treated with PTFE to provide a durable water repellant, and that the textile industry in the past had used PFOA as a processing aid to manufacture PTFE moisture barrier films and repellants. "It is possible that trace amounts may have been present as a residue when the films and finishes were incorporated into LION's turn-out gear. **However, based on all available scientific data, such nominal trace amounts, if they existed at all, would not have posed any health risk to firefighters. There is absolutely no connection at all between PFOS and firefighter turnout gear.**" (Emphasis added).

- b.   2018 – The National Fire Protection Association (which maintains committees on turnouts that are comprised, in part, of certain Defendants) issued a publication listing 11 ways to minimize risk of occupational cancer – the suggestions centered on wearing turnouts for protection resulting from combustion or spills, and cleaning turnouts after exposure to chemicals. There was not a single mention of avoiding contact with foam and/or the risks of wearing turnouts containing PFAS or PFAS-containing materials.

- c.   2019 – Defendant 3M Vice President, Denise Rutherford, testified before Congress that she **absolutely agreed with the statement that "the weight of current scientific evidence does not show that PFOS or PFOA cause adverse health effects in humans at current rates of exposure."** (emphasis added)

26

90.     As frequent sponsors and advertisers in fire service publications, Defendants have

been so influential in the industry that fire service leadership have echoed these narratives.

91.     For example, in 2017, the International Association of Fire Fighters ("IAFF"),

which represents more than 324,000 full-time professional firefighters, issued a statement that both

mischaracterized and purported to state that the risks associated with exposure to PFAS and PFAS

chemicals and materials in turnouts was minimal to non-existent. The statement even encouraged

firefighters to continue to wear turnouts, creating a false sense that these PFAS-containing turnouts

were safe. The statement reads, in relevant part:

> Importantly, PFOA use has been almost completely phased out in the US..... If
> PFOA is a combustion product of PFOA-containing consumer products made prior
> to phasing out use of this chemical, fire fighters will be exposed in fire suppression
> activities. However, the data are too limited at present to determine this. PFOA is
> unlikely to be a component in recently US manufactured turnout gear. However, if
> PFOA is a combustion product, it may be present as a contaminant on turnout gear.
> PFOA may also be present as a manufactured component of legacy turnout
> gear....The exposure contribution from any such PFOA content is likely to be
> minimal since volatilization from the manufactured product would be required....**At
> this time, IAFF does not recommend that legacy turnout gear be replaced
> outside of its lifecycle. Fire fighters wishing to minimize PFOA exposure should
> continue to wear their PPE...and regularly decontaminate their turnout gear.**
> IAFF will continue to monitor developments and update this fact sheet should new
> information become available.

92.     The IAFF maintained the Defendants' position that the turnout gear was safe until

new leadership took over in 2021. Because of these and other false claims and misrepresentations

on the part of Defendants, Plaintiff Clarke did not know and, in the exercise of reasonable

diligence, could not have known that the turnouts he used contained PFAS or PFAS-containing

materials, and caused Plaintiff Clarke to be exposed to PFAS and/or PFAS-containing materials,

leading to his cancer.

93.     Also, in January 2021, Defendants DuPont and Chemours along with Corteva (the

agricultural unit of DuPont that it spun off in 2019) announced a cost-sharing agreement worth $4

27

billion to settle lawsuits involving the historic use of PFAS – thereby acknowledging, at long last, the significant harm their PFAS chemicals have caused to human health and the environment.

**F. New Research Indicates That Firefighters are at Significant Risk of Harm From Exposure to PFAS in Turnouts and AFFF— But Defendants Continue to Discount or Deny These Risks**

94.    In June 2020, scientists at the University of Notre Dame published a ground-breaking study on PFAS in turnout gear, and the exposure risks posed to firefighters that wear, wore, or handle such gear ("Notre Dame Turnout Study"). The Notre Dame Turnout Study analyzed over 30 sets of used and unused (still in their original packaging) turnout gear made by six U.S. manufacturers, including Defendants MSA/Globe, Lion and Honeywell over several production years, as listed below:

| PPE gear manufacturers sampled: | # samples |
|---|---|
| Globe Manufacturing (Pittsfield MA), | 11 |
| Lion Group (Dayton OH), | 12 |
| Honeywell First Responder (Dayton, OH), | 2 |
| Lakeland Fire (Decatur, AL) | 2 |
| Quest Fire Apparel (Saratoga Springs, NY) | 1 |
| Quaker Safety (Quakertown, PA) | 2 |

The type and number of turnout gear samples used in this study.

95.    The Notre Dame Turnout Study noted that these manufacturers' turnout gear (or personal protective equipment-PPE, as it is described in the study) are manufactured "from textiles that are made from fluoropolymers (one form of PFAS) or extensively treated by PFAS in the form of side-chain fluoropolymers." According to the researchers, "[t]hese PFAS include fluoropolymer materials such as PTFE used as a moisture barrier in the inner layers of turnout gear." The study found significant levels of PFAS chemicals – including PFOA, PFOS, PFBA, PFPeA, PFHxA, PFHpA, PFNA, PFDA, PFUnA, PFDoA, PFTrDA, PFToDA, PFBS, PFOSA, N-EtFOSA, MeFOSAA, N-MeFOSE, N-EtFOSE and 6:20FTS – in both new and used turnout gear, and across

28

layers, portions, and materials in the turnout gear, including in material layers that are not intentionally treated with PFAS by the manufacturer, thereby providing "the first evidence that suggests PFAS appear to migrate from the highly fluorinated layers and collect in the untreated layer of clothing worn against the skin."

96.    These findings suggest that, as the garments are worn, PFAS from the outer shell and the moisture barrier can migrate from the turnouts and contaminate both the firefighter, their apparatus and workplace with PFAS. The analysis also indicated that fluoropolymers from the outer layer decompose into other PFAS, including PFOA.

Environmental Science & Technology Letters                    pubs.acs.org/journal/estlcu                    Letter

Table 2. Quantities of Target PFAS (in ppb) Found in US Turnout Gear by LC-MS/MS Analysis

| moles in ppb | jacket 2008 unused | | | pants 2014 used | | | jacket 2008 used | jacket 2017 unused |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | thermal liner | moisture barrier | outer shell | thermal liner | moisture barrier | outer shell | moisture barrier | moisture barrier |
| PFBA | <MDL | 12.5 | 16.4 | 1.99 | e15 | 21.5 | 28.5 | 951 |
| PFPeA | <MDL | 12.6 | 17.5 | 2.28 | 106 | 166 | 12.1 | 2.65 |
| PFHxA | <MDL | 5.5 | 16.5 | 199 | 28.6 | 109 | 35.2 | 16.5 |
| PFHpA | <MDL | 12.4 | 25.4 | 165 | 5.02 | 2.23 | 14.3 | 25.4 |
| PFOA | 71 | 44 | 182 | 3.90 | 71 | 97 | 37 | <MDL |
| PFNA | 2.53 | <MDL | 8.2 | 2.53 | 1.95 | <MDL | 2.76 | <MDL |
| PFDA | 2.98 | 6.51 | 5.51 | 1.33 | <MDL | <MDL | 23.7 | <MDL |
| PFUnA | <MDL | <MDL | <MDL | 7.36 | <MDL | <MDL | 2.51 | <MDL |
| PFDoA | <MDL | 5.01 | <MDL | 6.64 | <MDL | <MDL | 15.9 | <MDL |
| PFBS | 24? | 1.40 | 14.2 | 53400 | 47900 | 1050 | 230 | 9400 |
| PFOS | <MDL | <MDL | <MDL | 7 | <MDL | <MDL | 2 | <MDL |
| 6:2 FTS | <MDL | <MDL | <MDL | 15.9 | 129 | <MDL | <MDL | <MDL |
| 8:2 FTS | <MDL | <MDL | <MDL | 1.1 | <MDL | <MDL | <MDL | <MDL |

97.    "Startlingly," researchers reported, "garment to hand transfer of total fluorine in the ppm range was also observed when researchers simply manipulated the textiles in [the] laboratory." The accumulation of PFAS on researchers' hands strongly suggests that transference of ppm levels of PFAS can occur merely by handling the turnouts and that PFAS exposure pathways include inhalation, ingestion and/or absorption (through dermal contact) – all of which DuPont internally acknowledged as being toxic in 1980. Such exposure pathways are a concern not only for firefighters that rely on turnouts to protect them from heat, fire, water and chemical

hazards in the field, but to family members who may be exposed to the PFAS in turnouts as the
result of home washing or storage. Lead researcher Graham Peaslee commented that turnouts are
"the most highly fluorinated textiles I've ever seen" and that the level of PFAS in the turnout gear
means that firefighters are "swimming in a sea of [PFAS]. Those numbers for scientists are scarily
high..."



Credit: Environ. Sci. Technol. Lett.

Over time, PFAS in a firefighter's turnout gear can migrate from a moisture barrier (orange) into a thermal liner that
contacts skin. PFAS can also be shed from an outer shell (black) into the environment.

98.     Despite these findings, Defendants have been quick to mischaracterize, dismiss or
downplay the significance of the Notre Dame Turnout Study. Defendant MSA/Globe, when
contacted about the study and asked whether Globe planned to study this issue and find an
alternative to PFAS for turnouts, merely responded thusly: "[P]rotecting (firefighters) is Globe's
business; every piece of our turnout gear meets or exceeds applicable industry standards."

99.     Defendant Lion's responses have been similar and have also dismissed or
minimized the significance of the Notre Dame Turnout Study's findings. Lion issued a Customer

30

Safety Alert for PFOA and Turnout Gear stating: "Your LION turnout gear continues to be safe and ready for action especially when properly maintained. It is extremely important that firefighters continue to wear and properly care for their gear to stay safe on the job."

100.    The Customer Safety Alert goes on to stress that Lion does not use PFOA or PFOS (two long-chain PFAS chemicals) in its turnouts. It does not, however, address that the maker's turnouts in fact contain other PFAS chemicals, nor warn firefighters or the public about health harms associated with exposure to these toxic, bio-accumulating chemicals.

**HERE'S ALL YOU NEED TO KNOW**
**ABOUT PFOA AND YOUR TURNOUT GEAR.**

**What is PFOA and why are we talking about it?**

**Perfluorooctanoic Acid (PFOA) is a chemical that until recently was used in the process to make many different industrial chemicals and products.** The manufacture and use of PFOA was mostly phased out by 2010. By 2015, its manufacture was eliminated in the United States.

In the firefighting protective clothing industry, PFOA was used as a processing agent in the manufacture of resins used to make PTFE film – the primary component of the moisture barrier used in turnout gear. While most residual PFOA was eliminated from the manufacturing process of PTFE, some tiny trace amounts remained.

LION does not use PFOA or PFOS in our turnout gear or any of our protective products.

PFOS has never been a component of turnout gear. PFOS health and environmental concerns are largely related to AFFF foams and are not connected to turnout gear.

101.    Defendant Lion's paid consultant, Dr. Paul Chrostowski, also has taken aim at the Notre Dame Turnout Study and its findings. Refuting a Fire Rescue magazine article about the study, Chrostowski repeated Lion's website statement that "PFOA was never part of the gear itself and frequent independent testing has found only trace amounts of it in any of the gear – not nearly enough to cause concern, and in amounts similar to consumer products." Chrostowski went on to say "[t]he fact is that one may find trace amounts of 'short-chain' PFAS such as PFBS and PFHxA in firefighting textiles, but the scientific research shows that these materials are far less toxic than even PFOA and at the tiny trace levels the risk are extremely low based on numerous credible

31

published scientific research papers." Finally, Chrostowski falsely stated that the link between PFAS exposure and cancer is "extremely weak."

102.    And yet, Lion concedes that dermal absorption is a pathway of exposure to cancer causing chemicals for firefighters. In a *Not in Our House* cancer awareness fact sheet that currently appears on the company's website, Lion warns firefighters: "For every 5 degree increase in temperature, skin becomes 400% more absorbent. The hotter you are, the more carcinogens your skin absorbs. This statistic is alarming given that the core body temperature of firefighters routinely increases during firefighting activities while wearing turnouts which contain known carcinogens.



103.    The IAFF holds a yearly cancer summit and yet has done little to address the PFAS in turnouts. Defendants, including at least DuPont, Gore, Lion and MSA (Globe), have been regular sponsors of the IAFF Cancer Summit.



104.    At this event, as well as in firefighter cancer-related publications, programs and events, Defendants repeatedly used the summit as an opportunity to push the narrative that incidence of cancer among firefighters is attributable either to *other chemicals* encountered in the line of duty, or firefighters' failure to wash their turnouts after every call. Not once have the turnout Defendants admitted that the PFAS materials in their turnouts have been found to be carcinogenic, and that the very equipment that should be protecting firefighters are causing the most harm. Further, Lion's recently launched "Not in Our House" cancer awareness program is sadly ironic in that it encourages *firefighters to make a pledge* ("I will make every effort to protect myself and my team by doing my part to take precautions that will minimize the risk of exposure to carcinogens that may lead to cancer...") while refusing to take any responsibility for continually exposing firefighters to carcinogens in their protective gear.

105.    Plaintiff Clarke deserves more. Firefighters are the first to respond to emergencies faced by their community, and never hesitate to help. Whether delivering a baby, responding to a fire, medical emergency, accident, mass shooting, terrorist attack, natural disaster, or teaching kids about fire safety, they always put the community first. When a child is drowning in a pool or a family is caught in a burning house, firefighters do not stop to calculate whether they will benefit

33

by doing the right thing. They are true public servants. They step in and do what is needed when it is needed the most. Their health, safety and well-being must be of the highest priority.

## COUNT I | BREACH OF IMPLIED WARRANTIES

106.     This cause of action is asserted against all Defendants.

107.     Plaintiff Clarke incorporates by reference all allegations asserted in this Complaint, as though fully set forth herein.

108.     Each Defendant, their predecessors-in-interest, and/or their alter egos, and/or entities they have acquired, have engaged in the business of manufacturing, distributing, supplying, testing, labeling, promoting, or advertising of turnouts and through that conduct have knowingly placed PFAS-containing turnouts into the stream of commerce with full knowledge that they were sold to firefighters, fire departments or to companies that sold turnouts to fire departments for use by firefighters such as Plaintiff Clarke, who was exposed to PFAS through ordinary and foreseeable uses for the purpose of firefighting activities and training.

109.     Defendants intended that the turnouts they were manufacturing, selling, distributing, supplying, promoting, and or selling would be used by firefighters, including Plaintiff Clarke, without any substantial change in the condition of the products from when it was initially manufactured, sold, distributed, and marketed by Defendants. Turnouts were not safe for use by firefighters even when used as directed by the manufacturer and for its intended purpose for firefighting activities which include training, extinguishment, fire suppression, ventilation, search-and-rescue, salvage, containment, and overhaul.

110.     Further, knowing of the dangerous and hazardous properties of turnouts, Defendants could have manufactured, marketed, distributed, and sold alternative designs or formulations of turnouts that did not contain PFAS.

34

111.   These alternative designs and/or formulations were already available, practical, similar in cost, and technologically feasible.

112.   The use of these alternative designs would have reduced or prevented the reasonably foreseeable harm to Plaintiff Clarke that was caused by the Defendants' manufacture, marketing, and sale of PFAS-containing turnouts.

113.   Additionally, the turnouts that were designed, manufactured, marketed, tested, advertised, promoted, sold, and distributed by the Defendants contained PFAS or PFAS-containing materials that were so toxic and unreasonably dangerous to human health and the environment, with the toxic chemicals being so mobile and persistent, that the act of designing, formulating, manufacturing, marketing, distributing, and selling these products was unreasonably dangerous under the circumstances.

114.   The turnouts designed, manufactured, marketed, tested, advertised, marketed, promoted, sold and distributed by the Defendants were dangerous and defective in design or formulation because, at the time in which the products left the hands of the manufacturer or distributors, the foreseeable risks exceeded the benefits associated with the design or formulation of turnouts.

115.   The turnouts designed, manufactured, marketed, tested, advertised, marketed, promoted, sold, and distributed by the Defendants were dangerous and defective in design or formulation because, when the PFAS-containing turnouts left the hands of the manufacturer or distributors, said turnouts were unreasonably dangerous, unreasonably dangerous in normal use, and were more dangerous than an ordinary consumer-firefighter would expect.

116.   The turnouts were in a defective condition and unsafe, and Defendants knew or had reason to know that these PFAS-containing turnouts were defective and unsafe, especially when

35

used in the form and manner as provided by Defendants. In particular, Defendants' PFAS-containing turnouts were defective in the following ways:

a. When placed in the stream of commerce, Defendants' PFAS-containing turnouts were defective in design and formulation and as a result failed to meet ordinary users' expectations as to their safety and failed to perform as an ordinary user would expect.

b. When placed in the stream of commerce, Defendants' PFAS-containing turnouts were defective in design and formulation, and as a result, dangerous to an extent beyond which an ordinary consumer-firefighter would anticipate.

c. When placed in the stream of commerce, Defendants' PFAS-containing turnouts were unreasonable dangers in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

d. When placed in the stream of commerce, Defendants' PFAS-containing turnouts contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated manner.

e. When placed in the stream of commerce, Defendants' PFAS-containing turnouts did not provide an adequate warning of the potential harm that might result from exposure to PFAS and/or emitted from the turnouts and, alternatively, did not have adequate instructions for safe use of the products.

f. Exposure to PFAS presents a risk of grave and harmful side effects and injuries that outweigh any potential utility stemming from their use.

36

117.     Defendants knew or should have known at the time of manufacturing, selling, distributing, promoting or marketing their PFAS-containing turnouts that exposure to PFAS could result in cancer and other grave and serious illnesses and injuries as alleged herein.

118.     The foreseeable risk of harm could have been reduced or eliminated by the adoption of a reasonable, alternative design that was not unreasonably dangerous.

119.     Plaintiff Clarke used these PFAS-containing turnouts in the ways that Defendants intended them to be used.

120.     Plaintiff Clarke used these PFAS-containing turnouts in ways that were foreseeable to Defendants.

121.     Plaintiff Clarke was exposed to PFAS by using Defendants' turnouts in the course of his employment, as described above, without knowledge of turnouts' dangerous propensities.

122.     The design defect in turnouts containing PFAS exposed Plaintiff Clarke to toxic levels of PFAS and therefore, was a substantial factor in causing Plaintiff Clarke's cancer and damages.

123.     Through the use of advertising and marketing, Defendants, by and through their agents, employees, officers, representatives, and others for whom they are legally responsible, directed the attention of the public, including Plaintiff Clarke, to their products by means of implied representations, statements, and descriptions that the PFAS-containing turnouts they were manufacturing, selling, distributing, supplying, and/or promoting were safe for use and free from hazards or dangerous properties in their ordinary uses and in the manner directed and for the purposes intended by the Defendants, which became a part of the basis of the bargain.

124.     In using the PFAS-containing turnouts designed manufactured, sold, distributed, supplied, and/or promoted by the Defendants, Plaintiff Clarke relied upon the skill and judgment

37

of the Defendants, upon implied warranties of merchantability and fitness for a particular purpose that the PFAS-containing turnouts were safe and fit for their intended and foreseeable functions for which they were designed without causing the injuries of which Plaintiff Clarke complains as a result of probable, foreseeable, and ordinary uses of the product.

125.    At all times mentioned herein, the Defendants implied warranties of merchantability and fitness for a particular purpose in that the PFAS-containing turnouts designed, manufactured, sold, distributed, supplied, and/or advertised were unreasonably dangerous for their ordinary use and other reasonably foreseeable uses/purposes at the time they left Defendants' possession.

126.    As a direct and proximate result of the foregoing acts and omissions, Plaintiff Clarke suffered the injuries and damages described herein.

127.    Defendants acted with willful or conscious disregard for the rights, health, and safety of Plaintiff Clarke, as described herein, thereby entitling Plaintiff Clarke to an award of punitive damages.

## COUNT II | BREACH OF EXPRESS WARRANTIES

128.    This cause of action is asserted against all Defendants.

129.    Plaintiff Clarke incorporates by reference all allegations asserted in this Complaint, as though fully set forth herein.

130.    Each Defendant, their predecessors-in-interest, and/or their alter egos, and/or entities they have acquired, have engaged in the business of manufacturing, distributing, supplying, testing, labeling, promoting, or advertising of turnouts containing PFAS or PFAS-containing materials therein and, through that conduct, have knowingly placed PFAS-containing products into the stream of commerce with full knowledge that they were sold to fire departments,

38

firefighters, or to companies that sold turnouts to fire departments for the use by firefighters such as Plaintiff Clarke, who was exposed to PFAS through ordinary and foreseeable uses for the purpose of firefighting activities and training.

131.    The turnouts complained of were manufactured, designed, sold, supplied and/or distributed by each of the Defendants and Plaintiff was exposed to PFAS while using turnouts in the ordinary course and as part of performing his duties as a firefighter.

132.    Defendants expected that the PFAS-containing turnouts they were manufacturing, selling, distributing, supplying, and/or promoting would reach firefighters, including Plaintiff Clarke, without any substantial change in the condition of the products from when it was initially manufactured, sold, distributed, and marketed by Defendants.

133.    Defendants knew or should have reasonably known that the manner in which they were manufacturing, marketing, and selling turnouts containing PFAS was hazardous to human health.

134.    The potential risks of using PFAS-containing products presented a substantial danger to firefighters, including Plaintiff Clarke, when the turnouts were used or worn in an intended or reasonably foreseeable way.

135.    Plaintiff Clarke wore turnouts in the intended or reasonably foreseeable way in the ordinary course of performing his duties as a firefighter.

136.    The turnouts manufactured, marketed, and sold by the Defendants were dangerous and defective because the foreseeable risk of harm could have been reduced or eliminated by the adoption of a reasonable, alternative design that was not unreasonably dangerous.

39

137.    Defendants' products were in a defective condition and unreasonably dangerous, in that the turnouts which, by design, contain PFAS or PFAS-containing products, were deleterious, toxic, and highly harmful to Plaintiff Clarke.

138.    Defendants knew or should have reasonably known that exposure to PFAS was hazardous to human health, but:

> a.  Did not provide an adequate warning of the potential harm that might result from exposure to PFAS or PFAS-containing materials in turnouts;
>
> b.  Did not have adequate instructions for safe use of the products;
>
> c.  Did not have warnings to persons, such as Plaintiff Clarke, who had been, or reasonably may have been, exposed to Defendants' turnouts, of their disease potential, the proper steps to take to reduce the harmful effects of previous exposure, the need to have periodic medical examinations including the giving of histories which revealed the details of the previous exposure, and the need to have immediate and vigorous medical treatment for all related adverse health effects;
>
> d.  Did not manufacture, market, promote, distribute, or sell reasonably comparable products not containing PFAS when it became feasible to design.

139.    At the time of manufacture, distribution, promotion, labeling, distribution, and/or sale, Defendants could have provided warnings or instructions regarding the full and complete risks of turnouts containing PFAS, because Defendants knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

140.    At all relevant times, Defendants' turnouts did not contain an adequate warning or caution statement, which was necessary.

40

141. Plaintiff Clarke was unaware of the defective and unreasonably dangerous condition of Defendants' PFAS-containing turnouts at a time when such products were being used for the purposes for which they were intended, and Plaintiff Clarke was exposed to PFAS released from the Defendants' turnouts.

142. Plaintiff Clarke did not and could not have known that the use of turnouts in the ordinary course of performing his duties as a firefighter could be hazardous to his health, bio-accumulate in the blood, and cause serious health effects, including cancer.

143. Defendants knew that the use of turnouts, even when used as instructed by Defendants, subjected Plaintiff Clarke and others to a substantial risk of harm and yet, failed to adequately warn Plaintiff Clarke, the EPA or the public.

144. As a result of their inadequate warnings, Defendants' turnouts were defective and unreasonably dangerous when they left the possession and/or control of Defendants, were distributed by Defendants, and used or worn by Plaintiff Clarke.

145. The lack of adequate and sufficient warnings was a substantial factor in causing Plaintiff Clarke's cancer, as described herein.

146. Through the use of such advertising and marketing, Defendants, by and through their agents, employees, officers, representatives, and others for whom they are legally responsible, directed the attention of the public, including Plaintiff Clarke, to their products by means of express and implied representations, statements, and descriptions that the PFAS-containing products they were manufacturing, selling, distributing, supplying, and/or promoting were safe for use and free from hazards or dangerous properties in their ordinary uses and in the manner directed and for the purposes intended by the Defendants, which became a part of the basis of the bargain.

147. In using the PFAS-containing turnouts designed manufactured, sold, distributed, supplied, and/or promoted by the Defendants, Plaintiff Clarke relied upon the skill and judgment of the Defendants, upon implied warranties of merchantability and fitness for a particular purpose that the PFAS-containing turnouts were safe and fit for their intended and foreseeable functions for which they were designed without causing the injuries of which Plaintiff Clarke complains as a result of probable, foreseeable, and ordinary uses of the product.

148. At all times mentioned herein, the Defendants breached express warranties in that the PFAS-containing products designed, manufactured, sold, distributed, supplied, and/or advertised were defective and unreasonably dangerous for their ordinary use and other reasonably foreseeable uses/purposes at the time it left Defendants' possession contrary to express representations made by Defendants regarding the PFAS-containing turnouts safety and or lack of or absence of harmful substances such as PFAS.

149. As a direct and proximate result of the foregoing acts and omissions, Plaintiff Clarke suffered the injuries and damages described herein.

150. Defendants acted with willful or conscious disregard for the rights, health, and safety of Plaintiff Clarke, as described herein, thereby entitling Plaintiff Clarke to an award of punitive damages.

## COUNT III | NEGLIGENCE, GROSS NEGLIGENCE, RECKLESSNESS AND WILLFUL AND WANTON MISCONDUCT

151. This cause of action is asserted against all Defendants.

152. Plaintiff Clarke incorporates by reference all allegations asserted in this Complaint.

153. Defendants owed a duty of care towards Plaintiff Clarke that was commensurate with the inherently dangerous, harmful, injurious, bio-persistent, environmentally-persistent, toxic, and bio-accumulative nature of turnouts containing PFAS or PFAS-containing materials.

42

154. Defendants had a duty to exercise reasonable care in the design, research, testing, manufacture, marketing, formulation, supply, promotion, sale, labeling, training of users, production of information materials, use and/or distribution of turnouts into the stream of commerce, including a duty of care to ensure the PFAS did not infiltrate, persist in, accumulate in the blood and/or body of Plaintiff Clarke and including a duty to assure their products would not cause users to suffer unreasonable, dangerous side effects.

155. Defendants had a duty to exercise reasonable care to ensure that turnouts were manufactured, marketed, and sold in such a way as to ensure that the end users of turnouts were not exposed to the likely harm posed by PFAS and/or in such a way as to ensure that the end users were aware of the potential harm PFAS can cause to human health, and were advised to use it in such a way that would not be hazardous to their health.

156. Defendants had a duty to warn of the hazards associated with PFAS and PFAS-containing materials and were in the best position to provide adequate instructions, proper labeling, and sufficient warnings about the turnouts. However, Defendants knowingly elected not to do so.

157. Defendants failed to exercise ordinary care in the designing, researching, testing, manufacturing, formulating, marketing, testing, promotion, supply, sale, and/or distribution of their PFAS chemicals and PFAS-containing turnouts in the regular course of business, in that Defendants knew or should have known that use and exposure to PFAS and PFAS-containing turnouts and materials therein were hazardous to human health and created a high risk of unreasonable, dangerous side effects, including but not limited to severe personal injuries, as described herein.

158. Defendants also knew or should have known that the manner in which they were manufacturing, marketing, distributing, and selling PFAS to be used in turnouts and PFAS-

43

containing turnouts was hazardous to human health, bio-accumulated in the blood, and caused serious health effects, including cancer.

159.    Defendants negligently and deceptively underreported, underestimated, downplayed the serious health dangers of the PFAS-containing turnouts.

160.    At all times material, Plaintiff Clarke inhaled, ingested and/or absorbed dermally hazardous PFAS contaminants released from the Defendants' turnouts.

161.    Plaintiff Clarke's exposure to Defendants' turnouts, which were connected to and incidental to Defendants' manufacture, design, sale, supply and/or distribution of its PFAS-containing turnouts, was harmful and substantially increased the risk of injuries to the Plaintiff Clarke and did cause injuries to Plaintiff Clarke.

162.    Defendants knew or should have known that the manner in which they were manufacturing, marketing, distributing and selling turnouts containing PFAS or PFAS-containing materials therein would result in harm to Plaintiff Clarke as a result of using turnouts in the ordinary course of performing his duties as a firefighter.

163.    Defendants knew, foresaw, anticipated, and/or should have foreseen, anticipated, and/or known that the design, engineering, manufacture, fabrication, sale, release, handling, use, and/or distribution of PFAS or PFAS-containing materials in turnouts, and/or Defendants' other acts and/or omissions as described in this Complaint, could likely result in PFAS exposure to Plaintiff Clarke, the persistence and accumulation of toxic and harmful PFAS in his blood and/or body, and cause injuries to Plaintiff Clarke as herein alleged.

164.    Despite knowing, anticipating, and/or foreseeing the bio-persistent, bio-accumulative, toxic, and/or otherwise harmful and/or injurious nature of PFAS, Defendants, their agents, servants, and/or employees, committed negligent acts and/or omissions that resulted in

44

PFAS exposure to Plaintiff Clarke by and through their foreseeable use of turnouts, the persistence and accumulation of toxic and harmful PFAS in his blood and/or body, and causing injuries to Plaintiff Clarke as herein alleged.

165.    Defendants, through their acts and/or omissions as described in this complaint, breached their duties to Plaintiff Clarke.

166.    It was reasonably foreseeable to Defendants that Plaintiff Clarke would likely suffer the injuries and harm described in this complaint by virtue of Defendants' breach of their duty and failure to exercise ordinary care, as described herein.

167.    Defendants' acts and omissions amount to negligence, gross negligence, reckless disregard for human life and safety, and willful and wanton misconduct.

168.    As a direct and proximate result of the Defendants' acts and omissions, Plaintiff Clarke suffered the injuries and damages.

169.    Defendants acted with willful or wanton conduct, or such recklessness as evinces a conscious disregard for the rights, health, and safety of others including Plaintiff Clarke, as described herein, thereby entitling Plaintiff Clarke to an award of punitive damages.

### COUNT IV | VIOLATIONS OF THE VIRGINIA CONSUMER PROTECTION ACT [VCPA], Va. Code § 59.1-196, *et seq.*

170.    This cause of action is asserted against all Defendants.

171.    Plaintiff Clarke incorporates by reference all allegations asserted in this Complaint.

172.    Plaintiff Clarke's claims arise under the Commonwealth of Virginia's Consumer Protection Act [VCPA], Va. Code § 59.1-196, *et seq.*

173.    Defendants are "suppliers" as that term is defined by the VCPA.

45

174.    The turnouts designed, developed, manufactured, marketed, distributed, released, and/or sold by Defendants the reached Plaintiff Clarke as an end user are "goods" as that term is defined by the VCPA.

175.    Defendants design, develop, manufacture, marketing, distribution, release, and/or sale of the turnouts into the chain of commerce and ultimately reaching Plaintiff Clarke were consumer transactions as that term is defined under the VCPA. Va. Code § 59.1-198.

176.    Defendants, by and through their acts and omissions alleged *supra*, violated Sections 59.1-200(A)(5)(6) and (14) of the VCPA by

> a.    Misrepresenting that goods or services have certain quantities, characteristics, ingredients, uses, or benefits, Va. Code § 59.1-200(A)(5);
>
> b.    Misrepresenting that goods or services are of a particular standard, quality, grade, style, or model; and
>
> c.    Using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction, Va. Code § 59.1-200(A)(14).

177.    Defendants made various material misrepresentations to the general public regarding the attributes of turnouts and the dangers, or lack thereof, of PFAS chemicals for the purpose of inducing members of the general public to purchase their goods and rely on the safety of their goods.

178.    Defendants knew or should have known Plaintiff Clarke would rely, and he did rely, on the material misrepresentations concerning the safety and quality of their turnouts.

179.    As a direct and proximate result of the Defendants' acts and omissions, Plaintiff Clarke suffered injuries.

46

180.    Defendants acted with willful or wanton conduct, or such recklessness as evinces a conscious disregard for the rights, health, and safety of others including Plaintiff Clarke, as described herein, thereby entitling Plaintiff Clarke to an award of punitive damages.

181.    Plaintiff Clarke is also entitled to reasonable attorneys' fees and court costs pursuant to the VCPA, Va. Code § 59.1-204(B).

182.    Because the violations of the VCPA as alleged herein were willful, Plaintiff Clarke is entitled to treble damages pursuant to Va. Code § 59.1-204(A).

### DAMAGES

183.    Plaintiff Clarke incorporates by reference all allegations asserted in this Complaint.

184.    As a direct and proximate result of Defendants' aforementioned wrongful acts or omissions, and each of them, Plaintiff is entitled to recover punitive damages and treble damages pursuant to Virginia § 59.1-204(A).

185.    As a direct and proximate result of Defendants' aforementioned wrongful acts or omissions, and each of them, Plaintiff Clarke  incurred the following damages:

      a.  Bodily injuries, permanent in nature, which have affected their life;

      b.  Past, present and future physical pain and mental anguish;

      c.  Disfigurement and/or deformity coupled with associated humiliation and embarrassment;

      d.  Past, present and future inconvenience;

      e.  Past, present and future lost earnings, and a lessening of earning capacity;

      f.  Personal, social and financial limitations resulting from the injuries sustained by Plaintiffs; and

47

g. Other damages allowable at law, including medical expenses incurred in the past, present and future, and attorneys' fees and costs.

WHEREFORE, for the foregoing reasons, Plaintiff Jonathan Clarke respectfully prays for relief against Defendants, jointly and severally, in the sum of SEVENTY-FIVE MILLION DOLLARS ($75,000,000.00) in compensatory damages, ONE HUNDRED FIFTY MILLION DOLLARS ($150,000,000.00) in punitive damages or in an amount deemed recoverable pursuant to the law of the state deemed applicable to Plaintiff's claim to punitive damages, reasonable attorneys' fees and court costs pursuant to the VCPA, Va. Code Ann. § 59.1-204(B), treble damages pursuant to Va. Code § 59.1-204(A), the cost of this action, pre-judgment interest, post-judgment interest, and any other relief this Court deems just and proper.

## TRIAL BY JURY DEMANDED

The Plaintiff demands a trial with a jury on all issues in the cause, including liability and damages, and on any issue raised by this Complaint that involves any fact disputed by the Defendants and on any issue that may be raised by the Defendants that involves any fact disputed by the Plaintiffs.

Respectfully submitted,

Dated: March 24, 2025                By Counsel:

Kevin Biniazan, Esq. | VSB No. 92109
Jeffrey A. Breit, Esq. | VSB No. 18876
Don Scott, Esq. | VSB No. 88725
Scott M. Perry, Esq. | VSB No. 67417
Lauren Martin, Esq. | VSB No. 93653
Alexis Bale, Esq. | VSB No. 100318
BREIT BINIAZAN, PC
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, VA 23451

48

Telephone | 757.622.6000
Facsimile | 757.299.8028
Email | kevin@bbtrial.com
Email | jeffrey@bbtrial.com
Email | don@bbtrial.com
Email | scott@bbtrial.com
Email | lmartin@bbtrial.com
Email | abale@bbtrial.com

*Counsel for Plaintiffs*

VIRGINIA:  IN THE CIRCUIT COURT FOR THE CITY OF RICHMOND

JONATHAN CLARKE

     Plaintiff,

                        Civil Action No. CL24002853-00

v.

3M COMPANY (f/k/a Minnesota
Mining and Manufacturing Company);
AGC CHEMICALS AMERICAS, INC.;
AMEREX;
ARCHROMA U.S., INC.;
ARKEMA, INC.;
BASF CORPORATION;
BLUE RIDGE RESCUE SUPPLIERS, INC.;
BRADSDEN SOLUTIONS, INC.;
BUCKEYE FIRE EQUIPMENT COMPANY;
CARRIER GLOBAL CORPORATION;
CHEMDESIGN PRODUCTS, INC.;
CHEMGUARD, INC.;
CHEMICALS, INC.;
CHEMOURS COMPANY FC, LLC;
CLARIANT CORPORATION;
CORTEVA, INC.;
DAIKIN AMERICA, INC.;
DEEPWATER CHEMICALS, INC.;
DU PONT DE NEMOURS INC. (f/k/a
DOWDUPONT INC.);
DYNAX CORPORATION;
E.I. DU PONT DE NEMOURS AND
COMPANY;
FIRE SERVICE PLUS, INC.;
GLOBE MANUFACTURING COMPANY LLC;
HONEYWELL INTERNATIONAL, INC.;
HONEYWELL SAFETY PRODUCTS USA, INC.;
JOHNSON CONTROLS, INC;
KIDDIE P.L.C., INC.;
KIDDIE FENWAL, INC.;
LION GROUP, INC.;
MALLORY SAFETY AND SUPPLY, LLC;
MINE SAFETY APPLIANCES COMPANY, LLC;
MSA SAFETY SALES, LLC;
MUNICIPAL EMERGENCY SERVICES INC.;

**NATION FORD CHEMICAL COMPANY;**
**NATIONAL FOAM, INC.;**
**PBI PERFORMANCE PRODUCTS, INC.;**
**SOUTHERN MILLS, INC.;**
**STEDFAST USA, INC.;**
**TENCATE PROTECTIVE FABRICS USA**
**d/b/a SOUTHERN MILLS INC.;**
**THE CHEMOURS COMPANY LLC;**
**TYCO FIRE PRODUCTS;**
**UNITED TECHNOLOGIES CORPORATION;**
**UTC FIRE & SECURITY AMERICAS**
**CORPORATION, INC. (f/k/a GE Interlogix, Inc.);**
**W.L. GORE & ASSOCIATES, INC.;**

    **Defendants.**

### PLAINTIFF'S MOTION FOR LEAVE TO FILE AN AMENDED COMPLAINT

  COMES NOW, undersigned counsel on behalf of Plaintiff Jonathan Clarke, who moves

this Honorable Court for leave to amend the Complaint to clarify and streamline the issues

presented therein, including the causes of action, the named Defendants, and the claims against

those Defendants. In support, Plaintiff states as follows:

### FACTS

  Plaintiff Clarke is a former firefighter who served the city of Richmond. Throughout the

course of the Plaintiff's career, Plaintiff routinely and regularly wore protective clothing designed

for firefighting, known as "turnouts," which were manufactured, distributed, and sold by each of

the Defendants, either individually or through their predecessors or subsidiaries. Unbeknownst to

Plaintiff, these turnouts contained per- and polyfluoroalkyl substances ("PFAS"). PFAS are

human-made chemicals known to cause serious adverse health effects in humans. Plaintiff suffered

long-term exposure to PFAS contained in his turnouts, resulting in Plaintiff suffering injuries and

eventually developing Leukemia on or around July 2022. Consequently, Plaintiff commenced this

litigation on July 2, 2024 by filing his original Complaint in this matter. To date, only two

Defendants, Blue Ridge Rescue Suppliers and Bradsden Solutions, have been served with a copy of the Summons and Complaint.

## LEGAL STANDARD

Rule 1:8 of the Rules of the Supreme Court of Virginia provides leave to amend "shall be liberally granted in furtherance of the ends of justice." The right to file amended pleadings rests in the sound discretion of the trial court. Bentz v. Bentz, 2 Va. App. 486, 488 (1986); see also Kole v. City of Chesapeake, 247 Va. 51, 57 (1994). The Supreme Court has held that a trial court abuses its discretion when it refuses to permit leave to amend when nothing in the record suggests that the amendment will prejudice the opposing party. See, e.g., Ogunde v. Prison Health Servs., 274 Va. 55, 67 (2007) (finding abuse of discretion when a trial court refused to grant leave to amend where plaintiff filed his motion in a timely fashion and there was no evidence of prejudice to defendants); Whittaker v. Heinrich Schepers GMBH & Co. KG, 267 Va. 332, 336 (2008); Kole v. City of Chesapeake, 247 Va. 51, 57 (1994); Mortarino v. Consultant Engineering Servs., 251 Va. 289, 296 (1996). But see Griffin v. Rainer, 212 Va. 627, (1972) (holding that it was not an abuse of discretion for the trial court to deny the motion to amend Plaintiffs' motion for judgment when granting such motion would necessitate a new trial or the reopening of the case for discovery).

Factors that Virginia courts have considered when evaluating prejudice have included whether discovery has been propounded and to what degree an amendment will impact discovery; the number of times that the movant has sought leave to amend; the status and pendency of trial or other pretrial proceedings; and, generally, whether amendment will delay or hinder the resolution of the case. Booher v. Bd. of Supervisors, 65 Va. Cir. 53, 60 (2004); see also Nelson v. Commonwealth, 235 Va. 228, 344 (1988) (allowing amendment of pleadings thirteen days prior to trial); Bell v. Kirby, 226 Va. 641, 646 (1984) (permitting amendment to increase *ad damnum*

two days before trial); Kahn v. Washington, 74 Va. Cir. 95 (2007) (permitting amendment when there was no showing of prejudice as it was the first motion for leave to amend and the parties had six months to prepare for trial).

## ANALYSIS

Presently, Plaintiff's Complaint alleges negligence and breach of warranties against all Defendants for injuries Plaintiff sustained from his exposure to PFAS-containing firefighter turnout gear and AFFF products (also known as "Class B Foam" or "Foam"). See generally Compl. ¶¶ 144-230. Plaintiff's Amended Complaint alters this theory of liability slightly to remove any references to or claims based on Plaintiff's exposure to AFFF chemicals and/or products. The Amended Complaint, however, does not change or add new theories of liability nor does it seek to add new facts or parties to this case. Instead, Plaintiff's Amended Complaint is intended to streamline and clarify an issue that has arisen in other similar PFAS-related litigations – the issue being, which class of PFAS chemicals does Plaintiff allege caused the Plaintiff's injuries.

Currently, before the District Court for South Carolina is the matter of In Re: Aqueous Film-Forming Foams Products Liability Litigation (MDL No. 2873) (hereinafter, the "Foam MDL"). Most, if not all, of the Defendants involved in this litigation are also actively involved in the Foam MDL. The Foam MDL is based on injuries the plaintiffs there had sustained from a very specific PFAS chemical, known as AFFF or Class B foam. Of note, there are over 5,000 different PFAS chemicals, only one of which being the chemical found in Class B firefighting foam.

Plaintiff Clarke seeks to narrow the scope of his existing claims to remove any allegations or statements referencing exposure to or injury from Class B Foam. Plaintiff's claims are rooted in his exposure to the PFAS-containing *turnout gear*, the protective clothing specifically designed

for firefighters, which do not contain the Class B foam chemicals that are the basis of the Foam MDL. Despite this, Plaintiff's original Complaint mistakenly makes numerous references to, and allegations concerning, AFFF and Class B foam. Therefore, for clarity and to streamline litigation, Plaintiff asks this Honorable Court to grant him leave to file his First Amended Complaint, which removes the needless references to AFFF chemicals and removes those Defendants whose products contain such Class B Foam. Doing this will simplify an already intricate case for all parties and this Court.

Moreover, an amendment at this stage in the litigation is in good faith, it is not futile, and it will not prejudice any of the Defendants – of the 44 currently plead, only two Defendants, Bradsden Solutions, Inc., and Blue Ridge Rescue Suppliers, Inc. has filed an Answer, and none have filed any other responsive pleadings. Moreover, Plaintiff's sought amendments, in tandem with his Motions for Nonsuit, greatly ease the burden of this litigation by removing over half of the current plead parties. The parties are yet to confer over a discovery plan, discovery has not begun, depositions have not been noticed nor taken, and a scheduling order has yet to be entered. There is no cause to believe that any party to this matter will be prejudiced by an amendment.

## CONCLUSION

WHEREFORE, for the foregoing reasons, undersigned counsel on behalf of Plaintiff Jonathan Clarke respectfully asks that this Honorable Court grant this Motion for Leave to File an Amended Complaint. Plaintiffs have attached a version of the Amended Complaint in a form suitable for filing (**Exhibit A**), as well as a redlined version for easy review of the proposed changes (**Exhibit B**).

**Respectfully submitted,**

Dated: <u>March 24, 2025</u>          By Counsel:

Kevin Biniazan, Esq. | VSB No. 92109
Jeffrey A. Breit, Esq. | VSB No. 18876
Don Scott, Esq. | VSB No. 88725
Scott M. Perry, Esq. | VSB No. 67417
Lauren Martin, Esq. | VSB No. 93653
Alexis Bale, Esq. | VSB No. 100318
BREIT BINIAZAN, PC
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, VA 23451
Telephone | 757.622.6000
Facsimile | 757.299.8028
Email | kevin@bbtrial.com
Email | jeffrey@bbtrial.com
Email | don@bbtrial.com
Email | scott@bbtrial.com
Email | lauren@bbtrial.com
Email |abale@bbtrial.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of March, 2025, a true and correct copy of the foregoing was filed with the clerk of this Court and I emailed a copy to the following:

John R. Owen (VSB No. 39560)
Julie S. Palmer (VSB No. 65800)
John P. Dunnigan (VSB No. 93483)
Imani E. Sowell (VSB No. 95982)
Yevgeniy K. Klinovskiy (VSB No. 98264)
HARMON, CLAYTOR, CORRIGAN, & WELLMAN
P.O. Box 70280
Richmond, Virginia 23255
(804) 747-5200 – Phone
(804) 747-6085 – Fax
jowen@hccw.com
jpalmer@hccw.com
jdunnigan@hccw.com
isowell@hccw.com
yklinovskiy@hccw.com

*Counsel for Defendants Blue Ridge Rescue
Suppliers, Inc. and Bradsden Solutions, Inc.*

Kevin Biniazan

**VIRGINIA: IN THE CIRCUIT COURT FOR THE CITY OF RICHMOND**

**JONATHAN CLARKE**

        **Plaintiff,**

                                            Civil Action No. CL24002853-00.

**v.**

                                            **TRIAL BY JURY DEMANDED**

**3M COMPANY (f/k/a Minnesota
Mining and Manufacturing Company);
AGC CHEMICALS AMERICAS, INC.;
AMEREX;**
**ARCHROMA U.S., INC.;
ARKEMA, INC.;**
**BASF CORPORATION;**
**BLUE RIDGE RESCUE SUPPLIERS, INC.;
BRADSDEN SOLUTIONS, INC.;**
**BUCKEYE FIRE EQUIPMENT COMPANY;
CARRIER GLOBAL CORPORATION;
CHEMDESIGN PRODUCTS, INC.;
CHEMGUARD, INC.;
CHEMICALS, INC.;
CHEMOURS COMPANY FC, LLC;
CLARIANT CORPORATION;
CORTEVA, INC.;**
**DAIKIN AMERICA, INC.;**
**DEEPWATER CHEMICALS, INC.;
DU PONT DE NEMOURS INC. (f/k/a
DOWDUPONT INC.);
DYNAX CORPORATION;**
**E.I. DU PONT DE NEMOURS AND
COMPANY, a/k/a EDIP, Inc.;**
**FIRE SERVICE PLUS, INC.;**
**GLOBE MANUFACTURING COMPANY LLC;
HONEYWELL INTERNATIONAL, INC.;
HONEYWELL SAFETY PRODUCTS USA, INC.;**
**JOHNSON CONTROLS, INC.;
KIDDIE P.L.C., INC.;
KIDDE-FENWAL, INC.;**
**LION GROUP, INC.;
MALLORY SAFETY AND SUPPLY, LLC;
MINE SAFETY APPLIANCES COMPANY, LLC;
MSA SAFETY SALES, LLC;
MUNICIPAL EMERGENCY SERVICES INC.;**



PLAINTIFF'S
EXHIBIT

**B**

~~NATION FORD CHEMICAL COMPANY;~~
~~NATIONAL FOAM, INC.;~~
PBI PERFORMANCE PRODUCTS, INC.;
~~SOUTHERN MILLS, INC.;~~
STEDFAST USA, INC.;
TENCATE PROTECTIVE FABRICS USA
d/b/a SOUTHERN MILLS INC.;
THE CHEMOURS COMPANY LLC;
and
~~TYCO FIRE PRODUCTS~~;
~~UNITED TECHNOLOGIES CORPORATION;~~
~~UTC FIRE & SECURITY AMERICAS~~
~~CORPORATION, INC. (f/k/a GE Interlogix, Inc.);~~
W.L. GORE & ASSOCIATES, INC.;

       **Defendants.**

## FIRST AMENDED COMPLAINT

COMES NOW Plaintiff Jonathan Clarke who moves this Honorable Court for judgment

against 3M COMPANY (f/k/a Minnesota Mining and Manufacturing Company); AGC

CHEMICALS AMERICAS, INC.; ~~AMEREX;~~ ARCHROMA U.S., INC.; ARKEMA, INC.;

~~BASF CORPORATION~~; BLUE RIDGE RESCUE SUPPLIERS, INC.; BRADSDEN

SOLUTIONS, INC.; ~~BUCKEYE FIRE EQUIPMENT COMPANY; CARRIER GLOBAL~~

~~CORPORATION; CHEMDESIGN PRODUCTS, INC.; CHEMGUARD, INC.; CHEMICALS,~~

~~INC.; CHEMOURS COMPANY FC, LLC; CLARIANT CORPORATION; CORTEVA, INC.;~~

DAIKIN AMERICA, INC.;~~DEEPWATER CHEMICALS, INC.; DU PONT DE NEMOURS~~

~~INC. (f/k/a DOWDUPONT INC.); DYNAX CORPORATION~~; E.I. DU PONT DE NEMOURS

AND COMPANY, a/k/a EDIP, Inc.; ~~FIRE SERVICE PLUS, INC.~~; GLOBE MANUFACTURING

COMPANY LLC; HONEYWELL INTERNATIONAL, INC.; HONEYWELL SAFETY

PRODUCTS USA, INC.; ~~JOHNSON CONTROLS, INC.; KIDDIE P.L.C., INC.; KIDDE-~~

~~FENWAL, INC.~~;

2

LION GROUP, INC.; MALLORY SAFETY AND SUPPLY, LLC; MINE SAFETY APPLIANCES COMPANY, LLC; MSA SAFETY SALES, LLC; MUNICIPAL EMERGENCY SERVICES INC.; NATION FORD CHEMICAL COMPANY; NATIONAL FOAM, INC.; PBI PERFORMANCE PRODUCTS, INC.; SOUTHERN MILLS, INC.; STEDFAST USA, INC.; TENCATE PROTECTIVE FABRICS USA d/b/a SOUTHERN MILLS INC.; THE CHEMOURS COMPANY LLC; TYCO FIRE PRODUCTS; and UNITED TECHNOLOGIES CORPORATION; UTC FIRE & SECURITY AMERICAS CORPORATION, INC. (f/k/a GE Interlogix, Inc.); W.L. GORE & ASSOCIATES, INC.,; Defendants, jointly and severally, for compensatory damages, punitive damages, costs of this action, and pre-judgment interest and post-judgment interest together with actual damages, treble damages, and attorney's fees pursuant to the Virginia Consumer Protection Act on the grounds set forth below:

## BACKGROUND

1.     Jonathan Clarke ("Plaintiff Clarke") is a firefighter who works for the Richmond Fire Department and serves the City of Richmond.

2.     Plaintiff Clarke brings this action for monetary damages and appropriate equitable and injunctive relief for harm resulting from exposure to per- and polyfluoroalkyl substances ("PFAS") that were manufactured, designed, sold, supplied, distributed and/or contained in products protective clothing specifically designed for firefighters ("turnouts") manufactured, designed, sold supplied and/or distributed by each of the Defendants, individually or through their predecessors or subsidiaries.

3.     PFAS are human-made chemicals consisting of a chain of carbon and fluorine atoms used in manufactured products to, *inter alia*, resist and repel oil, stains, heat and water. PFAs

3

include "long-chain" PFAS made up of seven or more carbon atoms ("long-chain PFAS") as well as "short-chain" PFAS made up of six or fewer carbon atoms ("short-chain PFAS").

4.      PFAS are known as "forever chemicals" because they are immune to degradation, bioaccumulate in individual organisms and humans, and increase in concentration up the food chain. PFAS exposure to humans can occur through inhalation, ingestion and dermal contact.

5.      PFAS have been associated with multiple and serious adverse health effects in humans including cancer, tumors, liver damage, immune system and endocrine disorders, high cholesterol, thyroid disease, ulcerative colitis, birth defects, decreased fertility, and pregnancy-induced hypertension. PFAS have also been found to concentrate in human blood, bones, and organs.

6.      Unbeknownst to Plaintiff Clarke, Defendants have manufactured, marketed, distributed, sold, or used PFAS and PFAS-containing materials in protective clothing specifically designed for firefighters ("turnouts"), and firefighting foams known as aqueous-film forming foams ("AFFF").

7.      AFFF is a specialized substance designed to extinguish petroleum-based fires. It has been used for decades by firefights to extinguish fires in training and in response to Class B fires.

8.7.    For decades, Defendants were aware of the toxic nature of PFAS and the harmful impact these substances have on human health. Yet, Defendants manufactured, designed, marketed, sold, supplied, or distributed PFAS and PFAS chemical feedstock, as well PFAS-containing turnouts and AFFF, to firefighting training facilities and fire departments nationally, including in Virginia and in the City of Richmond. Defendants did so, moreover, without ever informing firefighters or the public that turnouts and AFFF contained PFAS, and without warning

4

firefighters or the public of the substantial and serious health injuries that can result from exposure to PFAS or PFAS-containing materials.

9.8. Plaintiff wore turnouts and used AFFF in the usual and normal course of performing his firefighting duties and training and was repeatedly exposed to PFAS in his workplaceturnouts. Plaintiff did not know and, in the exercise of reasonable diligence, could not have known that these products turnouts contained PFAS or PFAS-containing materials. Plaintiff Clarke also did not know that PFAS were in his body and blood.

10.9. At all relevant times and continuing to the present, Defendants have represented that their turnouts and AFFF are safe.

11.10. Plaintiff Clarke used the turnouts and AFFF as they were intended and in a foreseeable manner which exposed him to PFAS in the course of his firefighting activities. This repeated and extensive exposure to PFAS resulted in Plaintiff Clarke developing Leukemia.

12. This repeated and extensive exposure to PFAS resulted in Plaintiff Clarke developing Leukemia.

13.11. Defendants knowingly and willfully manufactured, designed, marketed, sold, and distributed chemicals and/or products containing PFAS for use within the State of Virginia when they knew or reasonably should have known that Plaintiff would repeatedly inhale, ingest, and/or have dermal contact with these harmful compounds during the ordinary course of his profession, including during firefighting training exercises and in firefighting emergencies, and that such exposure would threaten the health and welfare of firefighters exposed to these dangerous and hazardous chemicals.

## PARTIES

### *Plaintiff*

5

~~14.~~12. Plaintiff Jonathan Clarke is an adult resident of the Commonwealth of Virginia. Plaintiff Clarke has worked as a firefighter, serving the City of Richmond since February 9, 200~~2~~4. As a result of exposure to PFAS contained in his turnouts ~~and AFFF~~ while working as a firefighter, Plaintiff Clarke was diagnosed with Leukemia on or around July 2022.

### *Defendants*

~~15.    Defendants are designers, marketers, developers, manufacturers, distributors, promoters, instructors, and sellers of PFAS-containing turnout gear and/or AFFF products. The following Defendants, at all times relevant to this lawsuit, manufactured, designed, marketed, distributed, released, instructed, promoted and/or otherwise sold (directly or indirectly) PFAS-containing turnout gear and/or AFFF products across the United States, including Virginia and the City of Richmond, for use in firefighting duties and fighting Class B fires such that each Defendant knew or should have known said products would be delivered to areas for active use by Plaintiff Clarke during the course of training and firefighting duties.~~

~~16.~~13. Defendant 3M Company (a/k/a Minnesota Mining and Manufacturing Company) ("3M") is a Delaware corporation that does business throughout the United States, including conducting business in Virginia. 3M has its principal place of business in St. Paul, Minnesota. 3M developed, manufactured, marketed, distributed, released, sold and/or used PFAS, PFAS materials, and products containing PFAS in turnouts ~~and AFFF used in firefighting training and in firefighting~~, including in Virginia and in the City of Richmond.

~~17.~~14. Defendant AGC Chemicals Americas, Inc. ("AGC") is a Delaware corporation that does business throughout the United States, including conducting business in Virginia by and through its introduction of its products and goods into the stream of commerce which it knew or had reason to know would enter, be sold, used, and consumed throughout the Commonwealth of

6

Virginia. AGC has its principal place of business in Exton, Pennsylvania. AGC developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and AFFF used in firefighting training and in firefighting, including in Virginia and in the City of Richmond.

18. Defendant Amerex Corporation ("Amerex") is an Alabama corporation that does business throughout the United States, including conducting business in Virginia. Amerex has its principal place of business in Trussville, Alabama. Amerex developed, manufactured, marketed, distributed, released, sold and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and AFFF used in firefighting training and in firefighting, including in Virginia and in the City of Richmond.

19.15. Defendant Archroma U.S., Inc. ("Archroma") is a North Carolina corporation that does business throughout the United States, including conducting business in Virginia. Archroma has its principal place of business in Charlotte, North Carolina. Archroma developed, manufactured, marketed, distributed, released, sold and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and AFFF used in firefighting training and in firefighting, including in Virginia and in the City of Richmond.

20.16. Defendant Arkema, Inc. ("Arkema") is a Pennsylvania corporation that does business throughout the United States, including conducting business in Virginia. Arkema has its principal place of business in King of Prussia, Pennsylvania. Arkema developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and AFFF used in firefighting training and in firefighting, including in Virginia and in the City of Richmond.

21.   Defendant BASF Corporation ("BASF") is a Delaware corporation that does business throughout the United States, including conducting business in Virginia. BASF has its principal place of business in Florham Park, New Jersey. BASF developed, manufactured, marketed, distributed, released, sold and/or used PFAS, PFAS materials, and products containing PFAS in AFFF used in firefighting training and in firefighting by the City of Richmond Fire Department to include Plaintiff Clarke.

22.17.   Defendant Blue Ridge Rescue Suppliers, Inc. ("Blue Ridge") is or was a Virginia stock corporation doing business throughout the Commonwealth of Virginia by and through its sale and distribution of turnouts containing PFAS to the City of Richmond Fire Department to include Plaintiff Clarke.

23.18.   Defendant Bradsden Solutions, Inc. ("Bradsden"), is believed to be the acquiring company or the same corporate entity under a newly registered name as Blue Ridge Rescue Suppliers, Inc. Bradsden Solutions, Inc. is a Virginia stock corporation that did business throughout the Commonwealth of Virginia by and through its sale and distribution of turnouts containing PFAS to the City of Richmond Fire Department to include Plaintiff Clarke.

24.   Defendant Buckeye Fire Equipment Company ("Buckeye") is an Ohio corporation that does business throughout the United States, including conducting business in Virginia. Buckeye has its principal place of business in Mountain, North Carolina. Buckeye developed, manufactured, marketed, distributed, released, sold and/or used PFAS, PFAS materials, and products containing PFAS in AFFF used in firefighting training and in firefighting by the City Richmond Fire Department to include Plaintiff Clarke.

25.   Defendant Carrier Global Corporation ("Carrier") is a Delaware corporation that does business throughout the United States, including conducting business in Virginia. Carrier has

its principal place of business in Palm Beach Gardens, Florida. Carrier is the parent of Defendant Kidde-Fenwal, Inc. Carrier developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and in the City of Richmond.

26.    Defendant ChemDesign Products, Inc. ("ChemDesign") is a Texas corporation that does business throughout the United States, including conducting business in Virginia. ChemDesign has its principal place of business in Marinette, Wisconsin. ChemDesign developed, manufactured, marketed, distributed, released, sold and/or used PFAS, PFAS materials, and products containing PFAS in AFFF used in firefighting training and in firefighting by the City of Richmond Fire Department to include Plaintiff Clarke.

27.    Defendant Chemicals, Inc. ("Chemicals") is a Texas corporation that does business throughout the United States, including conducting business in Virginia. Chemicals has its principal place of business in Baytown, Texas. Chemicals developed, manufactured, marketed, distributed, released, sold and/or used PFAS, PFAS materials, and products containing PFAS in AFFF used in firefighting training and in firefighting by the City of Richmond Fire Department to include Plaintiff Clarke.

28.    Defendant Chemours Company FC, LLC ("Chemours FC") is a Delaware corporation that does business throughout the United States, including conducting business in Virginia. Chemours FC has its principal place of business in Wilmington, Delaware. Chemours FC developed, manufactured, marketed, distributed, released, sold and/or used PFAS, PFAS materials, and products containing PFAS in AFFF used in firefighting training and in firefighting by the City of Richmond Fire Department to include Plaintiff Clarke.

9

29.    Defendant Clariant Corporation ("Clariant") is a New York corporation that does business throughout the United States, including conducting business in Virginia. Clariant has its principal place of business in Charlotte, North Carolina. Clariant developed, manufactured, marketed, distributed, released, sold and/or used PFAS, PFAS materials, and products containing PFAS in AFFF used in firefighting training and in firefighting by the City of Richmond Fire Department to include Plaintiff Clarke.

30.    Defendant Corteva, Inc. ("Corteva") is a Delaware corporation that does business throughout the United States, including conducting business in Virginia. Corteva has its principal place of business in Wilmington, Delaware. Corteva is the successor-in-interest to Dupont Chemical Solutions Enterprise. Corteva developed, manufactured, marketed, distributed, released, sold and/or used PFAS, PFAS materials, and products containing PFAS in AFFF used in firefighting training and in firefighting by the City of Richmond Fire Department to include Plaintiff Clarke.

31.19.  Defendant Daikin America, Inc. ("Daikin America") is a Delaware corporation that does business throughout the United States, including conducting business in Virginia. Daikin America has its principal place of business in Orangeburg, New York. Daikin America developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and the City of Richmond.

32.    Defendant Deepwater Chemicals, Inc. ("Deepwater") is a Delaware corporation that does business throughout the United States, including conducting business in Virginia. Deepwater has its principal place of business in Woodward, Oklahoma. Deepwater developed, manufactured, marketed, distributed, released, sold and/or used PFAS, PFAS materials, and

10

products containing PFAS in AFFF used in firefighting training and in firefighting by the City of Richmond Fire Department to include Plaintiff Clarke.

33.    Defendant Du Pont de Nemours Inc. (f/k/a/ DowDuPont, Inc.) ("DowDuPont") is a Delaware corporation that does business throughout the United States, including conducting business in Virginia. DowDuPont has its principal place of business in Wilmington, Delaware and Midland, Michigan. DowDuPont was created in 2015 to transfer Chemours and Dupont liabilities for manufacturing and distributing flurosurfactants to AFFF manufacturers. DowDuPont developed, manufactured, marketed, distributed, released, sold and/or used PFAS, PFAS materials, and products containing PFAS in AFFF used in firefighting training and in firefighting by the City of Richmond Fire Department to include Plaintiff Clarke.

34.    Defendant Dynax Corporation ("Dynax") is a New York corporation that does business throughout the United States, including conducting business in Virginia. Dynax has its principal place of business in Elmsford, New York. Dynax developed, manufactured, marketed, distributed, released, sold and/or used PFAS, PFAS materials, and products containing PFAS in AFFF used in firefighting training and in firefighting by the City of Richmond Fire Department to include Plaintiff Clarke.

35.20.  Defendant E.I. du Pont de Nemours & Co., also known as EIDP, Inc. ("DuPont"), is a Delaware corporation that does business throughout the United States, including conducting business in Virginia. DuPont has its principal place of business in Wilmington, Delaware. DuPont developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and AFFF used in firefighting training and in firefighting, including in Virginia and in the City of Richmond.

11

36.   Defendant Fire Service Plus, Inc. ("Fire Service Plus") is a Georgia corporation that does business throughout the United States, including conducting business in Virginia by and through its introduction of its products and goods into the stream of commerce which it knew or had reason to know would enter, be sold, used, and consumed throughout the Commonwealth of Virginia. Fire Service Plus has its principal place of business in Simi Valley, California. Fire Service Plus developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and in the City of Richmond.

37.21. Defendant Globe Manufacturing Company, LLC ("Globe") is a New Hampshire corporation that does business throughout the United States, including conducting business in Virginia. Globe has its principal place of business in Pittsfield, New Hampshire. Globe developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and in the City of Richmond. Defendant Mine Safety Appliance Company acquired Globe Holding Company, LLC and its subsidiaries (collectively, "MSA/Globe") in 2017 and continues to do business under the Globe name.

38.22. Defendant Honeywell International, Inc. ("Honeywell International") is a Delaware corporation that does business throughout the United States, including conducting business in Virginia. Honeywell Int'l has its principal place of business in Charlotte, North Carolina. Honeywell International developed manufactured, marketed, distributed, released, sold and/or used PFAS, PFAS materials, and products containing PFAS in turnouts including its Morning Pride branded turnout throughout Virginia including the City of Richmond.

12

39.23. Defendant Honeywell Safety Products USA, Inc. ("Honeywell") is a Delaware corporation that does business throughout the United States, including conducting business in Virginia. Honeywell has its principal place of business in Charlotte, North Carolina. Honeywell developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts including its Morning Pride branded turnout throughout Virginia including the City of Richmond.

40.    Defendant Johnson Controls, Inc. ("Johnson Controls") is a Delaware corporation that does business throughout the United States, including conducting business in Virginia. Johnson Controls has its principal place of business in Milwaukee, Wisconsin. Johnson Controls is the parent of Defendants Tyco Fire Products, LP and Chemguard, Inc. Johnson Controls developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and in the City of Richmond.

41.    Defendant Kiddie P.L.C., Inc. ("Kiddie P.L.C.) is a foreign organized and existing under the laws of the State of Delaware and does business throughout the United States, including conducting business in Virginia. Kiddie P.L.C. has its principal place of business in Farmington, Connecticut. Kiddie P.L.C. developed, manufactured, marketed, distributed, released, sold and/or used PFAS, PFAS materials, and products containing PFAS in AFFF used in firefighting training and in firefighting by the City of Richmond Fire Department to include Plaintiff Clarke.

42.    Defendant Kidde-Fenwal, Inc. ("Kidde-Fenwal") is a Delaware corporation that does business throughout the United States, including conducting business in Virginia. Kidde-Fenwal has its principal place of business in Ashland, Massachusetts. Kidde-Fenwal developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and

products containing PFAS in turnouts and AFFF used in firefighter training and in firefighting, including in Virginia and in the City of Richmond.

43.24. Defendant Lion Group, Inc., ("Lion") is an Ohio corporation that does business throughout the United States, including conducting business in Virginia by and through its introduction of its products and goods into the stream of commerce which it knew or had reason to know would enter, be sold, used, and consumed throughout the Commonwealth of Virginia. Lion has its principal place of business in Dayton, Ohio. Lion developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and the City of Richmond.

44.25. Defendant Mallory Safety and Supply, LLC ("Mallory") is a California corporation that does business throughout the United States, including conducting business in Virginia. Mallory has its principal place of business in Portland, Oregon. Mallory developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and the City of Richmond.

45.26. Defendant Mine Safety Appliance Company, LLC ("MSA/Globe") is a Pennsylvania corporation that does business throughout the United States, including conducting business in Virginia. MSA has its principal place of business in Cranberry Township, Pennsylvania. MSA acquired Globe Holding Company, LLC and its subsidiaries (collectively, "MSA/Globe") in 2017 and continues to do business under the Globe name. MSA developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and the City of Richmond.

46.27. Defendant MSA Safety Sales, LLC ("MSA Safety Sales") is a Pennsylvania corporation that does business throughout the United States, including conducting business in

14

Virginia. MSA has its principal place of business in Cranberry Township, Pennsylvania. MSA Safety Sales developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and the City of Richmond.

47.28. Municipal Emergency Services, Inc. ("MES") is a Nevada corporation that does business throughout the United States, including conducting business in Virginia. MES has its principal place of business in Sandy Hook, Connecticut. MES developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and the City of Richmond.

48.   Defendant Nation Ford Chemical Company ("Nation Ford") is a South Carolina corporation that does business throughout the United States, including conducting business in Virginia. Nation Ford has its principal place of business in Fort Mill, South Carolina. Nation Ford developed, manufactured, marketed, distributed, released, sold and/or used PFAS, PFAS materials, and products containing PFAS in AFFF used in firefighting training and in firefighting by the City of Richmond Fire Department to include Plaintiff Clarke.

49.   Defendant National Foam, Inc. ("National Foam") is a Delaware corporation that does business throughout the United States, including conducting business in Virginia. National Ford has its principal place of business in Angier, North Carolina. National Foam developed, manufactured, marketed, distributed, released, sold and/or used PFAS, PFAS materials, and products containing PFAS in AFFF used in firefighting training and in firefighting by the City of Richmond Fire Department to include Plaintiff Clarke.

50.29. Defendant PBI Performance Products, Inc., ("PBI") is a Delaware corporation that does business throughout the United States, including conducting business in Virginia. PBI has its

principal place of business in Charlotte, North Carolina. PBI developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and City of Richmond.

51.30. Defendant StedFast USA, Inc. ("StedFast") is a Delaware corporation that does business throughout the United States, including conducting business in Virginia. StedFast has its principal place of business in Piney Flats, Tennessee. StedFast developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and City of Richmond.

52.31. Defendant TenCate Protective Fabrics USA d/b/a Southern Mills, Inc. ("Tencate") is a Georgia corporation that does business throughout the United States, including conducting business in Virginia by and through its introduction of its products and goods into the stream of commerce which it knew or had reason to know would enter, be sold, used, and consumed throughout the Commonwealth of Virginia. Tencate has its principal place of business in Senoia, Georgia. Tencate developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and the City of Richmond.

53.32. Defendant The Chemours Company, LLC ("Chemours") is a Delaware corporation that does business throughout the United States, including conducting business in Virginia. Chemours has its principal place of business in Wilmington, Delaware. Chemours developed, manufactured, marketed, distributed, released, sold and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and AFFF used in firefighting training and in firefighting, including in Virginia and in the City of Richmond.

16

54.    Defendant Tyco Fire Products, L.P. ("Tyco") is a Delaware corporation that does business throughout the United States, including conducting business in Virginia. Tyco has its principal place of business in Princeton, New Jersey. Tyco developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and AFFF used in firefighting training and in firefighting, including in Virginia and in the City of Richmond.

55.    Defendant United Technologies Corporation ("United Technologies") is a foreign corporation organized and existing under the laws of the State of Delaware and that does business throughout the United States, including conducting business in Virginia. United Technologies has its principal place of business in Farmington, Connecticut. United Technologies developed, manufactured, marketed, distributed, released, sold and/or used PFAS, PFAS materials, and products containing PFAS in AFFF used in firefighting training and in firefighting by the City of Richmond Fire Department to include Plaintiff Clarke.

56.    Defendant UTC Fire & Security Americas Corporation, Inc. (f/k/a GE Interlogix, Inc.) ("UTC") is a North Carolina corporation that does business throughout the United States, including conducting business in Virginia. UTC has its principal place of business in Lincolnton, North Carolina. UTC developed, manufactured, marketed, distributed, released, sold and/or used PFAS, PFAS materials, and products containing PFAS in AFFF used in firefighting training and in firefighting by the City of Richmond Fire Department to include Plaintiff Clarke. Upon information and belief, Kiddie-Fenwal, Inc. is part of the UTC Climate Control & Security unit of United Technologies Corporation.

57.33.  Defendant W. L. Gore & Associates, Inc., ("Gore") is a Delaware corporation that does business throughout the United States, including conducting business in Virginia. Gore has

17

its principal place of business in Newark, Delaware. Gore developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and in the City of Richmond.

## JURISDICTION AND VENUE

58.34. This Court has personal jurisdiction over the Defendants pursuant to Va. Code § 8.01-328.1(A)(1)–(4), as the cause of action arises from the foreign Defendants' transacting business in Virginia, contracting to supply services or things in Virginia, causing tortious injury by an act or omission in Virginia, and causing tortious injury by an act or omission outside of Virginia when they regularly conduct business in Virginia.

59.35. This Court has general and specific jurisdiction over Defendants, as they have purposefully availed themselves of the privileges of conducting business activities within Virginia through the marketing, sale, and distribution of products and services in Virginia, and/or profiting from such activity; they have purposefully directed activities towards Virginia and Virginia residents; and this litigation results from injuries that arose out of those activities.

60.36. This Court has general and specific jurisdiction over Defendants by virtue of their purposeful, continuous, systematic contacts, and general business purpose in Virginia.

61.37. Plaintiff's exposure and injuries, resulting from the acts of Defendants alleged herein, occurred within the Commonwealth of Virginia.

62.38. Venue is proper in this Court under Va. Code § 8.01-262(2), (3) and (4).

## SUBSTANTIVE ALLEGATIONS

### A. Plaintiff Clarke's Use of and Exposure to PFAS-Containing Products

63.39. Plaintiff Clarke proudly has served the City of Richmond as a firefighter for the Richmond Fire Department for over 20 years.

18

64.40. As a first responder to fire, hazardous materials incidents, and other emergency and medical calls, Plaintiff Clarke risks his life on a daily basis. He not only saved lives and homes but also provided emergency services and medical care, performed rescues, and offered support to people in traumatic circumstances. To prepare him for this enormously challenging work, Plaintiff Clarke wore turnouts , used AFFF to suppress Class B fires and received extensive and ongoing training in fire suppression, fire prevention, rescue, and emergency medical care action to protect and/or minimize the loss of life, property, and damage to the environment.

65.41. The Richmond Fire Department ("RFD") serves the residents of Richmond, Virginia by providing an all-hazard response service. Richmond firefighters also provide emergency medical technicians ("EMT") and paramedics to the community. RFD protects the city's residents, workers and tourists in high-rise buildings, schools, hospitals, churches, community centers, stores, historical landmarks, tunnels, bridges, hotels, and residential structures in densely populated neighborhoods.

66.42. For decades, Defendants, either individually or through their predecessors or subsidiaries, have manufactured, designed, sold, supplied, and distributed AFFF and/or turnouts containing PFAS to firefighters. firefighting training facilities, and fire departments globally, including within the Commonwealth of Virginia and the City of Richmond and neighboring communities in Virginia.

67.43. With over 5,000 individual chemicals, PFAS is a large and ever-growing category of human-made chemicals, consisting of a nearly indestructible chain of carbon and fluorine atoms that are widely used in products to, *inter alia*, resist and repel oil, heat and water, and have been found to have negative health effects. As detailed below, these toxic chemicals are present in firefighter turnouts and AFFF.

19

### (1) PFAS-Containing Turnout Gear

68.44. Defendants knew or should have known that during firefighting training and when responding to fires and performing fire extinguishment, firefighters wear turnouts that are intended to provide a degree of thermal, chemical, and biological protection for a firefighter. Turnout gear components include a helmet, hood, jacket, pants, boots, and gloves. Each component is made of an outer layer, as well as several inner layers that include a moisture barrier and thermal liner which are meant to protect the firefighter from ambient heat.

69.45. A June 2020 study of turnout gear by researchers at the University of Notre Dame analyzed 30 new and used turnout jackets and pants originally marketed, distributed and sold in 2008, 2014, and 2017, by six turnout gear makers, including Defendants MSA/Globe, Lion and Honeywell, and found high levels of PFAS in turnout gear worn, used, or handled by firefighters using these brands of turnout gear, which included Plaintiff Clarke.

70.46. In May 2023, Section 338 of the William M. Thornberry National Defense Authorization Act for titled the "Guaranteeing Equipment for Safety for Firefighters Act of 2020," directed the National Institute of Standards and Technology ("NIST") to identify the type, prevalence and concentration of PFAS in unused firefighter turnout gear. The study specifically looked at twenty textiles used to make firefighter turnout gear. The NIST study found between one and seventeen PFAS present in each textile used to construct the turnout gear.

71.47. When exposed to heat, PFAS chemicals in the turnouts off-gas, break down, and degrade into highly mobile and toxic particles and dust, exposing firefighters to PFAS chemicals, particles and dust, including through skin contact/absorption, ingestion (e.g., hand-to-mouth contact) and/or inhalation. Further firefighter exposure to these highly mobile and toxic materials

20

occurs through normal workplace activities, because particles or dust from their turnouts spread to fire vehicles and fire stations, as well as firefighters' cars and homes.

72.48. Such workplace exposure to PFAS or PFAS-containing materials has been found to be toxic to humans. As far back as a July 31, 1980, internal memo, DuPont officials described measures that were needed to prevent workplace exposure to PFOA, which they knew could permeate all protective materials, and noted that PFOA's toxicity varied depending on the exposure pathway, acknowledging that ingestion was "slightly toxic," dermal contact was "slightly to moderately toxic" and inhalation was "highly toxic." The memo concluded "continued exposure is not tolerable."

73.49. As alleged herein, the Plaintiff Clarke wore turnouts in the ordinary course of performing his duties, as the turnouts were intended to be used and in a foreseeable manner, which exposed him to significant levels of PFAS.

74.50. Plaintiff Clarke did not know, and in the exercise of reasonable diligence could not have known, that the turnouts they wore or used in the course of performing his duties contained PFAS or PFAS-containing materials, and similarly did not know and could not have known that he routinely suffered exposure to PFAS or PFAS-containing materials in the turnouts they wore or used in performing his duties. The turnout gear worn or used by Plaintiff Clarke did not contain labeling information saying that the gear contained PFAS, and similarly did not warn Plaintiff Clarke of the health risks associated with exposure to PFAS.

75.51. Like many fire departments across the country, Plaintiff Clarke only had one set ofhad a limited number of turnouts to wear for years, and would wash his turnouts at home and/or in station machines along with his daily station wear uniforms.

(2) PFAS-Containing AFFF

21

76.    Aqueous Film-Forming Foam ("AFFF") is a combination of chemicals used to extinguish hydrocarbon fuel-based fires.

77.    AFFF is a Class-B firefighting foam, which contains PFAS. It is mixed with water and used to extinguish fires that are difficult to fight, particularly those that involve petroleum or other flammable liquids.

78.    AFFF concentrate is typically sold in five-gallon containers that a firefighter is responsible for storing on the engine and/or pouring into the foam bladder of engine. To mix the foam concentrate and water in an engine that is not pre-plumbed, an eductor must be placed in the foam concentrate to draw up the concentrate and mix it with water to create a thick, white, foamy substance. The firefighter is responsible for this process of preparing the foam and for cleaning the equipment (bladders, hoses, nozzles, etc.) after use.

79.    The process of mixing AFFF, plumbing and preparing it, and cleaning the equipment after foam use causes exposure to PFAS through skin contact, inhalation, or ingestion (e.g., hand-to-mouth contact). The AFFF containers used by Plaintiff Clarke in his fire department to mix and prepare AFFF for use did not say that the foam contains PFAS, and did not warn Plaintiff Clarke of the serious health risks associated with exposure to PFAS.

80.    AFFF is used in fire extinguishment in a manner typical of routine methods of fire extinguishment—by being sprayed through a fire hose.

81.    The techniques used for "laying a blanket" of AFFF in fire extinguishment include: banking the foam off a wall or vertical surface to agitate the foam before it covers the fire; or applying it to the ground surface where the fire is burning. In structural fires, it can also be necessary to spray the ceilings, walls and floors. Reapplication of foam is often necessary because the foam blanket will break down over time.

82. These techniques are used routinely in firefighting training as well as in real-world fire extinguishment, and result in firefighters being sprayed or entirely soaked with AFFF, walking in and through AFFF, or kneeling in AFFF during used—all as depicted in the exemplar photos below. As a result, the techniques cause exposure to PFAS through skin contact, inhalation, or ingestion (e.g., hand-to-mouth contact).





23

83. ~~As alleged herein, Plaintiff Clarke used AFFF in the ordinary course of performing his firefighting duties, as it was intended to be used and in a foreseeable manner which exposed him to significant levels of PFAS.~~

84. ~~Plaintiff Clarke did not know, and in the exercise of reasonable diligence, could not have known that the AFFF he used in the course of performing his duties contained PFAS or PFAS-containing materials, and similarly did not known and could not have known that he routinely suffered exposure to PFAS or PFAS-containing materials in the AFFF used in performing his duties.~~

## B. The Chemical Structure of PFAS Makes Them Harmful to Human Health

~~85.~~52. PFAS are known as "forever chemicals" because they are immune to degradation, bioaccumulate in individual organisms and humans, and increase in concentration up the food chain. Indeed, scientists are unable to estimate an environmental half-life (i.e., the time it takes for 50% of the chemical to disappear) for PFAS. Additionally, some PFAS chemicals (known as "precursors") degrade into different long-chain PFAS chemicals.

~~86.~~53. PFAS are nearly indestructible and are highly transportable. PFAS exposure to humans can occur through inhalation, ingestion, or dermal contact.

~~87.~~54. PFAS chemicals include "older" long-chain PFAS like PFOA, PFOS, and PFNA that have seven or more carbon atoms, and "newer" short-chain PFAS, like PFBA, PFBS, PFHxA, and PFHxS. The PFAS chemical industry has repeatedly asserted that short-chain PFAS are safer and bio-degrade more easily than long-chain PFAS. However, short-chain PFAS are molecularly similar to long-chain PFAS, and recent scientific research conducted in 2020, shows that short-chain PFAS are in fact extremely persistent, highly mobile and transportable, almost impossible to remove from water, bio-accumulate in humans and the environment, and show similar toxicity

24

as long-chain PFAS. For example, short-chain PFBA (with only four carbon molecules) which was created by defendant 3M and reportedly has a shorter half-life than other PFAS, recently has been found to accumulate in the lungs and, in turn, increase the severity of COVID-19 in patients with elevated levels of PFBA, among other health concerns. Short-chain PFAS also have lower technical performance and may therefore be used at higher quantities cancelling out any supposed benefits of lower bioaccumulation potential.

88.55. In October 2021, the U.S. Environmental Protection Agency ("EPA") updated its 2018 assessment of short-chain PFAS, also known as "GenX", finding that two of Defendant Chemours GenX chemicals are *more toxic* than PFOA - the highly toxic chemical these were intended to replace.

89.56. To date, there is no safe, acceptable or "normal" level of PFAS in the human body. Further, the fact that PFOA, PFOS, PFHxS, PFHpA, and PFNA are often found together presents a substantial risk to human health. Defendants' assertions that their products are safe because they do not contain PFOA or PFOS, or because they contain short-chain PFAS is just another example of their efforts to deflect from the reality that there are thousands of PFAS – including precursor PFAS which degrade into PFOA and PFOS.

90.57. PFAS exposure affects nearly every system in the body. It has been associated with multiple and serious adverse health effects in humans including, but not limited to, cancer, tumors, liver damage, immune system and endocrine disorders, thyroid disease, ulcerative colitis, birth defects, decreased fertility, pregnancy-induced hypertension, accelerated changes in gene expression, and increases in oxidative stress which can contribute to DNA changes, tumor promotion, and other health conditions.

### C. Defendants Knowingly Manufactured, Developed, Marketed, Distributed, Supplied, and/or Sold Toxic PFAS and/or Products Containing PFAS

25

9̶1̶.58. Defendants have each marketed, developed, distributed, sold, promoted, manufactured, released, or otherwise used PFAS chemicals in ~~products, including in PFAS-containing~~ turnout gear ~~and AFFF,~~ throughout the United States and in Virginia.

9̶2̶.59. PFAS were first developed in the 1930s and 1940s. Soon after, 3M began manufacturing a PFAS material called perfluorooctanoic acid ("PFOA"), selling it to other companies, including DuPont.

9̶3̶.60. By the 1950s, PFAS were widely used in large-scale manufacturing. Prior to this, PFAS had never been detected in nor were present in human blood or bodies.

~~94.    In the 1960s, Class B foam (including AFFF) containing PFAS entered the global market and became the primary firefighting foam all over the world with 3M as one of the largest manufacturers.~~

~~95.    In the 1970s, Defendants National Foam and Tyco began to manufacture, market and sell AFFF containing PFAS, followed by Defendants Chemguard and Dynax in the 1990s. and Defendant Buckeye in the 2000s.~~

9̶6̶.61. Founded in 1918, Defendant MSA/Globe began manufacturing, marketing and selling turnout gear with DuPont's NOMEX® PFAS-containing flame resistant fabric in 1966. MSA/Globe (under the Globe name) continues to manufacture, market and sell turnout gear using PFAS-containing fabrics supplied by its partners, DuPont, Gore, Tencate, and PBI.

9̶7̶.62. Defendant Lion began to manufacture, market and sell turnout gear in 1970. Since its founding, and continuing through to the present, Lion makes, markets and sells turnout gear using PFAS-containing fabrics, including Teflon® F-PPE-treated thermal lining material supplied by Defendants DuPont's NOMEX® PFAS-containing flame/water/oil-resistant fabric, and moisture barrier fabrics supplied by Defendant Gore.

26

98.63. Defendant Honeywell acquired Norcross Safety Products LLC in 2008, entering the protective gear industry and becoming one of the leading manufacturers of turnouts. Honeywell makes, markets and sells turnout gear using PFAS-containing fabrics, supplied by Defendants DuPont, Gore, PBI and StedFast.

## D. Defendants Know Exposure to PFAS Causes Serious Health Impacts

99.64. Defendants, including specifically 3M and DuPont, have long known about the serious and significant impacts to health caused by exposure to PFAS, having conducted study after study on the exposure and health effects of PFAS on animals, and in some cases, even on their own employees. The findings of these studies were discussed internally within the companies, yet were never made public or shared with any regulatory agencies. Among the findings:

- a. A 1950 3M study showed that PFAS could build up in the blood of mice and that PFAS could bind to proteins in human blood suggesting that PFAS would not only remain, but also persist and accumulate in the body of the exposed individuals with each additional exposure.

- b. In 1961, a DuPont toxicologist warned that PFAS chemicals enlarge rat and rabbit livers. A year later, these results were replicated in studies with dogs.

- c. In 1963, 3M's technical handbook classified PFAS as toxic and advised that "due care should be exercised in handling these materials."

- d. In 1970, a company that purchased 3M's firefighting foam had to abandon a test of the product because all the fish died.

- e.d.In the 1970s, DuPont discovered that there were high concentrations of PFOA in the blood samples of factory workers at DuPont's Washington Works site.

- f.e. By the end of the 1970s, studies performed by, at least 3M, indicated that PFAS materials were resistant to environmental degradation and would persist in the environment.

- g.f. In 1981, 3M, which still supplied PFOA to DuPont and other corporations, found that ingestion of PFOA caused birth defects in rats. 3M reported this information to DuPont. DuPont then tested the children of pregnant employees in their Teflon division and found that of seven births, two

27

children had eye defects. Defendants reassigned the female employees, but did not inform the EPA or make this information public.

h. In 1988, a company that purchased PFAS firefighting foam complained to 3M because the product was not biodegradable as 3M represented. Subsequently, a 3M employee wrote an internal memo that 3M should stop perpetrating the myth that these fluorochemical surfactants are biodegradable, but the company continued to sell them.

i.g. By at least the end of the 1980s, research performed by Defendants, including specifically, Defendants 3M and DuPont, manufacturing and/or using PFAS materials indicated that at least one such PFAS material, PFOA, caused testicular tumors in a chronic cancer study in rats, resulting in at least Defendant DuPont classifying such PFAS material internally as a confirmed animal carcinogen and possible human carcinogen.

j.h. In the 1990s, Defendant DuPont knew that PFOA caused cancerous testicular, pancreatic and liver tumors in lab animals. One study also suggested that PFOA exposure could cause possible DNA damage. Another study of workers found a link between PFOA exposure and prostate cancer.

k.i. In response to the alarming and detrimental health impact, DuPont began to develop an alternative to PFOA and in 1993, an internal memo announced that "for the first time, we have a viable candidate" that appeared to be less toxic and showed less bioaccumulation. DuPont decided against using this potentially safer alternative, however, because products manufactured with PFOA were worth $1 billion in annual profit.

l.j. On June 30, 2000, 3M and DuPont met to share 3M's "pertinent data on PFOA." 3M informed DuPont that the half-life of PFOA was much longer than animal studies showed.

100.65.    Additionally, approximately fifty years of studies by Defendants, including by 3M and DuPont, on human exposure to PFAS found unacceptable levels of toxicity and bio-accumulation, as well as a link to increased incidence of liver damage, various cancers, and birth defects in humans exposed to PFAS. These studies also revealed that, once in the body, PFAS has a very long half-life and that it takes years before even one-half of the chemicals begins to be eliminated from the body—assuming, of course, the body experiences no additional PFAS chemical exposure.

101.66.     In the face of these findings, and despite passage of the Toxic Substances Control Act in 1976, which requires companies that manufacture, process or distribute chemicals to immediately report to the Environmental Protection Agency ("EPA") information that "reasonably supports the conclusion" that a chemical presents a substantial risk to health or the environment, Defendants did not inform the EPA, Plaintiff Clarke, or the public about the health impacts resulting from exposure to PFAS.

102.67.     In 2000, 3M announced that it would cease manufacturing a specific PFAS chemical, PFOS, on the same day the EPA announced that PFOA and PFOS, two chemicals in the PFAS family, had a "strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term."

103.68.     However, 3M did not recall PFOS, its chemical feedstock, or any Class B foam, including AFFF, that it had previously manufactured, sold, or distributed, or that was then stored at firehouses and being used by firefighters around the country. And, no other Defendant stopped manufacturing PFAS chemicals or products containing PFAS. Rather, Defendants continued to manufacture, develop, market, promote, distribute and sell PFAS chemicals and PFAS-containing products, including specifically PFAS-containing turnouts, and AFFF and did so without any warning to firefighters or to the public concerning the fact that these turnouts and foam contained PFAS, or that they posed a serious health risk to human health. Defendants instead continued to claim their products were safe.

104.69.     By the 2000s, Defendants' own research of its employees revealed multiple adverse health effects among workers who had been exposed to PFAS, including increased cancer incidence, hormone changes, lipid changes, and thyroid and liver impacts.

29

105.70.   In 2001, a class action lawsuit was filed in West Virginia against DuPont on behalf of people whose water had been contaminated by the nearby DuPont chemical plant where PFAS chemicals were manufactured.

106.71.   Defendants continued to manufacture, market, promote, distribute, and sell PFAS and PFAS-containing products, including turnouts and AFFF, and continued to publicly claim that these products were safe. Defendants affirmatively suppressed independent research on PFAS, and instead commissioned research and white papers to support their claims that PFAS and PFAS-containing products turnouts were safe to use, engaging consultants to further this strategy and ensure that they would continue to profit from these toxic chemicals and products.

107.72.   As one consultant wrote in pitching its services to DuPont, it was critical that the PFAS industry develop an aggressive strategy to "[discourage] governmental agencies, Plaintiffs' bar and misguided environmental groups" and "[implement] a strategy to limit the effect of litigation and regulation on the revenue stream generated by PFOA." The strategy was further described by consultant as follows:

> DUPONT MUST SHAPE THE DEBATE AT ALL LEVELS . . . The outcome of this process will result in the preparation of a multifaceted plan to take control of the ongoing risk assessment by the EPA, looming regulatory challenges, likely litigation, and almost certain medical monitoring hurdles. The primary focus of this endeavor is to strive to create the climate and conditions that will obviate, or at the very least, minimize ongoing litigation and contemplated regulation relating to PFOA. This would include facilitating the publication of papers and articles dispelling the alleged nexus between PFOA and teratogenicity as well as other claimed harm. We would also lay the foundation for creating Daubert precedent to discourage additional lawsuits.

108.73.   Defendants also pivoted with a new industry strategy. Defendants continued to publicly represent that PFAS and/or products containing PFAS were safe, while developing newer, "short-chain" PFAS alternatives.

30

~~109.~~74.    In 2005, the EPA fined DuPont $16.5 million for failing to submit decades of toxicity studies of PFOA (one PFAS chemical manufactured by the company). Undeterred by the EPA's action, Defendant turnout manufacturers, such as MSA (Globe) and Lion, partnered with DuPont and with Defendant Gore to develop, manufacture, market, and distribute turnouts made with DuPont's and/or Gore's PFAS-based textile coatings (e.g., Nomex® and Gore® Protective Fabrics).

~~110.~~75.    In 2006, the EPA "invited" eight PFOA manufacturers, including Defendants DuPont, 3M, Arkema, and Daikin to join in a "Global Stewardship Program" and phase out production of PFOA by 2015.

~~111.~~76.    By this time, Defendants had begun to aggressively manufacture, market and/or distribute short-chain PFAS, such as Gen X, claiming that these alternative PFAS chemicals did not pose significant health risks to humans or the environment. But, these claims, too, were false. Defendants knew that certain of these short-chain PFAS chemicals had been found in human blood, and that at least one of them produces the same types of cancerous tumors (testicular, liver, and pancreatic) in rats as had been found in long-chain PFAS studies.

~~112.~~77.    In 2011, a C8 Science Panel convened as part of a settlement in the West Virginia DuPont water contamination case described *supra* began releasing its findings. The Panel had analyzed the blood serum of nearly 70,000 residents living in the water contamination area for two long-chain PFAS (PFOA and PFOS), and found significant negative human health effects (including, kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, high cholesterol and preeclampsia) associated with exposure to these PFAS chemicals in the area groundwater.

~~113.~~78.    In 2013, DuPont entered an agreement with the EPA and ceased production and use of PFOA – just one of thousands of PFAS chemicals the company makes, promotes and

31

sells. Defendants, however, continued manufacturing short-chain PFAS materials, chemical feedstock, and products—all the while peddling them as safer, and as more easily bio-degraded than long-chain PFAS, despite evidence to the contrary.

~~114.~~79.   In 2015, DuPont spun-off its PFAS chemicals business, as well two-thirds of its environmental liabilities and 90% of its active litigation, to Defendant Chemours. As part of the transaction, DuPont required Chemours to indemnify the "new" DuPont for all assigned environmental liabilities should a regulatory agency or plaintiff seek to hold the "new" DuPont accountable. As Chemours President Paul Kirsch testified before Congress: "DuPont designed the separation of Chemours to create a company where it could dump its liabilities to protect itself from environmental cleanup and related responsibilities."

~~115.~~80.   In June 2018, the Agency for Toxic Substances and Disease Registry (ASTDR), a division of the Centers for Disease Control and Prevention at the US Department of Health and Human Services released an 852-page draft toxicology report analyzing scientific data about the most common PFAS chemical variants, finding that PFAS "are potentially more hazardous than previously known, are particularly concerning because of these compounds' persistence in the environment and widespread prevalence—PFAS are extremely slow to biodegrade."

~~116.~~81.   In September 2019, DuPont chief operations and engineering officer Daryl Roberts testified before Congress that the "new DuPont" (to be distinguished from the "old DuPont" which manufactured and sold PFAS for decades before being spun-off to Chemours) no longer uses or manufactures PFAS and is no longer responsible for obligations and harms resulting from over 65 years of producing PFAS. Roberts further testified that he knew nothing about "old DuPont's" efforts to suppress research on PFAS' toxicity as testified to by one of DuPont's former

32

scientists only a few days earlier. Finally, he stated that any liabilities from "old DuPont's" PFAS operations were now Chemours' problem because DuPont is essentially a completely new company with no past – only a bright future of doing good in the world.

### E. Defendants Failed to Warn Plaintiff Clarke of the Dangers of Exposure to PFAS and Falsely Represented That Their PFAS Products Were Safe.

~~117.~~82.      As alleged above, Defendants knew that PFAS are persistent, toxic, and bioaccumulating with very long half-life. They knew that exposure to PFAS can cause serious and life-threatening diseases, including cancer.

~~118.~~83.      Yet, Defendants **did not warn** Plaintiff Clarke that PFAS, and Defendants' PFAS-containing ~~products, including~~ turnouts ~~and AFFF~~ used by Plaintiff Clarke, contained PFAS, or that exposure to PFAS in the normal and intended use of such products, causes serious bodily harm and illnesses, including cancer.

~~119.~~84.      Instead, Defendants falsely represented—and continue to falsely represent— that PFAS and PFAS-containing ~~products, including~~ turnouts ~~and AFFF~~, are safe and not harmful to humans or the environment.

~~120.~~85.      Such assertions fly in the face of science and a global movement toward eliminating this class of chemicals from consumer products. In just these past few years, for example, Congress passed legislation to address PFAS in turnouts. The U.S. Food and Drug Administration similarly has called for phasing out of short-chain PFAS that contain 6:2 fluorotelomer alcohol (6:2 FTOH). And private companies like Home Depot, Lowes and Staples recently have begun to discontinue selling products containing any PFAS, as have several outdoor, durable clothing companies (e.g., Columbia and Marmot), clothing retailers (e.g., H&M, Levi Strauss & Co), shoe companies (e.g., Adidas and New Balance), car seat manufacturers (e.g.,

33

Britax and Graco), furniture companies (e.g., IKEA), personal care companies (e.g. Johnson & Johnson and Oral-B), and textile manufacturing companies.

### (1) Defendants Provide No Safety Warnings on Product Labels

121.   Plaintiff Clarke alleges that the packaging on the PFAS-containing AFFF containers used for mixing the foam with water, pumping the mixture from engines, and for spraying and laying foam blankets for fire suppression or fire suppression training, contained no warning that the AFFF contained PFAS. Nor did it inform persons handling or using the foam as it was intended to be handled that such use can result in exposure to PFAS and serious bodily harm and/or death.

122.   Below are pictures of some of the AFFF foam containers manufactured, marketed, distributed, or sold by Defendants in Virginia. The labels on the containers warned only of possible skin or eye irritation and suggest rinsing areas of contact with water. They contained **no information** about the AFFF containing PFAS or PFAS-containing materials, and provided no warning whatsoever of the human health risks and serious conditions associated with PFAS exposure resulting from the normal and intended use of AFFF in fire suppression or fire suppression training.

34





~~123.~~86.　　　The turnouts containing PFAS or PFAS materials sold by Defendants in Virginia, and used by Plaintiff Clarke in training, emergency incidents, or in fire suppression during their firefighting career, also contained no warning that the turnouts contain PFAS or PFAS materials. Nor did these labels inform persons handling, wearing, or using the turnouts as they were intended to be handled, worn or used can result in exposure to PFAS and serious bodily harm.

~~124.~~87.　　　Below are pictures of warning labels for turnouts manufactured, marked, sold and distributed by Defendants Honeywell International, Honeywell Safety, MSA/Globe and Lion. As depicted below, the labels make no mention of PFAS, do not advise that the turnouts contain PFAS or PFAS materials, and contain no warning that handling, wearing, or using the turnouts as they were intended to be handled, worn or used can result in exposure to PFAS and serious bodily harm. Further, while the labels provide washing instructions, the instructions do not

36

advise that turnouts should be washed in a commercial extractor to prevent cross-contamination and PFAS-exposure to family members who handle or wash the turnouts with other garments in home washing machines.





**Garment Safety Label**





**Garment Cleaning Label**

**Garment Information Label**





**Garment Liner Attachment Safety Label**



Drag Rescue Device (DRD) Label

38

### (2) Defendants' Misrepresentations About PFAS Continue to this Day

~~125.~~88.	Despite their decades of knowledge about PFAS and its dangers,

Defendants continue to make false claims, continue to misrepresent the safety of PFAS, and

continue to minimize and fail to warn about the hazards of exposure to PFAS, or turnouts ~~and~~

~~AFFF~~ made with or containing PFAS.

~~126.~~89.	Defendants' misinformation campaign is long-standing and continues to

this day. Some pertinent examples include:

- a. 2017 – Defendant Lion's President, Stephen Schwartz, wrote a letter to the editor of the Columbus Dispatch, expressing outrage at the assertion in a government filing that firefighters may have been exposed to PFAS through turnout gear. Schwartz called this assertion false, stating that Lion's turn-out gear is not treated or made with PFOS or PFOA:. "PFOAs and PFOSs have never been components of LION's turn-out gear, either as a coating or as a textile." He acknowledged that turn-out gear is treated with PTFE to provide a durable water repellant, and that the textile industry in the past had used PFOA as a processing aid to manufacture PTFE moisture barrier films and repellants. "It is possible that trace amounts may have been present as a residue when the films and finishes were incorporated into LION's turn-out gear. **However, based on all available scientific data, such nominal trace amounts, if they existed at all, would not have posed any health risk to firefighters. There is absolutely no connection at all between PFOS and firefighter turnout gear."** (Emphasis added).

- b. 2018 – The National Fire Protection Association (which maintains committees on ~~foams and~~ turnouts that are comprised, in part, of certain Defendants) issued a publication listing 11 ways to minimize risk of occupational cancer – the suggestions centered on wearing turnouts for protection resulting from combustion or spills, and cleaning turnouts after exposure to chemicals. There was not a single mention of avoiding contact with foam and/or the risks of wearing turnouts containing PFAS or PFAS-containing materials.

- c. 2019 – Defendant 3M Vice President, Denise Rutherford, testified before Congress that she **absolutely agreed with the statement that "the weight of current scientific evidence does not show that PFOS or PFOA cause adverse health effects in humans at current rates of exposure."** (emphasis added)

d. 2019 – The Fire Fighting Foam Council (of which many Defendants have been members since its inception in 2001) wrote in their newsletter that: "Short-chain (C6) fluorosurfactants do not contain or breakdown in the environment to PFOS or PFOA and are currently considered lower in toxicity and have significantly reduced bio-accumulative potential than long-chain PFAS."

e. 2020 – FluorCouncil – the lobbying arm of the PFAS industry – maintains that PFAS fluorotelomers that are in AFFF and turnouts do not cause cancer, disrupt endocrine activity, negatively affect human development or reproductive systems, do not build up in the human body, and do not become concentrated in the bodies of living organisms.

f. 2020 – The Fire Fighting Foam Council website states: "The short-chain (C6) fluorosurfactants that have been the predominant fluorochemicals used in fluorotelomer-based AFFF for the last 25 years are low in toxicity and not considered to be bio-accumulative based on current regulatory criteria."

g. 2020 – The Fire Fighting Foam Council's Best Practice Guidance for Use of Class B Foam – which was published in May 2016 and has not been updated to reflect the latest research – focuses entirely on eliminating and containing foam to minimize impact on the environment. It makes no mention of how to minimize the impact on firefighters who routinely handle, prepare, spray, or use Class B foam during training or in firefighting.

127.90.    As frequent sponsors and advertisers in fire service publications, Defendants have been so influential in the industry that fire service leadership have echoed these narratives.

128.91.    For example, in 2017, the International Association of Fire Fighters ("IAFF"), which represents more than 324,000 full-time professional firefighters, issued a statement that both mischaracterized and purported to state that the risks associated with exposure to PFAS and PFAS chemicals and materials in turnouts and AFFF was minimal to non-existent. The statement even encouraged firefighters to continue to wear turnouts, creating a false sense that these PFAS-containing turnouts were safe. The statement reads, in relevant part:

> Importantly, PFOA use has been almost completely phased out in the US….. If PFOA is a combustion product of PFOA-containing consumer products made prior

40

to phasing out use of this chemical, fire fighters will be exposed in fire suppression activities. However, the data are too limited at present to determine this. PFOA is unlikely to be a component in recently US manufactured turnout gear. However, if PFOA is a combustion product, it may be present as a contaminant on turnout gear. PFOA may also be present as a manufactured component of legacy turnout gear....The exposure contribution from any such PFOA content is likely to be minimal since volatilization from the manufactured product would be required....**At this time, IAFF does not recommend that legacy turnout gear be replaced outside of its lifecycle. Fire fighters wishing to minimize PFOA exposure should continue to wear their PPE...and regularly decontaminate their turnout gear.** IAFF will continue to monitor developments and update this fact sheet should new information become available.

~~129.~~92.        The IAFF maintained the Defendants' position that the turnout gear ~~and~~ ~~AFFF~~ was safe until new leadership took over in 2021. Because of these and other false claims and misrepresentations on the part of Defendants, Plaintiff Clarke did not know and, in the exercise of reasonable diligence, could not have known that the turnouts ~~and AFFF~~ he used contained PFAS or PFAS-containing materials, and caused Plaintiff Clarke to be exposed to PFAS and/or PFAS-containing materials, leading to his cancer.

~~130.~~93.        Also, in January 2021, Defendants DuPont and Chemours along with Corteva (the agricultural unit of DuPont that it spun off in 2019) announced a cost-sharing agreement worth $4 billion to settle lawsuits involving the historic use of PFAS – thereby acknowledging, at long last, the significant harm their PFAS chemicals have caused to human health and the environment.

## F. New Research Indicates That Firefighters are at Significant Risk of Harm From Exposure to PFAS in Turnouts and AFFF— But Defendants Continue to Discount or Deny These Risks

~~131.   While historical research (and follow-on litigation) has centered on environmental impacts and environmental exposures associated with PFAS and PFAS-containing products, recent studies have focused specifically on the serious health impacts to firefighters stemming from their occupational exposure to turnouts containing PFAS.~~

41

132.94.      In June 2020, scientists at the University of Notre Dame published a ground-breaking study on PFAS in turnout gear, and the exposure risks posed to firefighters that wear, wore, or handle such gear ("Notre Dame Turnout Study"). The Notre Dame Turnout Study analyzed over 30 sets of used and unused (still in their original packaging) turnout gear made by six U.S. manufacturers, including Defendants MSA/Globe, Lion and Honeywell over several production years, as listed below:

| PPE gear manufacturers sampled: | # samples |
|---|---|
| Globe Manufacturing (Pittsfield MA), | 11 |
| Lion Group (Dayton OH), | 12 |
| Honeywell First Responder (Dayton, OH), | 2 |
| Lakeland Fire (Decatur, AL) | 2 |
| Quest Fire Apparel (Saratoga Springs, NY) | 1 |
| Quaker Safety (Quakertown, PA) | 2 |

The type and number of turnout gear samples used in this study.

133.95.      The Notre Dame Turnout Study noted that these manufacturers' turnout gear (or personal protective equipment-PPE, as it is described in the study) are manufactured "from textiles that are made from fluoropolymers (one form of PFAS) or extensively treated by PFAS in the form of side-chain fluoropolymers." According to the researchers, "[t]hese PFAS include fluoropolymer materials such as PTFE used as a moisture barrier in the inner layers of turnout gear." The study found significant levels of PFAS chemicals – including PFOA, PFOS, PFBA, PFPeA, PFHxA, PFHpA, PFNA, PFDA, PFUnA, PFDoA, PFTrDA, PFToDA, PFBS, PFOSA, N-EtFOSA, MeFOSAA, N-MeFOSE, N-EtFOSE and 6:20FTS – in both new and used turnout gear, and across layers, portions, and materials in the turnout gear, including in material layers that are not intentionally treated with PFAS by the manufacturer, thereby providing "the first evidence that suggests PFAS appear to migrate from the highly fluorinated layers and collect in the untreated layer of clothing worn against the skin."

42

~~134.~~96.        These findings suggest that, as the garments are worn, PFAS from the outer

shell and the moisture barrier can migrate from the turnouts and contaminate both the firefighter,

their apparatus and workplace with PFAS. The analysis also indicated that fluoropolymers from

the outer layer decompose into other PFAS, including PFOA.

| Environmenta Science & Technology Letters | | | | | | pubs.acs.org/journal/estlcu | | Letter |
|---|---|---|---|---|---|---|---|---|

Table 2. Quantities of Target PFAS (in ppb) Found in US Turnout Gear by LC-MS/MS Analysis

| | jacket 2008 unused | | | parts 2014 used | | jacket 2008 used | | jacket 2017 unused |
|---|---|---|---|---|---|---|---|---|
| value in ppb | thermal liner | moisture barrier | outer shell | thermal liner | moisture barrier | outer shell | moisture barrier | moisture barrier |
| PFBA | <MDL | 12.8 | 16.4 | 1.99 | 6.15 | 21.5 | 20.5 | 951 |
| PFPeA | <MDL | 12.6 | 17.5 | 2.28 | 108 | 168 | 11.1 | 2.65 |
| PFHxA | <MDL | 16.5 | 16.5 | 1.99 | 28.6 | 109 | 35.8 | 36.5 |
| PFHpA | <MDL | 12.4 | 25.4 | 165 | 5.82 | 2.23 | 14.3 | 25.4 |
| PFOA | 78 | 46 | 182 | 330 | 71 | 97 | 35 | <MDL |
| PFNA | 2.63 | <MDL | 12 | 21.5 | 1.95 | <MDL | 1.76 | <MDL |
| PFDA | 2.93 | 6.51 | 5.31 | 133 | <MDL | <MDL | 21.7 | <MDL |
| PFUnA | <MDL | <MDL | <MDL | 7.36 | <MDL | <MDL | 2.51 | <MDL |
| PFDoA | <MDL | 5.01 | <MDL | 62.6 | <MDL | <MDL | 11.9 | <MDL |
| PFBS | 21.5 | 1.40 | 142 | 53.400 | 47900 | 1050 | 230 | 8.400 |
| PFOS | <MDL | <MDL | <MDL | 7 | <MDL | <MDL | 2 | <MDL |
| 6:2 FTS | <MDL | <MDL | <MDL | 25.9 | 129 | <MDL | <MDL | <MDL |
| 8:2 FTS | <MDL | <MDL | <MDL | 1.11 | <MDL | <MDL | <MDL | <MDL |

~~135.~~97.        "Startlingly," researchers reported, "garment to hand transfer of total

fluorine in the ppm range was also observed when researchers simply manipulated the textiles in

[the] laboratory." The accumulation of PFAS on researchers' hands strongly suggests that

transference of ppm levels of PFAS can occur merely by handling the turnouts and that PFAS

exposure pathways include inhalation, ingestion and/or absorption (through dermal contact) – all

of which DuPont internally acknowledged as being toxic in 1980. Such exposure pathways are a

concern not only for firefighters that rely on turnouts to protect them from heat, fire, water and

chemical hazards in the field, but to family members who may be exposed to the PFAS in turnouts

as the result of home washing or storage. Lead researcher Graham Peaslee commented that

turnouts are "the most highly fluorinated textiles I've ever seen" and that the level of PFAS in the

turnout gear means that firefighters are "swimming in a sea of [PFAS]. Those numbers for scientists are scarily high..."



Credit: *Environ. Sci. Technol. Lett.*

Over time, PFAS in a firefighter's turnout gear can migrate from a moisture barrier (orange) into a thermal liner that contacts skin. PFAS can also be shed from an outer shell (black) into the environment.

~~136.~~98._____Despite these findings, Defendants have been quick to mischaracterize, dismiss or downplay the significance of the Notre Dame Turnout Study. Defendant MSA/Globe, when contacted about the study and asked whether Globe planned to study this issue and find an alternative to PFAS for turnouts, merely responded thusly: "[P]rotecting (firefighters) is Globe's business; every piece of our turnout gear meets or exceeds applicable industry standards."

~~137.~~99._____Defendant Lion's responses have been similar and have also dismissed or minimized the significance of the Notre Dame Turnout Study's findings. Lion issued a Customer Safety Alert for PFOA and Turnout Gear stating: "Your LION turnout gear continues to be safe and ready for action especially when properly maintained. It is extremely important that firefighters continue to wear and properly care for their gear to stay safe on the job."

44

~~138.~~100.       The Customer Safety Alert goes on to stress that Lion does not use PFOA

or PFOS (two long-chain PFAS chemicals) in its turnouts. It does not, however, address that the

maker's turnouts in fact contain other PFAS chemicals, nor warn firefighters or the public about

health harms associated with exposure to these toxic, bio-accumulating chemicals.

**HERE'S ALL YOU NEED TO KNOW
ABOUT PFOA AND YOUR TURNOUT GEAR.**

**What is PFOA and why are we talking about it?**

Perfluorooctanic Acid (PFOA) is a chemical that until recently was used in the process to make many different industrial chemicals and products. The manufacture and use of PFOA was mostly phased out by major chemical companies by 2010. By 2015, its manufacture was eliminated in the United States.

In the firefighting protective clothing industry, PFOA was used as a processing agent in the manufacture of resins used to make PTFE films – the primary component of the moisture barrier used in turnout gear. While most residual PFOA was eliminated from the manufacturing process of PTFE, some tiny trace amounts remained.

LION does not use PFOA or PFOS in our turnout gear or any of our protective products.

PFOS has never been a component of turnout gear. PFOS health and environmental concerns are largely related to AFFF foams and are not connected to turnout gear.

~~139.~~101.       Defendant Lion's paid consultant, Dr. Paul Chrostowski, also has taken aim

at the Notre Dame Turnout Study and its findings. Refuting a Fire Rescue magazine article about

the study, Chrostowski repeated Lion's website statement that "PFOA was never part of the gear

itself and frequent independent testing has found only trace amounts of it in any of the gear – not

nearly enough to cause concern, and in amounts similar to consumer products." Chrostowski went

on to say "[t]he fact is that one may find trace amounts of 'short-chain' PFAS such as PFBS and

PFHxA in firefighting textiles, but the scientific research shows that these materials are far less

toxic than even PFOA and at the tiny trace levels the risk are extremely low based on numerous

credible published scientific research papers." Finally, Chrostowski falsely stated that the link

between PFAS exposure and cancer is "extremely weak."

~~140.~~102.       And yet, Lion concedes that dermal absorption is a pathway of exposure to

cancer causing chemicals for firefighters. In a *Not in Our House* cancer awareness fact sheet that

45

currently appears on the company's website, Lion warns firefighters: "For every 5 degree increase in temperature, skin becomes 400% more absorbent. The hotter you are, the more carcinogens your skin absorbs. This statistic is alarming given that the core body temperature of firefighters routinely increases during firefighting activities while wearing turnouts which contain known carcinogens.



~~141.~~103.	The IAFF holds a yearly cancer summit and yet has done little to address the PFAS in turnouts. Defendants, including at least DuPont, Gore, Lion and MSA (Globe), have been regular sponsors of the IAFF Cancer Summit.



~~142.~~104.      At this event, as well as in firefighter cancer-related publications, programs

and events, Defendants repeatedly used the summit as an opportunity to push the narrative that

incidence of cancer among firefighters is attributable either to *other chemicals* encountered in the

line of duty, or firefighters' failure to wash their turnouts after every call. Not once have the turnout

Defendants admitted that the PFAS materials in their ~~products~~ turnouts have ~~has~~ been found to be

carcinogenic, and that the very equipment that should be protecting firefighters are causing the

most harm. Further, Lion's recently launched "Not in Our House" cancer awareness program is

sadly ironic in that it encourages *firefighters to make a pledge* ("I will make every effort to protect

myself and my team by doing my part to take precautions that will minimize the risk of exposure

to carcinogens that may lead to cancer…") while refusing to take any responsibility for continually

exposing firefighters to carcinogens in their protective gear.

~~143.~~105.      Plaintiff Clarke deserves more. Firefighters are the first to respond to

emergencies faced by their community, and never hesitate to help. Whether delivering a baby,

responding to a fire, medical emergency, accident, mass shooting, terrorist attack, natural disaster,

or teaching kids about fire safety, they always put the community first. When a child is drowning

in a pool or a family is caught in a burning house, firefighters do not stop to calculate whether they

will benefit by doing the right thing. They are true public servants. They step in and do what is

47

needed when it is needed the most. Their health, safety and well-being must be of the highest priority.

### COUNT I | BREACH OF IMPLIED WARRANTIES

~~144.~~106.     This cause of action is asserted against all Defendants.

~~145.~~107.     Plaintiff Clarke incorporates by reference all allegations asserted in this Complaint, as though fully set forth herein.

~~146.~~108.     Each Defendant, their predecessors-in-interest, and/or their alter egos, and/or entities they have acquired, have engaged in the business of manufacturing, distributing, supplying, testing, labeling, promoting, or advertising of turnouts and ~~AFFFand~~ through that conduct have knowingly placed PFAS-containing ~~products~~ turnouts into the stream of commerce with full knowledge that they were sold to firefighters. fire departments or to companies that sold turnouts ~~and AFFF~~ to fire departments for use by firefighters such as Plaintiff Clarke, who was exposed to PFAS through ordinary and foreseeable uses for the purpose of firefighting activities and training.

~~147.~~109.     Defendants intended that the turnouts ~~and AFFF~~ they were manufacturing, selling, distributing, supplying, promoting, and or selling would be used by firefighters, including Plaintiff Clarke, without any substantial change in the condition of the products from when it was initially manufactured, sold, distributed, and marketed by Defendants. Turnouts ~~and AFFF~~ were not safe for use by firefighters even when used as directed by the manufacturer and for its intended purpose for firefighting activities which include training, extinguishment, fire suppression, ventilation, search-and-rescue, salvage, containment, and overhaul.

48

148.110.    Further, knowing of the dangerous and hazardous properties of turnouts and AFFF, Defendants could have manufactured, marketed, distributed, and sold alternative designs or formulations of turnouts that did not contain PFAS.

149.111.    These alternative designs and/or formulations were already available, practical, similar in cost, and technologically feasible.

150.112.    The use of these alternative designs would have reduced or prevented the reasonably foreseeable harm to Plaintiff Clarke that was caused by the Defendants' manufacture, marketing, and sale of turnouts and/or AFFF containing PFAS and PFAS-containing materialsturnouts.

151.113.    Additionally, the turnouts and AFFF that were designed, manufactured, marketed, tested, advertised, promoted, sold, and distributed by the Defendants contained PFAS or PFAS-containing materials that were so toxic and unreasonably dangerous to human health and the environment, with the toxic chemicals being so mobile and persistent, that the act of designing, formulating, manufacturing, marketing, distributing, and selling these products was unreasonably dangerous under the circumstances.

152.114.    The turnouts and/or AFFF designed, manufactured, marketed, tested, advertised, marketed, promoted, sold and distributed by the Defendants were dangerous and defective in design or formulation because, at the time in which the products left the hands of the manufacturer or distributors, the foreseeable risks exceeded the benefits associated with the design or formulation of turnouts and/or AFFF.

153.115.    The turnouts and/or AFFF designed, manufactured, marketed, tested, advertised, marketed, promoted, sold, and distributed by the Defendants were dangerous and defective in design or formulation because, when the PFAS-containing products turnouts left the

49

hands of the manufacturer or distributors, said ~~products~~ turnouts were unreasonably dangerous, unreasonably dangerous in normal use, and were more dangerous than an ordinary consumer-firefighter would expect.

~~154.~~116.     The turnouts ~~and/or AFFF~~ were in a defective condition and unsafe, and Defendants knew or had reason to know that these PFAS-containing ~~products~~ turnouts were defective and unsafe, especially when used in the form and manner as provided by Defendants. In particular, Defendants' PFAS-containing turnouts were defective in the following ways:

> ~~155.~~a.     When placed in the stream of commerce, Defendants' PFAS-containing turnouts ~~and/or AFFF~~ were defective in design and formulation and as a result failed to meet ordinary users' expectations as to their safety and failed to perform as an ordinary user would expect.

> ~~156.~~b.     When placed in the stream of commerce, Defendants' PFAS-containing turnouts ~~and/or AFFF~~ were defective in design and formulation, and as a result, dangerous to an extent beyond which an ordinary consumer-firefighter would anticipate.

> ~~157.~~c.     When placed in the stream of commerce, Defendants' PFAS-containing turnouts ~~and/or AFFF~~ were unreasonable dangers in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

> ~~158.~~d.     When placed in the stream of commerce, Defendants' PFAS-containing turnouts ~~and/or AFFF~~ contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated manner.

159.e.    When placed in the stream of commerce, Defendants' PFAS-containing turnouts and/or AFFF did not provide an adequate warning of the potential harm that might result from exposure to PFAS and/or emitted from the turnouts and, alternatively, did not have adequate instructions for safe use of the products.

160.f.    Exposure to PFAS presents a risk of grave and harmful side effects and injuries that outweigh any potential utility stemming from their use.

161.117.    Defendants knew or should have known at the time of manufacturing, selling, distributing, promoting or marketing their PFAS-containing turnouts and/or AFFF that exposure to PFAS could result in cancer and other grave and serious illnesses and injuries as alleged herein.

162.118.    The foreseeable risk of harm could have been reduced or eliminated by the adoption of a reasonable, alternative design that was not unreasonably dangerous.

163.119.    Plaintiff Clarke used these PFAS-containing products turnouts in the ways that Defendants intended them to be used.

164.120.    Plaintiff Clarke used these PFAS-containing products turnouts in ways that were foreseeable to Defendants.

165.121.    Plaintiff Clarke was exposed to PFAS by using Defendants' turnouts and AFFF in the course of his employment, as described above, without knowledge of turnouts' dangerous propensities.

166.122.    The design defect in turnouts and/or AFFF containing PFAS exposed Plaintiff Clarke to toxic levels of PFAS and therefore, was a substantial factor in causing Plaintiff Clarke's cancer and damages.

51

167. 123.        Through the use of advertising and marketing, Defendants, by and through their agents, employees, officers, representatives, and others for whom they are legally responsible, directed the attention of the public, including Plaintiff Clarke, to their products by means of implied representations, statements, and descriptions that the PFAS-containing products turnouts they were manufacturing, selling, distributing, supplying, and/or promoting were safe for use and free from hazards or dangerous properties in their ordinary uses and in the manner directed and for the purposes intended by the Defendants, which became a part of the basis of the bargain.

168. 124.        In using the PFAS-containing products turnouts designed manufactured, sold, distributed, supplied, and/or promoted by the Defendants, Plaintiff Clarke relied upon the skill and judgment of the Defendants, upon implied warranties of merchantability and fitness for a particular purpose that the PFAS-containing products turnouts were safe and fit for their intended and foreseeable functions for which they were designed without causing the injuries of which Plaintiff Clarke complains as a result of probable, foreseeable, and ordinary uses of the product.

169. 125.        At all times mentioned herein, the Defendants implied warranties of merchantability and fitness for a particular purpose in that the PFAS-containing products turnouts designed, manufactured, sold, distributed, supplied, and/or advertised were unreasonably dangerous for their ordinary use and other reasonably foreseeable uses/purposes at the time they left Defendants' possession.

170.   As a result of Defendants' design and formulation of a defective product. Defendants are strictly liable in damages to Plaintiff Clarke.

171. 126.        As a direct and proximate result of the foregoing acts and omissions, Plaintiff Clarke suffered the injuries and damages described herein.

52

172.127.     Defendants acted with willful or conscious disregard for the rights, health, and safety of Plaintiff Clarke, as described herein, thereby entitling Plaintiff Clarke to an award of punitive damages.

## COUNT II | BREACH OF EXPRESS WARRANTIES

173.128.     This cause of action is asserted against all Defendants.

174.129.     Plaintiff Clarke incorporates by reference all allegations asserted in this Complaint, as though fully set forth herein.

175.130.     Each Defendant, their predecessors-in-interest, and/or their alter egos, and/or entities they have acquired, have engaged in the business of manufacturing, distributing, supplying, testing, labeling, promoting, or advertising of turnouts and/or AFFF containing PFAS or PFAS-containing materials therein and, through that conduct, have knowingly placed PFAS-containing products into the stream of commerce with full knowledge that they were sold to fire departments, firefighters, or to companies that sold turnouts and/or AFFF to fire departments for the use by firefighters such as Plaintiff Clarke, who was exposed to PFAS through ordinary and foreseeable uses for the purpose of firefighting activities and training.

176.131.     The products turnouts complained of were manufactured, designed, sold, supplied and/or distributed by each of the Defendants and Plaintiff used by and/or in the vicinity of Plaintiff Clarke during his lifetime and/or was exposed to PFAS while using turnouts in the ordinary course and as part of performing his duties as a firefighter.

177.132.     Defendants expected that the PFAS-containing products turnouts they were manufacturing, selling, distributing, supplying, and/or promoting would reach firefighters, including Plaintiff Clarke, without any substantial change in the condition of the products from when it was initially manufactured, sold, distributed, and marketed by Defendants.

178.133.    Defendants knew or should have reasonably known that the manner in which they were manufacturing, marketing, and selling turnouts and/or AFFF containing PFAS was hazardous to human health.

179.134.    The potential risks of using PFAS-containing products presented a substantial danger to firefighters, including Plaintiff Clarke, when the turnouts and/or AFFF were used or worn in an intended or reasonably foreseeable way.

180.135.    Plaintiff Clarke wore turnouts and used AFFF in the intended or reasonably foreseeable way in the ordinary course of performing his duties as a firefighter., including fire suppression and fire suppression training.

181.136.    The turnouts and/or AFFF manufactured, marketed, and sold by the Defendants were dangerous and defective because the foreseeable risk of harm could have been reduced or eliminated by the adoption of a reasonable, alternative design that was not unreasonably dangerous.

182.137.    Defendants' products were in a defective condition and unreasonably dangerous, in that the turnouts and/or AFFF which, by design, contain PFAS or PFAS-containing products, were deleterious, toxic, and highly harmful to Plaintiff Clarke.

183.138.    Defendants knew or should have reasonably known that exposure to PFAS was hazardous to human health, but:

> a. Did not provide an adequate warning of the potential harm that might result from exposure to PFAS or PFAS-containing materials in turnouts and/or AFFF;
>
> b. Did not have adequate instructions for safe use of the products;
>
> c. Did not have warnings to persons, such as Plaintiff Clarke, who had been, or reasonably may have been, exposed to Defendants' turnouts and/or AFFF, of their

54

disease potential, the proper steps to take to reduce the harmful effects of previous exposure, the need to have periodic medical examinations including the giving of histories which revealed the details of the previous exposure, and the need to have immediate and vigorous medical treatment for all related adverse health effects;

d. Did not manufacture, market, promote, distribute, or sell reasonably comparable products not containing PFAS when it became feasible to design.

~~184.~~139.    At the time of manufacture, distribution, promotion, labeling, distribution, and/or sale, Defendants could have provided warnings or instructions regarding the full and complete risks of turnouts ~~and/or AFFF~~ containing PFAS ~~or PFAS-containing materials~~, because Defendants knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

~~185.~~140.    At all relevant times, Defendants' turnouts ~~and/or AFFF~~ did not contain an adequate warning or caution statement, which was necessary.

~~186.~~141.    Plaintiff Clarke was unaware of the defective and unreasonably dangerous condition of Defendants' ~~products~~ PFAS-containing turnouts at a time when such products were being used for the purposes for which they were intended, and Plaintiff Clarke was exposed to PFAS released from the Defendants' turnouts ~~and/or AFFF~~.

~~187.~~142.    Plaintiff Clarke did not and could not have known that the use of turnouts ~~and/or AFFF~~ in the ordinary course of performing his duties as a firefighter could be hazardous to his health, bio-accumulate in the blood, and cause serious health effects, including cancer.

~~188.~~143.    Defendants knew that the use of turnouts ~~and/or AFFF~~, even when used as instructed by Defendants, subjected Plaintiff Clarke and others to a substantial risk of harm and yet, failed to adequately warn Plaintiff Clarke, the EPA or the public.

55

189.144.    As a result of their inadequate warnings, Defendants' turnouts and/or AFFF were defective and unreasonably dangerous when they left the possession and/or control of Defendants, were distributed by Defendants, and used or worn by Plaintiff Clarke.

190.145.    The lack of adequate and sufficient warnings was a substantial factor in causing Plaintiff Clarke's cancer, as described herein.

191.    As a result of Defendants' failure to provide adequate and sufficient warnings, Defendants are strictly liable in damages to Plaintiff Clarke.

192.146.    Through the use of such advertising and marketing, Defendants, by and through their agents, employees, officers, representatives, and others for whom they are legally responsible, directed the attention of the public, including Plaintiff Clarke, to their products by means of express and implied representations, statements, and descriptions that the PFAS-containing products they were manufacturing, selling, distributing, supplying, and/or promoting were safe for use and free from hazards or dangerous properties in their ordinary uses and in the manner directed and for the purposes intended by the Defendants, which became a part of the basis of the bargain.

193.147.    In using the PFAS-containing products turnouts designed manufactured, sold, distributed, supplied, and/or promoted by the Defendants, Plaintiff Clarke relied upon the skill and judgment of the Defendants, upon implied warranties of merchantability and fitness for a particular purpose that the PFAS-containing products turnouts were safe and fit for their intended and foreseeable functions for which they were designed without causing the injuries of which Plaintiff Clarke complains as a result of probable, foreseeable, and ordinary uses of the product.

194.148.    At all times mentioned herein, the Defendants breached express warranties in that the PFAS-containing products designed, manufactured, sold, distributed, supplied, and/or

56

advertised were defective and unreasonably dangerous for their ordinary use and other reasonably foreseeable uses/purposes at the time it left Defendants' possession contrary to express representations made by Defendants regarding the PFAS-containing ~~products~~ turnouts safety and or lack of or absence of harmful substances such as PFAS.

~~195.~~149.      As a direct and proximate result of the foregoing acts and omissions, Plaintiff Clarke suffered the injuries and damages described herein.

~~196.~~150.      Defendants acted with willful or conscious disregard for the rights, health, and safety of Plaintiff Clarke, as described herein, thereby entitling Plaintiff Clarke to an award of punitive damages.

## COUNT III | NEGLIGENCE, GROSS NEGLIGENCE, RECKLESSNESS AND WILLFUL AND WANTON MISCONDUCT

~~197.~~151.      This cause of action is asserted against all Defendants.

~~198.~~152.      Plaintiff Clarke incorporates by reference all allegations asserted in this Complaint.

~~199.~~153.      Defendants owed a duty of care towards Plaintiff Clarke that was commensurate with the inherently dangerous, harmful, injurious, bio-persistent, environmentally-persistent, toxic, and bio-accumulative nature of turnouts ~~and/or AFFF~~ containing PFAS or PFAS-containing materials.

~~200.~~154.      Defendants had a duty to exercise reasonable care in the design, research, testing, manufacture, marketing, formulation, supply, promotion, sale, labeling, training of users, production of information materials, use and/or distribution of turnouts ~~and/or AFF~~ into the stream of commerce, including a duty of care to ensure the PFAS did not infiltrate, persist in, accumulate in the blood and/or body of Plaintiff Clarke and including a duty to assure their products would not cause users to suffer unreasonable, dangerous side effects.

57

201.155.    Defendants had a duty to exercise reasonable care to ensure that turnouts and/or AFFF were manufactured, marketed, and sold in such a way as to ensure that the end users of turnouts and/or AFFF were not exposed to the likely harm posed by PFAS and/or in such a way as to ensure that the end users were aware of the potential harm PFAS can cause to human health, and were advised to use it in such a way that would not be hazardous to their health.

202.156.    Defendants had a duty to warn of the hazards associated with PFAS and PFAS-containing materials and were in the best position to provide adequate instructions, proper labeling, and sufficient warnings about the turnouts and/or AFFF. However, Defendants knowingly and intentionally failedelected not to do so.

203.157.    Defendants failed to exercise ordinary care in the designing, researching, testing, manufacturing, formulating, marketing, testing, promotion, supply, sale, and/or distribution of their PFAS chemicals and PFAS-containing products turnouts in the regular course of business, in that Defendants knew or should have known that use and exposure to PFAS and PFAS-containing turnouts and materials therein wereas hazardous to human health and created a high risk of unreasonable, dangerous side effects, including but not limited to severe personal injuries, as described herein.

204.158.    Defendants also knew or should have known that the manner in which they were manufacturing, marketing, distributing, and selling PFAS to be used in turnouts and containing PFAS or PFAS-containing materials turnouts was hazardous to human health, bio-accumulated in the blood, and caused serious health effects, including cancer.

205.159.    Defendants negligently and deceptively underreported, underestimated, downplayed the serious health dangers of the PFAS-containing turnouts and/or AFFF products.

58

206.   Defendants negligently, carelessly and recklessly recommended application and disposal techniques for PFAS and/or for products containing PFAS that directly and proximately caused harm to Plaintiff Clarke.

207.   Defendants knew or should have known that firefighters wearing turnouts and/or AFFF products would be exposed to PFAS.

208.160.   At all times material, Plaintiff Clarke inhaled, ingested and/or absorbed dermally hazardous PFAS contaminants released from the Defendants' turnouts and/or AFFF.

209.161.   Plaintiff Clarke's exposure to Defendants' turnouts and/or AFFF, which were connected to and incidental to Defendants' manufacture, design, sale, supply and/or distribution of its PFAS-containing productsturnouts, was harmful and substantially increased the risk of injuries to the Plaintiff Clarke and did cause injuries to Plaintiff Clarke.

210.162.   Defendants knew or should have known that the manner in which they were manufacturing, marketing, distributing and selling turnouts and/or AFFF containing PFAS or PFAS-containing materials therein would result in harm to Plaintiff Clarke as a result of using turnouts and/or AFFF in the ordinary course of performing his duties as a firefighter.

211.163.   Defendants knew, foresaw, anticipated, and/or should have foreseen, anticipated, and/or known that the design, engineering, manufacture, fabrication, sale, release, handling, use, and/or distribution of PFAS or PFAS-containing materials in turnouts and/or AFFF, and/or Defendants' other acts and/or omissions as described in this Complaint, could likely result in PFAS exposure to Plaintiff Clarke, the persistence and accumulation of toxic and harmful PFAS in his blood and/or body, and cause injuries to Plaintiff Clarke as herein alleged.

212.164.   Despite knowing, anticipating, and/or foreseeing the bio-persistent, bio-accumulative, toxic, and/or otherwise harmful and/or injurious nature of PFAS materials,

Defendants, their agents, servants, and/or employees, committed negligent acts and/or omissions that resulted in PFAS exposure to Plaintiff Clarke by and through their foreseeable use of turnouts, the persistence and accumulation of toxic and harmful PFAS in his blood and/or body, and ~~caused~~ causing injuries to Plaintiff Clarke as herein alleged.

~~213.~~165.     Defendants, through their acts and/or omissions as described in this complaint, breached their duties to Plaintiff Clarke.

~~214.~~166.     It was reasonably foreseeable to Defendants that Plaintiff Clarke would likely suffer the injuries and harm described in this complaint by virtue of Defendants' breach of their duty and failure to exercise ordinary care, as described herein.

~~215.~~167.     Defendants' acts and omissions amount to negligence, gross negligence, reckless disregard for human life and safety, and willful and wanton misconduct.

~~216.~~168.     As a direct and proximate result of the Defendants' acts and omissions, Plaintiff Clarke suffered the injuries and damages.

~~217.~~169.     Defendants acted with willful or wanton conduct, or such recklessness as evinces a conscious disregard for the rights, health, and safety of others including Plaintiff Clarke, as described herein, thereby entitling Plaintiff Clarke to an award of punitive damages.

## COUNT IV | VIOLATIONS OF THE VIRGINIA CONSUMER PROTECTION ACT [VCPA],
### Va. Code § 59.1-196, *et seq.*

~~218.~~170.     This cause of action is asserted against all Defendants.

~~219.~~171.     Plaintiff Clarke incorporates by reference all allegations asserted in this Complaint.

~~220.~~172.     Plaintiff Clarke's claims arise under the Commonwealth of Virginia's Consumer Protection Act [VCPA], Va. Code § 59.1-196, *et seq.*

221.173.    Defendants are "suppliers" as that term is defined by the VCPA.

222.174.    The turnouts and/or AFFF designed, developed, manufactured, marketed, distributed, released, and/or sold by Defendants the reached Plaintiff Clarke as an end user are "goods" as that term is defined by the VCPA.

223.175.    Defendants design, develop, manufacture, marketing, distribution, release, and/or sale of the turnouts and/or AFFF into the chain of commerce and ultimately reaching Plaintiff Clarke were consumer transactions as that term is defined under the VCPA. Va. Code § 59.1-198.

224.176.    Defendants, by and through their acts and omissions alleged *supra*, violated Sections 59.1-200(A)(5)(6) and (14) of the VCPA by

> a. Misrepresenting that goods or services have certain quantities, characteristics, ingredients, uses, or benefits, Va. Code § 59.1-200(A)(5);
>
> b. Misrepresenting that goods or services are of a particular standard, quality, grade, style, or model; and
>
> c. Using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction, Va. Code § 59.1-200(A)(14).

225.177.    Defendants made various material misrepresentations to the general public regarding the attributes of turnouts and/or AFFF and the dangers, or lack thereof, of PFAS chemicals for the purpose of inducing members of the general public to purchase their goods and rely on the safety of their goods.

61

~~226.~~178.     Defendants knew or should have known Plaintiff Clarke would rely, and he did rely, on the material misrepresentations concerning the safety and quality of their turnouts. ~~products and goods.~~

~~227.~~179.     As a direct and proximate result of the Defendants' acts and omissions, Plaintiff Clarke suffered ~~the~~ injuries.

~~228.~~180.     Defendants acted with willful or wanton conduct, or such recklessness as evinces a conscious disregard for the rights, health, and safety of others including Plaintiff Clarke, as described herein, thereby entitling Plaintiff Clarke to an award of punitive damages.

~~229.~~181.     Plaintiff Clarke is also entitled to reasonable attorneys' fees and court costs pursuant to the VCPA, Va. Code § 59.1-204(B).

~~230.~~182.     Because the violations of the VCPA as alleged herein were willful, Plaintiff Clarke is entitled to treble damages pursuant to Va. Code § 59.1-204(A).

## ~~PRAYER FOR RELIEF~~DAMAGES

~~231.~~183.     Plaintiff Clarke incorporates by reference all allegations asserted in this Complaint.

184.     As a direct and proximate result of Defendants' aforementioned wrongful acts or omissions, and each of them, Plaintiff is entitled to recover punitive damages and treble damages pursuant to Virginia § 59.1-204(A).

185.     As a direct and proximate result of Defendants' aforementioned wrongful acts or omissions, and each of them, Plaintiff Clarke ~~suffered injuries and is entitled to damages in the form of~~ incurred the following damages:

  a.   Bodily injuries, permanent in nature, which have affected their life;

  b.   Past, present and future physical pain and mental anguish;

62

c. Disfigurement and/or deformity coupled with associated humiliation and embarrassment;

d. Past, present and future inconvenience;

e. Past, present and future lost earnings, and a lessening of earning capacity;

f. Personal, social and financial limitations resulting from the injuries sustained by Plaintiffs; and

g. Other damages allowable at law, including medical expenses incurred in the past, present and future, and attorneys' fees and costs.

232. WHEREFORE, Plaintiff Clarke respectfully moves this Court for the following relief:

a. Compensatory damages, including but not limited to, pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount according to proof at the time of trial;

b. Compensatory damages for future damages, including but not limited to the Plaintiff Clarke's pain and suffering and for severe permanent personal injuries sustained by Plaintiff Clarke, including future health care costs, medical monitoring, and/or economic loss;

c. Economic damages including but not limited to medical expenses, out of pocket expenses, lost earnings and other economic damages in an amount to be determined at trial;

d. Punitive damages for the wanton, willful, fraudulent, and reckless acts of the Defendants, who demonstrated a conscious disregard and reckless indifference for the safety and welfare of the public in general and of Plaintiff Clarke in particular,

> in an amount sufficient to punish Defendants and deter future similar conduct, to
> the extent allowed by applicable law;
>
> e.  Pre-judgment and post-judgment interest, at the legal rate, on all amounts claimed;
>
> f.  Attorneys' fees and costs pursuant as permitted by law;
>
> g.  For equitable and injunctive relief, as necessary, to ensure that Defendants refrain
> from continuing to harm others; and
>
> h.  Any such relief this Court deems just and proper.

WHEREFORE, for the foregoing reasons, Plaintiff Jonathan Clarke respectfully prays for
relief against Defendants, jointly and severally, in the sum of SEVENTY-FIVE MILLION
DOLLARS ($75,000,000.00) in compensatory damages, ONE HUNDRED FIFTY MILLION
DOLLARS ($150,000,000.00) in punitive damages or in an amount deemed recoverable pursuant
to the law of the state deemed applicable to Plaintiff's claim to punitive damages, reasonable
attorneys' fees and court costs pursuant to the VCPA, Va. Code Ann. § 59.1-204(B), treble
damages pursuant to Va. Code § 59.1-204(A), the cost of this action, pre-judgment interest, post-
judgment interest, and any other relief this Court deems just and proper.

## TRIAL BY JURY DEMANDED

The Plaintiff demands a trial with a jury on all issues in the cause, including liability and
damages, and on any issue raised by this Complaint that involves any fact disputed by the
Defendants and on any issue that may be raised by the Defendants that involves any fact disputed
by the Plaintiffs. Plaintiffs hereby demand a trial with a jury on all issues in the cause, including
liability and damages.

**Respectfully submitted,**



Dated: March 24, 2025            By Counsel: _____

Kevin Biniazan, Esq. | VSB No. 92109
Jeffrey A. Breit, Esq. | VSB No. 18876
Don Scott, Esq. | VSB No. 88725
Scott M. Perry, Esq. | VSB No. 67417
Lauren Martin, Esq. | VSB No. 93653
Alexis Bale, Esq. | VSB No. 100318
~~Salem B. Amare, Esq. | VSB No. 99238~~
BREIT BINIAZAN, PC
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, VA  23451
Telephone | 757.622.6000
Facsimile | 757.299.8028
Email | kevin@bbtrial.com
Email | jeffrey@bbtrial.com
Email | don@bbtrial.com
Email | scott@bbtrial.com
Email | lmartin@bbtrial.com
Email | abale@bbtrial.com
~~Email | salem@bbtrial.com~~

*Counsel for Plaintiffs*

## VIRGINIA: IN THE CIRCUIT COURT FOR THE CITY OF RICHMOND

### JONATHAN CLARKE

      Plaintiff,

                                      Civil Action No. CL24002853-00

v.

3M COMPANY (f/k/a Minnesota
Mining and Manufacturing Company);
AGC CHEMICALS AMERICAS, INC.;
AMEREX;
ARCHROMA U.S., INC.;
ARKEMA, INC.;
BASF CORPORATION;
BLUE RIDGE RESCUE SUPPLIERS, INC.;
BRADSDEN SOLUTIONS, INC.;
BUCKEYE FIRE EQUIPMENT COMPANY;
CARRIER GLOBAL CORPORATION;
CHEMDESIGN PRODUCTS, INC.;
CHEMGUARD, INC.;
CHEMICALS, INC.;
CHEMOURS COMPANY FC, LLC;
CLARIANT CORPORATION;
CORTEVA, INC.;
DAIKIN AMERICA, INC.;
DEEPWATER CHEMICALS, INC.;
DU PONT DE NEMOURS INC. (f/k/a
DOWDUPONT INC.);
DYNAX CORPORATION;
E.I. DU PONT DE NEMOURS AND
COMPANY;
FIRE SERVICE PLUS, INC.;
GLOBE MANUFACTURING COMPANY LLC;
HONEYWELL INTERNATIONAL, INC.;
HONEYWELL SAFETY PRODUCTS USA, INC.;
JOHNSON CONTROLS, INC;
KIDDIE P.L.C., INC.;
KIDDIE FENWAL, INC.;
LION GROUP, INC.;
MALLORY SAFETY AND SUPPLY, LLC;
MINE SAFETY APPLIANCES COMPANY, LLC;
MSA SAFETY SALES, LLC;
MUNICIPAL EMERGENCY SERVICES INC.;

**NATION FORD CHEMICAL COMPANY;**
**NATIONAL FOAM, INC.;**
**PBI PERFORMANCE PRODUCTS, INC.;**
**SOUTHERN MILLS, INC.;**
**STEDFAST USA, INC.;**
**TENCATE PROTECTIVE FABRICS USA**
**d/b/a SOUTHERN MILLS INC.;**
**THE CHEMOURS COMPANY LLC;**
**TYCO FIRE PRODUCTS;**
**UNITED TECHNOLOGIES CORPORATION;**
**UTC FIRE & SECURITY AMERICAS**
**CORPORATION, INC. (f/k/a GE Interlogix, Inc.);**
**W.L. GORE & ASSOCIATES, INC.;**

### Defendants.

### PLAINTIFF'S MOTION FOR LEAVE TO FILE AN AMENDED COMPLAINT

COMES NOW, undersigned counsel on behalf of Plaintiff Jonathan Clarke, who moves

this Honorable Court for leave to amend the Complaint to clarify and streamline the issues

presented therein, including the causes of action, the named Defendants, and the claims against

those Defendants. In support, Plaintiff states as follows:

### FACTS

Plaintiff Clarke is a former firefighter who served the city of Richmond. Throughout the

course of the Plaintiff's career, Plaintiff routinely and regularly wore protective clothing designed

for firefighting, known as "turnouts," which were manufactured, distributed, and sold by each of

the Defendants, either individually or through their predecessors or subsidiaries. Unbeknownst to

Plaintiff, these turnouts contained per- and polyfluoroalkyl substances ("PFAS"). PFAS are

human-made chemicals known to cause serious adverse health effects in humans. Plaintiff suffered

long-term exposure to PFAS contained in his turnouts, resulting in Plaintiff suffering injuries and

eventually developing Leukemia on or around July 2022. Consequently, Plaintiff commenced this

litigation on July 2, 2024 by filing his original Complaint in this matter. To date, only two

Defendants, Blue Ridge Rescue Suppliers and Bradsden Solutions, have been served with a copy of the Summons and Complaint.

## LEGAL STANDARD

Rule 1:8 of the Rules of the Supreme Court of Virginia provides leave to amend "shall be liberally granted in furtherance of the ends of justice." The right to file amended pleadings rests in the sound discretion of the trial court. Bentz v. Bentz, 2 Va. App. 486, 488 (1986); see also Kole v. City of Chesapeake, 247 Va. 51, 57 (1994). The Supreme Court has held that a trial court abuses its discretion when it refuses to permit leave to amend when nothing in the record suggests that the amendment will prejudice the opposing party. See, e.g., Ogunde v. Prison Health Servs., 274 Va. 55, 67 (2007) (finding abuse of discretion when a trial court refused to grant leave to amend where plaintiff filed his motion in a timely fashion and there was no evidence of prejudice to defendants); Whittaker v. Heinrich Schepers GMBH & Co. KG, 267 Va. 332, 336 (2008); Kole v. City of Chesapeake, 247 Va. 51, 57 (1994); Mortarino v. Consultant Engineering Servs., 251 Va. 289, 296 (1996). But see Griffin v. Rainer, 212 Va. 627, (1972) (holding that it was not an abuse of discretion for the trial court to deny the motion to amend Plaintiffs' motion for judgment when granting such motion would necessitate a new trial or the reopening of the case for discovery).

Factors that Virginia courts have considered when evaluating prejudice have included whether discovery has been propounded and to what degree an amendment will impact discovery; the number of times that the movant has sought leave to amend; the status and pendency of trial or other pretrial proceedings; and, generally, whether amendment will delay or hinder the resolution of the case. Booher v. Bd. of Supervisors, 65 Va. Cir. 53, 60 (2004); see also Nelson v. Commonwealth, 235 Va. 228, 344 (1988) (allowing amendment of pleadings thirteen days prior to trial); Bell v. Kirby, 226 Va. 641, 646 (1984) (permitting amendment to increase *ad damnum*

two days before trial); Kahn v. Washington, 74 Va. Cir. 95 (2007) (permitting amendment when there was no showing of prejudice as it was the first motion for leave to amend and the parties had six months to prepare for trial).

## ANALYSIS

Presently, Plaintiff's Complaint alleges negligence and breach of warranties against all Defendants for injuries Plaintiff sustained from his exposure to PFAS-containing firefighter turnout gear and AFFF products (also known as "Class B Foam" or "Foam"). See generally Compl. ¶¶ 144-230. Plaintiff's Amended Complaint alters this theory of liability slightly to remove any references to or claims based on Plaintiff's exposure to AFFF chemicals and/or products. The Amended Complaint, however, does not change or add new theories of liability nor does it seek to add new facts or parties to this case. Instead, Plaintiff's Amended Complaint is intended to streamline and clarify an issue that has arisen in other similar PFAS-related litigations – the issue being, which class of PFAS chemicals does Plaintiff allege caused the Plaintiff's injuries.

Currently, before the District Court for South Carolina is the matter of In Re: Aqueous Film-Forming Foams Products Liability Litigation (MDL No. 2873) (hereinafter, the "Foam MDL"). Most, if not all, of the Defendants involved in this litigation are also actively involved in the Foam MDL. The Foam MDL is based on injuries the plaintiffs there had sustained from a very specific PFAS chemical, known as AFFF or Class B foam. Of note, there are over 5,000 different PFAS chemicals, only one of which being the chemical found in Class B firefighting foam.

Plaintiff Clarke seeks to narrow the scope of his existing claims to remove any allegations or statements referencing exposure to or injury from Class B Foam. Plaintiff's claims are rooted in his exposure to the PFAS-containing *turnout gear*, the protective clothing specifically designed

for firefighters, which do not contain the Class B foam chemicals that are the basis of the Foam MDL. Despite this, Plaintiff's original Complaint mistakenly makes numerous references to, and allegations concerning, AFFF and Class B foam. Therefore, for clarity and to streamline litigation, Plaintiff asks this Honorable Court to grant him leave to file his First Amended Complaint, which removes the needless references to AFFF chemicals and removes those Defendants whose products contain such Class B Foam. Doing this will simplify an already intricate case for all parties and this Court.

Moreover, an amendment at this stage in the litigation is in good faith, it is not futile, and it will not prejudice any of the Defendants – of the 44 currently plead, only two Defendants, Bradsden Solutions, Inc., and Blue Ridge Rescue Suppliers, Inc. has filed an Answer, and none have filed any other responsive pleadings. Moreover, Plaintiff's sought amendments, in tandem with his Motions for Nonsuit, greatly ease the burden of this litigation by removing over half of the current plead parties. The parties are yet to confer over a discovery plan, discovery has not begun, depositions have not been noticed nor taken, and a scheduling order has yet to be entered. There is no cause to believe that any party to this matter will be prejudiced by an amendment.

## CONCLUSION

WHEREFORE, for the foregoing reasons, undersigned counsel on behalf of Plaintiff Jonathan Clarke respectfully asks that this Honorable Court grant this Motion for Leave to File an Amended Complaint. Plaintiffs have attached a version of the Amended Complaint in a form suitable for filing (**Exhibit A**), as well as a redlined version for easy review of the proposed changes (**Exhibit B**).

**Respectfully submitted,**

Dated: <u>March 24, 2025</u>          By Counsel: _____

Kevin Biniazan, Esq. | VSB No. 92109
Jeffrey A. Breit, Esq. | VSB No. 18876
Don Scott, Esq. | VSB No. 88725
Scott M. Perry, Esq. | VSB No. 67417
Lauren Martin, Esq. | VSB No. 93653
Alexis Bale, Esq. | VSB No. 100318
BREIT BINIAZAN, PC
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, VA 23451
Telephone | 757.622.6000
Facsimile | 757.299.8028
Email | kevin@bbtrial.com
Email | jeffrey@bbtrial.com
Email | don@bbtrial.com
Email | scott@bbtrial.com
Email | lauren@bbtrial.com
Email |abale@bbtrial.com

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 24th day of March, 2025, a true and correct copy of the foregoing was filed with the clerk of this Court and I emailed a copy to the following:

John R. Owen (VSB No. 39560)
Julie S. Palmer (VSB No. 65800)
John P. Dunnigan (VSB No. 93483)
Imani E. Sowell (VSB No. 95982)
Yevgeniy K. Klinovskiy (VSB No. 98264)
HARMON, CLAYTOR, CORRIGAN, & WELLMAN
P.O. Box 70280
Richmond, Virginia 23255
(804) 747-5200 – Phone
(804) 747-6085 – Fax
jowen@hccw.com
jpalmer@hccw.com
jdunnigan@hccw.com
isowell@hccw.com
yklinovskiy@hccw.com

*Counsel for Defendants Blue Ridge Rescue
Suppliers, Inc. and Bradsden Solutions, Inc.*

Kevin Biniazan

## VIRGINIA: IN THE CIRCUIT COURT FOR THE CITY OF RICHMOND

### JONATHAN CLARKE

Plaintiff,

Civil Action No. CL24002853-00

v.

3M COMPANY (f/k/a Minnesota
Mining and Manufacturing Company);
AGC CHEMICALS AMERICAS, INC.;
AMEREX;
ARCHROMA U.S., INC.;
ARKEMA, INC.;
BASF CORPORATION;
BLUE RIDGE RESCUE SUPPLIERS, INC.;
BRADSDEN SOLUTIONS, INC.;
BUCKEYE FIRE EQUIPMENT COMPANY;
CARRIER GLOBAL CORPORATION;
CHEMDESIGN PRODUCTS, INC.;
CHEMGUARD, INC.;
CHEMICALS, INC.;
CHEMOURS COMPANY FC, LLC;
CLARIANT CORPORATION;
CORTEVA, INC.;
DAIKIN AMERICA, INC.;
DEEPWATER CHEMICALS, INC.;
DU PONT DE NEMOURS INC. (f/k/a
DOWDUPONT INC.);
DYNAX CORPORATION;
E.I. DU PONT DE NEMOURS AND
COMPANY;
FIRE SERVICE PLUS, INC.;
GLOBE MANUFACTURING COMPANY LLC;
HONEYWELL INTERNATIONAL, INC.;
HONEYWELL SAFETY PRODUCTS USA, INC.;
JOHNSON CONTROLS, INC;
KIDDIE P.L.C., INC.;
KIDDIE FENWAL, INC.;
LION GROUP, INC.;
MALLORY SAFETY AND SUPPLY, LLC;
MINE SAFETY APPLIANCES COMPANY, LLC;
MSA SAFETY SALES, LLC;
MUNICIPAL EMERGENCY SERVICES INC.;

**NATION FORD CHEMICAL COMPANY;**
**NATIONAL FOAM, INC.;**
**PBI PERFORMANCE PRODUCTS, INC.;**
**SOUTHERN MILLS, INC.;**
**STEDFAST USA, INC.;**
**TENCATE PROTECTIVE FABRICS USA**
**d/b/a SOUTHERN MILLS INC.;**
**THE CHEMOURS COMPANY LLC;**
**TYCO FIRE PRODUCTS;**
**UNITED TECHNOLOGIES CORPORATION;**
**UTC FIRE & SECURITY AMERICAS**
**CORPORATION, INC. (f/k/a GE Interlogix, Inc.);**
**W.L. GORE & ASSOCIATES, INC.;**

               **Defendants.**

## PLAINTIFF'S MOTION FOR VOLUNTARY NONSUIT

       COMES NOW, Plaintiff Jonathan Clarke, by and through counsel, who moves this

Honorable Court for entry of an Order dismissing specifically **Defendant Basf Corporation** by

voluntary nonsuit in accordance with Virginia Code § 8.01-380. In support, Plaintiff states as

follows:

1.     Under Virginia Code § 8.01-380, Plaintiff is permitted to voluntarily nonsuit any

           other party to the proceeding, herein being Defendant Basf Corporation.

2.     This is Plaintiff's first motion for nonsuit as to any and all claims made against

           Defendant Basf Corporation. Prior to this motion, Plaintiff has not sought nonsuit

           in this action against Defendant Basf Corporation.

3.     At this stage in the proceedings, no motion to strike the evidence has been made

           nor sustained; the case is yet to be called before a jury; and the action is yet to be

           submitted to this Court for decision.

4.     Defendant Basf Corporation has not yet been served with process in this matter,

           let alone filed any counterclaims, cross claims, or third-party claims which arise

out of the same transaction or occurrence as the Plaintiff's claims.

5. As the requirements set forth in § 8.01-380(A), (B), & (D) are satisfied, and because Plaintiff has not previously sought nonsuit against the same party to the proceeding, herein Defendant Basf Corporation, Plaintiff is entitled to nonsuit as a matter of right.

WHEREFORE, Plaintiff Jonathan Clarke, through counsel, respectfully requests that this Honorable Court enter an Order nonsuiting Defendant Basf Corporation in accordance with Virginia Code § 8.01-380.

Respectfully submitted,

Kevin Biniazan, Esq. | VSB No. 92109
Jeffrey A. Breit, Esq. | VSB No. 18876
Don Scott, Esq. | VSB No. 88725
Scott M. Perry, Esq. | VSB No. 67417
Lauren Martin, Esq. | VSB No. 93653
Alexis Bale, Esq. | VSB No. 100318
Breit Biniazan, PC
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, VA 23451
Telephone | 757.622.6000
Facsimile | 757.299.8028
Email | kevin@bbtrial.com
Email | jeffrey@bbtrial.com
Email | don@bbtrial.com
Email | scott@bbtrial.com
Email | lmartin@bbtrial.com
Email | abale@bbtrial.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of March, 2025, a true and correct copy of the foregoing was filed with the clerk of this Court and I emailed a copy to the following:

John R. Owen (VSB No. 39560)
Julie S. Palmer (VSB No. 65800)
John P. Dunnigan (VSB No. 93483)
Imani E. Sowell (VSB No. 95982)
Yevgeniy K. Klinovskiy (VSB No. 98264)
HARMON, CLAYTOR, CORRIGAN, & WELLMAN
P.O. Box 70280
Richmond, Virginia 23255
(804) 747-5200 – Phone
(804) 747-6085 – Fax
jowen@hccw.com
jpalmer@hccw.com
jdunnigan@hccw.com
isowell@hccw.com
yklinovskiy@hccw.com

*Counsel for Defendants Blue Ridge Rescue*
*Suppliers, Inc. and Bradsden Solutions, Inc.*

Kevin Biñiazan

## VIRGINIA: IN THE CIRCUIT COURT FOR THE CITY OF RICHMOND

### JONATHAN CLARKE

#### Plaintiff,

Civil Action No. CL24002853-00

v.

3M COMPANY (f/k/a Minnesota
Mining and Manufacturing Company);
AGC CHEMICALS AMERICAS, INC.;
AMEREX;
ARCHROMA U.S., INC.;
ARKEMA, INC.;
BASF CORPORATION;
BLUE RIDGE RESCUE SUPPLIERS, INC.;
BRADSDEN SOLUTIONS, INC.;
BUCKEYE FIRE EQUIPMENT COMPANY;
CARRIER GLOBAL CORPORATION;
CHEMDESIGN PRODUCTS, INC.;
CHEMGUARD, INC.;
CHEMICALS, INC.;
CHEMOURS COMPANY FC, LLC;
CLARIANT CORPORATION;
CORTEVA, INC.;
DAIKIN AMERICA, INC.;
DEEPWATER CHEMICALS, INC.;
DU PONT DE NEMOURS INC. (f/k/a
DOWDUPONT INC.);
DYNAX CORPORATION;
E.I. DU PONT DE NEMOURS AND
COMPANY;
FIRE SERVICE PLUS, INC.;
GLOBE MANUFACTURING COMPANY LLC;
HONEYWELL INTERNATIONAL, INC.;
HONEYWELL SAFETY PRODUCTS USA, INC.;
JOHNSON CONTROLS, INC;
KIDDIE P.L.C., INC.;
KIDDIE FENWAL, INC.;
LION GROUP, INC.;
MALLORY SAFETY AND SUPPLY, LLC;
MINE SAFETY APPLIANCES COMPANY, LLC;
MSA SAFETY SALES, LLC;
MUNICIPAL EMERGENCY SERVICES INC.;

**NATION FORD CHEMICAL COMPANY;**
**NATIONAL FOAM, INC.;**
**PBI PERFORMANCE PRODUCTS, INC.;**
**SOUTHERN MILLS, INC.;**
**STEDFAST USA, INC.;**
**TENCATE PROTECTIVE FABRICS USA**
**d/b/a SOUTHERN MILLS INC.;**
**THE CHEMOURS COMPANY LLC;**
**TYCO FIRE PRODUCTS;**
**UNITED TECHNOLOGIES CORPORATION;**
**UTC FIRE & SECURITY AMERICAS**
**CORPORATION, INC. (f/k/a GE Interlogix, Inc.);**
**W.L. GORE & ASSOCIATES, INC.;**

   **Defendants.**

## PLAINTIFF'S MOTION FOR VOLUNTARY NONSUIT

  COMES NOW, Plaintiff Jonathan Clarke, by and through counsel, who moves this

Honorable Court for entry of an Order dismissing specifically **Defendant Amerex** by voluntary

nonsuit in accordance with Virginia Code § 8.01-380. In support, Plaintiff states as follows:

  1.  Under Virginia Code § 8.01-380, Plaintiff is permitted to voluntarily nonsuit any

    other party to the proceeding, herein being Defendant Amerex.

  2.  This is Plaintiff's first motion for nonsuit as to any and all claims made against

    Defendant Amerex.  Prior to this motion, Plaintiff has not sought nonsuit in this

    action against Defendant Amerex.

  3.  At this stage in the proceedings, no motion to strike the evidence has been made

    nor sustained; the case is yet to be called before a jury; and the action is yet to be

    submitted to this Court for decision.

  4.  Defendant Amerex has not yet been served with process in this matter, let alone

    filed any counterclaims, cross claims, or third-party claims which arise out of the

same transaction or occurrence as the Plaintiff's claims.

5. As the requirements set forth in § 8.01-380(A), (B), & (D) are satisfied, and because Plaintiff has not previously sought nonsuit against the same party to the proceeding, herein Defendant Amerex., Plaintiff is entitled to nonsuit as a matter of right.

WHEREFORE, Plaintiff Jonathan Clarke, through counsel, respectfully requests that this Honorable Court enter an Order nonsuiting Defendant Amerex in accordance with Virginia Code § 8.01-380.

**Respectfully submitted,**

Kevin Biniazan, Esq. | VSB No. 92109
Jeffrey A. Breit, Esq. | VSB No. 18876
Don Scott, Esq. | VSB No. 88725
Scott M. Perry, Esq. | VSB No. 67417
Lauren Martin, Esq. | VSB No. 93653
Alexis Bale, Esq. | VSB No. 100318
Breit Biniazan, PC
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, VA  23451
Telephone | 757.622.6000
Facsimile | 757.299.8028
Email | kevin@bbtrial.com
Email | jeffrey@bbtrial.com
Email | don@bbtrial.com
Email | scott@bbtrial.com
Email | lmartin@bbtrial.com
Email | abale@bbtrial.com

*Counsel for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 24th day of March, 2025, a true and correct copy of the foregoing was filed with the clerk of this Court and I emailed a copy to the following:

John R. Owen (VSB No. 39560)
Julie S. Palmer (VSB No. 65800)
John P. Dunnigan (VSB No. 93483)
Imani E. Sowell (VSB No. 95982)
Yevgeniy K. Klinovskiy (VSB No. 98264)
HARMON, CLAYTOR, CORRIGAN, & WELLMAN
P.O. Box 70280
Richmond, Virginia 23255
(804) 747-5200 – Phone
(804) 747-6085 – Fax
jowen@hccw.com
jpalmer@hccw.com
jdunnigan@hccw.com
isowell@hccw.com
yklinovskiy@hccw.com

*Counsel for Defendants Blue Ridge Rescue*
*Suppliers, Inc. and Bradsden Solutions, Inc.*

Kevin Biniazan

Uploaded Case 3:25-cv-00738-JAG Document 1-3 Filed 09/12/25 Page 291 of 400 PageID# 370
eFiled: 2025MAR24 RICHMOND CITY CC ILIPSCOMB at 2025MAR26 12:01 CL24002853-00

## VIRGINIA: IN THE CIRCUIT COURT FOR THE CITY OF RICHMOND

**JONATHAN CLARKE**

     **Plaintiff,**

                                    **Civil Action No. CL24002853-00**

v.

**3M COMPANY (f/k/a Minnesota**
**Mining and Manufacturing Company);**
**AGC CHEMICALS AMERICAS, INC.;**
**AMEREX;**
**ARCHROMA U.S., INC.;**
**ARKEMA, INC.;**
**BASF CORPORATION;**
**BLUE RIDGE RESCUE SUPPLIERS, INC.;**
**BRADSDEN SOLUTIONS, INC.;**
**BUCKEYE FIRE EQUIPMENT COMPANY;**
**CARRIER GLOBAL CORPORATION;**
**CHEMDESIGN PRODUCTS, INC.;**
**CHEMGUARD, INC.;**
**CHEMICALS, INC.;**
**CHEMOURS COMPANY FC, LLC;**
**CLARIANT CORPORATION;**
**CORTEVA, INC.;**
**DAIKIN AMERICA, INC.;**
**DEEPWATER CHEMICALS, INC.;**
**DU PONT DE NEMOURS INC. (f/k/a**
**DOWDUPONT INC.);**
**DYNAX CORPORATION;**
**E.I. DU PONT DE NEMOURS AND**
**COMPANY;**
**FIRE SERVICE PLUS, INC.;**
**GLOBE MANUFACTURING COMPANY LLC;**
**HONEYWELL INTERNATIONAL, INC.;**
**HONEYWELL SAFETY PRODUCTS USA, INC.;**
**JOHNSON CONTROLS, INC;**
**KIDDIE P.L.C., INC.;**
**KIDDIE FENWAL, INC.;**
**LION GROUP, INC.;**
**MALLORY SAFETY AND SUPPLY, LLC;**
**MINE SAFETY APPLIANCES COMPANY, LLC;**
**MSA SAFETY SALES, LLC;**
**MUNICIPAL EMERGENCY SERVICES INC.;**

**NATION FORD CHEMICAL COMPANY;**
**NATIONAL FOAM, INC.;**
**PBI PERFORMANCE PRODUCTS, INC.;**
**SOUTHERN MILLS, INC.;**
**STEDFAST USA, INC.;**
**TENCATE PROTECTIVE FABRICS USA**
**d/b/a SOUTHERN MILLS INC.;**
**THE CHEMOURS COMPANY LLC;**
**TYCO FIRE PRODUCTS;**
**UNITED TECHNOLOGIES CORPORATION;**
**UTC FIRE & SECURITY AMERICAS**
**CORPORATION, INC. (f/k/a GE Interlogix, Inc.);**
**W.L. GORE & ASSOCIATES, INC.;**

   **Defendants.**

### PLAINTIFF'S MOTION FOR VOLUNTARY NONSUIT

  COMES NOW, Plaintiff Jonathan Clarke, by and through counsel, who moves this Honorable Court for entry of an Order dismissing specifically **Defendant Buckeye Fire Equipment Company** by voluntary nonsuit in accordance with Virginia Code § 8.01-380. In support, Plaintiff states as follows:

  1.  Under Virginia Code § 8.01-380, Plaintiff is permitted to voluntarily nonsuit any other party to the proceeding, herein being Defendant Buckeye Fire Equipment Company.

  2.  This is Plaintiff's first motion for nonsuit as to any and all claims made against Defendant Buckeye Fire Equipment Company. Prior to this motion, Plaintiff has not sought nonsuit in this action against Defendant Buckeye Fire Equipment Company.

  3.  At this stage in the proceedings, no motion to strike the evidence has been made nor sustained; the case is yet to be called before a jury; and the action is yet to be

submitted to this Court for decision.

4.     Defendant Buckeye Fire Equipment Company has not yet been served with process in this matter, let alone filed any counterclaims, cross claims, or third-party claims which arise out of the same transaction or occurrence as the Plaintiff's claims.

5.     As the requirements set forth in § 8.01-380(A), (B), & (D) are satisfied, and because Plaintiff has not previously sought nonsuit against the same party to the proceeding, herein Defendant Buckeye Fire Equipment Company, Plaintiff is entitled to nonsuit as a matter of right.

WHEREFORE, Plaintiff Jonathan Clarke, through counsel, respectfully requests that this Honorable Court enter an Order nonsuiting Defendant Buckeye Fire Equipment Company in accordance with Virginia Code § 8.01-380.

Respectfully submitted,

Kevin Biniazan, Esq. | VSB No. 92109
Jeffrey A. Breit, Esq. | VSB No. 18876
Don Scott, Esq. | VSB No. 88725
Scott M. Perry, Esq. | VSB No. 67417
Lauren Martin, Esq. | VSB No. 93653
Alexis Bale, Esq. | VSB No. 100318
Breit Biniazan, PC
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, VA 23451
Telephone | 757.622.6000
Facsimile | 757.299.8028
Email | kevin@bbtrial.com
Email | jeffrey@bbtrial.com
Email | don@bbtrial.com

Email | scott@bbtrial.com
Email | lmartin@bbtrial.com
Email | abale@bbtrial.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of March, 2025, a true and correct copy of the foregoing was filed with the clerk of this Court and I emailed a copy to the following:

John R. Owen (VSB No. 39560)
Julie S. Palmer (VSB No. 65800)
John P. Dunnigan (VSB No. 93483)
Imani E. Sowell (VSB No. 95982)
Yevgeniy K. Klinovskiy (VSB No. 98264)
HARMON, CLAYTOR, CORRIGAN, & WELLMAN
P.O. Box 70280
Richmond, Virginia 23255
(804) 747-5200 – Phone
(804) 747-6085 – Fax
jowen@hccw.com
jpalmer@hccw.com
jdunnigan@hccw.com
isowell@hccw.com
yklinovskiy@hccw.com

*Counsel for Defendants Blue Ridge Rescue
Suppliers, Inc. and Bradsden Solutions, Inc.*

Kevin Biñiazan

Uploaded Case No. CL24002853-00 ... eFiled: 2025MAR24 RICHMOND CITY CC ILIPSCOMB at 2025MAR26 12:01 CL24002853-00   Page 296 of 400 PageID# 375

## VIRGINIA: IN THE CIRCUIT COURT FOR THE CITY OF RICHMOND

**JONATHAN CLARKE**

     **Plaintiff,**

                              **Civil Action No. CL24002853-00**

**v.**

**3M COMPANY (f/k/a Minnesota**
**Mining and Manufacturing Company);**
**AGC CHEMICALS AMERICAS, INC.;**
**AMEREX;**
**ARCHROMA U.S., INC.;**
**ARKEMA, INC.;**
**BASF CORPORATION;**
**BLUE RIDGE RESCUE SUPPLIERS, INC.;**
**BRADSDEN SOLUTIONS, INC.;**
**BUCKEYE FIRE EQUIPMENT COMPANY;**
**CARRIER GLOBAL CORPORATION;**
**CHEMDESIGN PRODUCTS, INC.;**
**CHEMGUARD, INC.;**
**CHEMICALS, INC.;**
**CHEMOURS COMPANY FC, LLC;**
**CLARIANT CORPORATION;**
**CORTEVA, INC.;**
**DAIKIN AMERICA, INC.;**
**DEEPWATER CHEMICALS, INC.;**
**DU PONT DE NEMOURS INC. (f/k/a**
**DOWDUPONT INC.);**
**DYNAX CORPORATION;**
**E.I. DU PONT DE NEMOURS AND**
**COMPANY;**
**FIRE SERVICE PLUS, INC.;**
**GLOBE MANUFACTURING COMPANY LLC;**
**HONEYWELL INTERNATIONAL, INC.;**
**HONEYWELL SAFETY PRODUCTS USA, INC.;**
**JOHNSON CONTROLS, INC;**
**KIDDIE P.L.C., INC.;**
**KIDDIE FENWAL, INC.;**
**LION GROUP, INC.;**
**MALLORY SAFETY AND SUPPLY, LLC;**
**MINE SAFETY APPLIANCES COMPANY, LLC;**
**MSA SAFETY SALES, LLC;**
**MUNICIPAL EMERGENCY SERVICES INC.;**



**NATION FORD CHEMICAL COMPANY;**
**NATIONAL FOAM, INC.;**
**PBI PERFORMANCE PRODUCTS, INC.;**
**SOUTHERN MILLS, INC.;**
**STEDFAST USA, INC.;**
**TENCATE PROTECTIVE FABRICS USA**
**d/b/a SOUTHERN MILLS INC.;**
**THE CHEMOURS COMPANY LLC;**
**TYCO FIRE PRODUCTS;**
**UNITED TECHNOLOGIES CORPORATION;**
**UTC FIRE & SECURITY AMERICAS**
**CORPORATION, INC. (f/k/a GE Interlogix, Inc.);**
**W.L. GORE & ASSOCIATES, INC.;**

    **Defendants.**

### PLAINTIFF'S MOTION FOR VOLUNTARY NONSUIT

  COMES NOW, Plaintiff Jonathan Clarke, by and through counsel, who moves this Honorable Court for entry of an Order dismissing specifically **Defendant Carrier Global Corporation** by voluntary nonsuit in accordance with Virginia Code § 8.01-380.  In support, Plaintiff states as follows:

1. Under Virginia Code § 8.01-380, Plaintiff is permitted to voluntarily nonsuit any other party to the proceeding, herein being Defendant Carrier Global Corporation.

2. This is Plaintiff's first motion for nonsuit as to any and all claims made against Defendant Carrier Global Corporation.  Prior to this motion, Plaintiff has not sought nonsuit in this action against Defendant Carrier Global Corporation.

3. At this stage in the proceedings, no motion to strike the evidence has been made nor sustained; the case is yet to be called before a jury; and the action is yet to be submitted to this Court for decision.

4. Defendant Carrier Global Corporation has not yet been served with process in this matter, let alone filed any counterclaims, cross claims, or third-party claims which

arise out of the same transaction or occurrence as the Plaintiff's claims.

5.      As the requirements set forth in § 8.01-380(A), (B), & (D) are satisfied, and

because Plaintiff has not previously sought nonsuit against the same party to the

proceeding, herein Defendant Carrier Global Corporation, Plaintiff is entitled to

nonsuit as a matter of right.

WHEREFORE, Plaintiff Jonathan Clarke, through counsel, respectfully requests that this

Honorable Court enter an Order nonsuiting Defendant Carrier Global Corporation in accordance

with Virginia Code § 8.01-380.


**Respectfully submitted,**

Kevin Biniazan, Esq. | VSB No. 92109
Jeffrey A. Breit, Esq. | VSB No. 18876
Don Scott, Esq. | VSB No. 88725
Scott M. Perry, Esq. | VSB No. 67417
Lauren Martin, Esq. | VSB No. 93653
Alexis Bale, Esq. | VSB No. 100318
Breit Biniazan, PC
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, VA 23451
Telephone | 757.622.6000
Facsimile | 757.299.8028
Email | kevin@bbtrial.com
Email | jeffrey@bbtrial.com
Email | don@bbtrial.com
Email | scott@bbtrial.com
Email | lmartin@bbtrial.com
Email | abale@bbtrial.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of March, 2025, a true and correct copy of the foregoing was filed with the clerk of this Court and I emailed a copy to the following:

John R. Owen (VSB No. 39560)
Julie S. Palmer (VSB No. 65800)
John P. Dunnigan (VSB No. 93483)
Imani E. Sowell (VSB No. 95982)
Yevgeniy K. Klinovskiy (VSB No. 98264)
HARMON, CLAYTOR, CORRIGAN, & WELLMAN
P.O. Box 70280
Richmond, Virginia 23255
(804) 747-5200 – Phone
(804) 747-6085 – Fax
jowen@hccw.com
jpalmer@hccw.com
jdunnigan@hccw.com
isowell@hccw.com
yklinovskiy@hccw.com

*Counsel for Defendants Blue Ridge Rescue*
*Suppliers, Inc. and Bradsden Solutions, Inc.*

Kevin Biñiazan

## VIRGINIA: IN THE CIRCUIT COURT FOR THE CITY OF RICHMOND

**JONATHAN CLARKE**

   **Plaintiff,**

             **Civil Action No. CL24002853-00**

**v.**

**3M COMPANY (f/k/a Minnesota Mining and Manufacturing Company); AGC CHEMICALS AMERICAS, INC.; AMEREX; ARCHROMA U.S., INC.; ARKEMA, INC.; BASF CORPORATION; BLUE RIDGE RESCUE SUPPLIERS, INC.; BRADSDEN SOLUTIONS, INC.; BUCKEYE FIRE EQUIPMENT COMPANY; CARRIER GLOBAL CORPORATION; CHEMDESIGN PRODUCTS, INC.; CHEMGUARD, INC.; CHEMICALS, INC.; CHEMOURS COMPANY FC, LLC; CLARIANT CORPORATION; CORTEVA, INC.; DAIKIN AMERICA, INC.; DEEPWATER CHEMICALS, INC.; DU PONT DE NEMOURS INC. (f/k/a DOWDUPONT INC.); DYNAX CORPORATION; E.I. DU PONT DE NEMOURS AND COMPANY; FIRE SERVICE PLUS, INC.; GLOBE MANUFACTURING COMPANY LLC; HONEYWELL INTERNATIONAL, INC.; HONEYWELL SAFETY PRODUCTS USA, INC.; JOHNSON CONTROLS, INC; KIDDIE P.L.C., INC.; KIDDIE FENWAL, INC.; LION GROUP, INC.; MALLORY SAFETY AND SUPPLY, LLC; MINE SAFETY APPLIANCES COMPANY, LLC; MSA SAFETY SALES, LLC; MUNICIPAL EMERGENCY SERVICES INC.;**

**NATION FORD CHEMICAL COMPANY;**
**NATIONAL FOAM, INC.;**
**PBI PERFORMANCE PRODUCTS, INC.;**
**SOUTHERN MILLS, INC.;**
**STEDFAST USA, INC.;**
**TENCATE PROTECTIVE FABRICS USA**
**d/b/a SOUTHERN MILLS INC.;**
**THE CHEMOURS COMPANY LLC;**
**TYCO FIRE PRODUCTS;**
**UNITED TECHNOLOGIES CORPORATION;**
**UTC FIRE & SECURITY AMERICAS**
**CORPORATION, INC. (f/k/a GE Interlogix, Inc.);**
**W.L. GORE & ASSOCIATES, INC.;**

      **Defendants.**

## PLAINTIFF'S MOTION FOR VOLUNTARY NONSUIT

COMES NOW, Plaintiff Jonathan Clarke, by and through counsel, who moves this

Honorable Court for entry of an Order dismissing specifically **Defendant ChemDesign Products,**

**Inc.** by voluntary nonsuit in accordance with Virginia Code § 8.01-380. In support, Plaintiff states

as follows:

1.     Under Virginia Code § 8.01-380, Plaintiff is permitted to voluntarily nonsuit any

       other party to the proceeding, herein being Defendant ChemDesign Products, Inc.

2.     This is Plaintiff's first motion for nonsuit as to any and all claims made against

       Defendant ChemDesign Products, Inc. Prior to this motion, Plaintiff has not

       sought nonsuit in this action against Defendant ChemDesign Products, Inc.

3.     At this stage in the proceedings, no motion to strike the evidence has been made

       nor sustained; the case is yet to be called before a jury; and the action is yet to be

       submitted to this Court for decision.

4.     Defendant ChemDesign Products, Inc. has not yet been served with process in this

       matter, let alone filed any counterclaims, cross claims, or third-party claims which

arise out of the same transaction or occurrence as the Plaintiff's claims.

5.     As the requirements set forth in § 8.01-380(A), (B), & (D) are satisfied, and
because Plaintiff has not previously sought nonsuit against the same party to the
proceeding, herein Defendant ChemDesign Products, Inc., Plaintiff is entitled to
nonsuit as a matter of right.

WHEREFORE, Plaintiff Jonathan Clarke, through counsel, respectfully requests that this
Honorable Court enter an Order nonsuiting Defendant ChemDesign Products, Inc. in accordance
with Virginia Code § 8.01-380.

**Respectfully submitted,**

Kevin Biniazan, Esq. | VSB No. 92109
Jeffrey A. Breit, Esq. | VSB No. 18876
Don Scott, Esq. | VSB No. 88725
Scott M. Perry, Esq. | VSB No. 67417
Lauren Martin, Esq. | VSB No. 93653
Alexis Bale, Esq. | VSB No. 100318
Breit Biniazan, PC
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, VA 23451
Telephone | 757.622.6000
Facsimile | 757.299.8028
Email | kevin@bbtrial.com
Email | jeffrey@bbtrial.com
Email | don@bbtrial.com
Email | scott@bbtrial.com
Email | lmartin@bbtrial.com
Email | abale@bbtrial.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of March, 2025, a true and correct copy of the foregoing was filed with the clerk of this Court and I emailed a copy to the following:

John R. Owen (VSB No. 39560)
Julie S. Palmer (VSB No. 65800)
John P. Dunnigan (VSB No. 93483)
Imani E. Sowell (VSB No. 95982)
Yevgeniy K. Klinovskiy (VSB No. 98264)
HARMON, CLAYTOR, CORRIGAN, & WELLMAN
P.O. Box 70280
Richmond, Virginia 23255
(804) 747-5200 – Phone
(804) 747-6085 – Fax
jowen@hccw.com
jpalmer@hccw.com
jdunnigan@hccw.com
isowell@hccw.com
yklinovskiy@hccw.com

*Counsel for Defendants Blue Ridge Rescue*
*Suppliers, Inc. and Bradsden Solutions, Inc.*

Kevin Biniazan

## VIRGINIA: IN THE CIRCUIT COURT FOR THE CITY OF RICHMOND

### JONATHAN CLARKE

      **Plaintiff,**

                                    **Civil Action No. CL24002853-00**

**v.**

**3M COMPANY (f/k/a Minnesota
Mining and Manufacturing Company);
AGC CHEMICALS AMERICAS, INC.;
AMEREX;
ARCHROMA U.S., INC.;
ARKEMA, INC.;
BASF CORPORATION;
BLUE RIDGE RESCUE SUPPLIERS, INC.;
BRADSDEN SOLUTIONS, INC.;
BUCKEYE FIRE EQUIPMENT COMPANY;
CARRIER GLOBAL CORPORATION;
CHEMDESIGN PRODUCTS, INC.;
CHEMGUARD, INC.;
CHEMICALS, INC.;
CHEMOURS COMPANY FC, LLC;
CLARIANT CORPORATION;
CORTEVA, INC.;
DAIKIN AMERICA, INC.;
DEEPWATER CHEMICALS, INC.;
DU PONT DE NEMOURS INC. (f/k/a
DOWDUPONT INC.);
DYNAX CORPORATION;
E.I. DU PONT DE NEMOURS AND
COMPANY;
FIRE SERVICE PLUS, INC.;
GLOBE MANUFACTURING COMPANY LLC;
HONEYWELL INTERNATIONAL, INC.;
HONEYWELL SAFETY PRODUCTS USA, INC.;
JOHNSON CONTROLS, INC;
KIDDIE P.L.C., INC.;
KIDDIE FENWAL, INC.;
LION GROUP, INC.;
MALLORY SAFETY AND SUPPLY, LLC;
MINE SAFETY APPLIANCES COMPANY, LLC;
MSA SAFETY SALES, LLC;
MUNICIPAL EMERGENCY SERVICES INC.;**



$14$

**NATION FORD CHEMICAL COMPANY;**
**NATIONAL FOAM, INC.;**
**PBI PERFORMANCE PRODUCTS, INC.;**
**SOUTHERN MILLS, INC.;**
**STEDFAST USA, INC.;**
**TENCATE PROTECTIVE FABRICS USA**
**d/b/a SOUTHERN MILLS INC.;**
**THE CHEMOURS COMPANY LLC;**
**TYCO FIRE PRODUCTS;**
**UNITED TECHNOLOGIES CORPORATION;**
**UTC FIRE & SECURITY AMERICAS**
**CORPORATION, INC. (f/k/a GE Interlogix, Inc.);**
**W.L. GORE & ASSOCIATES, INC.;**

          **Defendants.**

## PLAINTIFF'S MOTION FOR VOLUNTARY NONSUIT

      COMES NOW, Plaintiff Jonathan Clarke, by and through counsel, who moves this

Honorable Court for entry of an Order dismissing specifically **Defendant ChemGuard, Inc.** by

voluntary nonsuit in accordance with Virginia Code § 8.01-380. In support, Plaintiff states as

follows:

      1.     Under Virginia Code § 8.01-380, Plaintiff is permitted to voluntarily nonsuit any

            other party to the proceeding, herein being Defendant ChemGuard, Inc.

      2.     This is Plaintiff's first motion for nonsuit as to any and all claims made against

            Defendant ChemGuard, Inc. Prior to this motion, Plaintiff has not sought nonsuit

            in this action against Defendant ChemGuard, Inc.

      3.     At this stage in the proceedings, no motion to strike the evidence has been made

            nor sustained; the case is yet to be called before a jury; and the action is yet to be

            submitted to this Court for decision.

      4.     Defendant ChemGuard, Inc. has not yet been served with process in this matter,

            let alone filed any counterclaims, cross claims, or third-party claims which arise

out of the same transaction or occurrence as the Plaintiff's claims.

5.    As the requirements set forth in § 8.01-380(A), (B), & (D) are satisfied, and because Plaintiff has not previously sought nonsuit against the same party to the proceeding, herein Defendant ChemGuard, Inc., Plaintiff is entitled to nonsuit as a matter of right.

WHEREFORE, Plaintiff Jonathan Clarke, through counsel, respectfully requests that this Honorable Court enter an Order nonsuiting Defendant ChemGuard, Inc. in accordance with Virginia Code § 8.01-380.

**Respectfully submitted,**

Kevin Biniazan, Esq. | VSB No. 92109
Jeffrey A. Breit, Esq. | VSB No. 18876
Don Scott, Esq. | VSB No. 88725
Scott M. Perry, Esq. | VSB No. 67417
Lauren Martin, Esq. | VSB No. 93653
Alexis Bale, Esq. | VSB No. 100318
Breit Biniazan, PC
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, VA 23451
Telephone | 757.622.6000
Facsimile | 757.299.8028
Email | kevin@bbtrial.com
Email | jeffrey@bbtrial.com
Email | don@bbtrial.com
Email | scott@bbtrial.com
Email | lmartin@bbtrial.com
Email | abale@bbtrial.com

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 24th day of March, 2025, a true and correct copy of the foregoing was filed with the clerk of this Court and I emailed a copy to the following:

John R. Owen (VSB No. 39560)
Julie S. Palmer (VSB No. 65800)
John P. Dunnigan (VSB No. 93483)
Imani E. Sowell (VSB No. 95982)
Yevgeniy K. Klinovskiy (VSB No. 98264)
HARMON, CLAYTOR, CORRIGAN, & WELLMAN
P.O. Box 70280
Richmond, Virginia 23255
(804) 747-5200 – Phone
(804) 747-6085 – Fax
jowen@hccw.com
jpalmer@hccw.com
jdunnigan@hccw.com
isowell@hccw.com
yklinovskiy@hccw.com

*Counsel for Defendants Blue Ridge Rescue
Suppliers, Inc. and Bradsden Solutions, Inc.*

Kevin Biniazan

Uploaded: 2025MAR26 at 2025MAR24 RICHMOND CITY CC ILIPSCOMB at 2025MAR26 12.01 CL24002853-00 Page 308 of 400 PageID# 387
eFiled: 2025MAR24 RICHMOND CITY CC ILIPSCOMB at 2025MAR26 12.01 CL24002853-00 Page 308 of 400 PageID# 387

## VIRGINIA: IN THE CIRCUIT COURT FOR THE CITY OF RICHMOND

### JONATHAN CLARKE

    **Plaintiff,**

                                 **Civil Action No. CL24002853-00**

**v.**

**3M COMPANY (f/k/a Minnesota
Mining and Manufacturing Company);
AGC CHEMICALS AMERICAS, INC.;
AMEREX;
ARCHROMA U.S., INC.;
ARKEMA, INC.;
BASF CORPORATION;
BLUE RIDGE RESCUE SUPPLIERS, INC.;
BRADSDEN SOLUTIONS, INC.;
BUCKEYE FIRE EQUIPMENT COMPANY;
CARRIER GLOBAL CORPORATION;
CHEMDESIGN PRODUCTS, INC.;
CHEMGUARD, INC.;
CHEMICALS, INC.;
CHEMOURS COMPANY FC, LLC;
CLARIANT CORPORATION;
CORTEVA, INC.;
DAIKIN AMERICA, INC.;
DEEPWATER CHEMICALS, INC.;
DU PONT DE NEMOURS INC. (f/k/a
DOWDUPONT INC.);
DYNAX CORPORATION;
E.I. DU PONT DE NEMOURS AND
COMPANY;
FIRE SERVICE PLUS, INC.;
GLOBE MANUFACTURING COMPANY LLC;
HONEYWELL INTERNATIONAL, INC.;
HONEYWELL SAFETY PRODUCTS USA, INC.;
JOHNSON CONTROLS, INC;
KIDDIE P.L.C., INC.;
KIDDIE FENWAL, INC.;
LION GROUP, INC.;
MALLORY SAFETY AND SUPPLY, LLC;
MINE SAFETY APPLIANCES COMPANY, LLC;
MSA SAFETY SALES, LLC;
MUNICIPAL EMERGENCY SERVICES INC.;**



15

**NATION FORD CHEMICAL COMPANY;**
**NATIONAL FOAM, INC.;**
**PBI PERFORMANCE PRODUCTS, INC.;**
**SOUTHERN MILLS, INC.;**
**STEDFAST USA, INC.;**
**TENCATE PROTECTIVE FABRICS USA**
**d/b/a SOUTHERN MILLS INC.;**
**THE CHEMOURS COMPANY LLC;**
**TYCO FIRE PRODUCTS;**
**UNITED TECHNOLOGIES CORPORATION;**
**UTC FIRE & SECURITY AMERICAS**
**CORPORATION, INC. (f/k/a GE Interlogix, Inc.);**
**W.L. GORE & ASSOCIATES, INC.;**

    **Defendants.**

## PLAINTIFF'S MOTION FOR VOLUNTARY NONSUIT

  COMES NOW, Plaintiff Jonathan Clarke, by and through counsel, who moves this

Honorable Court for entry of an Order dismissing specifically **Defendant Chemicals, Inc.** by

voluntary nonsuit in accordance with Virginia Code § 8.01-380. In support, Plaintiff states as

follows:

  1.  Under Virginia Code § 8.01-380, Plaintiff is permitted to voluntarily nonsuit any

    other party to the proceeding, herein being Defendant Chemicals, Inc.

  2.  This is Plaintiff's first motion for nonsuit as to any and all claims made against

    Defendant Chemicals, Inc. Prior to this motion, Plaintiff has not sought nonsuit

    in this action against Defendant Chemicals, Inc.

  3.  At this stage in the proceedings, no motion to strike the evidence has been made

    nor sustained; the case is yet to be called before a jury; and the action is yet to be

    submitted to this Court for decision.

  4.  Defendant Chemicals, Inc. has not yet been served with process in this matter, let

    alone filed any counterclaims, cross claims, or third-party claims which arise out

of the same transaction or occurrence as the Plaintiff's claims.

5.    As the requirements set forth in § 8.01-380(A), (B), & (D) are satisfied, and because Plaintiff has not previously sought nonsuit against the same party to the proceeding, herein Defendant Chemicals, Inc., Plaintiff is entitled to nonsuit as a matter of right.

WHEREFORE, Plaintiff Jonathan Clarke, through counsel, respectfully requests that this Honorable Court enter an Order nonsuiting Defendant Chemicals, Inc. in accordance with Virginia Code § 8.01-380.

**Respectfully submitted,**

Kevin Biniazan, Esq. | VSB No. 92109
Jeffrey A. Breit, Esq. | VSB No. 18876
Don Scott, Esq. | VSB No. 88725
Scott M. Perry, Esq. | VSB No. 67417
Lauren Martin, Esq. | VSB No. 93653
Alexis Bale, Esq. | VSB No. 100318
Breit Biniazan, PC
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, VA 23451
Telephone | 757.622.6000
Facsimile | 757.299.8028
Email | kevin@bbtrial.com
Email | jeffrey@bbtrial.com
Email | don@bbtrial.com
Email | scott@bbtrial.com
Email | lmartin@bbtrial.com
Email | abale@bbtrial.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of March, 2025, a true and correct copy of the foregoing was filed with the clerk of this Court and I emailed a copy to the following:

John R. Owen (VSB No. 39560)
Julie S. Palmer (VSB No. 65800)
John P. Dunnigan (VSB No. 93483)
Imani E. Sowell (VSB No. 95982)
Yevgeniy K. Klinovskiy (VSB No. 98264)
HARMON, CLAYTOR, CORRIGAN, & WELLMAN
P.O. Box 70280
Richmond, Virginia 23255
(804) 747-5200 – Phone
(804) 747-6085 – Fax
jowen@hccw.com
jpalmer@hccw.com
jdunnigan@hccw.com
isowell@hccw.com
yklinovskiy@hccw.com

*Counsel for Defendants Blue Ridge Rescue*
*Suppliers, Inc. and Bradsden Solutions, Inc.*

Kevin Biniazan

# VIRGINIA: IN THE CIRCUIT COURT FOR THE CITY OF RICHMOND

## JONATHAN CLARKE

Plaintiff,

Civil Action No. CL24002853-00

v.

3M COMPANY (f/k/a Minnesota
Mining and Manufacturing Company);
AGC CHEMICALS AMERICAS, INC.;
AMEREX;
ARCHROMA U.S., INC.;
ARKEMA, INC.;
BASF CORPORATION;
BLUE RIDGE RESCUE SUPPLIERS, INC.;
BRADSDEN SOLUTIONS, INC.;
BUCKEYE FIRE EQUIPMENT COMPANY;
CARRIER GLOBAL CORPORATION;
CHEMDESIGN PRODUCTS, INC.;
CHEMGUARD, INC.;
CHEMICALS, INC.;
CHEMOURS COMPANY FC, LLC;
CLARIANT CORPORATION;
CORTEVA, INC.;
DAIKIN AMERICA, INC.;
DEEPWATER CHEMICALS, INC.;
DU PONT DE NEMOURS INC. (f/k/a
DOWDUPONT INC.);
DYNAX CORPORATION;
E.I. DU PONT DE NEMOURS AND
COMPANY;
FIRE SERVICE PLUS, INC.;
GLOBE MANUFACTURING COMPANY LLC;
HONEYWELL INTERNATIONAL, INC.;
HONEYWELL SAFETY PRODUCTS USA, INC.;
JOHNSON CONTROLS, INC;
KIDDIE P.L.C., INC.;
KIDDIE FENWAL, INC.;
LION GROUP, INC.;
MALLORY SAFETY AND SUPPLY, LLC;
MINE SAFETY APPLIANCES COMPANY, LLC;
MSA SAFETY SALES, LLC;
MUNICIPAL EMERGENCY SERVICES INC.;

**NATION FORD CHEMICAL COMPANY;**
**NATIONAL FOAM, INC.;**
**PBI PERFORMANCE PRODUCTS, INC.;**
**SOUTHERN MILLS, INC.;**
**STEDFAST USA, INC.;**
**TENCATE PROTECTIVE FABRICS USA**
**d/b/a SOUTHERN MILLS INC.;**
**THE CHEMOURS COMPANY LLC;**
**TYCO FIRE PRODUCTS;**
**UNITED TECHNOLOGIES CORPORATION;**
**UTC FIRE & SECURITY AMERICAS**
**CORPORATION, INC. (f/k/a GE Interlogix, Inc.);**
**W.L. GORE & ASSOCIATES, INC.;**

       **Defendants.**

## PLAINTIFF'S MOTION FOR VOLUNTARY NONSUIT

COMES NOW, Plaintiff Jonathan Clarke, by and through counsel, who moves this

Honorable Court for entry of an Order dismissing specifically **Defendant Chemours Company**

**FC, LLC** by voluntary nonsuit in accordance with Virginia Code § 8.01-380. In support, Plaintiff

states as follows:

1.      Under Virginia Code § 8.01-380, Plaintiff is permitted to voluntarily nonsuit any

        other party to the proceeding, herein being Defendant Chemours Company FC,

        LLC.

2.      This is Plaintiff's first motion for nonsuit as to any and all claims made against

        Defendant Chemours Company FC, LLC. Prior to this motion, Plaintiff has not

        sought nonsuit in this action against Defendant Chemours Company FC, LLC.

3.      At this stage in the proceedings, no motion to strike the evidence has been made

        nor sustained; the case is yet to be called before a jury; and the action is yet to be

        submitted to this Court for decision.

4.      Defendant Chemours Company FC, LLC has not yet been served with process in

this matter, let alone filed any counterclaims, cross claims, or third-party claims which arise out of the same transaction or occurrence as the Plaintiff's claims.

5.      As the requirements set forth in § 8.01-380(A), (B), & (D) are satisfied, and because Plaintiff has not previously sought nonsuit against the same party to the proceeding, herein Defendant Chemours Company FC, LLC, Plaintiff is entitled to nonsuit as a matter of right.

WHEREFORE, Plaintiff Jonathan Clarke, through counsel, respectfully requests that this Honorable Court enter an Order nonsuiting Defendant Chemours Company FC, LLC in accordance with Virginia Code § 8.01-380.

**Respectfully submitted,**

Kevin Biniazan, Esq. | VSB No. 92109
Jeffrey A. Breit, Esq. | VSB No. 18876
Don Scott, Esq. | VSB No. 88725
Scott M. Perry, Esq. | VSB No. 67417
Lauren Martin, Esq. | VSB No. 93653
Alexis Bale, Esq. | VSB No. 100318
Breit Biniazan, PC
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, VA 23451
Telephone | 757.622.6000
Facsimile | 757.299.8028
Email | kevin@bbtrial.com
Email | jeffrey@bbtrial.com
Email | don@bbtrial.com
Email | scott@bbtrial.com
Email | lmartin@bbtrial.com
Email | abale@bbtrial.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of March, 2025, a true and correct copy of the foregoing was filed with the clerk of this Court and I emailed a copy to the following:

John R. Owen (VSB No. 39560)
Julie S. Palmer (VSB No. 65800)
John P. Dunnigan (VSB No. 93483)
Imani E. Sowell (VSB No. 95982)
Yevgeniy K. Klinovskiy (VSB No. 98264)
HARMON, CLAYTOR, CORRIGAN, & WELLMAN
P.O. Box 70280
Richmond, Virginia 23255
(804) 747-5200 – Phone
(804) 747-6085 – Fax
jowen@hccw.com
jpalmer@hccw.com
jdunnigan@hccw.com
isowell@hccw.com
yklinovskiy@hccw.com

*Counsel for Defendants Blue Ridge Rescue
Suppliers, Inc. and Bradsden Solutions, Inc.*

Kevin Biñiazan

## VIRGINIA: IN THE CIRCUIT COURT FOR THE CITY OF RICHMOND

### JONATHAN CLARKE

#### Plaintiff,

Civil Action No. CL24002853-00

v.

3M COMPANY (f/k/a Minnesota
Mining and Manufacturing Company);
AGC CHEMICALS AMERICAS, INC.;
AMEREX;
ARCHROMA U.S., INC.;
ARKEMA, INC.;
BASF CORPORATION;
BLUE RIDGE RESCUE SUPPLIERS, INC.;
BRADSDEN SOLUTIONS, INC.;
BUCKEYE FIRE EQUIPMENT COMPANY;
CARRIER GLOBAL CORPORATION;
CHEMDESIGN PRODUCTS, INC.;
CHEMGUARD, INC.;
CHEMICALS, INC.;
CHEMOURS COMPANY FC, LLC;
CLARIANT CORPORATION;
CORTEVA, INC.;
DAIKIN AMERICA, INC.;
DEEPWATER CHEMICALS, INC.;
DU PONT DE NEMOURS INC. (f/k/a
DOWDUPONT INC.);
DYNAX CORPORATION;
E.I. DU PONT DE NEMOURS AND
COMPANY;
FIRE SERVICE PLUS, INC.;
GLOBE MANUFACTURING COMPANY LLC;
HONEYWELL INTERNATIONAL, INC.;
HONEYWELL SAFETY PRODUCTS USA, INC.;
JOHNSON CONTROLS, INC;
KIDDIE P.L.C., INC.;
KIDDIE FENWAL, INC.;
LION GROUP, INC.;
MALLORY SAFETY AND SUPPLY, LLC;
MINE SAFETY APPLIANCES COMPANY, LLC;
MSA SAFETY SALES, LLC;
MUNICIPAL EMERGENCY SERVICES INC.;

**NATION FORD CHEMICAL COMPANY;**
**NATIONAL FOAM, INC.;**
**PBI PERFORMANCE PRODUCTS, INC.;**
**SOUTHERN MILLS, INC.;**
**STEDFAST USA, INC.;**
**TENCATE PROTECTIVE FABRICS USA**
**d/b/a SOUTHERN MILLS INC.;**
**THE CHEMOURS COMPANY LLC;**
**TYCO FIRE PRODUCTS;**
**UNITED TECHNOLOGIES CORPORATION;**
**UTC FIRE & SECURITY AMERICAS**
**CORPORATION, INC. (f/k/a GE Interlogix, Inc.);**
**W.L. GORE & ASSOCIATES, INC.;**

        **Defendants.**

### PLAINTIFF'S MOTION FOR VOLUNTARY NONSUIT

COMES NOW, Plaintiff Jonathan Clarke, by and through counsel, who moves this

Honorable Court for entry of an Order dismissing specifically **Defendant Clariant Corporation**

by voluntary nonsuit in accordance with Virginia Code § 8.01-380. In support, Plaintiff states as

follows:

1.     Under Virginia Code § 8.01-380, Plaintiff is permitted to voluntarily nonsuit any

        other party to the proceeding, herein being Defendant Clariant Corporation.

2.     This is Plaintiff's first motion for nonsuit as to any and all claims made against

        Defendant Clariant Corporation.  Prior to this motion, Plaintiff has not sought

        nonsuit in this action against Defendant Clariant Corporation.

3.     At this stage in the proceedings, no motion to strike the evidence has been made

        nor sustained; the case is yet to be called before a jury; and the action is yet to be

        submitted to this Court for decision.

4.     Defendant Clariant Corporation has not yet been served with process in this matter,

        let alone filed any counterclaims, cross claims, or third-party claims which arise

out of the same transaction or occurrence as the Plaintiff's claims.

5.    As the requirements set forth in § 8.01-380(A), (B), & (D) are satisfied, and because Plaintiff has not previously sought nonsuit against the same party to the proceeding, herein Defendant Clariant Corporation, Plaintiff is entitled to nonsuit as a matter of right.

WHEREFORE, Plaintiff Jonathan Clarke, through counsel, respectfully requests that this Honorable Court enter an Order nonsuiting Defendant Clariant Corporation in accordance with Virginia Code § 8.01-380.

**Respectfully submitted,**

Kevin Biniazan, Esq. | VSB No. 92109
Jeffrey A. Breit, Esq. | VSB No. 18876
Don Scott, Esq. | VSB No. 88725
Scott M. Perry, Esq. | VSB No. 67417
Lauren Martin, Esq. | VSB No. 93653
Alexis Bale, Esq. | VSB No. 100318
Breit Biniazan, PC
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, VA 23451
Telephone | 757.622.6000
Facsimile | 757.299.8028
Email | kevin@bbtrial.com
Email | jeffrey@bbtrial.com
Email | don@bbtrial.com
Email | scott@bbtrial.com
Email | lmartin@bbtrial.com
Email | abale@bbtrial.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of March, 2025, a true and correct copy of the foregoing was filed with the clerk of this Court and I emailed a copy to the following:

John R. Owen (VSB No. 39560)
Julie S. Palmer (VSB No. 65800)
John P. Dunnigan (VSB No. 93483)
Imani E. Sowell (VSB No. 95982)
Yevgeniy K. Klinovskiy (VSB No. 98264)
HARMON, CLAYTOR, CORRIGAN, & WELLMAN
P.O. Box 70280
Richmond, Virginia 23255
(804) 747-5200 – Phone
(804) 747-6085 – Fax
jowen@hccw.com
jpalmer@hccw.com
jdunnigan@hccw.com
isowell@hccw.com
yklinovskiy@hccw.com

*Counsel for Defendants Blue Ridge Rescue
Suppliers, Inc. and Bradsden Solutions, Inc.*

Kevin Biniazan

## VIRGINIA: IN THE CIRCUIT COURT FOR THE CITY OF RICHMOND

### JONATHAN CLARKE

        **Plaintiff,**

                                      **Civil Action No. CL24002853-00**

v.

**3M COMPANY (f/k/a Minnesota**
**Mining and Manufacturing Company);**
**AGC CHEMICALS AMERICAS, INC.;**
**AMEREX;**
**ARCHROMA U.S., INC.;**
**ARKEMA, INC.;**
**BASF CORPORATION;**
**BLUE RIDGE RESCUE SUPPLIERS, INC.;**
**BRADSDEN SOLUTIONS, INC.;**
**BUCKEYE FIRE EQUIPMENT COMPANY;**
**CARRIER GLOBAL CORPORATION;**
**CHEMDESIGN PRODUCTS, INC.;**
**CHEMGUARD, INC.;**
**CHEMICALS, INC.;**
**CHEMOURS COMPANY FC, LLC;**
**CLARIANT CORPORATION;**
**CORTEVA, INC.;**
**DAIKIN AMERICA, INC.;**
**DEEPWATER CHEMICALS, INC.;**
**DU PONT DE NEMOURS INC. (f/k/a**
**DOWDUPONT INC.);**
**DYNAX CORPORATION;**
**E.I. DU PONT DE NEMOURS AND**
**COMPANY;**
**FIRE SERVICE PLUS, INC.;**
**GLOBE MANUFACTURING COMPANY LLC;**
**HONEYWELL INTERNATIONAL, INC.;**
**HONEYWELL SAFETY PRODUCTS USA, INC.;**
**JOHNSON CONTROLS, INC;**
**KIDDIE P.L.C., INC.;**
**KIDDIE FENWAL, INC.;**
**LION GROUP, INC.;**
**MALLORY SAFETY AND SUPPLY, LLC;**
**MINE SAFETY APPLIANCES COMPANY, LLC;**
**MSA SAFETY SALES, LLC;**
**MUNICIPAL EMERGENCY SERVICES INC.;**



**NATION FORD CHEMICAL COMPANY;**
**NATIONAL FOAM, INC.;**
**PBI PERFORMANCE PRODUCTS, INC.;**
**SOUTHERN MILLS, INC.;**
**STEDFAST USA, INC.;**
**TENCATE PROTECTIVE FABRICS USA**
**d/b/a SOUTHERN MILLS INC.;**
**THE CHEMOURS COMPANY LLC;**
**TYCO FIRE PRODUCTS;**
**UNITED TECHNOLOGIES CORPORATION;**
**UTC FIRE & SECURITY AMERICAS**
**CORPORATION, INC. (f/k/a GE Interlogix, Inc.);**
**W.L. GORE & ASSOCIATES, INC.;**

        **Defendants.**

## PLAINTIFF'S MOTION FOR VOLUNTARY NONSUIT

COMES NOW, Plaintiff Jonathan Clarke, by and through counsel, who moves this

Honorable Court for entry of an Order dismissing specifically **Defendant Corteva, Inc.** by

voluntary nonsuit in accordance with Virginia Code § 8.01-380. In support, Plaintiff states as

follows:

1.    Under Virginia Code § 8.01-380, Plaintiff is permitted to voluntarily nonsuit any

other party to the proceeding, herein being Defendant Corteva, Inc.

2.    This is Plaintiff's first motion for nonsuit as to any and all claims made against

Defendant Corteva, Inc. Prior to this motion, Plaintiff has not sought nonsuit in

this action against Defendant Corteva, Inc.

3.    At this stage in the proceedings, no motion to strike the evidence has been made

nor sustained; the case is yet to be called before a jury; and the action is yet to be

submitted to this Court for decision.

4.    Defendant Corteva, Inc. has not yet been served with process in this matter, let

alone filed any counterclaims, cross claims, or third-party claims which arise out

of the same transaction or occurrence as the Plaintiff's claims.

5.      As the requirements set forth in § 8.01-380(A), (B), & (D) are satisfied, and

because Plaintiff has not previously sought nonsuit against the same party to the

proceeding, herein Defendant Corteva, Inc., Plaintiff is entitled to nonsuit as a

matter of right.

WHEREFORE, Plaintiff Jonathan Clarke, through counsel, respectfully requests that this

Honorable Court enter an Order nonsuiting Defendant Corteva, Inc. in accordance with Virginia

Code § 8.01-380.

**Respectfully submitted,**

Kevin Biniazan, Esq. | VSB No. 92109
Jeffrey A. Breit, Esq. | VSB No. 18876
Don Scott, Esq. | VSB No. 88725
Scott M. Perry, Esq. | VSB No. 67417
Lauren Martin, Esq. | VSB No. 93653
Alexis Bale, Esq. | VSB No. 100318
Breit Biniazan, PC
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, VA 23451
Telephone | 757.622.6000
Facsimile | 757.299.8028
Email | kevin@bbtrial.com
Email | jeffrey@bbtrial.com
Email | don@bbtrial.com
Email | scott@bbtrial.com
Email | lmartin@bbtrial.com
Email | abale@bbtrial.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of March, 2025, a true and correct copy of the foregoing was filed with the clerk of this Court and I emailed a copy to the following:

John R. Owen (VSB No. 39560)
Julie S. Palmer (VSB No. 65800)
John P. Dunnigan (VSB No. 93483)
Imani E. Sowell (VSB No. 95982)
Yevgeniy K. Klinovskiy (VSB No. 98264)
HARMON, CLAYTOR, CORRIGAN, & WELLMAN
P.O. Box 70280
Richmond, Virginia 23255
(804) 747-5200 – Phone
(804) 747-6085 – Fax
jowen@hccw.com
jpalmer@hccw.com
jdunnigan@hccw.com
isowell@hccw.com
yklinovskiy@hccw.com

*Counsel for Defendants Blue Ridge Rescue*
*Suppliers, Inc. and Bradsden Solutions, Inc.*

Kevin Biniazan

## VIRGINIA: IN THE CIRCUIT COURT FOR THE CITY OF RICHMOND

**JONATHAN CLARKE**

     **Plaintiff,**

                                  **Civil Action No. CL24002853-00**

v.

**3M COMPANY (f/k/a Minnesota
Mining and Manufacturing Company);
AGC CHEMICALS AMERICAS, INC.;
AMEREX;
ARCHROMA U.S., INC.;
ARKEMA, INC.;
BASF CORPORATION;
BLUE RIDGE RESCUE SUPPLIERS, INC.;
BRADSDEN SOLUTIONS, INC.;
BUCKEYE FIRE EQUIPMENT COMPANY;
CARRIER GLOBAL CORPORATION;
CHEMDESIGN PRODUCTS, INC.;
CHEMGUARD, INC.;
CHEMICALS, INC.;
CHEMOURS COMPANY FC, LLC;
CLARIANT CORPORATION;
CORTEVA, INC.;
DAIKIN AMERICA, INC.;
DEEPWATER CHEMICALS, INC.;
DU PONT DE NEMOURS INC. (f/k/a
DOWDUPONT INC.);
DYNAX CORPORATION;
E.I. DU PONT DE NEMOURS AND
COMPANY;
FIRE SERVICE PLUS, INC.;
GLOBE MANUFACTURING COMPANY LLC;
HONEYWELL INTERNATIONAL, INC.;
HONEYWELL SAFETY PRODUCTS USA, INC.;
JOHNSON CONTROLS, INC;
KIDDIE P.L.C., INC.;
KIDDIE FENWAL, INC.;
LION GROUP, INC.;
MALLORY SAFETY AND SUPPLY, LLC;
MINE SAFETY APPLIANCES COMPANY, LLC;
MSA SAFETY SALES, LLC;
MUNICIPAL EMERGENCY SERVICES INC.;**

**NATION FORD CHEMICAL COMPANY;**
**NATIONAL FOAM, INC.;**
**PBI PERFORMANCE PRODUCTS, INC.;**
**SOUTHERN MILLS, INC.;**
**STEDFAST USA, INC.;**
**TENCATE PROTECTIVE FABRICS USA**
**d/b/a SOUTHERN MILLS INC.;**
**THE CHEMOURS COMPANY LLC;**
**TYCO FIRE PRODUCTS;**
**UNITED TECHNOLOGIES CORPORATION;**
**UTC FIRE & SECURITY AMERICAS**
**CORPORATION, INC. (f/k/a GE Interlogix, Inc.);**
**W.L. GORE & ASSOCIATES, INC.;**

        **Defendants.**

## PLAINTIFF'S MOTION FOR VOLUNTARY NONSUIT

COMES NOW, Plaintiff Jonathan Clarke, by and through counsel, who moves this Honorable Court for entry of an Order dismissing specifically **Defendant Deepwater Chemicals, Inc.** by voluntary nonsuit in accordance with Virginia Code § 8.01-380. In support, Plaintiff states as follows:

1.    Under Virginia Code § 8.01-380, Plaintiff is permitted to voluntarily nonsuit any other party to the proceeding, herein being Defendant Deepwater Chemicals, Inc.

2.    This is Plaintiff's first motion for nonsuit as to any and all claims made against Defendant Deepwater Chemicals, Inc. Prior to this motion, Plaintiff has not sought nonsuit in this action against Defendant Deepwater Chemicals, Inc.

3.    At this stage in the proceedings, no motion to strike the evidence has been made nor sustained; the case is yet to be called before a jury; and the action is yet to be submitted to this Court for decision.

4.    Defendant Deepwater Chemicals, Inc. has not yet been served with process in this matter, let alone filed any counterclaims, cross claims, or third-party claims which

arise out of the same transaction or occurrence as the Plaintiff's claims.

5.    As the requirements set forth in § 8.01-380(A), (B), & (D) are satisfied, and because Plaintiff has not previously sought nonsuit against the same party to the proceeding, herein Defendant Deepwater Chemicals, Inc., Plaintiff is entitled to nonsuit as a matter of right.

WHEREFORE, Plaintiff Jonathan Clarke, through counsel, respectfully requests that this Honorable Court enter an Order nonsuiting Defendant Deepwater Chemicals, Inc. in accordance with Virginia Code § 8.01-380.

**Respectfully submitted,**

Kevin Biniazan, Esq. | VSB No. 92109
Jeffrey A. Breit, Esq. | VSB No. 18876
Don Scott, Esq. | VSB No. 88725
Scott M. Perry, Esq. | VSB No. 67417
Lauren Martin, Esq. | VSB No. 93653
Alexis Bale, Esq. | VSB No. 100318
Breit Biniazan, PC
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, VA 23451
Telephone | 757.622.6000
Facsimile | 757.299.8028
Email | kevin@bbtrial.com
Email | jeffrey@bbtrial.com
Email | don@bbtrial.com
Email | scott@bbtrial.com
Email | lmartin@bbtrial.com
Email | abale@bbtrial.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of March, 2025, a true and correct copy of the foregoing was filed with the clerk of this Court and I emailed a copy to the following:

John R. Owen (VSB No. 39560)
Julie S. Palmer (VSB No. 65800)
John P. Dunnigan (VSB No. 93483)
Imani E. Sowell (VSB No. 95982)
Yevgeniy K. Klinovskiy (VSB No. 98264)
HARMON, CLAYTOR, CORRIGAN, & WELLMAN
P.O. Box 70280
Richmond, Virginia 23255
(804) 747-5200 – Phone
(804) 747-6085 – Fax
jowen@hccw.com
jpalmer@hccw.com
jdunnigan@hccw.com
isowell@hccw.com
yklinovskiy@hccw.com

*Counsel for Defendants Blue Ridge Rescue*
*Suppliers, Inc. and Bradsden Solutions, Inc.*

Kevin Biniazan

## VIRGINIA: IN THE CIRCUIT COURT FOR THE CITY OF RICHMOND

### JONATHAN CLARKE

      Plaintiff,

                                Civil Action No. CL24002853-00

v.

3M COMPANY (f/k/a Minnesota
Mining and Manufacturing Company);
AGC CHEMICALS AMERICAS, INC.;
AMEREX;
ARCHROMA U.S., INC.;
ARKEMA, INC.;
BASF CORPORATION;
BLUE RIDGE RESCUE SUPPLIERS, INC.;
BRADSDEN SOLUTIONS, INC.;
BUCKEYE FIRE EQUIPMENT COMPANY;
CARRIER GLOBAL CORPORATION;
CHEMDESIGN PRODUCTS, INC.;
CHEMGUARD, INC.;
CHEMICALS, INC.;
CHEMOURS COMPANY FC, LLC;
CLARIANT CORPORATION;
CORTEVA, INC.;
DAIKIN AMERICA, INC.;
DEEPWATER CHEMICALS, INC.;
DU PONT DE NEMOURS INC. (f/k/a
DOWDUPONT INC.);
DYNAX CORPORATION;
E.I. DU PONT DE NEMOURS AND
COMPANY;
FIRE SERVICE PLUS, INC.;
GLOBE MANUFACTURING COMPANY LLC;
HONEYWELL INTERNATIONAL, INC.;
HONEYWELL SAFETY PRODUCTS USA, INC.;
JOHNSON CONTROLS, INC;
KIDDIE P.L.C., INC.;
KIDDIE FENWAL, INC.;
LION GROUP, INC.;
MALLORY SAFETY AND SUPPLY, LLC;
MINE SAFETY APPLIANCES COMPANY, LLC;
MSA SAFETY SALES, LLC;
MUNICIPAL EMERGENCY SERVICES INC.;

**NATION FORD CHEMICAL COMPANY;**
**NATIONAL FOAM, INC.;**
**PBI PERFORMANCE PRODUCTS, INC.;**
**SOUTHERN MILLS, INC.;**
**STEDFAST USA, INC.;**
**TENCATE PROTECTIVE FABRICS USA**
**d/b/a SOUTHERN MILLS INC.;**
**THE CHEMOURS COMPANY LLC;**
**TYCO FIRE PRODUCTS;**
**UNITED TECHNOLOGIES CORPORATION;**
**UTC FIRE & SECURITY AMERICAS**
**CORPORATION, INC. (f/k/a GE Interlogix, Inc.);**
**W.L. GORE & ASSOCIATES, INC.;**

> **Defendants.**

## PLAINTIFF'S MOTION FOR VOLUNTARY NONSUIT

COMES NOW, Plaintiff Jonathan Clarke, by and through counsel, who moves this

Honorable Court for entry of an Order dismissing specifically **Defendant Du Pont De Nemours**

**Inc. (f/k/a DowDuPont Inc.)** by voluntary nonsuit in accordance with Virginia Code § 8.01-380.

In support, Plaintiff states as follows:

1.     Under Virginia Code § 8.01-380, Plaintiff is permitted to voluntarily nonsuit any

other party to the proceeding, herein being Defendant Du Pont De Nemours Inc.

(f/k/a DowDuPont Inc.).

2.     This is Plaintiff's first motion for nonsuit as to any and all claims made against

Defendant Du Pont De Nemours Inc. Prior to this motion, Plaintiff has not sought

nonsuit in this action against Defendant Du Pont De Nemours Inc.

3.     At this stage in the proceedings, no motion to strike the evidence has been made

nor sustained; the case is yet to be called before a jury; and the action is yet to be

submitted to this Court for decision.

4.     Defendant Du Pont De Nemours Inc. has not yet been served with process in this

matter, let alone filed any counterclaims, cross claims, or third-party claims which arise out of the same transaction or occurrence as the Plaintiff's claims.

5.    As the requirements set forth in § 8.01-380(A), (B), & (D) are satisfied, and because Plaintiff has not previously sought nonsuit against the same party to the proceeding, herein Defendant Du Pont De Nemours Inc., Plaintiff is entitled to nonsuit as a matter of right.

WHEREFORE, Plaintiff Jonathan Clarke, through counsel, respectfully requests that this Honorable Court enter an Order nonsuiting Defendant Du Pont De Nemours Inc. (f/k/a DowDuPont Inc.) in accordance with Virginia Code § 8.01-380.

**Respectfully submitted,**

Kevin Biniazan, Esq. | VSB No. 92109
Jeffrey A. Breit, Esq. | VSB No. 18876
Don Scott, Esq. | VSB No. 88725
Scott M. Perry, Esq. | VSB No. 67417
Lauren Martin, Esq. | VSB No. 93653
Alexis Bale, Esq. | VSB No. 100318
Breit Biniazan, PC
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, VA 23451
Telephone | 757.622.6000
Facsimile | 757.299.8028
Email | kevin@bbtrial.com
Email | jeffrey@bbtrial.com
Email | don@bbtrial.com
Email | scott@bbtrial.com
Email | lmartin@bbtrial.com
Email | abale@bbtrial.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of March, 2025, a true and correct copy of the foregoing was filed with the clerk of this Court and I emailed a copy to the following:

John R. Owen (VSB No. 39560)
Julie S. Palmer (VSB No. 65800)
John P. Dunnigan (VSB No. 93483)
Imani E. Sowell (VSB No. 95982)
Yevgeniy K. Klinovskiy (VSB No. 98264)
HARMON, CLAYTOR, CORRIGAN, & WELLMAN
P.O. Box 70280
Richmond, Virginia 23255
(804) 747-5200 – Phone
(804) 747-6085 – Fax
jowen@hccw.com
jpalmer@hccw.com
jdunnigan@hccw.com
isowell@hccw.com
yklinovskiy@hccw.com

*Counsel for Defendants Blue Ridge Rescue*
*Suppliers, Inc. and Bradsden Solutions, Inc.*

Kevin Biniazan

## VIRGINIA: IN THE CIRCUIT COURT FOR THE CITY OF RICHMOND

#### JONATHAN CLARKE

Plaintiff,

Civil Action No. CL24002853-00

v.

3M COMPANY (f/k/a Minnesota
Mining and Manufacturing Company);
AGC CHEMICALS AMERICAS, INC.;
AMEREX;
ARCHROMA U.S., INC.;
ARKEMA, INC.;
BASF CORPORATION;
BLUE RIDGE RESCUE SUPPLIERS, INC.;
BRADSDEN SOLUTIONS, INC.;
BUCKEYE FIRE EQUIPMENT COMPANY;
CARRIER GLOBAL CORPORATION;
CHEMDESIGN PRODUCTS, INC.;
CHEMGUARD, INC.;
CHEMICALS, INC.;
CHEMOURS COMPANY FC, LLC;
CLARIANT CORPORATION;
CORTEVA, INC.;
DAIKIN AMERICA, INC.;
DEEPWATER CHEMICALS, INC.;
DU PONT DE NEMOURS INC. (f/k/a
DOWDUPONT INC.);
DYNAX CORPORATION;
E.I. DU PONT DE NEMOURS AND
COMPANY;
FIRE SERVICE PLUS, INC.;
GLOBE MANUFACTURING COMPANY LLC;
HONEYWELL INTERNATIONAL, INC.;
HONEYWELL SAFETY PRODUCTS USA, INC.;
JOHNSON CONTROLS, INC;
KIDDIE P.L.C., INC.;
KIDDIE FENWAL, INC.;
LION GROUP, INC.;
MALLORY SAFETY AND SUPPLY, LLC;
MINE SAFETY APPLIANCES COMPANY, LLC;
MSA SAFETY SALES, LLC;
MUNICIPAL EMERGENCY SERVICES INC.;

**NATION FORD CHEMICAL COMPANY;**
**NATIONAL FOAM, INC.;**
**PBI PERFORMANCE PRODUCTS, INC.;**
**SOUTHERN MILLS, INC.;**
**STEDFAST USA, INC.;**
**TENCATE PROTECTIVE FABRICS USA**
**d/b/a SOUTHERN MILLS INC.;**
**THE CHEMOURS COMPANY LLC;**
**TYCO FIRE PRODUCTS;**
**UNITED TECHNOLOGIES CORPORATION;**
**UTC FIRE & SECURITY AMERICAS**
**CORPORATION, INC. (f/k/a GE Interlogix, Inc.);**
**W.L. GORE & ASSOCIATES, INC.;**

    **Defendants.**

## PLAINTIFF'S MOTION FOR VOLUNTARY NONSUIT

   COMES NOW, Plaintiff Jonathan Clarke, by and through counsel, who moves this

Honorable Court for entry of an Order dismissing specifically **Defendant Dynax Corporation** by

voluntary nonsuit in accordance with Virginia Code § 8.01-380. In support, Plaintiff states as

follows:

  1.  Under Virginia Code § 8.01-380, Plaintiff is permitted to voluntarily nonsuit any

     other party to the proceeding, herein being Defendant Dynax Corporation.

  2.  This is Plaintiff's first motion for nonsuit as to any and all claims made against

     Defendant Dynax Corporation.  Prior to this motion, Plaintiff has not sought

     nonsuit in this action against Defendant Dynax Corporation.

  3.  At this stage in the proceedings, no motion to strike the evidence has been made

     nor sustained; the case is yet to be called before a jury; and the action is yet to be

     submitted to this Court for decision.

  4.  Defendant Dynax Corporation has not yet been served with process in this matter,

     let alone filed any counterclaims, cross claims, or third-party claims which arise

out of the same transaction or occurrence as the Plaintiff's claims.

5.      As the requirements set forth in § 8.01-380(A), (B), & (D) are satisfied, and

because Plaintiff has not previously sought nonsuit against the same party to the

proceeding, herein Defendant Dynax Corporation, Plaintiff is entitled to nonsuit

as a matter of right.

WHEREFORE, Plaintiff Jonathan Clarke, through counsel, respectfully requests that this

Honorable Court enter an Order nonsuiting Defendant Dynax Corporation in accordance with

Virginia Code § 8.01-380.

**Respectfully submitted,**

Kevin Biniazan, Esq. | VSB No. 92109
Jeffrey A. Breit, Esq. | VSB No. 18876
Don Scott, Esq. | VSB No. 88725
Scott M. Perry, Esq. | VSB No. 67417
Lauren Martin, Esq. | VSB No. 93653
Alexis Bale, Esq. | VSB No. 100318
Breit Biniazan, PC
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, VA  23451
Telephone | 757.622.6000
Facsimile | 757.299.8028
Email | kevin@bbtrial.com
Email | jeffrey@bbtrial.com
Email | don@bbtrial.com
Email | scott@bbtrial.com
Email | lmartin@bbtrial.com
Email | abale@bbtrial.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of March, 2025, a true and correct copy of the foregoing was filed with the clerk of this Court and I emailed a copy to the following:

John R. Owen (VSB No. 39560)
Julie S. Palmer (VSB No. 65800)
John P. Dunnigan (VSB No. 93483)
Imani E. Sowell (VSB No. 95982)
Yevgeniy K. Klinovskiy (VSB No. 98264)
HARMON, CLAYTOR, CORRIGAN, & WELLMAN
P.O. Box 70280
Richmond, Virginia 23255
(804) 747-5200 – Phone
(804) 747-6085 – Fax
jowen@hccw.com
jpalmer@hccw.com
jdunnigan@hccw.com
isowell@hccw.com
yklinovskiy@hccw.com

*Counsel for Defendants Blue Ridge Rescue*
*Suppliers, Inc. and Bradsden Solutions, Inc.*

Kevin Biniazan

## VIRGINIA: IN THE CIRCUIT COURT FOR THE CITY OF RICHMOND

**JONATHAN CLARKE**

   **Plaintiff,**

                **Civil Action No. CL24002853-00**

**v.**

**3M COMPANY (f/k/a Minnesota
Mining and Manufacturing Company);
AGC CHEMICALS AMERICAS, INC.;
AMEREX;
ARCHROMA U.S., INC.;
ARKEMA, INC.;
BASF CORPORATION;
BLUE RIDGE RESCUE SUPPLIERS, INC.;
BRADSDEN SOLUTIONS, INC.;
BUCKEYE FIRE EQUIPMENT COMPANY;
CARRIER GLOBAL CORPORATION;
CHEMDESIGN PRODUCTS, INC.;
CHEMGUARD, INC.;
CHEMICALS, INC.;
CHEMOURS COMPANY FC, LLC;
CLARIANT CORPORATION;
CORTEVA, INC.;
DAIKIN AMERICA, INC.;
DEEPWATER CHEMICALS, INC.;
DU PONT DE NEMOURS INC. (f/k/a
DOWDUPONT INC.);
DYNAX CORPORATION;
E.I. DU PONT DE NEMOURS AND
COMPANY;
FIRE SERVICE PLUS, INC.;
GLOBE MANUFACTURING COMPANY LLC;
HONEYWELL INTERNATIONAL, INC.;
HONEYWELL SAFETY PRODUCTS USA, INC.;
JOHNSON CONTROLS, INC;
KIDDIE P.L.C., INC.;
KIDDIE FENWAL, INC.;
LION GROUP, INC.;
MALLORY SAFETY AND SUPPLY, LLC;
MINE SAFETY APPLIANCES COMPANY, LLC;
MSA SAFETY SALES, LLC;
MUNICIPAL EMERGENCY SERVICES INC.;**

**NATION FORD CHEMICAL COMPANY;**
**NATIONAL FOAM, INC.;**
**PBI PERFORMANCE PRODUCTS, INC.;**
**SOUTHERN MILLS, INC.;**
**STEDFAST USA, INC.;**
**TENCATE PROTECTIVE FABRICS USA**
**d/b/a SOUTHERN MILLS INC.;**
**THE CHEMOURS COMPANY LLC;**
**TYCO FIRE PRODUCTS;**
**UNITED TECHNOLOGIES CORPORATION;**
**UTC FIRE & SECURITY AMERICAS**
**CORPORATION, INC. (f/k/a GE Interlogix, Inc.);**
**W.L. GORE & ASSOCIATES, INC.;**

        **Defendants.**

### PLAINTIFF'S MOTION FOR VOLUNTARY NONSUIT

COMES NOW, Plaintiff Jonathan Clarke, by and through counsel, who moves this

Honorable Court for entry of an Order dismissing specifically **Defendant Fire Service Plus, Inc.**

by voluntary nonsuit in accordance with Virginia Code § 8.01-380. In support, Plaintiff states as

follows:

    1.    Under Virginia Code § 8.01-380, Plaintiff is permitted to voluntarily nonsuit any

        other party to the proceeding, herein being Defendant Fire Service Plus, Inc.

    2.    This is Plaintiff's first motion for nonsuit as to any and all claims made against

        Defendant Fire Service Plus, Inc. Prior to this motion, Plaintiff has not sought

        nonsuit in this action against Defendant Fire Service Plus, Inc.

    3.    At this stage in the proceedings, no motion to strike the evidence has been made

        nor sustained; the case is yet to be called before a jury; and the action is yet to be

        submitted to this Court for decision.

    4.    Defendant Fire Service Plus, Inc has not yet been served with process in this

        matter, let alone filed any counterclaims, cross claims, or third-party claims which

arise out of the same transaction or occurrence as the Plaintiff's claims.

5.       As the requirements set forth in § 8.01-380(A), (B), & (D) are satisfied, and

because Plaintiff has not previously sought nonsuit against the same party to the

proceeding, herein Defendant Fire Service Plus, Inc., Plaintiff is entitled to nonsuit

as a matter of right.

WHEREFORE, Plaintiff Jonathan Clarke, through counsel, respectfully requests that this

Honorable Court enter an Order nonsuiting Defendant Fire Service Plus, Inc. in accordance with

Virginia Code § 8.01-380.


**Respectfully submitted,**

Kevin Biniazan, Esq. | VSB No. 92109
Jeffrey A. Breit, Esq. | VSB No. 18876
Don Scott, Esq. | VSB No. 88725
Scott M. Perry, Esq. | VSB No. 67417
Lauren Martin, Esq. | VSB No. 93653
Alexis Bale, Esq. | VSB No. 100318
Breit Biniazan, PC
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, VA  23451
Telephone | 757.622.6000
Facsimile | 757.299.8028
Email | kevin@bbtrial.com
Email | jeffrey@bbtrial.com
Email | don@bbtrial.com
Email | scott@bbtrial.com
Email | lmartin@bbtrial.com
Email | abale@bbtrial.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of March, 2025, a true and correct copy of the foregoing was filed with the clerk of this Court and I emailed a copy to the following:

John R. Owen (VSB No. 39560)
Julie S. Palmer (VSB No. 65800)
John P. Dunnigan (VSB No. 93483)
Imani E. Sowell (VSB No. 95982)
Yevgeniy K. Klinovskiy (VSB No. 98264)
HARMON, CLAYTOR, CORRIGAN, & WELLMAN
P.O. Box 70280
Richmond, Virginia 23255
(804) 747-5200 – Phone
(804) 747-6085 – Fax
jowen@hccw.com
jpalmer@hccw.com
jdunnigan@hccw.com
isowell@hccw.com
yklinovskiy@hccw.com

*Counsel for Defendants Blue Ridge Rescue*
*Suppliers, Inc. and Bradsden Solutions, Inc.*

Kevin Biniazan

## VIRGINIA: IN THE CIRCUIT COURT FOR THE CITY OF RICHMOND

### JONATHAN CLARKE

      Plaintiff,

                                    Civil Action No. CL24002853-00

v.

3M COMPANY (f/k/a Minnesota
Mining and Manufacturing Company);
AGC CHEMICALS AMERICAS, INC.;
AMEREX;
ARCHROMA U.S., INC.;
ARKEMA, INC.;
BASF CORPORATION;
BLUE RIDGE RESCUE SUPPLIERS, INC.;
BRADSDEN SOLUTIONS, INC.;
BUCKEYE FIRE EQUIPMENT COMPANY;
CARRIER GLOBAL CORPORATION;
CHEMDESIGN PRODUCTS, INC.;
CHEMGUARD, INC.;
CHEMICALS, INC.;
CHEMOURS COMPANY FC, LLC;
CLARIANT CORPORATION;
CORTEVA, INC.;
DAIKIN AMERICA, INC.;
DEEPWATER CHEMICALS, INC.;
DU PONT DE NEMOURS INC. (f/k/a
DOWDUPONT INC.);
DYNAX CORPORATION;
E.I. DU PONT DE NEMOURS AND
COMPANY;
FIRE SERVICE PLUS, INC.;
GLOBE MANUFACTURING COMPANY LLC;
HONEYWELL INTERNATIONAL, INC.;
HONEYWELL SAFETY PRODUCTS USA, INC.;
JOHNSON CONTROLS, INC;
KIDDIE P.L.C., INC.;
KIDDIE FENWAL, INC.;
LION GROUP, INC.;
MALLORY SAFETY AND SUPPLY, LLC;
MINE SAFETY APPLIANCES COMPANY, LLC;
MSA SAFETY SALES, LLC;
MUNICIPAL EMERGENCY SERVICES INC.;

**NATION FORD CHEMICAL COMPANY;**
**NATIONAL FOAM, INC.;**
**PBI PERFORMANCE PRODUCTS, INC.;**
**SOUTHERN MILLS, INC.;**
**STEDFAST USA, INC.;**
**TENCATE PROTECTIVE FABRICS USA**
**d/b/a SOUTHERN MILLS INC.;**
**THE CHEMOURS COMPANY LLC;**
**TYCO FIRE PRODUCTS;**
**UNITED TECHNOLOGIES CORPORATION;**
**UTC FIRE & SECURITY AMERICAS**
**CORPORATION, INC. (f/k/a GE Interlogix, Inc.);**
**W.L. GORE & ASSOCIATES, INC.;**

             **Defendants.**

### PLAINTIFF'S MOTION FOR VOLUNTARY NONSUIT

       COMES NOW, Plaintiff Jonathan Clarke, by and through counsel, who moves this

Honorable Court for entry of an Order dismissing specifically **Defendant Johnson Controls, Inc.**

by voluntary nonsuit in accordance with Virginia Code § 8.01-380. In support, Plaintiff states as

follows:

     1.     Under Virginia Code § 8.01-380, Plaintiff is permitted to voluntarily nonsuit any

           other party to the proceeding, herein being Defendant Johnson Controls, Inc.

     2.     This is Plaintiff's first motion for nonsuit as to any and all claims made against

           Defendant Johnson Controls, Inc. Prior to this motion, Plaintiff has not sought

           nonsuit in this action against Defendant Johnson Controls, Inc.

     3.     At this stage in the proceedings, no motion to strike the evidence has been made

           nor sustained; the case is yet to be called before a jury; and the action is yet to be

           submitted to this Court for decision.

     4.     Defendant Johnson Controls, Inc has not yet been served with process in this

           matter, let alone filed any counterclaims, cross claims, or third-party claims which

arise out of the same transaction or occurrence as the Plaintiff's claims.

5.    As the requirements set forth in § 8.01-380(A), (B), & (D) are satisfied, and
      because Plaintiff has not previously sought nonsuit against the same party to the
      proceeding, herein Defendant Johnson Controls, Inc., Plaintiff is entitled to
      nonsuit as a matter of right.

WHEREFORE, Plaintiff Jonathan Clarke, through counsel, respectfully requests that this
Honorable Court enter an Order nonsuiting Defendant Johnson Controls, Inc. in accordance with
Virginia Code § 8.01-380.

**Respectfully submitted,**

Kevin Biniazan, Esq. | VSB No. 92109
Jeffrey A. Breit, Esq. | VSB No. 18876
Don Scott, Esq. | VSB No. 88725
Scott M. Perry, Esq. | VSB No. 67417
Lauren Martin, Esq. | VSB No. 93653
Alexis Bale, Esq. | VSB No. 100318
Breit Biniazan, PC
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, VA 23451
Telephone | 757.622.6000
Facsimile | 757.299.8028
Email | kevin@bbtrial.com
Email | jeffrey@bbtrial.com
Email | don@bbtrial.com
Email | scott@bbtrial.com
Email | lmartin@bbtrial.com
Email | abale@bbtrial.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of March, 2025, a true and correct copy of the foregoing was filed with the clerk of this Court and I emailed a copy to the following:

John R. Owen (VSB No. 39560)
Julie S. Palmer (VSB No. 65800)
John P. Dunnigan (VSB No. 93483)
Imani E. Sowell (VSB No. 95982)
Yevgeniy K. Klinovskiy (VSB No. 98264)
HARMON, CLAYTOR, CORRIGAN, & WELLMAN
P.O. Box 70280
Richmond, Virginia 23255
(804) 747-5200 – Phone
(804) 747-6085 – Fax
jowen@hccw.com
jpalmer@hccw.com
jdunnigan@hccw.com
isowell@hccw.com
yklinovskiy@hccw.com

*Counsel for Defendants Blue Ridge Rescue
Suppliers, Inc. and Bradsden Solutions, Inc.*

Kevin Biniazan

## VIRGINIA: IN THE CIRCUIT COURT FOR THE CITY OF RICHMOND

**JONATHAN CLARKE**

     **Plaintiff,**

                            **Civil Action No. CL24002853-00**

v.

**3M COMPANY (f/k/a Minnesota
Mining and Manufacturing Company);
AGC CHEMICALS AMERICAS, INC.;
AMEREX;
ARCHROMA U.S., INC.;
ARKEMA, INC.;
BASF CORPORATION;
BLUE RIDGE RESCUE SUPPLIERS, INC.;
BRADSDEN SOLUTIONS, INC.;
BUCKEYE FIRE EQUIPMENT COMPANY;
CARRIER GLOBAL CORPORATION;
CHEMDESIGN PRODUCTS, INC.;
CHEMGUARD, INC.;
CHEMICALS, INC.;
CHEMOURS COMPANY FC, LLC;
CLARIANT CORPORATION;
CORTEVA, INC.;
DAIKIN AMERICA, INC.;
DEEPWATER CHEMICALS, INC.;
DU PONT DE NEMOURS INC. (f/k/a
DOWDUPONT INC.);
DYNAX CORPORATION;
E.I. DU PONT DE NEMOURS AND
COMPANY;
FIRE SERVICE PLUS, INC.;
GLOBE MANUFACTURING COMPANY LLC;
HONEYWELL INTERNATIONAL, INC.;
HONEYWELL SAFETY PRODUCTS USA, INC.;
JOHNSON CONTROLS, INC;
KIDDIE P.L.C., INC.;
KIDDIE FENWAL, INC.;
LION GROUP, INC.;
MALLORY SAFETY AND SUPPLY, LLC;
MINE SAFETY APPLIANCES COMPANY, LLC;
MSA SAFETY SALES, LLC;
MUNICIPAL EMERGENCY SERVICES INC.;**

**NATION FORD CHEMICAL COMPANY;**
**NATIONAL FOAM, INC.;**
**PBI PERFORMANCE PRODUCTS, INC.;**
**SOUTHERN MILLS, INC.;**
**STEDFAST USA, INC.;**
**TENCATE PROTECTIVE FABRICS USA**
**d/b/a SOUTHERN MILLS INC.;**
**THE CHEMOURS COMPANY LLC;**
**TYCO FIRE PRODUCTS;**
**UNITED TECHNOLOGIES CORPORATION;**
**UTC FIRE & SECURITY AMERICAS**
**CORPORATION, INC. (f/k/a GE Interlogix, Inc.);**
**W.L. GORE & ASSOCIATES, INC.;**

    **Defendants.**

### PLAINTIFF'S MOTION FOR VOLUNTARY NONSUIT

  COMES NOW, Plaintiff Jonathan Clarke, by and through counsel, who moves this

Honorable Court for entry of an Order dismissing specifically **Defendant Kidde Fenwal, Inc.** by

voluntary nonsuit in accordance with Virginia Code § 8.01-380. In support, Plaintiff states as

follows:

  1.  Under Virginia Code § 8.01-380, Plaintiff is permitted to voluntarily nonsuit any

     other party to the proceeding, herein being Defendant Kidde Fenwal, Inc.

  2.  This is Plaintiff's first motion for nonsuit as to any and all claims made against

     Defendant Kidde Fenwal, Inc. Prior to this motion, Plaintiff has not sought nonsuit

     in this action against Defendant Kidde Fenwal, Inc.

  3.  At this stage in the proceedings, no motion to strike the evidence has been made

     nor sustained; the case is yet to be called before a jury; and the action is yet to be

     submitted to this Court for decision.

  4.  Defendant Kidde Fenwal, Inc. has not yet been served with process in this matter,

     let alone filed any counterclaims, cross claims, or third-party claims which arise

out of the same transaction or occurrence as the Plaintiff's claims.

5.      As the requirements set forth in § 8.01-380(A), (B), & (D) are satisfied, and
because Plaintiff has not previously sought nonsuit against the same party to the
proceeding, herein Defendant Kidde Fenwal, Inc., Plaintiff is entitled to nonsuit
as a matter of right.

WHEREFORE, Plaintiff Jonathan Clarke, through counsel, respectfully requests that this
Honorable Court enter an Order nonsuiting Defendant Kidde Fenwal, Inc. in accordance with
Virginia Code § 8.01-380.

**Respectfully submitted,**

Kevin Biniazan, Esq. | VSB No. 92109
Jeffrey A. Breit, Esq. | VSB No. 18876
Don Scott, Esq. | VSB No. 88725
Scott M. Perry, Esq. | VSB No. 67417
Lauren Martin, Esq. | VSB No. 93653
Alexis Bale, Esq. | VSB No. 100318
Breit Biniazan, PC
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, VA  23451
Telephone | 757.622.6000
Facsimile | 757.299.8028
Email | kevin@bbtrial.com
Email | jeffrey@bbtrial.com
Email | don@bbtrial.com
Email | scott@bbtrial.com
Email | lmartin@bbtrial.com
Email | abale@bbtrial.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of March, 2025, a true and correct copy of the foregoing was filed with the clerk of this Court and I emailed a copy to the following:

John R. Owen (VSB No. 39560)
Julie S. Palmer (VSB No. 65800)
John P. Dunnigan (VSB No. 93483)
Imani E. Sowell (VSB No. 95982)
Yevgeniy K. Klinovskiy (VSB No. 98264)
HARMON, CLAYTOR, CORRIGAN, & WELLMAN
P.O. Box 70280
Richmond, Virginia 23255
(804) 747-5200 – Phone
(804) 747-6085 – Fax
jowen@hccw.com
jpalmer@hccw.com
jdunnigan@hccw.com
isowell@hccw.com
yklinovskiy@hccw.com

*Counsel for Defendants Blue Ridge Rescue*
*Suppliers, Inc. and Bradsden Solutions, Inc.*

Kevin Biniazan

Uploaded Case 3:25-cv-00738... eFiled: 2025MAR24 RICHMOND CITY CC ILIPSCOMB at 2025MAR26 12:01 CL24002853-00 Page 348 of 400 PageID# 427

## VIRGINIA: IN THE CIRCUIT COURT FOR THE CITY OF RICHMOND

**JONATHAN CLARKE**

**Plaintiff,**

**Civil Action No. CL24002853-00**

**v.**

**3M COMPANY (f/k/a Minnesota
Mining and Manufacturing Company);
AGC CHEMICALS AMERICAS, INC.;
AMEREX;
ARCHROMA U.S., INC.;
ARKEMA, INC.;
BASF CORPORATION;
BLUE RIDGE RESCUE SUPPLIERS, INC.;
BRADSDEN SOLUTIONS, INC.;
BUCKEYE FIRE EQUIPMENT COMPANY;
CARRIER GLOBAL CORPORATION;
CHEMDESIGN PRODUCTS, INC.;
CHEMGUARD, INC.;
CHEMICALS, INC.;
CHEMOURS COMPANY FC, LLC;
CLARIANT CORPORATION;
CORTEVA, INC.;
DAIKIN AMERICA, INC.;
DEEPWATER CHEMICALS, INC.;
DU PONT DE NEMOURS INC. (f/k/a
DOWDUPONT INC.);
DYNAX CORPORATION;
E.I. DU PONT DE NEMOURS AND
COMPANY;
FIRE SERVICE PLUS, INC.;
GLOBE MANUFACTURING COMPANY LLC;
HONEYWELL INTERNATIONAL, INC.;
HONEYWELL SAFETY PRODUCTS USA, INC.;
JOHNSON CONTROLS, INC;
KIDDIE P.L.C., INC.;
KIDDIE FENWAL, INC.;
LION GROUP, INC.;
MALLORY SAFETY AND SUPPLY, LLC;
MINE SAFETY APPLIANCES COMPANY, LLC;
MSA SAFETY SALES, LLC;
MUNICIPAL EMERGENCY SERVICES INC.;**

**NATION FORD CHEMICAL COMPANY;**
**NATIONAL FOAM, INC.;**
**PBI PERFORMANCE PRODUCTS, INC.;**
**SOUTHERN MILLS, INC.;**
**STEDFAST USA, INC.;**
**TENCATE PROTECTIVE FABRICS USA**
**d/b/a SOUTHERN MILLS INC.;**
**THE CHEMOURS COMPANY LLC;**
**TYCO FIRE PRODUCTS;**
**UNITED TECHNOLOGIES CORPORATION;**
**UTC FIRE & SECURITY AMERICAS**
**CORPORATION, INC. (f/k/a GE Interlogix, Inc.);**
**W.L. GORE & ASSOCIATES, INC.;**

        **Defendants.**

## PLAINTIFF'S MOTION FOR VOLUNTARY NONSUIT

COMES NOW, Plaintiff Jonathan Clarke, by and through counsel, who moves this

Honorable Court for entry of an Order dismissing specifically **Defendant Kiddie P.L.C., Inc.** by

voluntary nonsuit in accordance with Virginia Code § 8.01-380. In support, Plaintiff states as

follows:

1.     Under Virginia Code § 8.01-380, Plaintiff is permitted to voluntarily nonsuit any

        other party to the proceeding, herein being Defendant Kiddie P.L.C., Inc.

2.     This is Plaintiff's first motion for nonsuit as to any and all claims made against

        Defendant Kiddie P.L.C., Inc. Prior to this motion, Plaintiff has not sought nonsuit

        in this action against Defendant Kiddie P.L.C., Inc.

3.     At this stage in the proceedings, no motion to strike the evidence has been made

        nor sustained; the case is yet to be called before a jury; and the action is yet to be

        submitted to this Court for decision.

4.     Defendant Kiddie P.L.C., Inc. has not yet been served with process in this matter,

        let alone filed any counterclaims, cross claims, or third-party claims which arise

out of the same transaction or occurrence as the Plaintiff's claims.

5.     As the requirements set forth in § 8.01-380(A), (B), & (D) are satisfied, and because Plaintiff has not previously sought nonsuit against the same party to the proceeding, herein Defendant Kiddie P.L.C., Inc., Plaintiff is entitled to nonsuit as a matter of right.

WHEREFORE, Plaintiff Jonathan Clarke, through counsel, respectfully requests that this Honorable Court enter an Order nonsuiting Defendant Kiddie P.L.C., Inc. in accordance with Virginia Code § 8.01-380.

**Respectfully submitted,**

Kevin Biniazan, Esq. | VSB No. 92109
Jeffrey A. Breit, Esq. | VSB No. 18876
Don Scott, Esq. | VSB No. 88725
Scott M. Perry, Esq. | VSB No. 67417
Lauren Martin, Esq. | VSB No. 93653
Alexis Bale, Esq. | VSB No. 100318
Breit Biniazan, PC
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, VA 23451
Telephone | 757.622.6000
Facsimile | 757.299.8028
Email | kevin@bbtrial.com
Email | jeffrey@bbtrial.com
Email | don@bbtrial.com
Email | scott@bbtrial.com
Email | lmartin@bbtrial.com
Email | abale@bbtrial.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of March, 2025, a true and correct copy of the foregoing was filed with the clerk of this Court and I emailed a copy to the following:

John R. Owen (VSB No. 39560)
Julie S. Palmer (VSB No. 65800)
John P. Dunnigan (VSB No. 93483)
Imani E. Sowell (VSB No. 95982)
Yevgeniy K. Klinovskiy (VSB No. 98264)
HARMON, CLAYTOR, CORRIGAN, & WELLMAN
P.O. Box 70280
Richmond, Virginia 23255
(804) 747-5200 – Phone
(804) 747-6085 – Fax
jowen@hccw.com
jpalmer@hccw.com
jdunnigan@hccw.com
isowell@hccw.com
yklinovskiy@hccw.com

*Counsel for Defendants Blue Ridge Rescue*
*Suppliers, Inc. and Bradsden Solutions, Inc.*

Kevin Biniazan

## VIRGINIA: IN THE CIRCUIT COURT FOR THE CITY OF RICHMOND

### JONATHAN CLARKE

      Plaintiff,

Civil Action No. CL24002853-00

v.

3M COMPANY (f/k/a Minnesota
Mining and Manufacturing Company);
AGC CHEMICALS AMERICAS, INC.;
AMEREX;
ARCHROMA U.S., INC.;
ARKEMA, INC.;
BASF CORPORATION;
BLUE RIDGE RESCUE SUPPLIERS, INC.;
BRADSDEN SOLUTIONS, INC.;
BUCKEYE FIRE EQUIPMENT COMPANY;
CARRIER GLOBAL CORPORATION;
CHEMDESIGN PRODUCTS, INC.;
CHEMGUARD, INC.;
CHEMICALS, INC.;
CHEMOURS COMPANY FC, LLC;
CLARIANT CORPORATION;
CORTEVA, INC.;
DAIKIN AMERICA, INC.;
DEEPWATER CHEMICALS, INC.;
DU PONT DE NEMOURS INC. (f/k/a
DOWDUPONT INC.);
DYNAX CORPORATION;
E.I. DU PONT DE NEMOURS AND
COMPANY;
FIRE SERVICE PLUS, INC.;
GLOBE MANUFACTURING COMPANY LLC;
HONEYWELL INTERNATIONAL, INC.;
HONEYWELL SAFETY PRODUCTS USA, INC.;
JOHNSON CONTROLS, INC;
KIDDIE P.L.C., INC.;
KIDDIE FENWAL, INC.;
LION GROUP, INC.;
MALLORY SAFETY AND SUPPLY, LLC;
MINE SAFETY APPLIANCES COMPANY, LLC;
MSA SAFETY SALES, LLC;
MUNICIPAL EMERGENCY SERVICES INC.;

**NATION FORD CHEMICAL COMPANY;**
**NATIONAL FOAM, INC.;**
**PBI PERFORMANCE PRODUCTS, INC.;**
**SOUTHERN MILLS, INC.;**
**STEDFAST USA, INC.;**
**TENCATE PROTECTIVE FABRICS USA**
**d/b/a SOUTHERN MILLS INC.;**
**THE CHEMOURS COMPANY LLC;**
**TYCO FIRE PRODUCTS;**
**UNITED TECHNOLOGIES CORPORATION;**
**UTC FIRE & SECURITY AMERICAS**
**CORPORATION, INC. (f/k/a GE Interlogix, Inc.);**
**W.L. GORE & ASSOCIATES, INC.;**

     **Defendants.**

### PLAINTIFF'S MOTION FOR VOLUNTARY NONSUIT

   COMES NOW, Plaintiff Jonathan Clarke, by and through counsel, who moves this Honorable Court for entry of an Order dismissing specifically **Defendant Nation Ford Chemical Company** by voluntary nonsuit in accordance with Virginia Code § 8.01-380. In support, Plaintiff states as follows:

  1. Under Virginia Code § 8.01-380, Plaintiff is permitted to voluntarily nonsuit any other party to the proceeding, herein being Defendant Nation Ford Chemical Company.

  2. This is Plaintiff's first motion for nonsuit as to any and all claims made against Defendant Nation Ford Chemical Company. Prior to this motion, Plaintiff has not sought nonsuit in this action against Defendant Nation Ford Chemical Company.

  3. At this stage in the proceedings, no motion to strike the evidence has been made nor sustained; the case is yet to be called before a jury; and the action is yet to be submitted to this Court for decision.

  4. Defendant Nation Ford Chemical Company has not yet been served with process

in this matter, let alone filed any counterclaims, cross claims, or third-party claims

which arise out of the same transaction or occurrence as the Plaintiff's claims.

5.    As the requirements set forth in § 8.01-380(A), (B), & (D) are satisfied, and

because Plaintiff has not previously sought nonsuit against the same party to the

proceeding, herein Defendant Nation Ford Chemical Company, Plaintiff is entitled

to nonsuit as a matter of right.

WHEREFORE, Plaintiff Jonathan Clarke, through counsel, respectfully requests that this

Honorable Court enter an Order nonsuiting Defendant Nation Ford Chemical Company in

accordance with Virginia Code § 8.01-380.


**Respectfully submitted,**

Kevin Biniazan, Esq. | VSB No. 92109
Jeffrey A. Breit, Esq. | VSB No. 18876
Don Scott, Esq. | VSB No. 88725
Scott M. Perry, Esq. | VSB No. 67417
Lauren Martin, Esq. | VSB No. 93653
Alexis Bale, Esq. | VSB No. 100318
Breit Biniazan, PC
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, VA  23451
Telephone | 757.622.6000
Facsimile | 757.299.8028
Email | kevin@bbtrial.com
Email | jeffrey@bbtrial.com
Email | don@bbtrial.com
Email | scott@bbtrial.com
Email | lmartin@bbtrial.com
Email | abale@bbtrial.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of March, 2025, a true and correct copy of the foregoing was filed with the clerk of this Court and I emailed a copy to the following:

John R. Owen (VSB No. 39560)
Julie S. Palmer (VSB No. 65800)
John P. Dunnigan (VSB No. 93483)
Imani E. Sowell (VSB No. 95982)
Yevgeniy K. Klinovskiy (VSB No. 98264)
HARMON, CLAYTOR, CORRIGAN, & WELLMAN
P.O. Box 70280
Richmond, Virginia 23255
(804) 747-5200 – Phone
(804) 747-6085 – Fax
jowen@hccw.com
jpalmer@hccw.com
jdunnigan@hccw.com
isowell@hccw.com
yklinovskiy@hccw.com

*Counsel for Defendants Blue Ridge Rescue*
*Suppliers, Inc. and Bradsden Solutions, Inc.*

Kevin Biniazan

## VIRGINIA: IN THE CIRCUIT COURT FOR THE CITY OF RICHMOND

**JONATHAN CLARKE**

      **Plaintiff,**

                                      **Civil Action No. CL24002853-00**

v.

**3M COMPANY (f/k/a Minnesota
Mining and Manufacturing Company);
AGC CHEMICALS AMERICAS, INC.;
AMEREX;
ARCHROMA U.S., INC.;
ARKEMA, INC.;
BASF CORPORATION;
BLUE RIDGE RESCUE SUPPLIERS, INC.;
BRADSDEN SOLUTIONS, INC.;
BUCKEYE FIRE EQUIPMENT COMPANY;
CARRIER GLOBAL CORPORATION;
CHEMDESIGN PRODUCTS, INC.;
CHEMGUARD, INC.;
CHEMICALS, INC.;
CHEMOURS COMPANY FC, LLC;
CLARIANT CORPORATION;
CORTEVA, INC.;
DAIKIN AMERICA, INC.;
DEEPWATER CHEMICALS, INC.;
DU PONT DE NEMOURS INC. (f/k/a
DOWDUPONT INC.);
DYNAX CORPORATION;
E.I. DU PONT DE NEMOURS AND
COMPANY;
FIRE SERVICE PLUS, INC.;
GLOBE MANUFACTURING COMPANY LLC;
HONEYWELL INTERNATIONAL, INC.;
HONEYWELL SAFETY PRODUCTS USA, INC.;
JOHNSON CONTROLS, INC;
KIDDIE P.L.C., INC.;
KIDDIE FENWAL, INC.;
LION GROUP, INC.;
MALLORY SAFETY AND SUPPLY, LLC;
MINE SAFETY APPLIANCES COMPANY, LLC;
MSA SAFETY SALES, LLC;
MUNICIPAL EMERGENCY SERVICES INC.;**

**NATION FORD CHEMICAL COMPANY;**
**NATIONAL FOAM, INC.;**
**PBI PERFORMANCE PRODUCTS, INC.;**
**SOUTHERN MILLS, INC.;**
**STEDFAST USA, INC.;**
**TENCATE PROTECTIVE FABRICS USA**
**d/b/a SOUTHERN MILLS INC.;**
**THE CHEMOURS COMPANY LLC;**
**TYCO FIRE PRODUCTS;**
**UNITED TECHNOLOGIES CORPORATION;**
**UTC FIRE & SECURITY AMERICAS**
**CORPORATION, INC. (f/k/a GE Interlogix, Inc.);**
**W.L. GORE & ASSOCIATES, INC.;**

    **Defendants.**

## PLAINTIFF'S MOTION FOR VOLUNTARY NONSUIT

   COMES NOW, Plaintiff Jonathan Clarke, by and through counsel, who moves this

Honorable Court for entry of an Order dismissing specifically **Defendant National Foam, Inc.** by

voluntary nonsuit in accordance with Virginia Code § 8.01-380. In support, Plaintiff states as

follows:

   1.  Under Virginia Code § 8.01-380, Plaintiff is permitted to voluntarily nonsuit any

      other party to the proceeding, herein being Defendant National Foam, Inc.

   2.  This is Plaintiff's first motion for nonsuit as to any and all claims made against

      Defendant National Foam, Inc. Prior to this motion, Plaintiff has not sought

      nonsuit in this action against Defendant National Foam, Inc.

   3.  At this stage in the proceedings, no motion to strike the evidence has been made

      nor sustained; the case is yet to be called before a jury; and the action is yet to be

      submitted to this Court for decision.

   4.  Defendant National Foam, Inc. has not yet been served with process in this matter,

      let alone filed any counterclaims, cross claims, or third-party claims which arise

out of the same transaction or occurrence as the Plaintiff's claims.

5.  As the requirements set forth in § 8.01-380(A), (B), & (D) are satisfied, and because Plaintiff has not previously sought nonsuit against the same party to the proceeding, herein Defendant National Foam, Inc., Plaintiff is entitled to nonsuit as a matter of right.

WHEREFORE, Plaintiff Jonathan Clarke, through counsel, respectfully requests that this Honorable Court enter an Order nonsuiting Defendant National Foam, Inc. in accordance with Virginia Code § 8.01-380.

**Respectfully submitted,**

Kevin Biniazan, Esq. | VSB No. 92109
Jeffrey A. Breit, Esq. | VSB No. 18876
Don Scott, Esq. | VSB No. 88725
Scott M. Perry, Esq. | VSB No. 67417
Lauren Martin, Esq. | VSB No. 93653
Alexis Bale, Esq. | VSB No. 100318
Breit Biniazan, PC
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, VA 23451
Telephone | 757.622.6000
Facsimile | 757.299.8028
Email | kevin@bbtrial.com
Email | jeffrey@bbtrial.com
Email | don@bbtrial.com
Email | scott@bbtrial.com
Email | lmartin@bbtrial.com
Email | abale@bbtrial.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of March, 2025, a true and correct copy of the foregoing was filed with the clerk of this Court and I emailed a copy to the following:

John R. Owen (VSB No. 39560)
Julie S. Palmer (VSB No. 65800)
John P. Dunnigan (VSB No. 93483)
Imani E. Sowell (VSB No. 95982)
Yevgeniy K. Klinovskiy (VSB No. 98264)
HARMON, CLAYTOR, CORRIGAN, & WELLMAN
P.O. Box 70280
Richmond, Virginia 23255
(804) 747-5200 – Phone
(804) 747-6085 – Fax
jowen@hccw.com
jpalmer@hccw.com
jdunnigan@hccw.com
isowell@hccw.com
yklinovskiy@hccw.com

*Counsel for Defendants Blue Ridge Rescue
Suppliers, Inc. and Bradsden Solutions, Inc.*

Kevin Biniazan

## VIRGINIA: IN THE CIRCUIT COURT FOR THE CITY OF RICHMOND

**JONATHAN CLARKE**

        **Plaintiff,**

                                      **Civil Action No. CL24002853-00**

v.

**3M COMPANY (f/k/a Minnesota
Mining and Manufacturing Company);
AGC CHEMICALS AMERICAS, INC.;
AMEREX;
ARCHROMA U.S., INC.;
ARKEMA, INC.;
BASF CORPORATION;
BLUE RIDGE RESCUE SUPPLIERS, INC.;
BRADSDEN SOLUTIONS, INC.;
BUCKEYE FIRE EQUIPMENT COMPANY;
CARRIER GLOBAL CORPORATION;
CHEMDESIGN PRODUCTS, INC.;
CHEMGUARD, INC.;
CHEMICALS, INC.;
CHEMOURS COMPANY FC, LLC;
CLARIANT CORPORATION;
CORTEVA, INC.;
DAIKIN AMERICA, INC.;
DEEPWATER CHEMICALS, INC.;
DU PONT DE NEMOURS INC. (f/k/a
DOWDUPONT INC.);
DYNAX CORPORATION;
E.I. DU PONT DE NEMOURS AND
COMPANY;
FIRE SERVICE PLUS, INC.;
GLOBE MANUFACTURING COMPANY LLC;
HONEYWELL INTERNATIONAL, INC.;
HONEYWELL SAFETY PRODUCTS USA, INC.;
JOHNSON CONTROLS, INC;
KIDDIE P.L.C., INC.;
KIDDIE FENWAL, INC.;
LION GROUP, INC.;
MALLORY SAFETY AND SUPPLY, LLC;
MINE SAFETY APPLIANCES COMPANY, LLC;
MSA SAFETY SALES, LLC;
MUNICIPAL EMERGENCY SERVICES INC.;**

**NATION FORD CHEMICAL COMPANY;**
**NATIONAL FOAM, INC.;**
**PBI PERFORMANCE PRODUCTS, INC.;**
**SOUTHERN MILLS, INC.;**
**STEDFAST USA, INC.;**
**TENCATE PROTECTIVE FABRICS USA**
**d/b/a SOUTHERN MILLS INC.;**
**THE CHEMOURS COMPANY LLC;**
**TYCO FIRE PRODUCTS;**
**UNITED TECHNOLOGIES CORPORATION;**
**UTC FIRE & SECURITY AMERICAS**
**CORPORATION, INC. (f/k/a GE Interlogix, Inc.);**
**W.L. GORE & ASSOCIATES, INC.;**

    **Defendants.**

## PLAINTIFF'S MOTION FOR VOLUNTARY NONSUIT

  COMES NOW, Plaintiff Jonathan Clarke, by and through counsel, who moves this

Honorable Court for entry of an Order dismissing specifically **Defendant Southern Mills, Inc.** by

voluntary nonsuit in accordance with Virginia Code § 8.01-380. In support, Plaintiff states as

follows:

  1. Under Virginia Code § 8.01-380, Plaintiff is permitted to voluntarily nonsuit any

    other party to the proceeding, herein being Defendant Southern Mills, Inc.

  2. This is Plaintiff's first motion for nonsuit as to any and all claims made against

    Defendant Southern Mills, Inc.  Prior to this motion, Plaintiff has not sought

    nonsuit in this action against Defendant Southern Mills, Inc.

  3. At this stage in the proceedings, no motion to strike the evidence has been made

    nor sustained; the case is yet to be called before a jury; and the action is yet to be

    submitted to this Court for decision.

  4. Defendant Southern Mills, Inc. has not yet been served with process in this matter,

    let alone filed any counterclaims, cross claims, or third-party claims which arise

out of the same transaction or occurrence as the Plaintiff's claims.

5.    As the requirements set forth in § 8.01-380(A), (B), & (D) are satisfied, and because Plaintiff has not previously sought nonsuit against the same party to the proceeding, herein Defendant Southern Mills, Inc., Plaintiff is entitled to nonsuit as a matter of right.

WHEREFORE, Plaintiff Jonathan Clarke, through counsel, respectfully requests that this Honorable Court enter an Order nonsuiting Defendant Southern Mills, Inc. in accordance with Virginia Code § 8.01-380.

**Respectfully submitted,**

Kevin Biniazan, Esq. | VSB No. 92109
Jeffrey A. Breit, Esq. | VSB No. 18876
Don Scott, Esq. | VSB No. 88725
Scott M. Perry, Esq. | VSB No. 67417
Lauren Martin, Esq. | VSB No. 93653
Alexis Bale, Esq. | VSB No. 100318
Breit Biniazan, PC
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, VA 23451
Telephone | 757.622.6000
Facsimile | 757.299.8028
Email | kevin@bbtrial.com
Email | jeffrey@bbtrial.com
Email | don@bbtrial.com
Email | scott@bbtrial.com
Email | lmartin@bbtrial.com
Email | abale@bbtrial.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of March, 2025, a true and correct copy of the foregoing was filed with the clerk of this Court and I emailed a copy to the following:

John R. Owen (VSB No. 39560)
Julie S. Palmer (VSB No. 65800)
John P. Dunnigan (VSB No. 93483)
Imani E. Sowell (VSB No. 95982)
Yevgeniy K. Klinovskiy (VSB No. 98264)
HARMON, CLAYTOR, CORRIGAN, & WELLMAN
P.O. Box 70280
Richmond, Virginia 23255
(804) 747-5200 – Phone
(804) 747-6085 – Fax
jowen@hccw.com
jpalmer@hccw.com
jdunnigan@hccw.com
isowell@hccw.com
yklinovskiy@hccw.com

*Counsel for Defendants Blue Ridge Rescue*
*Suppliers, Inc. and Bradsden Solutions, Inc.*

Kevin Biniazan

## VIRGINIA: IN THE CIRCUIT COURT FOR THE CITY OF RICHMOND

### JONATHAN CLARKE

Plaintiff,

Civil Action No. CL24002853-00

v.

3M COMPANY (f/k/a Minnesota
Mining and Manufacturing Company);
AGC CHEMICALS AMERICAS, INC.;
AMEREX;
ARCHROMA U.S., INC.;
ARKEMA, INC.;
BASF CORPORATION;
BLUE RIDGE RESCUE SUPPLIERS, INC.;
BRADSDEN SOLUTIONS, INC.;
BUCKEYE FIRE EQUIPMENT COMPANY;
CARRIER GLOBAL CORPORATION;
CHEMDESIGN PRODUCTS, INC.;
CHEMGUARD, INC.;
CHEMICALS, INC.;
CHEMOURS COMPANY FC, LLC;
CLARIANT CORPORATION;
CORTEVA, INC.;
DAIKIN AMERICA, INC.;
DEEPWATER CHEMICALS, INC.;
DU PONT DE NEMOURS INC. (f/k/a
DOWDUPONT INC.);
DYNAX CORPORATION;
E.I. DU PONT DE NEMOURS AND
COMPANY;
FIRE SERVICE PLUS, INC.;
GLOBE MANUFACTURING COMPANY LLC;
HONEYWELL INTERNATIONAL, INC.;
HONEYWELL SAFETY PRODUCTS USA, INC.;
JOHNSON CONTROLS, INC;
KIDDIE P.L.C., INC.;
KIDDIE FENWAL, INC.;
LION GROUP, INC.;
MALLORY SAFETY AND SUPPLY, LLC;
MINE SAFETY APPLIANCES COMPANY, LLC;
MSA SAFETY SALES, LLC;
MUNICIPAL EMERGENCY SERVICES INC.;

**NATION FORD CHEMICAL COMPANY;**
**NATIONAL FOAM, INC.;**
**PBI PERFORMANCE PRODUCTS, INC.;**
**SOUTHERN MILLS, INC.;**
**STEDFAST USA, INC.;**
**TENCATE PROTECTIVE FABRICS USA**
**d/b/a SOUTHERN MILLS INC.;**
**THE CHEMOURS COMPANY LLC;**
**TYCO FIRE PRODUCTS;**
**UNITED TECHNOLOGIES CORPORATION;**
**UTC FIRE & SECURITY AMERICAS**
**CORPORATION, INC. (f/k/a GE Interlogix, Inc.);**
**W.L. GORE & ASSOCIATES, INC.;**

**Defendants.**

## PLAINTIFF'S MOTION FOR VOLUNTARY NONSUIT

COMES NOW, Plaintiff Jonathan Clarke, by and through counsel, who moves this Honorable Court for entry of an Order dismissing specifically **Defendant Tyco Fire Products** by voluntary nonsuit in accordance with Virginia Code § 8.01-380. In support, Plaintiff states as follows:

1. Under Virginia Code § 8.01-380, Plaintiff is permitted to voluntarily nonsuit any other party to the proceeding, herein being Defendant Tyco Fire Products.

2. This is Plaintiff's first motion for nonsuit as to any and all claims made against Defendant Tyco Fire Products. Prior to this motion, Plaintiff has not sought nonsuit in this action against Defendant Tyco Fire Products.

3. At this stage in the proceedings, no motion to strike the evidence has been made nor sustained; the case is yet to be called before a jury; and the action is yet to be submitted to this Court for decision.

4. Defendant Tyco Fire Products has not yet been served with process in this matter, let alone filed any counterclaims, cross claims, or third-party claims which arise

out of the same transaction or occurrence as the Plaintiff's claims.

5.       As the requirements set forth in § 8.01-380(A), (B), & (D) are satisfied, and

because Plaintiff has not previously sought nonsuit against the same party to the

proceeding, herein Defendant Tyco Fire Products, Plaintiff is entitled to nonsuit

as a matter of right.

WHEREFORE, Plaintiff Jonathan Clarke, through counsel, respectfully requests that this

Honorable Court enter an Order nonsuiting Defendant Tyco Fire Products in accordance with

Virginia Code § 8.01-380.

**Respectfully submitted,**

Kevin Biniazan, Esq. | VSB No. 92109
Jeffrey A. Breit, Esq. | VSB No. 18876
Don Scott, Esq. | VSB No. 88725
Scott M. Perry, Esq. | VSB No. 67417
Lauren Martin, Esq. | VSB No. 93653
Alexis Bale, Esq. | VSB No. 100318
Breit Biniazan, PC
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, VA  23451
Telephone | 757.622.6000
Facsimile | 757.299.8028
Email | kevin@bbtrial.com
Email | jeffrey@bbtrial.com
Email | don@bbtrial.com
Email | scott@bbtrial.com
Email | lmartin@bbtrial.com
Email | abale@bbtrial.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of March, 2025, a true and correct copy of the foregoing was filed with the clerk of this Court and I emailed a copy to the following:

John R. Owen (VSB No. 39560)
Julie S. Palmer (VSB No. 65800)
John P. Dunnigan (VSB No. 93483)
Imani E. Sowell (VSB No. 95982)
Yevgeniy K. Klinovskiy (VSB No. 98264)
HARMON, CLAYTOR, CORRIGAN, & WELLMAN
P.O. Box 70280
Richmond, Virginia 23255
(804) 747-5200 – Phone
(804) 747-6085 – Fax
jowen@hccw.com
jpalmer@hccw.com
jdunnigan@hccw.com
isowell@hccw.com
yklinovskiy@hccw.com

*Counsel for Defendants Blue Ridge Rescue
Suppliers, Inc. and Bradsden Solutions, Inc.*

Kevin Biniazan

Uploaded: 2025MAR24 14:51 Filed by RVANBOENING on behalf of Bar# 92109 RBINIAZAN Reference: EF-167815
eFiled: 2025MAR24 CPM OND COVTCC ILIPS document 1.1-26 filed 03/24/25 Page 368 of 400 PageID# 447

**VIRGINIA: IN THE CIRCUIT COURT FOR THE CITY OF RICHMOND**

**JONATHAN CLARKE**

      **Plaintiff,**

**Civil Action No. CL24002853-00**

**v.**

**3M COMPANY (f/k/a Minnesota**
**Mining and Manufacturing Company);**
**AGC CHEMICALS AMERICAS, INC.;**
**AMEREX;**
**ARCHROMA U.S., INC.;**
**ARKEMA, INC.;**
**BASF CORPORATION;**
**BLUE RIDGE RESCUE SUPPLIERS, INC.;**
**BRADSDEN SOLUTIONS, INC.;**
**BUCKEYE FIRE EQUIPMENT COMPANY;**
**CARRIER GLOBAL CORPORATION;**
**CHEMDESIGN PRODUCTS, INC.;**
**CHEMGUARD, INC.;**
**CHEMICALS, INC.;**
**CHEMOURS COMPANY FC, LLC;**
**CLARIANT CORPORATION;**
**CORTEVA, INC.;**
**DAIKIN AMERICA, INC.;**
**DEEPWATER CHEMICALS, INC.;**
**DU PONT DE NEMOURS INC. (f/k/a**
**DOWDUPONT INC.);**
**DYNAX CORPORATION;**
**E.I. DU PONT DE NEMOURS AND**
**COMPANY;**
**FIRE SERVICE PLUS, INC.;**
**GLOBE MANUFACTURING COMPANY LLC;**
**HONEYWELL INTERNATIONAL, INC.;**
**HONEYWELL SAFETY PRODUCTS USA, INC.;**
**JOHNSON CONTROLS, INC;**
**KIDDIE P.L.C., INC.;**
**KIDDIE FENWAL, INC.;**
**LION GROUP, INC.;**
**MALLORY SAFETY AND SUPPLY, LLC;**
**MINE SAFETY APPLIANCES COMPANY, LLC;**
**MSA SAFETY SALES, LLC;**
**MUNICIPAL EMERGENCY SERVICES INC.;**

**NATION FORD CHEMICAL COMPANY;**
**NATIONAL FOAM, INC.;**
**PBI PERFORMANCE PRODUCTS, INC.;**
**SOUTHERN MILLS, INC.;**
**STEDFAST USA, INC.;**
**TENCATE PROTECTIVE FABRICS USA**
**d/b/a SOUTHERN MILLS INC.;**
**THE CHEMOURS COMPANY LLC;**
**TYCO FIRE PRODUCTS;**
**UNITED TECHNOLOGIES CORPORATION;**
**UTC FIRE & SECURITY AMERICAS**
**CORPORATION, INC. (f/k/a GE Interlogix, Inc.);**
**W.L. GORE & ASSOCIATES, INC.;**

**Defendants.**

**PLAINTIFF'S MOTION FOR VOLUNTARY NONSUIT**

COMES NOW, Plaintiff Jonathan Clarke, by and through counsel, who moves this Honorable Court for entry of an Order dismissing specifically **Defendant United Technologies Corporation** by voluntary nonsuit in accordance with Virginia Code § 8.01-380. In support, Plaintiff states as follows:

1.      Under Virginia Code § 8.01-380, Plaintiff is permitted to voluntarily nonsuit any other party to the proceeding, herein being Defendant United Technologies Corporation.

2.      This is Plaintiff's first motion for nonsuit as to any and all claims made against Defendant United Technologies Corporation. Prior to this motion, Plaintiff has not sought nonsuit in this action against Defendant United Technologies Corporation.

3.      At this stage in the proceedings, no motion to strike the evidence has been made nor sustained; the case is yet to be called before a jury; and the action is yet to be

submitted to this Court for decision.

4.     Defendant United Technologies Corporation has not yet been served with process

in this matter, let alone filed any counterclaims, cross claims, or third-party claims

which arise out of the same transaction or occurrence as the Plaintiff's claims.

5.     As the requirements set forth in § 8.01-380(A), (B), & (D) are satisfied, and

because Plaintiff has not previously sought nonsuit against the same party to the

proceeding, herein Defendant United Technologies Corporation, Plaintiff is

entitled to nonsuit as a matter of right.

WHEREFORE, Plaintiff Jonathan Clarke, through counsel, respectfully requests that this

Honorable Court enter an Order nonsuiting Defendant United Technologies Corporation in

accordance with Virginia Code § 8.01-380.

Respectfully submitted,

Kevin B. Biniazan, Esq. | VSB No. 92109
Jeffrey A. Breit, Esq. | VSB No. 18876
Don Scott, Esq. | VSB No. 88725
Scott M. Perry, Esq. | VSB No. 67417
Lauren Martin, Esq. | VSB No. 93653
Alexis Bale, Esq. | VSB No. 100318
Breit Biniazan, PC
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, VA 23451
Telephone | 757.622.6000
Facsimile | 757.299.8028
Email | kevin@bbtrial.com
Email | jeffrey@bbtrial.com
Email | don@bbtrial.com
Email | scott@bbtrial.com
Email | lmartin@bbtrial.com

Email | abale@bbtrial.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of March, 2025, a true and correct copy of the foregoing was filed with the clerk of this Court and I emailed a copy to the following:

John R. Owen (VSB No. 39560)
Julie S. Palmer (VSB No. 65800)
John P. Dunnigan (VSB No. 93483)
Imani E. Sowell (VSB No. 95982)
Yevgeniy K. Klinovskiy (VSB No. 98264)
HARMON, CLAYTOR, CORRIGAN, & WELLMAN
P.O. Box 70280
Richmond, Virginia 23255
(804) 747-5200 – Phone
(804) 747-6085 – Fax
jowen@hccw.com
jpalmer@hccw.com
jdunnigan@hccw.com
isowell@hccw.com
yklinovskiy@hccw.com

*Counsel for Defendants Blue Ridge Rescue*
*Suppliers, Inc. and Bradsden Solutions, Inc.*

Kevin Biniazan

Uploaded 2025MAR24 ... Page 373 of 400 PageID# 452
eFiled: 2025MAR24 RICHMOND CITY CC ILIPSCOMB at 2025MAR26 12.01 CL24002853-00

# VIRGINIA: IN THE CIRCUIT COURT FOR THE CITY OF RICHMOND

## JONATHAN CLARKE

Plaintiff,

Civil Action No. CL24002853-00

v.

3M COMPANY (f/k/a Minnesota
Mining and Manufacturing Company);
AGC CHEMICALS AMERICAS, INC.;
AMEREX;
ARCHROMA U.S., INC.;
ARKEMA, INC.;
BASF CORPORATION;
BLUE RIDGE RESCUE SUPPLIERS, INC.;
BRADSDEN SOLUTIONS, INC.;
BUCKEYE FIRE EQUIPMENT COMPANY;
CARRIER GLOBAL CORPORATION;
CHEMDESIGN PRODUCTS, INC.;
CHEMGUARD, INC.;
CHEMICALS, INC.;
CHEMOURS COMPANY FC, LLC;
CLARIANT CORPORATION;
CORTEVA, INC.;
DAIKIN AMERICA, INC.;
DEEPWATER CHEMICALS, INC.;
DU PONT DE NEMOURS INC. (f/k/a
DOWDUPONT INC.);
DYNAX CORPORATION;
E.I. DU PONT DE NEMOURS AND
COMPANY;
FIRE SERVICE PLUS, INC.;
GLOBE MANUFACTURING COMPANY LLC;
HONEYWELL INTERNATIONAL, INC.;
HONEYWELL SAFETY PRODUCTS USA, INC.;
JOHNSON CONTROLS, INC;
KIDDIE P.L.C., INC.;
KIDDIE FENWAL, INC.;
LION GROUP, INC.;
MALLORY SAFETY AND SUPPLY, LLC;
MINE SAFETY APPLIANCES COMPANY, LLC;
MSA SAFETY SALES, LLC;
MUNICIPAL EMERGENCY SERVICES INC.;

**NATION FORD CHEMICAL COMPANY;**
**NATIONAL FOAM, INC.;**
**PBI PERFORMANCE PRODUCTS, INC.;**
**SOUTHERN MILLS, INC.;**
**STEDFAST USA, INC.;**
**TENCATE PROTECTIVE FABRICS USA**
**d/b/a SOUTHERN MILLS INC.;**
**THE CHEMOURS COMPANY LLC;**
**TYCO FIRE PRODUCTS;**
**UNITED TECHNOLOGIES CORPORATION;**
**UTC FIRE & SECURITY AMERICAS**
**CORPORATION, INC. (f/k/a GE Interlogix, Inc.);**
**W.L. GORE & ASSOCIATES, INC.;**

        **Defendants.**

## PLAINTIFF'S MOTION FOR VOLUNTARY NONSUIT

COMES NOW, Plaintiff Jonathan Clarke, by and through counsel, who moves this Honorable Court for entry of an Order dismissing specifically **Defendant UTC Fire & Security Americas Corporation, Inc. (f/k/a GE Interlogix, Inc.)** by voluntary nonsuit in accordance with Virginia Code § 8.01-380. In support, Plaintiff states as follows:

1.     Under Virginia Code § 8.01-380, Plaintiff is permitted to voluntarily nonsuit any other party to the proceeding, herein being Defendant UTC Fire & Security Americas Corporation, Inc. (f/k/a GE Interlogix, Inc.).

2.     This is Plaintiff's first motion for nonsuit as to any and all claims made against Defendant UTC Fire & Security Americas Corporation, Inc. Prior to this motion, Plaintiff has not sought nonsuit in this action against Defendant UTC Fire & Security Americas Corporation, Inc.

3.     At this stage in the proceedings, no motion to strike the evidence has been made nor sustained; the case is yet to be called before a jury; and the action is yet to be

submitted to this Court for decision.

4.      Defendant UTC Fire & Security Americas Corporation, Inc. has not yet been

served with process in this matter, let alone filed any counterclaims, cross claims,

or third-party claims which arise out of the same transaction or occurrence as the

Plaintiff's claims.

5.      As the requirements set forth in § 8.01-380(A), (B), & (D) are satisfied, and

because Plaintiff has not previously sought nonsuit against the same party to the

proceeding, herein Defendant UTC Fire & Security Americas Corporation, Inc.,

Plaintiff is entitled to nonsuit as a matter of right.

WHEREFORE, Plaintiff Jonathan Clarke, through counsel, respectfully requests that this

Honorable Court enter an Order nonsuiting Defendant UTC Fire & Security Americas

Corporation, Inc. (f/k/a GE Interlogix, Inc.) in accordance with Virginia Code § 8.01-380.

Respectfully submitted,

Kevin Biniazan, Esq. | VSB No. 92109
Jeffrey A. Breit, Esq. | VSB No. 18876
Don Scott, Esq. | VSB No. 88725
Scott M. Perry, Esq. | VSB No. 67417
Lauren Martin, Esq. | VSB No. 93653
Alexis Bale, Esq. | VSB No. 100318
Breit Biniazan, PC
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, VA  23451
Telephone | 757.622.6000
Facsimile | 757.299.8028
Email | kevin@bbtrial.com
Email | jeffrey@bbtrial.com
Email | don@bbtrial.com

Email | scott@bbtrial.com
Email | lmartin@bbtrial.com
Email | abale@bbtrial.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of March, 2025, a true and correct copy of the foregoing was filed with the clerk of this Court and I emailed a copy to the following:

John R. Owen (VSB No. 39560)
Julie S. Palmer (VSB No. 65800)
John P. Dunnigan (VSB No. 93483)
Imani E. Sowell (VSB No. 95982)
Yevgeniy K. Klinovskiy (VSB No. 98264)
HARMON, CLAYTOR, CORRIGAN, & WELLMAN
P.O. Box 70280
Richmond, Virginia 23255
(804) 747-5200 – Phone
(804) 747-6085 – Fax
jowen@hccw.com
jpalmer@hccw.com
jdunnigan@hccw.com
isowell@hccw.com
yklinovskiy@hccw.com

*Counsel for Defendants Blue Ridge Rescue
Suppliers, Inc. and Bradsden Solutions, Inc.*

Kevin Biñiazan

# V VIRGINIA: IN THE CIRCUIT COURT FOR THE CITY OF RICHMOND

## JONATHAN CLARKE

Plaintiff,

Civil Action No. CL24002853-00

v.

3M COMPANY (f/k/a Minnesota
Mining and Manufacturing Company);
AGC CHEMICALS AMERICAS, INC.;
AMEREX;
ARCHROMA U.S., INC.;
ARKEMA, INC.;
BASF CORPORATION;
BLUE RIDGE RESCUE SUPPLIERS, INC.;
BRADSDEN SOLUTIONS, INC.;
BUCKEYE FIRE EQUIPMENT COMPANY;
CARRIER GLOBAL CORPORATION;
CHEMDESIGN PRODUCTS, INC.;
CHEMGUARD, INC.;
CHEMICALS, INC.;
CHEMOURS COMPANY FC, LLC;
CLARIANT CORPORATION;
CORTEVA, INC.;
DAIKIN AMERICA, INC.;
DEEPWATER CHEMICALS, INC.;
DU PONT DE NEMOURS INC. (f/k/a
DOWDUPONT INC.);
DYNAX CORPORATION;
E.I. DU PONT DE NEMOURS AND
COMPANY;
FIRE SERVICE PLUS, INC.;
GLOBE MANUFACTURING COMPANY LLC;
HONEYWELL INTERNATIONAL, INC.;
HONEYWELL SAFETY PRODUCTS USA, INC.;
JOHNSON CONTROLS, INC;
KIDDIE P.L.C., INC.;
KIDDIE FENWAL, INC.;
LION GROUP, INC.;
MALLORY SAFETY AND SUPPLY, LLC;
MINE SAFETY APPLIANCES COMPANY, LLC;
MSA SAFETY SALES, LLC;
MUNICIPAL EMERGENCY SERVICES INC.;

**NATION FORD CHEMICAL COMPANY;**
**NATIONAL FOAM, INC.;**
**PBI PERFORMANCE PRODUCTS, INC.;**
**SOUTHERN MILLS, INC.;**
**STEDFAST USA, INC.;**
**TENCATE PROTECTIVE FABRICS USA**
**d/b/a SOUTHERN MILLS INC.;**
**THE CHEMOURS COMPANY LLC;**
**TYCO FIRE PRODUCTS;**
**UNITED TECHNOLOGIES CORPORATION;**
**UTC FIRE & SECURITY AMERICAS**
**CORPORATION, INC. (f/k/a GE Interlogix, Inc.);**
**W.L. GORE & ASSOCIATES, INC.;**

    **Defendants.**

## ORDER ON PLAINTIFF'S MOTIONS FOR VOLUNTARY NONSUIT

    CAME THIS DAY, pursuant to Virginia Code § 8.01-380, Plaintiff Jonathan Clarke, by and through counsel, on Plaintiff's Motions for Voluntary Nonsuit of Defendants Amerex; Basf Corporation; Buckeye Fire Equipment Company; Carrier Global Corporation; ChemDesign Products, Inc.; ChemGuard, Inc.; Chemicals, Inc.; Chemours Company FC, LLC; Clariant Corporation; Corteva, Inc.; Deepwater Chemicals, Inc.; Du Pont De Nemours Inc. (f/k/a DowDuPont Inc.); Dynax Corporation; Fire Service Plus, Inc.; Johnson Controls, Inc.; Kiddie P.L.C., Inc.; Kidde Fenwal, Inc.; Nation Ford Chemical Company; National Foam, Inc.; Southern Mills, Inc.; Tyco Fire Products; United Technologies Corporation; and UTC Fire & Securities Americas Corporation, Inc. (f/k/a GE Interlogix, Inc.).

    IT APPEARING to the Court that Plaintiff has not previously moved to nonsuit any of the above-listed Defendants; that no motion to strike has been sustained nor this matter ever submitted to a jury or this Court for decision; and that none of these specific Defendants have filed any counterclaims, cross claims, or third-party claims, this Court **FINDS** that Plaintiff has acted in accordance with Virginia Code § 8.01-380.

It is hereby **ORDERED** that each of Plaintiff's Motions for Nonsuit, as filed on March 24, 2025,

are **GRANTED** and Defendants Amerex; Basf Corporation; Buckeye Fire Equipment Company;

Carrier Global Corporation; ChemDesign Products, Inc.; ChemGuard, Inc.; Chemicals, Inc.;

Chemours Company FC, LLC; Clariant Corporation; Corteva, Inc.; Deepwater Chemicals, Inc.;

Du Pont De Nemours Inc. (f/k/a DowDuPont Inc.); Dynax Corporation; Fire Service Plus, Inc.;

Johnson Controls, Inc.; Kiddie P.L.C., Inc.; Kidde Fenwal, Inc.; Nation Ford Chemical Company;

National Foam, Inc.; Southern Mills, Inc.; Tyco Fire Products; United Technologies Corporation;

and UTC Fire & Securities Americas Corporation, Inc. (f/k/a GE Interlogix, Inc.). are

**DISMISSED** by nonsuit pursuant to Virginia Code § 8.01-380, subject to the rights and provisions

set forth in Virginia Code § 8.01-229(E)(3).


Entered this _____ day of _____ 2025.


_____
Judge

WE ASKED FOR THIS

Kevin Biniazan, Esq. | VSB No. 92109
Jeffrey A. Breit, Esq. | VSB No. 18876
Don Scott, Esq. | VSB No. 88725
Scott M. Perry, Esq. | VSB No. 67417
Lauren Martin, Esq. | VSB No. 93653
Alexis Bale, Esq. | VSB No. 100318
Breit Biniazan, PC
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, VA 23451
Telephone | 757.622.6000
Facsimile | 757.299.8028
Email | kevin@bbtrial.com

Email | jeffrey@bbtrial.com
Email | don@bbtrial.com
Email | scott@bbtrial.com
Email | lmartin@bbtrial.com
Email | abale@bbtrial.com

*Counsel for Plaintiffs*

SEEN AND NOT OBJECTED. TO

*imonu E. Soull*

John R. Owen (VSB No. 39560)
Julie S. Palmer (VSB No. 65800)
John P. Dunnigan (VSB No. 93483)
Imani E. Sowell (VSB No. 95982)
Yevgeniy K. Klinovskiy (VSB No. 98264)
HARMON, CLAYTOR, CORRIGAN, & WELLMAN
P.O. Box 70280
Richmond, Virginia 23255
(804) 747-5200 – Phone
(804) 747-6085 – Fax
jowen@hccw.com
jpalmer@hccw.com
jdunnigan@hccw.com
isowell@hccw.com
yklinovskiy@hccw.com

*Counsel for Defendants Blue Ridge Rescue
Suppliers, Inc. and Bradsden Solutions. Inc.*

V VIRGINIA:  IN THE CIRCUIT COURT FOR THE CITY OF RICHMOND

**JONATHAN CLARKE**

        **Plaintiff,**

                                      Civil Action No. <u>CL24002853-00</u>

v.

**3M COMPANY (f/k/a Minnesota
Mining and Manufacturing Company);
AGC CHEMICALS AMERICAS, INC.;
AMEREX;
ARCHROMA U.S., INC.;
ARKEMA, INC.;
BASF CORPORATION;
BLUE RIDGE RESCUE SUPPLIERS, INC.;
BRADSDEN SOLUTIONS, INC.;
BUCKEYE FIRE EQUIPMENT COMPANY;
CARRIER GLOBAL CORPORATION;
CHEMDESIGN PRODUCTS, INC.;
CHEMGUARD, INC.;
CHEMICALS, INC.;
CHEMOURS COMPANY FC, LLC;
CLARIANT CORPORATION;
CORTEVA, INC.;
DAIKIN AMERICA, INC.;
DEEPWATER CHEMICALS, INC.;
DU PONT DE NEMOURS INC. (f/k/a
DOWDUPONT INC.);
DYNAX CORPORATION;
E.I. DU PONT DE NEMOURS AND
COMPANY;
FIRE SERVICE PLUS, INC.;
GLOBE MANUFACTURING COMPANY LLC;
HONEYWELL INTERNATIONAL, INC.;
HONEYWELL SAFETY PRODUCTS USA, INC.;
JOHNSON CONTROLS, INC;
KIDDIE P.L.C., INC.;
KIDDIE FENWAL, INC.;
LION GROUP, INC.;
MALLORY SAFETY AND SUPPLY, LLC;
MINE SAFETY APPLIANCES COMPANY, LLC;
MSA SAFETY SALES, LLC;
MUNICIPAL EMERGENCY SERVICES INC.;**

**NATION FORD CHEMICAL COMPANY;**
**NATIONAL FOAM, INC.;**
**PBI PERFORMANCE PRODUCTS, INC.;**
**SOUTHERN MILLS, INC.;**
**STEDFAST USA, INC.;**
**TENCATE PROTECTIVE FABRICS USA**
**d/b/a SOUTHERN MILLS INC.;**
**THE CHEMOURS COMPANY LLC;**
**TYCO FIRE PRODUCTS;**
**UNITED TECHNOLOGIES CORPORATION;**
**UTC FIRE & SECURITY AMERICAS**
**CORPORATION, INC. (f/k/a GE Interlogix, Inc.);**
**W.L. GORE & ASSOCIATES, INC.;**

        **Defendants.**

## ORDER ON PLAINTIFF'S MOTIONS FOR VOLUNTARY NONSUIT

CAME THIS DAY, pursuant to Virginia Code § 8.01-380, Plaintiff Jonathan Clarke, by and through counsel, on Plaintiff's Motions for Voluntary Nonsuit of Defendants Amerex; Basf Corporation; Buckeye Fire Equipment Company; Carrier Global Corporation; ChemDesign Products, Inc.; ChemGuard, Inc.; Chemicals, Inc.; Chemours Company FC, LLC; Clariant Corporation; Corteva, Inc.; Deepwater Chemicals, Inc.; Du Pont De Nemours Inc. (f/k/a DowDuPont Inc.); Dynax Corporation; Fire Service Plus, Inc.; Johnson Controls, Inc.; Kiddie P.L.C., Inc.; Kidde Fenwal, Inc.; Nation Ford Chemical Company; National Foam, Inc.; Southern Mills, Inc.; Tyco Fire Products; United Technologies Corporation; and UTC Fire & Securities Americas Corporation, Inc. (f/k/a GE Interlogix, Inc.).

IT APPEARING to the Court that Plaintiff has not previously moved to nonsuit any of the above-listed Defendants; that no motion to strike has been sustained nor this matter ever submitted to a jury or this Court for decision; and that none of these specific Defendants have filed any counterclaims, cross claims, or third-party claims, this Court **FINDS** that Plaintiff has acted in accordance with Virginia Code § 8.01-380.

It is hereby **ORDERED** that each of Plaintiff's Motions for Nonsuit, as filed on March 24, 2025, are **GRANTED** and Defendants Amerex; Basf Corporation; Buckeye Fire Equipment Company; Carrier Global Corporation; ChemDesign Products, Inc.; ChemGuard, Inc.; Chemicals, Inc.; Chemours Company FC, LLC; Clariant Corporation; Corteva, Inc.; Deepwater Chemicals, Inc.; Du Pont De Nemours Inc. (f/k/a DowDuPont Inc.); Dynax Corporation; Fire Service Plus, Inc.; Johnson Controls, Inc.; Kiddie P.L.C., Inc.; Kidde Fenwal, Inc.; Nation Ford Chemical Company; National Foam, Inc.; Southern Mills, Inc.; Tyco Fire Products; United Technologies Corporation; and UTC Fire & Securities Americas Corporation, Inc. (f/k/a GE Interlogix, Inc.). are **DISMISSED** by nonsuit pursuant to Virginia Code § 8.01-380, subject to the rights and provisions set forth in Virginia Code § 8.01-229(E)(3).

Entered this _____ day of _____ 2025.

_____
Judge

WE ASKED FOR THIS

_____
Kevin Biniazan, Esq. | VSB No. 92109
Jeffrey A. Breit, Esq. | VSB No. 18876
Don Scott, Esq. | VSB No. 88725
Scott M. Perry, Esq. | VSB No. 67417
Lauren Martin, Esq. | VSB No. 93653
Alexis Bale, Esq. | VSB No. 100318
Breit Biniazan, PC
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, VA 23451
Telephone | 757.622.6000
Facsimile | 757.299.8028
Email | kevin@bbtrial.com

Email | jeffrey@bbtrial.com
Email | don@bbtrial.com
Email | scott@bbtrial.com
Email | lmartin@bbtrial.com
Email | abale@bbtrial.com

*Counsel for Plaintiffs*

SEEN AND NOT OBJECTED. TO

*imani E. Sowell*

John R. Owen (VSB No. 39560)
Julie S. Palmer (VSB No. 65800)
John P. Dunnigan (VSB No. 93483)
Imani E. Sowell (VSB No. 95982)
Yevgeniy K. Klinovskiy (VSB No. 98264)
HARMON, CLAYTOR, CORRIGAN, & WELLMAN
P.O. Box 70280
Richmond, Virginia 23255
(804) 747-5200 – Phone
(804) 747-6085 – Fax
jowen@hccw.com
jpalmer@hccw.com
jdunnigan@hccw.com
isowell@hccw.com
yklinovskiy@hccw.com

*Counsel for Defendants Blue Ridge Rescue
Suppliers, Inc. and Bradsden Solutions, Inc.*

Uploaded: 2025MAR24 14:53 Filed By:KVANBOENING on behalf of Bar# 92109 KBINIAZAN Reference: EF-167813

V VIRGINIA: IN THE CIRCUIT COURT FOR THE CITY OF RICHMOND

JONATHAN CLARKE

Plaintiff,

Civil Action No. CL24002853-00 — BBC

v.

3M COMPANY (f/k/a Minnesota
Mining and Manufacturing Company);
AGC CHEMICALS AMERICAS, INC.;
AMEREX;
ARCHROMA U.S., INC.;
ARKEMA, INC.;
BASF CORPORATION;
BLUE RIDGE RESCUE SUPPLIERS, INC.;
BRADSDEN SOLUTIONS, INC.; .
BUCKEYE FIRE EQUIPMENT COMPANY;
CARRIER GLOBAL CORPORATION;
CHEMDESIGN PRODUCTS, INC.;
CHEMGUARD, INC.;
CHEMICALS, INC.;
CHEMOURS COMPANY FC, LLC;
CLARIANT CORPORATION;
CORTEVA, INC.;
DAIKIN AMERICA, INC.;
DEEPWATER CHEMICALS, INC.;
DU PONT DE NEMOURS INC. (f/k/a
DOWDUPONT INC.);
DYNAX CORPORATION;
E.I. DU PONT DE NEMOURS AND
COMPANY;
FIRE SERVICE PLUS, INC.;
GLOBE MANUFACTURING COMPANY LLC;
HONEYWELL INTERNATIONAL, INC.;
HONEYWELL SAFETY PRODUCTS USA, INC.;
JOHNSON CONTROLS, INC;
KIDDIE P.L.C., INC.;
KIDDIE FENWAL, INC.;
LION GROUP, INC.;
MALLORY SAFETY AND SUPPLY, LLC;
MINE SAFETY APPLIANCES COMPANY, LLC;
MSA SAFETY SALES, LLC;
MUNICIPAL EMERGENCY SERVICES INC.;

NATION FORD CHEMICAL COMPANY;
NATIONAL FOAM, INC.;
PBI PERFORMANCE PRODUCTS, INC.;
SOUTHERN MILLS, INC.;
STEDFAST USA, INC.;
TENCATE PROTECTIVE FABRICS USA
d/b/a SOUTHERN MILLS INC.;
THE CHEMOURS COMPANY LLC;
TYCO FIRE PRODUCTS;
UNITED TECHNOLOGIES CORPORATION;
UTC FIRE & SECURITY AMERICAS
CORPORATION, INC. (f/k/a GE Interlogix, Inc.);
W.L. GORE & ASSOCIATES, INC.;

       **Defendants.**

### ORDER ON PLAINTIFF'S MOTIONS FOR VOLUNTARY NONSUIT

CAME THIS DAY, pursuant to Virginia Code § 8.01-380, Plaintiff Jonathan Clarke, by and through counsel, on Plaintiff's Motions for Voluntary Nonsuit of Defendants Amerex; Basf Corporation; Buckeye Fire Equipment Company; Carrier Global Corporation; ChemDesign Products, Inc.; ChemGuard, Inc.; Chemicals, Inc.; Chemours Company FC, LLC; Clariant Corporation; Corteva, Inc.; Deepwater Chemicals, Inc.; Du Pont De Nemours Inc. (f/k/a DowDuPont Inc.); Dynax Corporation; Fire Service Plus, Inc.; Johnson Controls, Inc.; Kiddie P.L.C., Inc.; Kidde Fenwal, Inc.; Nation Ford Chemical Company; National Foam, Inc.; Southern Mills, Inc.; Tyco Fire Products; United Technologies Corporation; and UTC Fire & Securities Americas Corporation, Inc. (f/k/a GE Interlogix, Inc.).

IT APPEARING to the Court that Plaintiff has not previously moved to nonsuit any of the above-listed Defendants; that no motion to strike has been sustained nor this matter ever submitted to a jury or this Court for decision; and that none of these specific Defendants have filed any counterclaims, cross claims, or third-party claims, this Court **FINDS** that Plaintiff has acted in accordance with Virginia Code § 8.01-380.

It is hereby **ORDERED** that each of Plaintiff's Motions for Nonsuit, as filed on March 24, 2025, are **GRANTED** and Defendants Amerex; Basf Corporation; Buckeye Fire Equipment Company; Carrier Global Corporation; ChemDesign Products, Inc.; ChemGuard, Inc.; Chemicals, Inc.; Chemours Company FC, LLC; Clariant Corporation; Corteva, Inc.; Deepwater Chemicals, Inc.; Du Pont De Nemours Inc. (f/k/a DowDuPont Inc.); Dynax Corporation; Fire Service Plus, Inc.; Johnson Controls, Inc.; Kiddie P.L.C., Inc.; Kidde Fenwal, Inc.; Nation Ford Chemical Company; National Foam, Inc.; Southern Mills, Inc.; Tyco Fire Products; United Technologies Corporation; and UTC Fire & Securities Americas Corporation, Inc. (f/k/a GE Interlogix, Inc.). are **DISMISSED** by nonsuit pursuant to Virginia Code § 8.01-380, subject to the rights and provisions set forth in Virginia Code § 8.01-229(E)(3).

Entered this _3_ day of _April_ 2025.

_____
Judge

WE ASKED FOR THIS

Kevin Biniazan, Esq. | VSB No. 92109
Jeffrey A. Breit, Esq. | VSB No. 18876
Don Scott, Esq. | VSB No. 88725
Scott M. Perry, Esq. | VSB No. 67417
Lauren Martin, Esq. | VSB No. 93653
Alexis Bale, Esq. | VSB No. 100318
Breit Biniazan, PC
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, VA 23451
Telephone | 757.622.6000
Facsimile | 757.299.8028
Email | kevin@bbtrial.com

Email | jeffrey@bbtrial.com
Email | don@bbtrial.com
Email | scott@bbtrial.com
Email | lmartin@bbtrial.com
Email | abale@bbtrial.com

*Counsel for Plaintiffs*

SEEN AND NOT OBJECTED TO

*imani E. Sowell*

John R. Owen (VSB No. 39560)
Julie S. Palmer (VSB No. 65800)
John P. Dunnigan (VSB No. 93483)
Imani E. Sowell (VSB No. 95982)
Yevgeniy K. Klinovskiy (VSB No. 98264)
HARMON, CLAYTOR, CORRIGAN, & WELLMAN
P.O. Box 70280
Richmond, Virginia 23255
(804) 747-5200 – Phone
(804) 747-6085 – Fax
jowen@hccw.com
jpalmer@hccw.com
jdunnigan@hccw.com
isowell@hccw.com
yklinovskiy@hccw.com

*Counsel for Defendants Blue Ridge Rescue*
*Suppliers, Inc. and Bradsden Solutions, Inc.*

Uploaded: 2025APR21 14:49 Filed by: KALLEN on behalf of Bar# 65800 JPALMER Reference: EF-169911
eFiled: 2025APR21 RICHMOND CIB-RC JLIPSCOMB U DE28AER22 09:51 CL2400285300 Page 390 of 400 PageID# 469

VIRGINIA:

### IN THE CIRCUIT COURT FOR THE CITY OF RICHMOND

JONATHAN CLARKE,

    Plaintiff,

v.                                                                          Case No. CL24002853-00

3M COMPANY (F/K/A MINNESOTA
MINING AND MANUFACTURING
COMPANY), et al.,

    Defendants.

### ANSWER OF BLUE RIDGE RESCUE SUPPLIERS, INC.

Blue Ridge Rescue Suppliers, Inc. ("Blue Ridge") by and through undersigned counsel, states as follows for its Answer to Plaintiff's Amended Complaint:

1.    In responses to Plaintiff's first unnumbered paragraph of the Amended Complaint, Blue Ridge denies that Plaintiff is entitled to any recovery under any theory against it.

2.    Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 1 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

3.    Blue Ridge denies the allegations contained in Paragraph 2 of Plaintiff's Amended Complaint.

4.    Blue Ridge avers that Paragraph 3 of Plaintiff's Amended Complaint seeks expert opinion thereby requiring no response. To the extent a response is required, Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in

Paragraph 3 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

5.    Blue Ridge avers that Paragraph 4 of Plaintiff's Amended Complaint seeks expert opinion thereby requiring no response. To the extent a response is required, Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 4 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

6.    Blue Ridge avers that Paragraph 5 of Plaintiff's Amended Complaint seeks expert opinion thereby requiring no response. To the extent a response is required, Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 5 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

7.    Blue Ridge denies the allegations contained in Paragraph 6 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge expressly denies that Plaintiff was exposed to harmful levels of PFAS from any product for which Blue Ridge may be held liable. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the remaining allegations contained in Paragraph 6 of Plaintiff's Amended Complaint that pertain to the other defendants; therefore, it denies those allegations and calls for strict proof thereof.

8.    In response to Paragraph 7 of Plaintiff's Amended Complaint, Blue Ridge admits that it has sold turnouts designed for firefighters and that it has sold some turnouts to fire departments in Virginia. Blue Ridge avers that the allegations contained in Paragraph 7 of Plaintiff's Amended Complaint concerning the alleged nature and impact of PFAS seek expert opinion, thereby requiring no response. Blue Ridge denies the allegations contained in Paragraph

2

8 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge expressly denies that Plaintiff was exposed to harmful levels of PFAS from any product for which Blue Ridge may be held liable. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the remaining allegations contained in Paragraph 7 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

9.    Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 8 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof. Blue Ridge expressly denies that Plaintiff was exposed to harmful levels of PFAS from any product for which Blue Ridge may be held liable.

10.    In response to Paragraph 9 of Plaintiff's Amended Complaint, Blue Ridge denies that the Plaintiff was exposed to harmful levels of PFAS for which Blue Ridge may be held liable. Blue Ridge avers that the allegations contained in Paragraph 9 of Plaintiff's Amended Complaint, as phrased, state legal conclusions, thereby requiring no response.

11.    Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 10 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof. Blue Ridge expressly denies that Plaintiff was exposed to harmful levels of PFAS from any product for which Blue Ridge may be held liable.

12.    Blue Ridge denies the allegations contained in Paragraph 11 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 11 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

13.     Blue Ridge lacks information to form a belief as to the truth or falsity of the allegations contained in Paragraph 12 of Plaintiff's Amended Complaint; therefore it denies those allegations and calls for strict proof thereof. Blue Ridge expressly denies that Plaintiff was exposed to harmful levels of PFAS from any product for which Blue Ridge may be held liable.

14.     The allegations contained in Paragraph 13 of Plaintiff's Amended Complaint are not directed at Blue Ridge; therefore, no response is required. To the extent a response is required, Blue Ridge lacks information sufficient to admit or deny the allegations; therefore, the allegations are denied.

15.     The allegations contained in Paragraph 14 of Plaintiff's Amended Complaint are not directed at Blue Ridge; therefore, no response is required. To the extent a response is required, Blue Ridge lacks information sufficient to admit or deny the allegations; therefore, the allegations are denied.

16.     The allegations contained in Paragraph 15 of Plaintiff's Amended Complaint are not directed at Blue Ridge; therefore, no response is required. To the extent a response is required, Blue Ridge lacks information sufficient to admit or deny the allegations; therefore, the allegations are denied.

17.     The allegations contained in Paragraph 16 of Plaintiff's Amended Complaint are not directed at Blue Ridge; therefore, no response is required. To the extent a response is required, Blue Ridge lacks information sufficient to admit or deny the allegations; therefore, the allegations are denied.

18.     In response to Paragraph 17 of Plaintiff's Amended Complaint, Blue Ridge avers that it previously was a Virginia stock corporation doing business in the Commonwealth of Virginia. Blue Ridge avers that in January 2023, it entered into an Asset Purchase Agreement

whereby Municipal Emergency Services, Inc. purchased its assets. Therefore, Blue Ridge is no longer in the business of selling turnouts and firefighting related products.

19.     The allegations contained in Paragraph 18 of Plaintiff's Amended Complaint are not directed at Blue Ridge; therefore, no response is required. To the extent a response is required, Blue Ridge lacks information sufficient to admit or deny the allegations; therefore, the allegations are denied.

20.     The allegations contained in Paragraph 19 of Plaintiff's Amended Complaint are not directed at Blue Ridge; therefore, no response is required. To the extent a response is required, Blue Ridge lacks information sufficient to admit or deny the allegations; therefore, the allegations are denied.

21.     The allegations contained in Paragraph 20 of Plaintiff's Amended Complaint are not directed at Blue Ridge; therefore, no response is required. To the extent a response is required, Blue Ridge lacks information sufficient to admit or deny the allegations; therefore, the allegations are denied.

22.     The allegations contained in Paragraph 21 of Plaintiff's Amended Complaint are not directed at Blue Ridge; therefore, no response is required. To the extent a response is required, Blue Ridge lacks information sufficient to admit or deny the allegations; therefore, the allegations are denied.

23.     The allegations contained in Paragraph 22 of Plaintiff's Amended Complaint are not directed at Blue Ridge; therefore, no response is required. To the extent a response is required, Blue Ridge lacks information sufficient to admit or deny the allegations; therefore, the allegations are denied.

5

24.     The allegations contained in Paragraph 23 of Plaintiff's Amended Complaint are not directed at Blue Ridge; therefore, no response is required. To the extent a response is required, Blue Ridge lacks information sufficient to admit or deny the allegations; therefore, the allegations are denied.

25.     The allegations contained in Paragraph 24 of Plaintiff's Amended Complaint are not directed at Blue Ridge; therefore, no response is required. To the extent a response is required, Blue Ridge lacks information sufficient to admit or deny the allegations; therefore, the allegations are denied.

26.     The allegations contained in Paragraph 25 of Plaintiff's Amended Complaint are not directed at Blue Ridge; therefore, no response is required. To the extent a response is required, Blue Ridge lacks information sufficient to admit or deny the allegations; therefore, the allegations are denied.

27.     The allegations contained in Paragraph 26 of Plaintiff's Amended Complaint are not directed at Blue Ridge; therefore, no response is required. To the extent a response is required, Blue Ridge lacks information sufficient to admit or deny the allegations; therefore, the allegations are denied.

28.     The allegations contained in Paragraph 27 of Plaintiff's Amended Complaint are not directed at Blue Ridge; therefore, no response is required. To the extent a response is required, Blue Ridge lacks information sufficient to admit or deny the allegations; therefore, the allegations are denied.

29.     The allegations contained in Paragraph 28 of Plaintiff's Amended Complaint are not directed at Blue Ridge; therefore, no response is required. To the extent a response is

6

required, Blue Ridge lacks information sufficient to admit or deny the allegations; therefore, the allegations are denied.

30.    The allegations contained in Paragraph 29 of Plaintiff's Amended Complaint are not directed at Blue Ridge; therefore, no response is required. To the extent a response is required, Blue Ridge lacks information sufficient to admit or deny the allegations; therefore, the allegations are denied.

31.    The allegations contained in Paragraph 30 of Plaintiff's Amended Complaint are not directed at Blue Ridge; therefore, no response is required. To the extent a response is required, Blue Ridge lacks information sufficient to admit or deny the allegations; therefore, the allegations are denied.

32.    The allegations contained in Paragraph 31 of Plaintiff's Amended Complaint are not directed at Blue Ridge; therefore, no response is required. To the extent a response is required, Blue Ridge lacks information sufficient to admit or deny the allegations; therefore, the allegations are denied.

33.    The allegations contained in Paragraph 32 of Plaintiff's Amended Complaint are not directed at Blue Ridge; therefore, no response is required. To the extent a response is required, Blue Ridge lacks information sufficient to admit or deny the allegations; therefore, the allegations are denied.

34.    The allegations contained in Paragraph 33 of Plaintiff's Amended Complaint are not directed at Blue Ridge; therefore, no response is required. To the extent a response is required, Blue Ridge lacks information sufficient to admit or deny the allegations; therefore, the allegations are denied.

## JURISDICTION AND VENUE

7

35.    Blue Ridge avers that Paragraph 34 of Plaintiff's Amended Complaint contains legal conclusions, thereby requiring no response. To the extent a response is required, Blue Ridge avers that it is not challenging the Court's exercise of personal jurisdiction over it in this case. Blue Ridge lacks information sufficient to form a belief as to the truth or the falsity of the allegations contained in Paragraph 34 of Plaintiff's Amended Complaint as they pertain to the other defendants; therefore, it denies those allegations.

36.    Blue Ridge avers that Paragraph 35 of Plaintiff's Amended Complaint contains legal conclusions, thereby requiring no response. To the extent a response is required, Blue Ridge avers that it is not challenging the Court's exercise of personal jurisdiction over it in this case. Blue Ridge lacks information sufficient to form a belief as to the truth or the falsity of the allegations contained in Paragraph 35 of Plaintiff's Amended Complaint as they pertain to the other defendants; therefore, it denies those allegations.

37.    Blue Ridge avers that Paragraph 36 of Plaintiff's Amended Complaint contains legal conclusions, thereby requiring no response. To the extent a response is required, Blue Ridge avers that it is not challenging the Court's exercise of personal jurisdiction over it in this case. Blue Ridge lacks information sufficient to form a belief as to the truth or the falsity of the allegations contained in Paragraph 36 of Plaintiff's Amended Complaint as they pertain to the other defendants; therefore, it denies those allegations.

38.    Blue Ridge denies the allegations contained in Paragraph 37 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge lacks information sufficient to form a belief as to the truth or the falsity of the allegations contained in Paragraph 37 of Plaintiff's Amended Complaint as they pertain to the other defendants; therefore, it denies those allegations.

39.     Blue Ridge avers that Paragraph 38 of Plaintiff's Amended Complaint contains legal conclusions; thereby requiring no response. To the extent a response is required, Blue Ridge avers that it is not challenging venue in this case. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 38 of Plaintiff's Amended Complaint as they pertain to the other defendants; therefore, it denies those allegations.

40.     Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 39 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

41.     Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 40 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

42.     Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 41 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

43.     In response to Paragraph 42 of Plaintiff's Amended Complaint, Blue Ridge avers that it has sold turnouts designed for firefighters and that it has sold some turnouts to fire departments in Virginia. Blue Ridge denies the allegations contained in Paragraph 42 of Plaintiff's Amended Complaint that pertain to it. Blue Ridge expressly denies that Plaintiff was exposed to harmful levels of PFAS from any product for which Blue Ridge may be held liable. Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the remaining allegations contained in Paragraph 42 of Plaintiff's Amended Complaint that pertain to other defendants; therefore, it denies those allegations and calls for strict proof thereof.

44.     Blue Ridge avers that Paragraph 43 of Plaintiff's Amended Complaint seeks expert opinion, thereby requiring no response. To the extent a response is required, Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 43 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

45.     Upon information and belief, Blue Ridge admits the allegations contained in Paragraph 44 of Plaintiff's Amended Complaint.

46.     Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 45 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

47.     Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 46 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof.

48.     Blue Ridge avers that Paragraph 47 of Plaintiff's Amended Complaint seeks expert opinion, thereby requiring no response. To the extent that a response is required, Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 47 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof. Blue Ridge expressly denies that Plaintiff was exposed to harmful levels of PFAS from any product for which Blue Ridge may be held liable.

49.     Blue Ridge avers that Paragraph 48 of Plaintiff's Amended Complaint seeks expert opinion, thereby requiring no response. To the extent that a response is required, Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 48 of Plaintiff's Amended Complaint; therefore, it denies those

10

allegations and calls for strict proof thereof. Blue Ridge expressly denies that Plaintiff was exposed to harmful levels of PFAS from any product for which Blue Ridge may be held liable.

50.    Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 49 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof. Blue Ridge expressly denies that Plaintiff was exposed to harmful levels of PFAS from any product for which Blue Ridge may be held liable.

51.    Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 50 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof. Blue Ridge expressly denies that Plaintiff was exposed to harmful levels of PFAS from any product for which Blue Ridge may be held liable.

52.    Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 51 of Plaintiff's Amended Complaint; therefore it denies those allegations and calls for strict proof thereof.

53.    Blue Ridge avers that Paragraph 52 of Plaintiff's Amended Complaint seeks expert opinion, thereby requiring no response. To the extent that a response is required, Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 52 of Plaintiff's Amended Complaint; therefore, it denies those allegations and calls for strict proof thereof. Blue Ridge expressly denies that Plaintiff was exposed to harmful levels of PFAS from any product for which Blue Ridge may be held liable.

54.    Blue Ridge avers that Paragraph 53 of Plaintiff's Amended Complaint seeks expert opinion, thereby requiring no response. To the extent that a response is required, Blue Ridge lacks information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 53 of Plaintiff's Amended Complaint; therefore, it denies those